1

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEW JERSEY
 2                     CIVIL ACTION CASE NO. 2:08-CV-1567
     ---------------------------------------------:
 3   DR. FADI CHAABAN; DR. SABINO R. TORRE, DR.   :
     CONSTANTINOS A. COSTEAS and DR. ANTHONY J.   :
 4   CASELLA, as Trustee of Diagnostic & Clinical :
     Cardiology, P.A. Profit Sharing Plan,        :
 5                                                :
                         Plaintiffs,              :
 6                                                :
              vs.                                 :
 7                                                :
     DR. MARIO A. CRISCITO,                       :
 8                                                :
                         Defendant.               :
 9   ---------------------------------------------:
                              Tuesday, June 16, 2009
10

11         Deposition of BRIAN WARNOCK, VOLUME I, before

12   Nancy A. Miani, a Certified Court Reporter, License

13   No. XI00814, and a Notary Public of the State of New

14   Jersey at the offices of WITMAN, STADTMAUER, ESQS, 26

15   Columbia Turnpike, Florham Park, New Jersey, on

16   Tuesday, June 16, 2009, at 10 a.m.

17

18

19

20

21
                        MIANI COURT REPORTING
22                    CERTIFIED COURT REPORTERS
                         1741 DANIEL COURT
23                        WALL, NJ  07719
                           (732) 681-4776
24

25
```

```
 1    A P P E A R A N C E S:

 2    WITMAN, STADTMAUER, ESQS.
      26 Columbia Turnpike
 3    Florham Park, NJ 07932
      By:  STEPHEN M. CHARME, ESQ.
 4    Attorneys for the Plaintiffs

 5    KERN, AUGUSTINE, CONROY & SCHOPPMANN, P.C.
      1120 Route 22 East
 6    Bridgewater, NJ 08807
      BY:  STEVEN KERN, ESQ.
 7    AND  CHARLES H. NEWMAN, ESQ.
      Attorneys for the Defendant
 8
      ALSO PRESENT:
 9
      Anthony Casella, M.D.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                        I N D E X

2   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3   BRIAN WARNOCK

4       BY MR. CHARME      6

5       BY MR. KERN                114

6

7                      E X H I B I T S

8   EXHIBIT NO.         DESCRIPTION              PAGE

9   Warnock-1     Loan Amortization Schedule,     28
                  Four Pages
10
    Warnock-2     Nine Page Document from         30
11                American Pension Corporation
                  Entitled "Money Purchase
12                Retirement Plan"

13  Warnock-3     Seven Pages of Handrwitten      33
                  Notes
14
    Warnock-4     Three Pages of Handwritten      39
15                Notes

16  Warnock-5     Two Pages of Handwritten Notes  45

17  Warnock-6     One-Page Handwritten Letter with 50
                  Attached Typewritten Letter to
18                Dr. Criscito dated 1/7/91 from
                  Brian Warnock
19
    Warnock-7     Form 5500 for 1999, 18 Pages    54
20
    Warnock-8     Form 5500 for 2000, 12 Pages    56
21
    Warnock-9     One Pages of Handwritten Notes  57
22                With Attached Three Pages of
                  Typewritten Notes
23
    Warnock-10    Two Pages of Typewritten Notes  63
24
    Warnock-11    Two Pages Reconciliation of     69
25                Trust Assets for 1999
```

```
 1                        E X H I B I T S

 2    EXHIBIT NO.      DESCRIPTION                       PAGE

 3    Warnock-12       Reconciliation of Trust            71
                       Assets for 2005, One Page
 4
      Warnock-13       Form 1096 for 2005, Two            75
 5                     Pages

 6    Warnock-14       Form 5498 for 2006, One            76
                       Page
 7
      Warnock-15       Copy of Savings Withdrawal         76
 8                     Slip, One Page

 9    Warnock-16       Seven Pages of Handwritten         79
                       Notes
10
      Warnock-17       Memo from Brian Warnock            90
11                     Dated 9/14/07 with Two
                       Page Attachment
12
      Warnock-18       Two-Page Letter to Anthony        101
13                     Casella, M.D., from Brian
                       Warnock dated August 28, 2007
14
      Warnock-19       One-Page E-mail from Marysue      104
15                     McCarthy dated 7/28/06

16    Warnock-20       Two-Page Letter to Joy M.         107
                       Mercer, Esq. From Brian
17                     Warnock dated 11/13/07

18    Warnock-21       Three-Page Letter to Joy M.       108
                       Mercer, Esq., from Brian
19                     Warnock dated 12/6/07

