# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Stephen M. Charme
Tara S. Sinha
WITMAN STADTMAUER, P.A.
26 Columbia Turnpike
Florham Park, New Jersey 07932-2213
(973) 822-0220

John M. Agnello
Melissa E. Flax
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

*Attorneys for Plaintiffs*

| | |
|---|---|
| DR. FADI CHAABAN, DR. SABINO R. TORRE, DR. CONSTANTINOS A. COSTEAS, AND DR. ANTHONY J. CASELLA as Trustees of Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan,<br><br>Plaintiffs,<br><br>v.<br><br>DR. MARIO A. CRISCITO,<br><br>Defendant. | Civil Action No. 2:08-cv-01567 (GEB/MCA)<br><br>**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE PURSUANT TO LOCAL CIVIL RULE 56.1 IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56.1(a) of the Local Civil Rules of United States District Court

for the District of New Jersey, plaintiffs, Dr. Fadi Chaaban, Dr. Sabino R. Torre, Dr.

Constantinos A. Costeas, and Dr. Anthony J. Casella, as Trustees of Diagnostic &

Clinical Cardiology, P.A. Profit Sharing Plan, submit their Statement of Undisputed

Material Facts in Support of Plaintiffs' Motion for Summary Judgment, as follows:

## TABLE OF CONTENTS

PARTIES ............................................................................................................... 1

    Plaintiffs .......................................................................................................... 1

    Defendant ......................................................................................................... 1

THE FORMATION OF THE MONEY PURCHASE PLAN ............................................. 3

CRISCITO IS SOLE TRUSTEE AND FIDUCIARY OF THE MONEY PURCHASE
PLAN AND PROFIT SHARING PLAN .................................................................... 4

CRISCITO HIRED APC AS THIRD PARTY ADMINISTRATOR................................. 4

THE PRE-2000 COMMINGLED AND SEGREGATED ACCOUNTS .......................... 5

ANNUAL REPORTS ............................................................................................... 7

CRISCITO CONCEALS PLAN INFORMATION......................................................... 8

THE MORGAN STANLEY ACCOUNT ...................................................................... 9

THE SMITH BARNEY ACCOUNT............................................................................ 11

THE SEGREGATED ACCOUNTS CREATED IN 2000 ............................................... 12

CRISCITO'S USE OF THE MORGAN STANLEY ACCOUNT TRUST MONIES AS
HIS PERSONAL ACCOUNT .................................................................................... 16

CRISCITO'S USE OF THE SOVEREIGN BANK PENSION FUND ACCOUNT
TRUST MONIES AS HIS PERSONAL ACCOUNT ..................................................... 23

THE 2005 FORM 1099-R ...................................................................................... 29

FALSIFIED IRS 5500 FORMS................................................................................ 30

NO ACCOUNTING BY CRISCITO ........................................................................... 35

CRISCITO'S $250,000 LOAN FROM THE PLAN ...................................................... 35

PRINCIPAL AND INTEREST DUE TO THE PROFIT SHARING PLAN AS A
RESULT OF CRISCITO'S FRAUDULENT CONDUCT................................................ 36

## PARTIES

### Plaintiffs

1.       Plaintiff Dr. Fadi Chaaban ("Chaaban") is a cardiologist currently employed by Diagnostic & Clinical Cardiology, P.A., formerly located at 769 Northfield Avenue, Suite 220, West Orange, New Jersey ("DCC").[1]  Since July 11, 2007, he has been and is a trustee of the Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan (the "Profit Sharing Plan").  Declaration of Melissa E. Flax in Support of Plaintiffs' Motion for Summary Judgment ("Flax Decl."), Ex. 1 at ¶8.

2.       Plaintiff Dr. Sabino R. Torre ("Torre") is a cardiologist currently employed by DCC.  Since July 11, 2007 he has been and is a trustee of the Profit Sharing Plan.  Flax Decl., Ex. 1 at ¶9.

3.       Plaintiff Dr. Constantinos Costeas ("Costeas") is a cardiologist currently employed by DCC.  Since July 11, 2007 he has been and is a trustee of the Profit Sharing Plan.  Flax Decl., Ex. 1 at ¶10.

4.       Plaintiff Dr. Anthony J. Casella ("Casella") is a cardiologist currently employed by DCC.  Since November 15, 2007 he has been and is a trustee of the Profit Sharing Plan.  Flax Decl., Ex 1 at ¶11.

### Defendant

5.       Defendant Dr. Mario A. Criscito ("Criscito") is a cardiologist and former employee of DCC.  For more than 30 years, from in or about April 1976 until July 2, 2007, Criscito was the sole trustee of the Profit Sharing Plan and its predecessor retirement plan, Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan (the

---

[1] The current address for DCC is 375 Mt. Pleasant Avenue, West Orange, New Jersey.

"Money Purchase Plan").  Criscito's employment with DCC ended on August 2, 2007. Flax Decl., Ex. 1 at ¶12.

6.      In addition to his medical practice, Criscito has, for many years, served as a trustee and fiduciary for the following large health care organizations:

- Criscito was a Trustee of "The St. Barnabas Physician Partnership Health Plan Trust" for at least the period 2003 through 2007.  *See* Flax Decl., Exs. 2 through 6 at pp. PI 2, PI 4, PI 6, PI 8, and PI 10.[2]

- Criscito was a Trustee of the "St. Barnabas Corporation" for at least the period 2002 through 2008.  *See* Flax Decl., Exs. 7 through 13 at pp. PI 12, PI 14, PI 16, PI 18, PI 20, PI 22, and PI 24.

- Criscito was a Trustee of the "Clara Maass Medical Center" for at least the period 2002 through 2008.  *See* Flax Decl., Exs. 14 through 20 at pp. PI 26, PI 28, PI 30, PI 32, PI 34, PI 36 and PI 38.

- Criscito was a Trustee of the "Clara Maass Health System Inc." for at least the period 2002 through 2008.  *See* Flax Decl., Exs. 21 through 27 at pp. PI 40, PI 42, PI 44, PI 46, PI 48, PI 50 and PI 52.

- St. Barnabas Health Care System promotional flyers for the years 2008, 2009 and 2010 list Criscito as a Trustee of that entity.  *See* Flax Decl., Ex. 28.[3]

---

[2] The relevant portions of the IRS Forms 990 appearing as Exhibits 2 through 27 to the Flax Decl. were obtained from the internet website http://foundationcenter.org/findfunders/990finder/.  This Court may take judicial notice of this public information.  *See* Fed.R.Evid. 201(b)(2) and 807.  Full copies of the Forms 990 can be provided if the Court so desires.

[3] The promotional flyers were obtained from the internet website www.claramaassfoundation.org/download/golfjournal2008.pdf, www.claramaassfoundation.org/download/golfjournal2009.pdf                                     and

- Clara Maass Medical Center promotional flyers for the years 2008 and 2009 list Criscito as a Trustee of that entity. *See* Flax Decl., Ex. 29.[4]

- Criscito was a fiduciary (Director) for QualCare, Inc. for at least the year 2006. *See* Flax Decl., Ex. 30 at PI 66.[5]

7. In addition to his medical practice and his trusteeships, Criscito has also been a real estate developer and businessman. Flax Decl., Ex.31 at p. 8.[6]

## THE FORMATION OF THE MONEY PURCHASE PLAN

8. Criscito formed DCC as a New Jersey Professional Association in or about 1975. Flax Decl., Ex.32 (Criscito) at 9:12 to 10:2.

9. At or about the time Criscito formed DCC, he also formed the Money Purchase Plan, a retirement fund for DCC employees. Flax Decl., Ex. 32 (Criscito) at 11:3-5; Ex. 33 at p. 2212.

10. Criscito executed the Money Purchase Plan document on behalf of DCC and as its sole Trustee. Flax Decl., Ex. 33 at p. 2279.

---

www.claramaassfoundation.org/download/golfjournal2010.pdf . This Court may take judicial notice of this public information. *See* Fed.R.Evid. 201(b)(2) and 807.