20

21

22

23

24

25
```

                                                                5

1                        LITIGATION SUPPORT

2

3    DIRECTION NOT TO ANSWER

4            (None)

5

6    MOTION TO STRIKE

7            (None)

8

9    DOCUMENT REQUEST

10           (None)

11

12   EXHIBIT ANALYSIS

13           Original Exhibits Attached to Original
             Transcript.
14
             Copies of All Exhibits attached to
15           All Transcripts.

16

17

18

19

20

21

22

23

24

25

6

```
 1   B R I A N     W A R N O C K,
 2   American Pension Corporation, 1375 Plainfield Avenue,
 3   Watchung, New Jersey, sworn.
 4   DIRECT EXAMINATION BY MR. CHARME:
 5        Q.    Good morning, Mr. Warnock.  My name is
 6   Stephen Charme.  I represent the plaintiffs in the
 7   lawsuit in which you were subpoenaed.
 8              Are you represented by counsel today?
 9        A.    No.
10        Q.    Okay.  Are you aware that you have a
11   right to be represented by counsel?
12        A.    Yeah.
13        Q.    You've chosen --
14        A.    I didn't --
15        Q.    So you've chosen not to be represented by
16   counsel.  Is that correct?
17        A.    That's correct.
18        Q.    Okay.  Have you ever had your deposition
19   taken before?
20        A.    Yes.
21        Q.    How recently was the last time?
22        A.    Maybe 2 or 3 years ago.
23        Q.    What kind of case?
24        A.    About 2 or 3 years ago.  It was a case
25   involving work.
```

156

1    responsibilities are completely different.  We are not
2    the plan administrator.
3         Q.    What's the difference between the two?
4         A.    Well, you look at the plan documents,
5    there's a whole list of requirements for the plan
6    administrator.  The company is responsible for
7    administering the plan.  We are assisting them by
8    providing third party administration services, doing
9    forms, preparing the forms for them to sign.  We don't
10   sign it as plan administrator.  There is a major
11   difference.
12        Q.    If I'm looking at this correctly, this
13   form was signed, looks like on October 15th or so.
14        A.    Yes.
15        Q.    2000, correct?
16        A.    Yes, correct.
17        Q.    The two signatures there appear to be
18   different from one another.
19              MR. CHARME:  I object to the form.
20        Q.    Can you explain why?
21        A.    No, I cannot explain why.
22        Q.    Do you know if both signatures were made
23   by Dr. Criscito?
24        A.    I see his name typed there.
25        Q.    By the time this document was prepared,

Case 2:08-cv-01567-GEB -MCA   Document 42-3   Filed 04/26/10   Page 8 of 14 PageID: 604

157

1   APC had in its files the year end statement from
2   Morgan Stanley for the year 1999, correct?
3        A.   Year end statement of 1999.  No, that is
4   not correct.
5             (There is a discussion off the record.)
6        Q.   Did you have any statements for the year
7   2000 prior to the filing of this Form 5500?
8        A.   Yes, we did.  They didn't realize they
9   were in the file.
10       Q.   What did you have?
11       A.   We had monthly statements that were
12  coming in, starting, I believe it was March of 2000.
13       Q.   When you looked at those statements, did
14  it suggest a discrepancy between what was reported on
15  Warnock-7 and what was most likely in the account at
16  the end of 1999?
17            MR. CHARME: I object to the form.  At
18  what point in time?
19       A.   That would be my question, too.  At what
20  point in time?  When we did this report, no, we had
21  not even looked at those pages at all.
22       Q.   My question is had you looked at the
23  March statement and February statement from 2000,
24  would that have set off any kind of bells or whistles
25  or alarms in anybody's head concerning the accuracy of

158

```
 1   the report which was ultimately filed in October of
 2   2000?
 3              MR. CHARME:  I object to the form.
 4       A.     Well, for one thing, the statements would
 5   have been in 2000, in our file for the year 2000,
 6   which is how we keep our filing, so we would not have
 7   even looked in that file when we were preparing the
 8   1999 5500 forms.
 9       Q.     How about when you were preparing the
10   2000 5500 report, would you have that information
11   available to you then?
12       A.     It was then in there, and it just was
13   overlooked.  We did not even realize they were in the
14   file.
15       Q.     If somebody had looked at it, would that
16   have, at a minimum, set off an inquiry as to a
17   possible discrepancy between the 1999 filing and the
18   true amount in the account?
19       A.     Had it been looked at, yes, it would have
20   raised a question.
21       Q.     When you started getting these
22   statements, did anyone inquire as to why you were
23   getting them or why you hadn't gotten them in the
24   past?
25       A.     No, the statements come in from Morgan
```

159