[4] The promotional flyers were obtained from the internet website www.claramaassfoundation.org/download/golfjournal2008.pdf, and www.claramaassfoundation.org/download/golfjournal2009.pdf. This Court may take judicial notice of this public information. *See* Fed.R.Evid. 201(b)(2) and 807.

[5] This information was obtained from the internet website www.bluelilydesign.com/images/large/QualCareYrEnd2006.pdf. This Court may take judicial notice of this public information. *See* Fed.R.Evid. 201(b)(2) and 807.

[6] The Court may take judicial notice of this public information. *See* Fed. R. Evid. 201(b)(2), 801(d)(2) and 807.

## CRISCITO IS SOLE TRUSTEE AND FIDUCIARY OF THE
## MONEY PURCHASE PLAN AND PROFIT SHARING PLAN

11.     From the time the Money Purchase Pension Plan was created until January 2005 when the Money Purchase Plan was converted into the Profit Sharing Plan, Criscito was the sole trustee of the Money Purchase Plan and executed numerous documents relating to the Money Purchase Plan as its sole Trustee.  Flax Decl., Ex. 34 at p. 7875; Ex. 35 at p. 7793; Ex. 36 at p. 7700; Ex. 37; Ex. 38 at pp. 7449 and 7453; Ex. 32 (Criscito) at 26:11-16; Ex. 39 (Warnock) at 26:1-7.[7]

12.     When the Money Purchase Plan was converted to the Profit Sharing Plan in 2005, Criscito became the sole Trustee of the Profit Sharing Plan.  Flax Decl., Ex. 40 at pp. 7597 and 7668.

13.     Criscito remained the sole Trustee of the Profit Sharing Plan until he was removed as Trustee in July 2007.[8]

## CRISCITO HIRED APC AS THIRD PARTY ADMINISTRATOR

14.     Criscito hired American Pension Corporation ("APC") as the third party administrator for the Money Purchase Plan.  Flax Decl., Ex. 32 (Criscito) at 14:5-12, Ex. 39 (Warnock) at 16:23 to 17:11.

---

[7] This sampling of documents is in addition to the annual IRS 5500 Forms executed by Criscito as Trustee.  *See* ¶¶122-146 below.

[8] Although Criscito executed the Money Purchase Plan document as its sole Trustee and executed numerous documents thereafter as Trustee, Criscito claims he does not know what a "Trustee" is and also claims that it was his usual practice to sign documents without reading them.  Flax Decl., Ex. 32 (Criscito) at 13:11 to 14:3.  Criscito claims he did not know what a "fiduciary" was before this lawsuit was started.  Flax Decl., Ex. 32 (Criscito) at 39:7-9.  Criscito's claims that he does not or did not know what a "Trustee" or a "fiduciary" is, made during his deposition on December 4, 2009, are directly at odds with the fact that he has, for many years, served as a Trustee and fiduciary for a number of large healthcare organizations.  *See* ¶6 above.

15.     Brian P. Warnock ("Warnock") is currently Vice President of APC and has worked at APC from 1981 to the present. Flax Decl., Ex. 39 (Warnock) at 9:17-18, 11:13 to 12:1.

16.     From at least 1981 to the present, APC was the only third party administrator for the Money Purchase Plan and subsequently the Profit Sharing Plan. Flax Decl., Ex. 39 (Warnock) 113:17 to 114:2.

17.     As third party administrator, APC provided the Money Purchase Plan with administrative services that included calculating the contributions to be made by DCC to the Money Purchase Plan, allocating the Money Purchase Plan's assets in the commingled account among the participants, preparing the Money Purchase Plan's Annual Report, preparing the annual Forms 5500 filed with the IRS, providing forms for use in connection with distributions made to terminated participants, and assisting the Trustee (Criscito) with keeping the plan document in compliance with various changes in the law. Flax Decl., Ex. 39 (Warnock) at 131:11-22.

## THE PRE-2000 COMMINGLED AND SEGREGATED ACCOUNTS

18.     During the period 1976 through December 31, 1999, professional, administrative and staff employees hired by DCC became participants in the Money Purchase Plan. The Money Purchase Plan (and subsequently the Profit Sharing Plan) included both segregated (individual) accounts and a commingled account. Criscito, all of the rank and file administrative and staff employees of DCC and at least one physician other than Criscito, had their retirement monies in the commingled account. The segregated (individual) accounts that were part of the Money Purchase Plan were in the individual names of a number of DCC physicians. No rank and file administrative and

staff employees had segregated (individual) accounts during the period 1976 through December 31, 1999.   No participant in the Money Purchase Plan intentionally had retirement monies in both a segregated (individual) account and in the commingled account. As set forth in the 1999 Annual Report prepared by APC[9], as of December 31, 1999, the DCC employees having retirement funds in the commingled account were as follows:

| **EMPLOYEE NAME** | **JOB TITLE** |
|---|---|
| Brown, Mark | Administrator |
| Cortes, Maria | Billing Coordinator |
| Criscito, Mario | Physician |
| Hawthorne, Keith | Physician |
| Roberts, Kim | Billing/Clerical |
| Roelke, Marc | Physician |
| McAllister, Charese | Medical Assistant/Office Manager |
| Foggio, Antoinette | Medical Assistant |
| Hayes, Barbara | Bookkeeping/Billing/Medical Assistant |
| Gonnella, Renee | Receptionist/Billing |
| Banks, Wisteria | Billing |
| Canales, Mary Ann | Medical Assistant |
| Cruz, Linda | Billing/Office Manager |
| Dimitrion, Marianne | Medical Assistant |
| DiFazio, Lisa | Medical Assistant |

---

[9] *See* ¶¶ 20-22 below.

Foy (Vitale), Dianne                    Medical Assistant/Office Manager

Flax Decl., Ex. 39 (Warnock) at 26:22 to 28:2; Ex. 41 (Warnock) at 383:16 to 384:10;

Ex. 42 at p. 11719.

19.    Criscito has acknowledged that he knows the difference between the

segregated (individual) accounts and the commingled account and that he was the sole

Trustee for the commingled account.  Flax Decl., Ex. 32 (Criscito) at 27:5-17.

## ANNUAL REPORTS

20.    As part of its third party administrator responsibilities, APC would prepare

an Annual Report for the Money Purchase Plan's commingled account setting forth the

names of all those having their retirement savings in the commingled account and the

dollar amount of their retirement savings that was invested in the commingled account.

APC would give the Annual Report for the commingled account to Criscito each year.

Flax Decl., Ex. 39 (Warnock) at 126:5-18, 131:11-17, 126:5-18.   The information

regarding the assets in the commingled account that were used by APC to prepare the

Annual Report came from Criscito.  Flax Decl., Ex. 39 (Warnock) at 115:19-22; Ex. 41

(Warnock) at 308:5-8.

21.    A copy of the Annual Report for 1999 is annexed to the Flax Decl. as Ex.

42.

22.    The Annual Report prepared by APC contained, among other things, a list

of the participants in the commingled account and the Annual Report was provided to

Criscito each year.  Flax Decl., Ex. 39 (Warnock) at 126:5-18.

7

## CRISCITO CONCEALS PLAN INFORMATION

23.    During the period 1981 through at least 2006, Criscito repeatedly told Warnock that everything regarding the Money Purchase Plan and Profit Sharing Plan should be sent to Criscito's home, that APC could not send copies of any Plan information to DCC doctors or employees, that APC was not permitted to speak with anyone regarding the commingled account except Criscito, and on one occasion Criscito even told Warnock that if any information regarding the Plan goes to DCC's office or to Casella, Criscito would personally come to APC and "beat him".[10]   The foregoing repeated directions from Criscito to APC not to share any information regarding the Plan or the commingled account were recorded in numerous handwritten notes found in APC's files. *See* Flax Decl., Ex.43; Ex. 39 (Warnock) at 78:21 to 80:17, 82:8 to 84:21, 112:20 to 113:3.

24.    In a December 6, 2007 letter from Warnock to then counsel for the plaintiffs, Joy M. Mercer, Esq., Warnock reiterated that "Dr. Criscito always emphasized that he was the 'boss', and that everything was to be sent to him directly at his home." Warnock also testified that there was no doubt in his mind that Criscito was the "boss". Flax Decl., Ex. 44 at p. 3; Ex. 39 (Warnock) at 111:25 to 112:19.