```
 1   Stanley, there's a stack of them that come in like
 2   this for each month for each participant, and they
 3   just get filed away.  The reason we knew they were
 4   getting these statements, they were coming in, because
 5   they were getting, they had just set up these separate
 6   accounts for the new employees, that's why we were
 7   getting statements.  We saw them come in, that's good,
 8   we're getting them.  No one looked at them.
 9        Q.    But you also got them for the commingled
10   account?
11        A.    We did get them.  We didn't know we were
12   getting them for the commingled account, but yes, we
13   did get them.
14        Q.    Nobody was hiding them from anybody?
15              MR. CHARME:  I object to the form.
16        A.    They came to us.
17        Q.    Let me put it to you this way:  You had
18   all of the information you needed in your file by, at
19   the earliest, March of 2000, and certainly by the
20   beginning of 2001, had somebody looked, to realize
21   that there was probably an error or some discrepancy
22   in that 1999 5500 filing, correct?
23        A.    Had we looked at the statement, the
24   December 31st, 2000 statement, then we would have, we
25   would have realized it was a mistake.  We didn't look
```

160

1  at it. We never received them before, thought we were
2  only getting the new ones. Sounds easy to say, gee,
3  how did you miss that. We did. We have a
4  participant's report, we went through, here's the
5  guy's name, check, check, never even noticed there was
6  a pile of papers this thick, but, yes, had we looked
7  at it, had we realized it was in there, we had an
8  extra statement in there and that that was it, it
9  would have raised a question.
10        Q.    The note on Warnock-7 is attached to the
11 statement from Morgan Stanley. Do you know which
12 statement that was?
13              MR. CHARME: Did you mean 17?
14              MR. KERN: Is this 17?
15              MR. CHARME: This is 7.
16              (There is a discussion off the record.)
17        Q.    Look at Warnock-17.
18        A.    Okay.
19        Q.    You got it?
20        A.    Yes.
21        Q.    Do you know what statement that was, that
22 note was attached to?
23        A.    That's the December 31st, 2000 statement,
24 we received that in January of 2001.
25        Q.    Before filing the 2000 5500, correct?

161

1    A.    Yes.
2    Q.    And before filing the annual, before
3    preparing the annual reports, correct?
4    A.    For 2000, yes.
5    Q.    Is this your handwriting?
6    A.    That's my handwriting.
7    Q.    You say how could we miss that, correct?
8    A.    Yeah.
9    Q.    Why did you write "how could we miss
10   this"?
11   A.    How could we miss this.  Dr. Casella
12   found this in the file, and I said to Dominique, how
13   did we miss this.
14   Q.    This was an important document?
15   A.    Well, if we had found it, as your
16   questions previously were, it would have certainly set
17   off an alarm, yes.
18   Q.    And whatever issues we're dealing with
19   today could possibly have been addressed and resolved
20   at that time?
21         MR. CHARME:  I object to the form.
22   A.    I certainly would have asked what's this,
23   you know.
24   Q.    And I take it if you couldn't get
25   adequate or reasonable answers to your questions that

162

1   you would have raised in 2000, had you not missed this
2   document, you would have taken steps to let
3   appropriate people know that there was a problem,
4   correct?
5       A.   If we were off seven million dollars,
6   yes. We wouldn't have just said, well, I guess that's
7   4,000 that went in by accident, yes. We're talking
8   about a difference.
9       Q.   What would you have done, if you --
10      A.   Well, I would have first -- well, I would
11  have asked Mario what's this. That's what I would
12  have done.
13      Q.   And if you couldn't get adequate,
14  responsible responses, what would you have done?
15      A.   If he had said mind your own business,
16  then I think I would have -- well, I'm sure I would
17  have gone to Dr. Casella and said something to him.
18      Q.   Certainly, by this point in time, you had
19  all the information you needed had you looked at it to
20  initiate an inquiry in an attempt to resolve the
21  discrepancy between the information you received as to
22  the 1999 year end balance and the monies in the Morgan
23  Stanley account, correct?
24      A.   If we had noticed this, we probably would
25  have raised the question.

1    Q.    Probably --
2    A.    Well, we would have, but unless we were
3  examining each statement, we wouldn't have asked the
4  question on January 1st, 2001, but when we were doing
5  the annual report, which would probably have been
6  October, 2001, at that point, we would have said
7  something is wrong here and we would have raised the
8  question, yes.
9    Q.    No question about that, correct?
10   A.    There's no question about that.  We would
11 definitely have raised the question.
12   Q.    Are you aware of any efforts by Dr.
13 Criscito to keep you from becoming aware of the
14 information on the statements that you received on the
15 commingled  -- received from Morgan Stanley concerning
16 the commingled account?
17   A.    I don't think it was his intention that
18 we receive these, but I don't know that.  They did
19 stop coming.  They didn't continue to come.
20   Q.    But they came for a while, correct, for
21 about a year?
22   A.    They came for about a year, and I think
23 -- I would have to check the file, but I have a
24 feeling that's the last one we got.
25   Q.    When they stopped coming, did you inquire