25.    In 1999, Mark Brown, DCC's administrator requested information from APC regarding his "money" in the commingled account.  APC advised Brown that they could not release that information to him and told him that only Criscito was allowed to have that information.  Flax Decl., Ex. 45 (Brown) at 7:21 to 8:7.

---

[10] Warnock subsequently testified that although Criscito made that statement, Warnock did not believe that Criscito would actually "beat him" but he certainly believed Criscito would have fired APC if information regarding the commingled account was given to anyone but Criscito.  Flax Decl., Ex. 41 (Warnock) at 281:23 to 282:1.

26.     Brown requested the information from Criscito who responded "Don't ask Mario. You're fine. Uncle Mario is taking care of you." Brown told Criscito that he was meeting with his financial advisor and that he did not have any idea what was in his retirement account. Criscito got irate, yelled at Brown, took Brown's hand and attempted to write a number on it. When Brown pulled his hand back, Criscito wrote a number on a napkin and gave it to Brown. Flax Decl., Ex. 45 (Brown) at 8:8-22.

27.     Brown also requested information regarding his retirement monies in the commingled account from Mary Sue McCarthy at Morgan Stanley.[11] McCarthy, like APC, told Brown that any information regarding his retirement monies would have to come from Criscito. Flax Decl., Ex. 45 (Brown) at 11:6-16.

## THE MORGAN STANLEY ACCOUNT

28.     As of December 31, 1997, Criscito had established accounts with the following institutions into which he placed the retirement savings of the DCC employees who were participants in the commingled account:

- Morgan Stanley Dean Witter (the "Morgan Stanley Account")

- Schwab

- Solomon Smith Barney (the "Smith Barney account")

- North American Venture

Criscito reported the 1997 year-end balances for the investments maintained with the above institutions on his fax to APC dated September 14, 1998. Flax Decl., Ex. 46 at p. 1; Ex. 41 (Warnock) at 194:25 to 196:12.

---

[11] *See* ¶28 below.

29.     As of December 31, 1998, the Morgan Stanley account included 7,875 shares of a volatile high tech stock known as Veritas Software. The 1998 year-end value of the Morgan Stanley account was $2,355,460.58. Flax Decl., Ex. 1 at Exhibit 1, p.1.

30.     During the year 1999, Criscito bought an additional 59,250 shares of Veritas Software in the Morgan Stanley account. The price of Veritas Software stock soared during the 1999 tech bubble. As a result, as of December 31, 1999, the Morgan Stanley account (that included 67,125 shares of Veritas Software) had a balance of $12,952,936.43. Flax Decl., Ex. 1 at Exhibit 2, p. 1.

31.     On January 5, 2000, Criscito sold all 67,125 shares of Veritas Software held in the Morgan Stanley account at a huge profit. Flax Decl., Ex. 1 at Exhibit 3, p.1.[12]

32.     As part of his scheme to put a disproportionate share of the increase in the value of the Morgan Stanley account into his pocket, Criscito concealed the true December 31, 1999 value of the Morgan Stanley account (*i.e.*, $12,952,936.43) from APC and the other plan participants. Then, on January 13, 2000 -- the day after the last sale of Veritas Software stock by Criscito-Criscito sent a fax to APC in which he falsely stated that the 1999 year-end balance for the Morgan Stanley account was $4,017,942.57. Flax Decl., Ex. 47.

33.     Criscito provided APC with no back-up for the false 1999 year-end balance for the Morgan Stanley account. Flax Decl., Ex. 39 (Warnock) at 67:24 to 68:12.

34.     By falsely reporting the 1999 year-end value of the Morgan Stanley account to be $4,017,942.57, Criscito hid from APC, the IRS and the other plan

---

[12] On January 7, 2000, and January 12, 2000, respectively, Criscito bought and then sold an additional 20,000 shares of Veritas Software. Flax Decl., Ex. 1 at Exhibit 3, pp. 4 and 5.

participants $8,934,993.86 ($12,952,936.43 - $4,017,942.57) of the commingled account's assets, so he could keep the monies for himself. *See* ¶32 above.

35.    Plaintiffs became the Trustees of the Plan following the removal of Criscito as the sole Trustee in July of 2007. Declaration of Anthony J. Casella in Support of Plaintiffs' Motion for Summary Judgment ("Casella Decl.") at ¶4.

36.    In or about September of 2007, shortly after Criscito was removed as the Trustee of the profit sharing plan, Casella reviewed APC's files and discovered a Morgan Stanley account statement that revealed that the 1999 year-end balance in the Morgan Stanley account was $12,952,936.43 as opposed to the figure of $4,017,942.57 reported to APC by Criscito. Flax Decl., Ex. 39 (Warnock) at 90:8 to 93:5, 110:13-17; Ex. 48; Ex. 49 at pp. 25873 to 25882.

## THE SMITH BARNEY ACCOUNT

37.    In addition to Criscito falsifying the 1999 year-end value for the Morgan Stanley account by under-reporting the figure by $8,934,993.86, and as an additional component of his scheme to keep the increased value of the Smith Barney account for himself, Criscito also falsified the 1999 year-end value of the Smith Barney account that was part of the commingled account. Criscito falsely reported to APC that the Smith Barney account had a 1999 year-end value of $798,425.50 (*see* Flax Decl., Ex. 47) when, in reality, the Smith Barney account had a 1999 year-end value of $3,924,549.92. Flax Decl., Ex. 1 at Exhibit 5.

38.    By falsely reporting the 1999 year-end value of the Smith Barney account to be $798,425.50, Criscito hid from APC, the IRS and the other plan participants

11

$3,126,124.42 ($3,924,549.92 - $798,425.50) of the commingled account's assets, so he could keep those monies for himself.

39.     It was not until after July 2007 that the new Trustees for the first time had access to the financial information for the Money Purchase Plan and Profit Sharing Plan in the possession of APC and were able to obtain other documents revealing Criscito's fraudulent conduct with respect to the Smith Barney account. Casella Decl. at ¶11.

40.     In or about October 2007, months after Criscito was removed as sole Trustee of the Profit Sharing Plan, Criscito directed Smith Barney to transfer the entire balance of the Smith Barney account (that was maintained in the name of the Profit Sharing Plan) to Criscito's own individual IRA account. Casella Decl. at ¶10.

41.     Upon being advised by the Trustees of the Profit Sharing Plan that Criscito had no authority to transfer funds from the Smith Barney account, Smith Barney recouped the amounts that were transferred and returned them to the Smith Barney account. Casella Decl. at ¶10.

## THE SEGREGATED ACCOUNTS CREATED IN 2000

42.     As noted above, on January 13, 2000, Criscito faxed to APC what he claimed to be the 1999 year-end value of the commingled account to APC. Flax Decl., Ex. 47.[13]

43.     The handwritten note on the top of the January 13, 2000 fax put there by APC states "Do Mario's report ASAP & send to Mario so he can transfer to separate account". Flax Decl., Ex. 47.

---

[13] Criscito acknowledged that the "fax" number at the top of Flax Decl., Ex. 47 is his home fax number.

44.     The handwritten note referred to the fact that as of January 13, 2000, a decision had been made to take all of the money out of the commingled account and set up segregated (individual) accounts for all of the DCC employees participating in the commingled account. Flax Decl., Ex. 39 (Warnock) at 63:20 to 64:6.

45.     Criscito did not specifically advise APC or Warnock why, as of January 2000, segregated (individual) accounts would be established.  In fact, over the years, APC had suggested to Criscito that it would be a good idea to have segregated accounts for all employees, since it is unusual to have a retirement plan in which there are both segregated accounts and a commingled account.  In that regard, from APC's standpoint, it was almost as if there was a plan within a plan.  Criscito took no action on APC's suggestion prior to late 1999. Flax Decl., Ex. 39 (Warnock) at 64:7 to 65:10.

46.     In late 1999, in response to a request by Criscito, APC provided Criscito with a form letter to the participants in the commingled account advising them that their retirement funds in the commingled account could be transferred into their own separate (segregated/individual) accounts.  The cover letter from APC enclosing the form letter is dated November 23, 1999. Flax Decl., Ex. 50; Flax Decl., Ex. 41 (Warnock) at 294:23 to 295:8.

47.     As of the November 23, 1999 letter, Criscito was suddenly "gearing it up" to have the separate accounts established. Flax Decl., Ex. 41 (Warnock) at 299:13-20.

48.     The 1999 Annual Report for the Money Purchase Plan dated January 13, 2000 was prepared based upon the false 1999 year-end asset value information for the commingled account that Criscito provided to APC in his January 13, 2000 fax.  The 1999 Annual Report was prepared early in 2000 to enable Criscito to immediately

transfer monies from the commingled account to the segregated accounts. Flax Decl., Ex. 39 (Warnock) at 101:11 to 102:5; Flax Decl., Ex. 42 at pp. 11708-11709; Flax Decl., Ex. 51 at p.2503, ¶3.

49.     The 1999 Annual Report broke out the individual account balances for the participants in the commingled account so that Criscito could use those numbers to create the segregated accounts for those participants. Flax Decl., Ex. 41 (Warnock) at 206:13-22.

50.     In order to have the correct amounts go into the newly created segregated accounts, it was necessary to have the correct 1999 year-end value of the assets in the commingled account. Since Criscito provided APC with false (dramatically understated) information regarding the assets in the commingled account as of year-end 1999, the allocations prepared by APC for the participants in the commingled account were, likewise, dramatically understated and, therefore, the amounts that were transferred into the newly created segregated accounts were far less than they should have been. Flax Decl., Ex. 41 (Warnock) at 380:4-22.

51.     By distributing less monies to the other participants in the commingled account, Criscito increased his remaining interest in the commingled account. Flax Decl., Ex. 41 (Warnock) at 250:20 to 251:2.

52.     As Trustee, Criscito was not entitled to withhold from (or fail to transfer to) the newly created segregated accounts the true, accurate and full amount of all monies due to the participants in the commingled account (based upon the true and accurate value of the assets in the commingled account as of the 1999 year-end). Flax Decl., Ex. 41 (Warnock) at 346:8 to 347:1.

14

53.     During the period January through March 2000, DCC employees (other than Criscito) that were participants in the commingled account (and therefore owned a proportionate share of the true value of the commingled account), established individually directed retirement accounts at Morgan Stanley.  The amounts that these participants received were taken from the Morgan Stanley account and deposited into newly created individually directed (segregated) retirement accounts at Morgan Stanley. The amounts were not calculated based upon the true and accurate 1999 year-end balances in the Morgan Stanley account ($12,952,936.43) and the Smith Barney account ($3,924,549.92), but were calculated instead on the false values provided to APC by Criscito for those accounts, $4,017,942.57 and $798,425.50 respectively.  Flax Decl., Ex. 52 at p. 1; *see* ¶¶32 and 37 above.

54.     During the deposition of plaintiffs' damage expert, Scott M. Feit ("Feit"),[14] Criscito's attorney asked Feit what precipitated the move to the segregated accounts in 2000.  In response, Feit testified that, based upon his past experience as a Certified Fraud Examiner, Criscito gave the false values and wanted to create segregated accounts quickly because the assets were significantly higher than Criscito had reported and, if the participants received their allocated amounts based on the dramatically understated value of the assets, Criscito would take the rest.  Feit concluded his deposition answers on this subject by stating that: "It appears to be a fraud".  Flax Decl., Ex. 53 (Feit) at 70:3 to 71:14; Ex. 54 at pp. Feit 0235-0236.

55.     Following the establishment of the individually directed (segregated) retirement accounts for the other DCC employees, the only individuals having an interest

---

[14] *See* ¶154 below.

in the Morgan Stanley account (where the approximately $9,000,000 in Veritas Software profits resided) were Criscito and two former DCC employees Antoinette Foggio ("Foggio") and Mary Ann Canales ("Canales") with relatively small balances.[15] Flax Decl., Ex. 39 (Warnock) at 164:20 to 166:4.

56.    When the new segregated accounts were created in 2000, the former participants in the commingled account did not receive their allocated portion of the approximately $12,000,000 in the Morgan Stanley account and the Smith Barney account that Criscito concealed. Flax Decl., Ex. 52 at p. 1.

**CRISCITO'S USE OF THE MORGAN STANLEY ACCOUNT
TRUST MONIES AS HIS PERSONAL ACCOUNT**

59.    The Morgan Stanley account in the name of Diagnostic & Clinical Cardiology Money Purchase Plan, c/o Mario A. Criscito, Trustee was Account No. 769 086347 070.   The Morgan Stanley account was part of the Money Purchase Plan's commingled account. Flax Decl., Ex. 1 at Exhibit 2. *See* ¶28 above.

**1998**

60.    On December 1, 1998, Criscito withdrew $100,000 from the Morgan Stanley account. Flax Decl., Ex. 1 at Exhibit 1, p. 0917.

---

[15] In an August 28, 2007 letter to Casella, Warnock explained that when the 1999 Annual Report was prepared, APC realized that it had made a miscalculation in a previous year and that, as a result, using the 1999 year-end values reported by Criscito, former DCC employee Canales was entitled to an additional $9,424.70 bringing her total allocation (based upon Criscito's false 1999 year-end values) to $14,094.67 instead of $4,669.97. Criscito refused to make the additional payment of $9,424.70 to Canales and forcefully told APC to "zero her out".   By not paying Canales the additional $9,424.70 from the commingled account, that amount increased Criscito's remaining interest in the commingled account. Flax Decl., Ex.51; Ex.42 at p. 11719; Ex. 39 (Warnock) at 101:11 to 104:20.

## 1999

61.     On June 14, 1999, Criscito withdrew $75,000 from the Morgan Stanley account. Flax Decl., Ex. 54 at p. Feit 0169.

62.     On October 19, 1999, Criscito withdrew $50,000 from the Morgan Stanley account. Flax Decl., Ex. 54 at p. Feit 0180.

## 2000

63.     In early January 2000, even before Criscito falsely reported the 1999 year-end balance in the Morgan Stanley account to APC on January 13, 2000, Criscito withdrew $950,000 and then an additional $150,000 from the Morgan Stanley account for his personal use.  Criscito testified that he did not know "off hand" the reason for the transfer of those significant funds, that they may have been a loan for him to do what he wanted with the money and he may have ultimately treated the withdrawals as a distribution.  Flax Decl., Ex. 55 at p. MC-906; Ex. 56 at pp. 25687, 25685 and 25688; Ex.57 (Criscito) at 201:19 to 202:23.

64.     In May 2000, Criscito sent a handwritten note to Herb Mendel, the Money Purchase Plan's financial advisor at Morgan Stanley ("Mendel"), requesting the transfer of $75,000 from the Morgan Stanley account via wire transfer to the "Evelyn Langlieb Greer Trust".  Criscito testified that he did not know what the money was for and that he never heard of Evelyn Langlieb Greer.[16]  Flax Decl., Ex. 55 at pp. MC-927 AND MC-930; Ex. 56 at pp. 25703 and 25704; Ex. 57 (Criscito) at 220:25 to 221:20.

---

[16] Ms. Greer is an attorney and President of Greer Properties, Inc., a real estate development company in Florida. *See* Flax Decl., Ex. 58.  This Court may take judicial notice of this public information. *See* Fed. R. Evid. 201(b)(2) and 807.

65.    In September 2000, Criscito transferred $350,000 from the Morgan Stanley account to another account in his name.  Criscito testified that he did not know what the $350,000 withdrawal was for.  Flax Decl., Ex. 55 at pp. MC-956 and MC-958; Ex. 57 (Criscito) at 203:6-25.

66.    In November 2000, Criscito withdrew $250,000 from the Morgan Stanley account and forwarded it via wire transfer to "POSTX Corp., Acct: 1000020403". Criscito testified that the $250,000 was a loan to himself for an investment that he eventually treated as a distribution.  Flax Decl., Ex. 55 at pp. MC-970 and MC-972; Ex. 57 (Criscito) at 204:1-25.

## 2001

67.    In January of 2001, Criscito withdrew $150,000 from the Morgan Stanley account.  Criscito testified that he did not know what that amount was for, or if it was ultimately a loan to himself or treated as a distribution.  Flax Decl., Ex. 55 at pp. MC-70; Ex. 57 (Criscito) at 205:1-16.

68.    In February 2001, Criscito sent a handwritten note to Mendel requesting the transfer of $265,680 from the Morgan Stanley account, via wire transfer, to CitiBank/Pillsbury Winthrop LLP Trust Clearing Account.  Criscito testified that he did not know "off hand" what this withdrawal was for, but believes it was treated as a distribution.  Criscito also testified he has "no idea" what CitiBank/Pillsbury Winthrop is. Flax Decl., Ex. 55 at pp. MC-78 and MC-81; Ex. 57 (Criscito) at 205:17 to 206:16; Ex. 56 at p. 25707.

69.    In March 2001, Criscito caused $250,000 to be transferred from the Morgan Stanley account to another account in his name.  Criscito testified he does not

know what that transfer was for.  Flax Decl., Ex. 55 at pp. MC-84 and MC-86; Ex. 57 (Criscito) at 206:21-25.

70.     In April 2001, Criscito sent a letter to Mendel requesting a wire transfer of $143,686.01 to R.C. Shea and Associates Attorney Trust Account/Real Estate.  Criscito testified that he believes the money was for an investment in real property at the New Jersey seashore.  Criscito was eventually bought out of the investment.  When he received his buy-out, he "spent" the money as opposed to returning it to the Morgan Stanley account.  Flax Decl., Ex. 55 at p. MC-90; Ex. 56 at p. 25708; Ex. 57 (Criscito) at 223:18 to 225:18.

71.     In October 2001, Criscito wrote to Mendel requesting that $250,000 be transferred from the Morgan Stanley account to Criscito's account at Independence Community Bank (subsequently changed to Sovereign Bank).  Criscito testified he does not know what that transfer was for.  Flax Decl., Ex.56 at p. 25717; Ex. 57 (Criscito) at 230:5-15; Ex. 55 at pp. MC-132 and MC-134; Ex. 57 (Criscito) at 207:5-12.

72.     In December 2001, Criscito had a check in the amount of $5,218.50 sent from the Morgan Stanley account to a Miami, Florida resort he belonged to known as the "Surf Club"[17].  Criscito testified that these monies were used to pay "chits" for food and entertainment.  Flax Decl., Ex. 55 at pp. MC-152 and MC-155; Ex. 57 (Criscito) at 189:3-25, 207:13 to 208:10.

---

[17] *See* Flax Decl., Ex. 59.  This Court may take judicial notice of this public information. *See*  Fed. R. Evid. 201(b)2 and 807.

19

**2002**

73.     On January 7, 2002, Criscito wrote to Mendel requesting a check from the Morgan Stanley account for $20,000 made payable to the Surf Club.  Flax Decl., Ex. 56 at p. 25714; Ex. 57 (Criscito) at 227:16 to 229:9.

74.     On January 8, 2002, Criscito wrote to Mendel requesting a check from the Morgan Stanley account made payable to the Surf Club in the amount of $2,218.85.  Flax Decl., Ex. 56 at p. 25715; Ex. 57 (Criscito) at 229:10 to 230:4.

75.     On or about January 14, 2002, Criscito withdrew $6,000,000 from the Morgan Stanley account.  He deposited that money in a certificate of deposit account at Independence Community Bank (predecessor to Sovereign Bank).[18]  Criscito opened the certificate of deposit account in the name of the Diagnostic & Clinical Cardiology PA Pension Fund, Mario Criscito, Trustee.  Criscito used the Money Purchase Plan's Employer Identification Number (22-2323990) but used his home address as the account address.  Criscito could give no reason why the account was not opened in his name.  As detailed below, Criscito treated the money in this account (the "Sovereign Bank Pension Fund account") as his own.  Flax Decl., Ex 61; Ex. 60 at pp. 5-6; Ex. 32 (Criscito) at 116:17 to 118:17.

76.     In April 2002, Criscito withdrew $227,500 from the Morgan Stanley account.  Criscito believes the letter authorizing the withdrawal was sent by him but he does not know what the monies were used for.  Flax Decl., Ex. 55 at pp. MC-209 and MC-211; Ex. 57 (Criscito) at 208:11-25.

---

[18] Sovereign Bank was formerly known as Independence Community Bank.  Flax Decl., Ex. 60; Ex.32 (Criscito) at 122:15-17.

77.    On October 9, 2002, Criscito wrote to Mendel requesting a check from the Morgan Stanley account made payable to the Surf Club in the amount of $1,342.70.  Flax Decl., Ex.56 at p. 25718; Ex. 57 (Criscito) at 230:16 to 231:16.

### 2003

78.    On January 12, 2003, Criscito wrote to Mendel requesting two checks totaling $16,597.29 from the Morgan Stanley account.  One check ($4,597.29) went to the Surf Club for food and entertainment; the other check ($12,000) was paid to TRC Holding, a real estate investment relating to property at the New Jersey seashore.  Flax Decl., Ex. 55 at pp. MC-279 and MC-282; Ex.57 (Criscito) at 209:1 to 210:2; Ex.56 at p. 25719; Ex.57 (Criscito) at 231:17 to 232:16.

79.    In December 2003, Criscito transferred $1,000,000 from the Morgan Stanley account to the Sovereign Bank Pension Fund account (Account No. 1108007053001).  Flax Decl., Ex. 55 at pp. MC-389 and MC-390; Ex. 57 (Criscito) at 210:3-22.

### 2004

80.    In January and February 2004, Criscito paid additional monies to the Surf Club from the Morgan Stanley account for food and entertainment: $4,494 in January and $1,207.25 in February.  Flax Decl., Ex. 55 at pp. MC-403, MC-411 and MC-412; Ex.57 (Criscito) at 211:6-20.

81.    In May 2004, Criscito withdrew $2,000 from the Morgan Stanley account. Criscito testified that he did not know what that withdrawal was for.  Flax Decl., Ex. 55 at p. MC-473; Ex. 57 (Criscito) at 211:21-24.

82.   In August 2004, Criscito caused a check in the amount of $14,490 to be paid from the Morgan Stanley account to "Richard Fairclough". Criscito testified that he had "no idea" who Richard Fairclough was. Flax Decl., Ex. 55 at pp. MC-473 and MC-476; Ex. 57 (Criscito) at 211:25 to 212:15; Ex. 56 at p. 25720; Ex. 57 (Criscito) at 232:17 to 233:5.

83.   In September 2004, Criscito caused a check in the amount of $10,000 drawn on the Morgan Stanley account to be paid to "Short Hills West LLC". Short Hills West was a real estate company in which Criscito was a member. Flax Decl., Ex. 55 at pp. MC-487 and MC-490; Ex. 57 (Criscito) at 212:16 to 213:4.

84.   In October 2004, Criscito caused a check in the amount of $10,000 to be paid to TRC Holding (the real estate investment at the New Jersey seashore). Criscito testified that he does not know what the $10,000 was used for. Flax Decl., Ex. 55 at pp. MC-501 and MC-503; Ex. 57 (Criscito) at 213:5-14.

85.   In May 2005, Criscito wrote to "Jane" at Morgan Stanley requesting a check from the Morgan Stanley account in the amount of $5,000 to be paid to the Surf Club. Criscito testified that he "guesses" it was for food and entertainment. Flax Decl., Ex. 55 at pp. MC-599 and MC-602; Ex. 57 (Criscito) at 213:20-25; Ex. 56 at p. 25722.

## 2006

86.   In January 2006, Criscito caused a check to be drawn on the Morgan Stanley account made payable to the Surf Club in the amount of $6,652.04 to pay for food and entertainment. Flax Decl., Ex. 55 at pp.MC-1138 and MC-1141; Ex. 57 (Criscito) at 214:1-6.

87.    In August 2006, Criscito transferred the remaining balance in the Morgan Stanley account into an IRA account in his name at Morgan Stanley (Account No. 769-086649-000).  Flax Decl., Ex. 55 at pp. MC-1231, MC-1233, MC-1234 and MC-1235; Ex. 57 (Criscito) at 214:16 to 216:10.

88.    In November 2006, Criscito caused $20,000 that had been deposited into and/or credited to the Morgan Stanley account to be transferred to his IRA account at Morgan Stanley (account No. 769-066649-000).

As of November 30, 2006, the Morgan Stanley account had a balance of $0.00.  Flax Decl., Ex. 55 at pp. MC-1255 and MC-1257; Ex. 57 (Criscito) at 216:11-25.

89.    Morgan Stanley did not withhold any monies (for taxes) in connection with any of Criscito's withdrawals of pension fund monies from the Morgan Stanley account listed above.  Flax Decl., Ex. 57 (Criscito) at 217:1-4.

90.    No 1099 Forms were issued in connection with any of Criscito's withdrawals of pension fund monies from the Morgan Stanley account listed above.  Flax Decl., Ex. 57 (Criscito) at 217:5-11.

91.    Criscito does not believe he told anyone at APC about any of the withdrawals of the pension fund monies from the Morgan Stanley account listed above. Flax Decl., Ex. 57 (Criscito) at 217:8-11.

### CRISCITO'S USE OF THE SOVEREIGN BANK PENSION FUND ACCOUNT TRUST MONIES AS HIS PERSONAL ACCOUNT

#### 2002

92.    As noted above, on or about January 14, 2002, Criscito withdrew $6,000,000 from Morgan Stanley account and deposited that money into the Sovereign Bank Pension Fund account (Account No. 1108007053001 as of June 2002).  Criscito

23

opened the Sovereign Bank Pension Fund account in the name of Diagnostic & Clinical Cardiology PA Pension Fund, Mario Criscito, Trustee, using the Money Purchase Plan's Employer Identification Number (22-2323990). Criscito specified the account address as his home address so that he would receive all statements and information relating to the account. *See* ¶75 above.

## 2003

93.     On February 27, 2003, Criscito deposited $1,850,000 into the Sovereign Bank Pension Fund account. Flax Decl., Ex. 60 at p. 6; Ex. 62.

94.     On December 26, 2003, Criscito withdrew $1,000,000 from the Morgan Stanley account and deposited the $1,000,000 into the Sovereign Bank Pension Fund account. Flax Decl., Ex. 60 at p. 6; *see* ¶79.

## 2004

95.     On May 6, 2004, Criscito withdrew $3,259,143.02 from the Sovereign Bank Pension Fund account for a deposit on his new home. Criscito never spoke to anyone at Sovereign Bank to tell them that the withdrawal was from a pension fund account as opposed to an individual account. Criscito never told anyone at APC that he was making the withdrawal of pension funds from the Sovereign Bank Pension Fund account. Flax Decl., Ex. 60 at p. 34; Ex. 32 (Criscito) at 119:12 to 121:17.

96.     The luxury home (*see* Flax Decl., Ex. 63[19] located at 32 Chelsea Drive, Livingston, New Jersey purchased by Criscito with the Sovereign Bank Pension Fund

---

[19] The aerial satellite photograph of 32 Chelsea Drive, Livingston, New Jersey 07039 was obtained by plaintiffs' counsel from the internet website *earth.google.com* (download GoogleEarth5) on August 12, 2010. Fed. R. Evid. 201 permits the taking of judicial notice of generally known facts capable of ready and accurate determination by resort to sources whose accuracy cannot reasonably be questioned. *See Gordon v. Lewistown*

account trust monies had a purchase price of $3,500,000 as reflected in the Deed and Bill of Sale recorded in the Office of the Essex County Register. Flax Decl., Ex. 64; Ex. 32 (Criscito) at 120:2-7.

## 2005

97.    On March 25, 2005, Criscito withdrew $50,000 from the Sovereign Bank Pension Fund account and paid it to Home Theatre Architects, a business owned by Criscito specializing in the design of home theatres. Flax Decl., Ex. 65 at pp. 4 and 3; Ex. 32 (Criscito) at 135:10-22; 147:2-7.

98.    On March 18, 2005, Criscito deposited $95,975 into the Sovereign Bank Pension Fund account. Flax Decl., Ex. 60 at p.9.

99.    On April 8, 2005, Criscito withdrew $650,000 from his personal account depositing $500,000 into the Sovereign Bank Pension Fund account and the balance of $150,000 into the Home Theatre Architect account. Flax Decl., Ex. 65 at pp. 5, 6, and 7; Ex. 32 (Criscito) at 145:15 to 147:1.

100.    On May 2, 2005, Criscito withdrew $100,000 from the Sovereign Bank Pension Fund account and deposit it into his personal account. Flax Decl., Ex. 65 at pp.9 and 8; Ex. 32 (Criscito) at 145:4-8.

---

*Hospital*, 272 F. Supp. 2d 393, 429 n.34 (M.D. Pa. 2003), *aff'd*, 423 F.3d 184 (3d Cir. 2005) (where the district court took judicial notice, under Fed. R. Evid. 201, of travel times secured on Mapquest.com); *Super 8 Motels, Inc. v. Rahmatullah*, 2009 WL 2905463, *8 (S.D. Ind. 2009) (where the Court took judicial notice of the location of a hotel, and the mileage distance between that hotel and the defendant's facility, from exhibits taken from *maps.google.com* and *earth.google.com*); *U.S. v. Brown*, 636, F. Supp. 2d 1116, 1124 n.1 (D. Nev. 2009) (where the Court noted that federal courts have generally taken judicial notice of facts gleaned from internet mapping tools such as Google Maps or Mapquest).

101.    On May 24, 2005, Criscito withdrew $200,000 from the Sovereign Bank Pension Fund account and deposited it into his personal account.  Flax Decl., Ex. 65 at pp. 11 and 10; Ex. 32 (Criscito) at 144:19-25.

102.    On June 10, 2005, Criscito withdrew $100,000 from the Sovereign Bank Pension Fund account and deposited it into his personal account.  Flax Decl., Ex. 65 at pp. 13 and 12; Ex. 32 (Criscito) at 144:12-16.

103.    On July 15, 2005, Criscito withdrew $100,000 from the Sovereign Bank Pension Fund account and deposited it into Home Theatre's account.  Flax Decl., Ex. 65 at pp. 15 and 14; Ex. 32 (Criscito) at 143:12-25.

104.    On August 5, 2005, Criscito transferred $166,706.97 from the Sovereign Bank Pension Fund account to his personal account.  Flax Decl., Ex. 65 at pp. 17 and 16; Ex. 32 (Criscito) at 143:1-8.

105.    On September 14, 2005, Criscito transferred $100,000 from the Sovereign Bank Pension Fund account to the Home Theatre account.  Flax Decl., Ex.65 at pp. 20, 19 and 18; Ex. 32 (Criscito) at 141:17 to 142:25.

106.    On November 28, 2005, Criscito transferred $100,000 from the Sovereign Bank Pension Fund account to his personal account.  Flax Decl., Ex.65 at pp. 22 and 21; Ex. 32 (Criscito) at 141:10-16.

107.    On December 10, 2005, Criscito transferred $150,000 from the Sovereign Bank Pension Fund account to his personal account.  Flax Decl., Ex. 65 at pp. 24 and 23; Ex. 32 (Criscito) at 139:14-19.

**2006**

108.    On February 8, 2006, Criscito withdrew $15,000 from the Sovereign Bank Pension Fund account and deposited it into the Home Theatre account.  Flax Decl., Ex. 65 at pp. 28 and 27; Ex. 32 (Criscito) at 136:15-21.

109.    On February 9, 2006, Criscito withdrew $35,000 from the Sovereign Bank Pension Fund account and deposited it into Home Theatre's account.  Flax Decl., Ex. 65 at pp. 30 and 29; Ex. 32 (Criscito) at 134:18-25.

110.    On April 6, 2006, Criscito deposited $66,000 from his personal account into the Sovereign Bank Pension Fund account.  There was no "rhyme or reason" for the amount of the deposit.  Flax Decl., Ex. 65 at pp. 32 and 31; Ex. 32 (Criscito) at 133:21 to 134:17.

111.    On May 5, 2006, Criscito withdrew $100,000 from the Sovereign Bank Pension Fund and deposited it into his personal account.  Flax Decl., Ex. 65 at pp. 34 and 33; Ex. 32 (Criscito) at 133:8-14.

112.    On June 6, 2006, Criscito withdrew $20,000 from the Sovereign Bank Pension Fund account and paid it to Short Hills West, a real estate company, for a capital call.  Criscito was a member of Short Hills West.  Flax Decl., Ex. 65 at pp. 36 and 35; Ex. 32 (Criscito) at 129:10-25.

113.    On June 30, 2006, Criscito withdrew $130,000 from the Sovereign Bank Pension Fund account and deposited it into his personal account.  Flax Decl., Ex. 65 at pp. 38 and 37; Ex. 32 (Criscito) at 127:21 to 128:10.

114.    On July 14, 2006, Criscito withdrew $262,000 from the Sovereign Bank Pension Fund account and paid it to Conza Builders, LLC, a building company owned by

Criscito and a few others.  Flax Decl., Ex. 65 at pp. 40 and 39; Ex. 32 (Criscito) at 124:8-14; 125:15-18.

115.    On August 4, 2006, Criscito withdrew $30,000 from the Sovereign Bank Pension Fund account and deposited it into the Conza Builders account.  Flax Decl., Ex. 65 at pp. 42 and 41.

116.    During the period of February 2003 through April 2006, Criscito deposited approximately $3,500,000 into the Sovereign Bank Pension Fund account as follows:

| | | |
|---|---|---|
| a. | 1,850,000 | 2/27/03 |
| b. | 1,000,000 | 12/26/03 |
| c. | 95,975 | 3/18/05 |
| d. | 500,000 | 4/8/05 |
| e. | 66,000 | 4/6/06 |

Flax Decl., Ex. 60 at pp. 6, 9 and 11.

117.    On August 21, 2006, Criscito closed the Sovereign Bank Pension Fund account.  He withdrew $3,388,916.11.  Criscito deposited $3,000,000 into his IRA account at Sovereign (Account No. 1108019512001) and deposited the balance of $388,916.11 into his personal account.  Flax Decl., Ex. 65 at pp. 45, 44 and 43; Ex. 60; Ex. 32 (Criscito) at 122:4-20; Ex. 66; Ex. 67.

118.    Sovereign Bank did not withhold any monies (for taxes) in connection with any of Criscito's withdrawals of pension fund monies from the Sovereign Bank Pension Fund account, nor did Sovereign Bank issue any 1099 Forms for the

withdrawals.  Flax Decl., Ex. 32 (Criscito) at 122:18 to 127:12; 128:23 to 129:5; 130:7-12; 133:18-20; and 136:10-17.

119.    Plaintiffs did not learn that Criscito had been using the Morgan Stanley account and the Sovereign Bank Pension Fund account as if they were his personal accounts, until after Criscito was removed as sole trustee of the Profit Sharing Plan in July 2007. Casella Decl. at ¶9.

## THE 2005 FORM 1099-R

120.    An IRS Form 1099-R is filed when monies are distributed from a pension fund.  APC prepared a Form 1099-R for the year 2005 reflecting a distribution to Criscito from the commingled account in the amount of $4,510,543.84.  Criscito told APC that he had "rolled over" the money into his "IRA account".  There was no actual "rollover" of $4,510,543.84 into any Criscito IRA account in 2005.

The 1099-R Form for 2005 was the only 1099 form APC ever prepared for Criscito.  The distribution from the commingled account reflected on the 1099-R Form for 2005 is the only distribution to Criscito from the commingled account that APC was aware of.  If other distributions were made to Criscito, he should have advised APC so that appropriate 1099 Forms could have been prepared and the value of his interest in the commingled account could have been adjusted accordingly.  Criscito did not do so.  Flax Decl., Ex. 32 (Criscito) at 73:4-7, 75:2 to 76:2, Ex. 68 at pp. 25009 and 25010; Ex. 39 (Warnock) at 107:5 to 108:3, Ex. 69 at p. 25118.

121.    Criscito never added up the total amount of the withdrawals that he made from the Morgan Stanley account or the Sovereign Bank Pension Fund account that he treated as distributions from those accounts.  He does not know if the total distributions

29

from the Morgan Stanley account and the Sovereign Bank Pension Fund account add up to the $4.5 million dollar figure that was on the Form 1099 for 2005 prepared by APC. In fact, the total amount of the withdrawals from the Morgan Stanley account during the period January 1, 2000 through December 31, 2005 far exceeded $4.5 million. Flax Decl., Ex. 57 (Criscito) at 220:5-24, Ex.68 at p. 25010; *see also* ¶¶63-85 above.

## FALSIFIED IRS 5500 FORMS

122.   APC prepared the annual IRS 5500 Forms for the Money Purchase Plan and the Profit Sharing Plan as part of their responsibility as third party administrator. Flax Decl., Ex.39 (Warnock) at 131:11-17.

123.   During the period 1981 through 2005, APC prepared each and every annual IRS Form 5500 for the Money Purchase Plan. Flax Decl., Ex. 39 (Warnock) at 54:14-23.

124.   The information regarding the value of the assets in the commingled account needed to prepare the annual Form 5500 (and the Annual Report) was provided to APC by Criscito and no one else.   Flax Decl., Ex.39, (Warnock) at 28:3-9; Ex. 41 (Warnock) at 308:5-8.

125.   Criscito would "fax" the year-end figures for the commingled accounts to APC for APC's use in preparing the 5500 Forms and the Annual Report.   Exhibit 46 to the Flax Decl. are examples of the faxes that were received by APC from Criscito setting forth the year-end values of the investment accounts that made up the commingled account. Flax Decl., Ex. 39 (Warnock) at 57:22 to 60:12.

126.   Exhibit 47 to the Flax Decl. is a copy of the fax provided to APC by Criscito setting forth the 1999 year-end value of all of the investments that comprised the

assets of the commingled account.  APC used this information to prepare Schedule I of the 5500 Form for 1999.  Flax Decl., Ex. 39 (Warnock) at 97:25 to 98:25.

127.   APC believed that the information that Criscito provided with respect to the year-end values for the assets in the commingled account was accurate and honest. Flax Decl., Ex. 41 (Warnock) at 307:17-20.

128.   Criscito had never done anything to cause APC to suspect that the information that he was providing with regard to the year-end values of the assets in the commingled account were anything but accurate and honest.  Flax Decl., Ex. 41 (Warnock) at 307:21-24.

129.   APC did not ask Criscito for back up with respect to the year-end values for the assets in the commingled account that he provided because APC trusted Criscito and thought he was an honest person.  Criscito had never done anything to cause APC to think otherwise.  Flax Decl., Ex. 39 (Warnock) at 118:22-25; Ex. 41 (Warnock) at 308:21 to 309:4, 313:24 to 314:14.

130.   Third party administrators such as APC are not required to, nor do they, audit year-end asset values given to them by trustees or otherwise independently verify year-end values.  Third party administrators rely on the integrity of the person supplying the information.  Flax Decl., Ex. 41 (Warnock) at 314:15 to 315:3.

131.   APC's protocol with respect to the preparation, execution and filing of the Annual IRS Form 5500 was always the same.  APC would prepare the forms and send them to Criscito to sign and mail to the IRS.  APC would provide an additional blank first page of the Form 5500 for Criscito to sign and send back to APC for their files.

Sometimes, APC did not get a signed copy back. Flax Decl., Ex. 41 (Warnock) at 192:1 to 194:2.

132.    Exhibit 70 to the Flax Decl. is the 1999 Form 5500 for the Money Purchase Plan that bears what appears to be Criscito's signature on the first page and on Schedule P (the fourth to last page).[20]

133.    Exhibit 71 to the Flax Decl. is the 2000 Form 5500 for the Money Purchase Plan that bears what appears to be Criscito's signature on the first page and on Schedule P (the fourth to last page).

134.    Exhibit 72 to the Flax Decl. is the 2001 Form 5500 for the Money Purchase Plan that bears what appears to be Criscito's signature on the first page.

135.    Exhibit 73 to the Flax Decl. is the 2002 Form 5500 for the Money Purchase Plan that bears what appears to be Criscito's signature on the first page and on Schedule P (the fourth to last page).

136.    Exhibit 74 to the Flax Decl. is the 2003 Form 5500 for the Money Purchase Plan that bears what appears to be Criscito's signature on the first page and on Schedule P (the fourth to last page).

137.    Exhibit 75 to the Flax Decl. is the 2004 Form 5500 for the Money Purchase Plan that bears what appears to be Criscito's signature on the first page.

138.    Exhibit 76 to the Flax Decl. is the 2005 Form 5500 for the Profit Sharing Plan that bears what appears to be Criscito's signature on the first page.

---

[20] IRS 5500 Forms are public information that can be obtained from http://www.freeerisa.com and/or by FOIA request to the U.S. Department of Labor, *see* http://www.doc.gov/ebsa/publications/how_to_obtain_. The Court may take judicial notice of this public information. *See* Fed.R.Evid. 201(b)(2) and 807.

139.    When Criscito was shown the 1999 through 2005 5500 Forms during his deposition, Criscito did not deny that his signature appeared on the Forms.  He instead evasively testified in the case of each Form that it "may be" his signature on the Form. Flax Decl., Ex. 32 (Criscito) at 36:7-17, 37:3-7, 37:10-23, 38:9-13, 38:18 to 39:4, 42:21 to 43:9, 43:12-19, 44:4-15.

140.    Likewise, when asked if he had previously seen the 1999 through 2005 5500 Forms, Criscito did not deny having previously seen them, choosing again to evasively testify that he "may have".  Flax Decl., Ex. 32 (Criscito) 44:18-21.

141.    At no point during the course of this litigation has Criscito claimed that the 5500 Forms for the years 1999 through 2005 referred to above do not bear his signature or were not filed with the IRS.

142.    Above Criscito's signature on the first page of the 5500 Forms for the years 1999 and 2000 appears the statement "Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, and to the best of my knowledge and belief, it is true, correct and complete."  A similar statement appears above Criscito's signature on Schedule P.  Flax Decl., Exs. 70 and 71.

143.    Above Criscito's signature on the first page of the 5500 Forms for the years 2001 through 2005 appears the statement "Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report if it is being filed electronically, and to the best of my

knowledge and belief, it is true, correct and complete." A similar statement appears above Criscito's signature on Schedule P. Flax Decl., Exs.72 through 76.

144.    Criscito declared under penalty of perjury that the IRS Forms 5500 for the Money Purchase Plan and Profit Sharing Plan for the years 1999 through 2005 were true, correct and complete. *See* ¶¶142 and 143 above.

145.    As a result of Criscito providing false and inaccurate figures to APC with respect to the 1999 year-end value of the assets in the commingled account, the Form 5500 for the Money Purchase Plan for the year 1999 contained inaccurate and false information. Flax Decl., Ex. 39 (Warnock) at 98:18-25.

146.    The 1999 year-end value of the assets in the commingled account contained in the 1999 Form 5500 tie into the figures contained in the 2000 Form 5500 and all of the 5500 Forms filed thereafter. It is a "domino effect". Criscito continued to provide APC with false information in the years 2001 through 2005. Flax Decl., Ex. 77 (Casella) at 125:14 to 126:20, Flax Decl., Ex. 39 (Warnock) at 99:1-14.

147.    To amend and correct the 5500 Forms starting with the 1999 5500 Form would entail a significant amount of work. Schedule 1 for each year starting in 1999 (the Schedule containing the asset values) would have to be redone. In addition, the corrected forms would have to take into account all of the distributions that were made from the Money Purchase Plan and Profit Sharing Plan accounts. Flax Decl., Ex.39 (Warnock) at 99:18 to 101:6.

## NO ACCOUNTING BY CRISCITO

148.    When Criscito was removed as the sole Trustee of the Profit Sharing Plan in July 2007, he did not turn over any records or documents relating to the Money Purchase Plan or the Profit Sharing Plan to plaintiffs. Casella Decl. at ¶6.

149.    After Criscito was removed as sole Trustee in July 2007, the documentation that the plaintiffs obtained regarding the Money Purchase Plan and the Profit Sharing Plan came from the files of APC and outside sources. Casella Decl. at ¶7.

150.    Criscito has never accounted for his administration of the Money Purchase Plan or the Profit Sharing Plan during his more than 30-year reign as sole Trustee. Casella Decl. at ¶8.

## CRISCITO'S $250,000 LOAN FROM THE PLAN

151.    In April 1982, Criscito borrowed $250,000 from the Money Purchase Plan. A Loan Amortization Schedule for the $250,000 loan was prepared by APC. Flax Decl., Ex. 78; Ex. 39 (Warnock) at 28:21 to 29:3.

152.    In 1991, Criscito informed APC that the $250,000 loan had been paid in full. APC did not independently verify that the loan had been paid off. Flax Decl., Ex. 41 (Warnock) at 327:24 to 328:17; Ex. 79 at p. 2550; Ex. 39 (Warnock) at 33:17 to 34:15.

153.    When plaintiffs became Trustees, they were not provided with any backup information regarding the repayment of the $250,000 loan nor did they discover any such backup information in the Money Purchase Plan's records. Flax Decl., Ex. 77 (Casella) at 111:22 to 112:25; Casella Decl. at ¶5.

## PRINCIPAL AND INTEREST DUE TO THE PROFIT SHARING
## PLAN AS A RESULT OF CRISCITO'S FRAUDULENT CONDUCT

154.    Plaintiffs' expert, Scott M. Feit of Abar Pension Services, Inc., a Certified Public Accountant, a Certified Pension Consultant, a Qualified Pension Administrator and Qualified 401K Administrator, has calculated that the participants in the Money Purchase Plan (other than Criscito) should have received an additional $1,681,572.65, had Criscito accurately reported the 1999 year-end values of the Morgan Stanley account, the Smith Barney account and other commingled assets.  Flax Decl., Ex. 52.

155.    Criscito does not dispute Feit's calculation of the additional amount that the participants should have received as of the beginning of 2000 but for Criscito's false and fraudulent reporting.  Criscito's proffered damage expert, Kenneth Marblestone, Esq.[21] agrees with the methodology used by Feit, his calculations and his determination that, as of the beginning of 2000, the participants (other than Criscito) were deprived of $1,681,572.65 as a result of Criscito's actions.  In that regard, in Marblestone's letter report, he states: "Based on the revised calculations completed by Abar in their May 28, 2009 report, they have valued the transfer shortfall at $1,681,572.65.  Based on our review of the information supplied, we do not dispute that the methodology used by Abar to calculate the transfer amount, as well as the amount of the shortfall, is correct."  Flax Decl., Ex. 53 (Feit) at 79:8-15.

156.    Feit calculated the interest (earnings) due on the additional (shortfall) amount owed to the plan participants as of the beginning of 2000 ($1,681,572.65) to be $2,239,781.04 as of April 30, 2010.  Flax Decl., Exs. 52 and 80.

---

[21] Plaintiffs reserve their rights to challenge Mr. Marblestone's qualifications as well as portions of his opinion.

157.   Feit calculated the interest using the Voluntary Fiduciary Correction Program Online Calculator provided by the U.S. Department of Labor-EBSA.  In Feit's experience, in cases where there is a misrepresentation of the value of plan assets and a breach of fiduciary duty, the Online Calculator is used to calculate lost earnings and that methodology has been approved by the U.S. Department of Labor and the Internal Revenue Service.  Flax Decl., Ex. 52; Ex. 53 (Feit) at 20:9 to 21:12, 29:1-20.


Dated:  September 17, 2010

Respectfully submitted,

Stephen M. Charme
Tara S. Sinha
WITMAN STADTMAUER, P.A.
26 Columbia Turnpike
Florham Park, New Jersey 07932-2213
(973) 822-0220

By: /s/ Stephen M. Charme
       Stephen M. Charme

John M. Agnello
Melissa E. Flax
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

By: /s/ John M. Agnello
       John M. Agnello

*Attorneys for Plaintiffs*