**EXHIBIT 32**

1

                    UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
2                   CIVIL ACTION CASE NO. 2:08-CV-1567
    --------------------------------------------:
3   DR. FADI CHAABAN; DR. SABINO R. TORRE, DR.  :
    CONSTANTINOS A. COSTEAS and DR. ANTHONY J.   :
4   CASELLA, as Trustee of Diagnostic & Clinical:
    Cardiology, P.A. Profit Sharing Plan,        :
5                                                :
                      Plaintiffs,                :
6                                                :
            vs.                                  :
7                                                :
    DR. MARIO A. CRISCITO,                       :
8                                                :
                      Defendant.                 :
9   --------------------------------------------:
                        Friday, December 4, 2009

10

11          Deposition of MARIO CRISCITO, M.D., VOLUME I,

12   before Nancy A. Miani, a Certified Court Reporter,

13   License No. XI00814, at the offices of WITMAN,

14   STADTMAUER, ESQS, 26 Columbia Turnpike, Florham Park,

15   New Jersey, on Friday, December 4, 2009, at 12:45 p.m.

16

17

18

19

20                  MIANI COURT REPORTING
                  CERTIFIED COURT REPORTERS
21                   1741 DANIEL COURT
                      WALL, NJ  07719
22                    (732) 681-4776

23

24

25

```
 1   A P P E A R A N C E S:

 2   WITMAN, STADTMAUER, ESQS.
     26 Columbia Turnpike
 3   Florham Park, NJ 07932
     By:   STEPHEN M. CHARME, ESQ.
 4   Attorneys for the Plaintiffs

 5   KERN, CONROY & SCHOPPMANN, P.C.
     1120 Route 22 East
 6   Bridgewater, NJ 08807
     BY:   STEVEN KERN, ESQ.
 7   Attorneys for the Defendant

 8   ALSO PRESENT:

 9   Anthony Casella, M.D.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        A.      And then two years of fellowship in

2   cardiology at St. Barnabas.

3        Q.      After the fellowship in cardiology, did

4   you open your own practice?

5        A.      I opened -- I was practicing prior to

6   that.

7        Q.      You were.  When were you practicing on

8   your own?

9        A.      19 -- what the hell is it?  1974.

10       Q.      Okay.  What was the name of the practice?

11       A.      It was myself.

12       Q.      Just yourself.  Okay.  At some point, did

13  you participate in a practice called Diagnostic &

14  Clinical Cardiology?

15       A.      Yes.

16       Q.      When was that?

17       A.      1975 or '76.

18       Q.      Okay.  And is there a reason that you

19  used that entity to practice instead of just

20  practicing on your own?

21       A.      No, I was advised to form a corporation.

22       Q.      And that was Diagnostic & Clinical

23  Cardiology, P. A.?

24       A.      Correct.

25       Q.      Okay.  When you started it in 1975, were

1    there any other members of it besides you?

2         A.    No.

3         Q.    Subsequently, did anyone join -- for

4    short, I'm going to just call it Diagnostic.

5         A.    Okay.

6         Q.    Subsequently, did anyone join Diagnostic?

7         A.    Yes.

8         Q.    Who was that?

9         A.    Dr. Casella.

10        Q.    When did he come?

11        A.    1977.

12        Q.    Okay.  And at some point, did he become a

13   member of Diagnostic, or did he become a member right

14   away?

15              MR. KERN:  What do you mean by "member"?

16        Q.    It's a professional association.  Did he

17   become a shareholder right away?

18        A.    I would -- you know, I don't know.  I

19   don't know.

20        Q.    Okay.  When you hired him, did you view

21   him as an equal partner?

22        A.    He became an equal partner.

23        Q.    When was that?

24        A.    I don't know.  You'd have to ask him.

25        Q.    Was it within the first five years after

1    he was hired?

2        A.    I believe so.

3        Q.    Okay.  When Diagnostic was formed, did

4    you also arrange for a pension plan to be enacted?

5        A.    Yes.

6        Q.    What I'm going to do is show you a series

7    of documents.  I don't need you to read them, but I

8    just need you to confirm for me whether or not it's

9    your signature on the documents.  Okay.

10                (Exhibit Criscito-1 is marked for

11    Identification.)

12        Q.    Let's start, I'm going to show you what's

13    premarked as Criscito 1.  It's entitled "Indenture

14    Creating Diagnostic & Clinical Cardiology, P.A.,

15    Money-Purchase Pension Plan," and further down on the

16    page it says effective April 1, 1976.

17                If you would please, Dr. Criscito, turn

18    --

19        A.    Take these?

20        Q.    Yes, take that, please.  Turn to the last

21    page.  There's Bate stamps.  It's 2279.  Okay.  There

22    is a signature on the right side that says "by."  Is

23    that your signature?

24        A.    It may be.

25        Q.    You're not sure?

1    that's your signature?

2           A.      I can't vouch by it.

3           Q.      In 1976, as far as you know, were you the

4    trustee of the Diagnostic & Clinical Cardiology P.A.

5    Money-Purchase Pension Plan?

6           A.      Well, can you tell me what a trustee

7    means?

8           Q.      You don't know what a trustee means?

9           A.      No.

10          Q.      So let me ask the question differently.

11                  There is a reference on the last page

12   that's Bate stamped 2279, and it says "trustee" and

13   then there's a signature.  I know you've told me that

14   you can't say for sure if that's your signature.  Are

15   you also telling me that sitting here today you don't

16   know what a trustee is?

17          A.      I don't know, correct.

18          Q.      Okay.  If that is your signature and you

19   signed this document, do you think you knew what a

20   trustee was when you signed the document?

21          A.      I signed a lot of documents, Mr. Charme,

22   to be honest, and I don't -- didn't read them.  I just

23   signed them.

24          Q.      You just signed documents without reading

25   them?

1    A.    Correct.

2    Q.    Is that your usual practice?

3    A.    A lot of times, yes.

4    Q.    Okay.  Let me take that back.

5          Have you heard of a company called

6    American Pension Corporation?

7    A.    Yes.

8    Q.    And who are they?

9    A.    American Pension.

10   Q.    Did you hire them to be the third party

11   administrator for the Diagnostic pension plan?

12   A.    I believe so.

13   Q.    And when did you do that?

14   A.    I haven't the slightest idea.

15   Q.    Do you think you did it soon after the

16   pension plan was formed?

17   A.    I -- I honestly, I can't tell you.  I

18   don't know.

19         (Exhibit Criscito-2 is marked for

20   Identification.)

21   Q.    Okay.  I'm going to show you what I'm

22   marking as Criscito-2, which is entitled "Amendments

23   to the Trust Instrument Creating the Diagnostic &

24   Clinical Cardiology, P.A., Money Purchase Pension

25   Plan."  There is Bate stamp numbers on this, and I'd

1    Q.    As of September 19, 2003, which is the

2    date referred to above the signature line, were you

3    president of Diagnostic & Clinical Cardiology?

4    A.    Yes.

5    Q.    And were you also the trustee of the

6    pension plan?

7    A.    Yes.

8    I don't recognize the document.

9    MR. KERN:  Don't volunteer.  Just answer

10   the questions.

11   Q.    Just so that I'm clear, between 1976,

12   which was the date of the first document we marked,

13   April of 1976, and this one, which is September of

14   '03, you were the trustee of the Diagnostic & Clinical

15   Cardiology pension plan, right?

16   A.    Yes.

17   Q.    Okay.  There was no other trustee of that

18   plan, was there?

19   MR. KERN:  During that period of time?

20   MR. CHARME:  During that period of time,

21   from 1976 through when this document says it was

22   signed in September of 2003.

23   A.    I don't know if that's correct.

24   Q.    Are you aware of any pension plan

25   documents that have anyone else's name besides yours

1    as the trustee for the plan?

2         A.    I think there were.  I think there were

3    -- I think everybody had their, a lot of them had

4    their individual plans and they were trustees.

5         Q.    I'm not talking about segregated

6    accounts.  Do you know the difference between a

7    commingled account and a segregated account?

8         A.    I'm learning.

9         Q.    Do you understand the difference?

10        A.    Yes.

11        Q.    Okay.  My question is with regard to the

12   commingled account, not individual segregated accounts

13   of doctors, during the period 1976 through the date of

14   the last document I showed you, which is September of

15   2003, you were the only trustee for the pension plan,

16   correct?

17        A.    Yes.

18        Q.    Okay.

19        A.    I believe so.

20             (Exhibit Criscito-8 is marked for

21   Identification.)

22        Q.    Okay.  I'd like to show you what I'm

23   marking as Criscito-8, which is entitled "Resolution

24   of the Board of Directors of Diagnostic & Clinical

25   Cardiology, P.A."  Take a look at that and tell me,

1    A.    No.

2    Q.    Okay.  Before the lawsuit, do you recall

3  signing Form 5500's?

4    A.    May have.

5         (Exhibit Criscito-13 is marked for

6  Identification.)

7    Q.    Let me show you what I'm marking as

8  Criscito-13, which is a Form 5500 for the year 1999.

9  Take a look and tell me if that is your signature

10  above the line where it says "signature of plan

11  administrator" and to the right it says "Mario

12  Criscito, MD."

13    A.    May be.

14    Q.    And is that your signature on the next

15  line above where it says "signature of employer plan

16  sponsor DFE," and then to the right it says "Mario

17  Criscito, MD"?

18    A.    May be.

19    Q.    Do you recall signing this form?

20    A.    No.

21    Q.    Okay.  And your testimony is that before

22  this lawsuit, you didn't know what a Form 5500 was

23  for?

24    A.    Correct.

25    Q.    What's your understanding as to what it's

1    for now?

2        A.    The end year report.

3        Q.    Okay.  Let me go back to Criscito-13 for

4    a minute.  On Schedule P, which is toward the end,

5    there is a signature line that says "signature of

6    fiduciary."  Is that your signature?

7        A.    May be.

8             (Exhibit Criscito-14 is marked for

9    Identification.)

10       Q.    Okay.  I'm going to show you Criscito-14,

11   which is a Form 5500 for the year 2000.  On the first

12   page there is a signature above the typed signature of

13   plan administrator.  Is that your signature?

14      A.    May be.

15      Q.    And above the next line, which says

16   "signature of employer/plan sponsor/DFE," is that your

17   signature?

18      A.    May be.

19      Q.    Turn, please, to Schedule P.  I think you

20   have to go back a few pages.  Okay.  Next to the

21   "signature of fiduciary" on Schedule P, is that your

22   signature?

23      A.    May be.

24      Q.    What's your middle initial?

25      A.    A.

1       Q.      Okay.  Does that appear to be an A that's

2  in the middle of that signature to you on Schedule P

3  for the Form 5500 for 2000?

4       A.      A or B.

5       Q.      You think that could be an A or a B?

6       A.      Yes.

7               (Exhibit Criscito-15 is marked for

8  Identification.)

9       Q.      Okay.  I'm going to show you

10  Criscito-15, which is a Form 5500 for the year 2001,

11  and ask you on the first page above the signature of

12  plan administrator if that's your signature?

13      A.      May be.

14      Q.      Okay.  Turn, please -- never mind.

15  That's good.

16              (Exhibit Criscito-16 is marked for

17  Identification.)

18              I'm going to show you what I've marked as

19  Criscito-16, which is a Form 5500 for the year 2002.

20  On the first line above the words "signature of plan

21  administrator," is that your signature?

22      A.      May be.

23      Q.      And on the second line, where it says

24  "signature of employer," et cetera, is that your

25  signature?

1      A.      May be.

2      Q.      Okay.  Turn, please, to Schedule P.  Next

3 to signature of fiduciary, is that your signature?

4      A.      May be.

5      Q.      Do you know what a fiduciary is?

6      A.      The one responsible.

7      Q.      Did you know what a fiduciary was before

8 the lawsuit started?

9      A.      No.

10      Q.      Did you ever discuss with APC what it

11 meant to be a fiduciary?

12      A.      No.

13      Q.      Did you ever discuss with APC the duties

14 and responsibilities of a trustee for a pension plan?

15      A.      No.

16      Q.      Did you ever discuss with APC the duties

17 and responsibilities of a plan administrator for a

18 pension plan?

19      A.      No.

20      Q.      Did you ever discuss with APC their

21 duties and responsibilities as a third party

22 administrator?

23      A.      I thought they ran everything.

24      Q.      Okay.  When you say you thought they ran

25 everything, what do you mean?

1      Q.      Okay.  Did you understand, though, that

2  you were making investment decisions for those other

3  people?

4      A.      No.

5      Q.      So you thought you were making investment

6  decisions just for yourself?

7      A.      Correct.

8      Q.      Okay.  Did you ever discuss that with

9  APC?

10     A.      No.

11     Q.      Did you ever discuss that with any of the

12 brokers?

13     A.      No.

14     Q.      Did any of the brokers ever tell you that

15 the investment decisions you were making affected not

16 only your investments, but that of the other plan

17 participants?

18     A.      No.

19             (Exhibit Criscito-17 is marked for

20 Identification.)

21     Q.      Okay.  I'm going to show you what I'm

22 marking as Criscito-17, which is a Form 5500 for the

23 year 2003.  Above the line "signature of plan

24 administrator," is that your signature?

25     A.      May be.

43

1  Q.  Above the line that starts "signature of
2 employer," is that your signature?

3  A.  May be, sir.

4  Q.  Turn, please, to Schedule P, which is a
5 couple of pages from the end.

6  A.  Uh-hum.

7  Q.  Next to "signature fiduciary," is that
8 your signature?

9  A.  May be.

10  (Exhibit Criscito-18 is marked for
11 Identification.)

12  Q.  I'm going to show you what I'm marking as
13 Criscito-18, which is a Form 5500 for the year 2004.
14 Above the line "signature of plan administrator," is
15 that your signature?

16  A.  May be.

17  Q.  Above the line that starts "signature of
18 employer," is that your signature?

19  A.  May be.

20  Q.  Okay.  I'll take that.  I see you're
21 perusing the document.  Is there something in
22 particular you're looking for?

23  A.  You keep asking me about Schedule B.  I'm
24 just --

25  Q.  It didn't apply to this one.

1     A.    Oh.

2         (Exhibit Criscito-19 is marked for

3  Identification.)

4     Q.    I'm going to show you Criscito-19, which

5  is a Form 5500 for the year 2005.  It says, "care of

6  Mario Criscito," this is in Box 2A, "32 Chelsea Drive,

7  Livingston, New Jersey."  Was that your residence

8  address in 2005?

9     A.    Yes.

10     Q.    Down below, above "signature of plan

11  administrator," is that your signature?

12     A.    May be.

13     Q.    And above the line that says "signature

14  of employer," is that your signature?

15     A.    May be.

16     Q.    Okay.  Turn, please, to -- never mind.

17  I'll take it back.

18         What I marked as Criscito-13 through 19

19  of Form 5500's for 1999 through 2005, do you recall

20  ever seeing any of those documents before today?

21     A.    May have.

22     Q.    Okay.  Do you recall -- withdrawn.

23         You said today you understand the purpose

24  of a Form 5500?

25     A.    Correct.

1    Q.      Which people were they?

2    A.      Mark Brown, Dr. Chaaban, that I know of.

3    Q.      When you say they wanted their money, was

4  it your understanding they wanted a distribution, or

5  they just wanted their own separate, segregated

6  account?

7    A.      Separate, segregated account.

8    Q.      Okay.  Who was the first person you heard

9  of who wanted their own separate, segregated account?

10   A.      I don't know.

11   Q.      Okay.  Do you recall Mark Brown ever

12 asking you for the value of his account and holding up

13 your hand and writing something in ink on your hand?

14   A.      Absolutely not.

15   Q.      Never happened?

16   A.      Never happened.

17   Q.      Do you recall him ever asking you for the

18 value of his account?

19   A.      If he did, I told him to see Dr. Casella

20 because he was the man that was writing all the

21 checks.

22   Q.      Well, as far as you knew, was Dr. Casella

23 receiving copies of the same brokerage statements that

24 you did, that designated you as the trustee?

25   A.      I have no idea.

1    commingled account, I'd like it?

2        A.     Talking to me?

3        Q.     Yes.

4        A.     I mean not you talking to me.  The

5    employee talking to me?

6        Q.     Yes.

7        A.     No.

8        Q.     Or American Pension Corporation talking

9    to you about that.

10       A.     No.

11       Q.     Do you recall ever -- withdrawn.

12              Brian Warnock testified that he never

13    received any brokerage statements from you to support

14    year end values.  Is that correct?

15       A.     Not that I can recall.  I thought he was

16    getting them all from the brokerage firms.

17       Q.     Did you tell any of the brokerage firms,

18    and I mean specifically Morgan Stanley and Smith

19    Barney, to send Brian Warnock brokerage statements?

20       A.     May have.

21       Q.     But do you recall doing it?

22       A.     I may have.

23       Q.     But you don't have a specific

24    recollection that you did?

25       A.     Correct.

1      Q.      Okay.   Brian Warnock also said there was

2  no other form of backup that you sent to him for year

3  end values.  Is that correct?

4      A.      I don't know.

5      Q.      You don't know?

6      A.      No.

7      Q.      Brian Warnock said that he expected to

8  rely on you for the accuracy of the information you

9  gave him as to year end values.  Was that your

10 understanding?

11     A.      I mean, he's -- Mr. Charme, he's talking

12 a lot.  I probably spent 30 seconds with this guy a

13 year.

14     Q.      Did you ever give Brian Warnock any

15 reason to think that he couldn't rely on you to give

16 him accurate information as to year end values?

17     A.      No.

18     Q.      Did you ever give Brian Warnock or anyone

19 else at APC any reason to think that you would be

20 dishonest in supplying year end values?

21     A.      No.

22     Q.      You said you only spoke to Brian Warnock,

23 what did you say, 30 seconds a year?

24     A.      Something in that league.  There was no

25 long discussion.  There was no repetitive discussion,

1    December 31, 1999, that there was enough money in the

2    Smith Barney account to cover the additional money

3    that the plan participants should have gotten, right?

4         A.      Correct.

5         Q.      Okay.  And what I'm saying to you is are

6    you prepared today to authorize the money in the Smith

7    Barney account to be released to be used for that

8    purpose?

9         A.      I would -- what I would -- what I would

10   recommend is that I see the account.  I'd like to see

11   what's in the account, what happened to the account.

12        Q.      You don't know what's happened to the

13   account?

14        A.      Zero.

15        Q.      Okay.  I'm going to show you -- is that

16   the complaint?

17               (Exhibit Criscito-22 is marked for

18   Identification.)

19        Q.      I'm going to show you what I'm marking as

20   Criscito-22, which is a document Bate stamped 25716

21   dated January 14, 2002.  Is that your signature?

22               MR. KERN: Just one page?

23               MR. CHARME:  Yes, one page.  That's it.

24   You got it.

25        Q.      Is that your signature?

1       A.      Appears to be.

2       Q.      Appears to be.  Okay.  Did you receive

3  the six million dollars that you requested?

4       A.      Yes.

5       Q.      What did you do with the money?

6       A.      Put it into Sovereign Bank, I think.

7       Q.      The entire six million?

8       A.      Yes, I believe so.

9       Q.      And at the time you requested the six

10  million dollars, did you believe that you were

11  entitled to all of that money?

12      A.      Correct.

13      Q.      Okay.  I'm going to mark as Exhibit 23A a

14  fax from Sovereign Bank that says fax one of two, and

15  I'm going to mark as Exhibit 23B a fax from Sovereign

16  Bank that says two of two, both sent the same day.

17              MR. KERN: Let me see.

18              (Exhibits Criscito-23A and 23B are marked

19  for Identification.)

20      Q.      What I'd like you to do, Dr. Criscito, is

21  on 23A, which is fax one of two, turn, please, to Page

22  5 of the fax.  The page numbers are in the upper right

23  corner.  There you go.  Okay.

24              On the left side, it says "Diagnostic &

25  Clinical Cardiology, P.A., Pension Fund, Trustee,

1  Mario Criscito, 32 Chelsea Drive, Livingston, New

2  Jersey."  Was that your address --

3       A.    Yes.

4       Q.    -- in 2006?  Yes?

5       A.    Yes.

6       Q.    How long did you live at that address?

7       A.    I think from 2004.

8       Q.    Okay.  You testified before that the

9  whole six million dollars that you requested from Herb

10  Mendel was your money, correct?

11       A.    Right.

12       Q.    Is there a reason that this account is

13  opened in the name of the pension fund instead of your

14  own name?

15       A.    This one?

16       Q.    Yes.

17       A.    No.

18       Q.    Okay.  If the money was all yours, why

19  didn't you just open the account in the name of Mario

20  Criscito?

21       A.    Because I -- it was pension fund money,

22  for me.

23       Q.    I understand, but it belonged completely

24  to you, you said.

25       A.    I know.  I don't know, that's what I

1    thought, it was pension fund money that belonged

2    strictly to me.

3         Q.      Did you tell that to anyone at Sovereign

4    Bank when you opened the account?

5         A.      That's why I opened it up under

6    Diagnostic & Clinical Cardiology pension fund.

7         Q.      And you listed yourself as trustee?

8         A.      Right.

9         Q.      And the reason you did that was because

10   it was pension fund money?

11        A.      Right.

12        Q.      Okay.  I'd like you to turn, if you will,

13   please, to Page 34 of 23A.

14        A.      34?

15        Q.      Yes.  Do you see down below there's a

16   date that says May 6, 2004?

17        A.      Correct.

18        Q.      Then if you go up above, there's an

19   amount of 3,259,143.02.  Do you see that?

20        A.      Correct.

21        Q.      Okay.  You took that amount of money out

22   of the Sovereign account in 2004, correct?

23        A.      Correct.

24        Q.      What did you use the money for?

25        A.      Probably down payment for my house.

1    Bought my house.

2          Q.      Okay.  When you say a down payment, did

3    you use the entire 3,259,000 for your house?

4          A.      Probably.

5          Q.      Okay.  What was the purchase price of the

6    house?

7          A.      Three and a half, I think.

8          Q.      Okay.  Did you ask Sovereign Bank to

9    prepare a Form 1099 for you?

10         A.      What's a 1099?  It is what?

11         Q.      Okay.  Was Sovereign Bank aware that a

12   distribution was being taken from an account you

13   opened as a pension plan?

14         A.      I believe so.

15         Q.      Did you speak to anyone at Sovereign Bank

16   about the fact that this money was coming out to you

17   personally from a pension plan account as opposed to

18   an individual account?

19         A.      Did I talk to them?

20         Q.      Yes.

21         A.      No.  You mean, to tell them that it's

22   coming from --

23         Q.      Right.

24         A.      No, that was a pension fund account.

25         Q.      You don't know sitting here today whether

1    anyone at Sovereign Bank focused on the fact when this

2    withdrawal was made that it was coming from a pension

3    fund as opposed to an individual account, do you?

4         A.    Not that I know of.

5         Q.    Okay.  Were you aware in May of 2004 when

6    this withdrawal was made that when a withdrawal is

7    made from a pension fund account, that 20 percent is

8    supposed to be withheld if it doesn't go into an IRA

9    or another qualified pension plan?

10        A.    Did I know that?  No.

11        Q.    Didn't know that?

12        A.    No.

13        Q.    No one at Sovereign Bank told you that?

14        A.    No.

15        Q.    And you never discussed that with anyone

16   at APC?

17        A.    Correct.

18        Q.    Okay.  Did you tell anyone at APC that

19   you were making this withdrawal from the Sovereign

20   Bank account?

21        A.    No, sir.

22        Q.    Okay.  I'd like you to now look at

23   Exhibit 23B.

24        A.    Same document?

25        Q.    No, 23B.  It's a different document.  It

122

1   says fax two of two.  And I'd like you to turn to Page

2   44.

3           A.      44.

4           Q.      Actually, I'm sorry.  Turn to Page 45.

5   It's the last page on the fax.

6           A.      This one?

7           Q.      The very last page.  Very last.  You got

8   it.  Okay.

9                   Down below, it says "withdrawal,

10  8/21/2006, 3,388,916.11."  Do you see that?

11          A.      Yes.

12          Q.      And that's another withdrawal that you

13  made from the Sovereign account, right?

14          A.      Yes.

15          Q.      Sovereign used to be known as

16  Independence, right?

17          A.      Yes.

18          Q.      And this withdrawal closed out the

19  account, correct?

20          A.      Yes.

21          Q.      Okay.

22          A.      Let me go back.  I believe so.

23          Q.      Well, let me show you, in case you have

24  any doubt, go back to 23A, to Page 5.

25          A.      Okay.

123

1        Q.        If you look at Page 5, you see on

2   8/21/2006, 3,388,916.11?

3        A.        Yes.

4        Q.        And then up above it it says closed?

5        A.        Yes.

6        Q.        So this withdrawal closed out the

7   Sovereign account, correct?

8        A.        Correct.

9        Q.        Okay.  What did you do with that money?

10       A.        This one?  This was a rollover.

11       Q.        Where did you roll it over to?

12       A.        To an IRA.

13       Q.        Okay.  Do you have the account number for

14   that IRA?

15       A.        No.

16       Q.        Okay.  Well, what I'd like to ask you to

17   do, just to confirm the rollover, if you would,

18   please, the next time you come, just tell me the name

19   of the institution and the account number where it was

20   rolled over to.

21       A.        Okay.

22       Q.        Okay.  Going back to 23B, which is fax

23   two of two, if you go to the very last page -- I'm

24   sorry, if you go to the page before -- actually, never

25   mind.  That's okay.  I got the wrong page number.  I'm

1    sorry.

2              If you go to Page 41, this is fax 2 of

3    two, 41.

4         A.    Okay.

5         Q.    Okay.   There is a reference to Conza

6    Builders, LLC, and it says "savings deposit, $30,000"?

7         A.    Yes.

8         Q.    Who is Conza Builders?

9         A.    It's a building company.

10        Q.    And LLC is a limited liability company.

11   Is that what your understanding is?

12        A.    Right.

13        Q.    Who are the members?

14        A.    Myself, and a few other partners.

15        Q.    Okay.   Is there a reason that you put

16   money from Conza Builders into the pension plan

17   account, or did you have a separate account at

18   Independence for Conza Builders?

19        A.    This is probably a separate account.

20        Q.    Well, let's see.   If you look at Page 40

21   of Exhibit 23B, there is a check for -- a withdrawal

22   for $262,000, and the name on it is Mario Criscito

23   Pension Fund.   Do you see that?

24        A.    Yes.

25        Q.    Okay.   And then if you go to the page

1   before, which is 39, you see a savings deposit slip

2   for Conza Builders for the same amount of money.   Do

3   you see that?

4        A.      Yes.

5        Q.      And you see it says transferred from and

6   it has an account number?

7        A.      Right.

8        Q.      Okay.  And if you go back to Page 40,

9   that's the same account number listed for the Mario

10  Criscito Pension Fund, correct?   The account number

11  on Page 40 ends in 53001 and the transfer on Page 39

12  also ends in 53001.  Do you see that?

13       A.      No.  Help me here.  Oh.  Here.  Transfer,

14  this?

15       Q.      I'm simply asking you to confirm for me

16  that the $262,000 withdrawal was put into the account

17  of Conza Builders.

18       A.      Oh, probably was, yeah.  I would say yes.

19       Q.      Okay.  Is there a reason that you took

20  money from the pension fund to put into Conza Builders

21  for that dollar amount?

22       A.      I took it as a loan.

23       Q.      Did you ever pay that loan back?

24       A.      I believe so.

25       Q.      Do you have any documents to show you

1    did?

2         A.       Indirectly, yeah.

3         Q.       Okay.   Well, I'm going to ask you the

4    next time around if you would please bring me any

5    documents you have to show that the $262,000 was paid

6    back.  Okay?

7         A.       No, I -- no.  No.  Not that I -- I took

8    it, I took -- the money from the pension was put into

9    Conza, and I took the loan of 262, right, 262,

10   whatever it was.

11        Q.       Who was lending the money to who?

12        A.       The pension fund is lending the money to

13   Conza.  So the 262 is a loan.

14        Q.       Right.

15        A.       And there were other loans, and I took

16   that as a distribution to me as income finally and I

17   paid taxes on it.

18        Q.       Okay.  So you're saying, so Conza

19   Builders didn't repay the 262?

20        A.       No.

21        Q.       Okay.  You're saying you treated the 262

22   as a distribution to you?

23        A.       As a loan to me.  As a loan to me.

24        Q.       Okay.

25             MR. KERN:  Which was ultimately turned

1    into a, treated for tax purposes as a distribution.

2        Q.    Was turned into a distribution?

3        A.    Yes.

4        Q.    Do you know if a Form 1099 was ever filed

5    for that distribution?

6        A.    I doubt it.  I don't think so.  I don't

7    even know what a 499 is or whatever.

8        Q.    Okay.  And there was no money withheld by

9    Sovereign Bank from the 262 that was transferred,

10   correct?

11       The full 262 was transferred?

12       A.    Correct.

13       Q.    Okay.  Did Sovereign Bank -- back up.

14       Go, please, to Page 39.  We're still on

15   the same exhibit, this is 23B.  Are you on Page 39, it

16   says "savings withdrawal"?

17       A.    Uh-hum.

18       Q.    Okay.  And --

19       A.    Excuse me a second.  You say 29 or 39?

20       Q.    39.  I think it says 39.  I'm sorry.

21   It's 38.  I couldn't read it.  38.  It says "savings

22   withdrawal."  It says name, "Diagnostic & Clinical

23   Cardiology, $130,000."  Do you see that?

24       A.    Yes.

25       Q.    Then if you turn to Page 37, the page

1    before it, it says transfer from, it's the same

2    account number that was on Page 38.  You see that?

3           A.     Right.

4           Q.     And it says "personal checking account

5    deposit ticket name, Mario Criscito."

6           A.     Correct.

7           Q.     So you took $130,000 from the pension

8    account and you put it into your own personal checking

9    account?

10          A.     Correct.  Took it as a loan.

11          Q.     Eventually, did you treat it as a

12   distribution?

13          A.     Yes.

14          Q.     No Form 1099 was filed, right?

15          A.     Right.

16          Q.     When you say you treated things as

17   distributions, you never told APC you were doing that,

18   did you?

19          A.     Yeah, I think eventually, yes, I think

20   yes.

21          Q.     You think eventually you told them?

22          A.     Yes.

23          Q.     Okay.  And am I correct, though, as far

24   as you know, there is no Form 1099 for the 262,000 or

25   the 130,000, is there, a separate --

1          A.       No, sir.

2          Q.       Okay.  And just so I'm clear, you got the

3    full 130,000 to put into your checking account,

4    Sovereign didn't withhold any of that money?

5          A.       Correct.

6          Q.       Let's go to Page 36 of the fax, and it

7    says "savings withdrawal, Diagnostic & Clinical

8    Cardiology, $20,000," do you see that?

9          A.       Yes.

10         Q.       Okay.  And if you go to Page 35, there is

11   a check for $20,000 payable to Short Hills West.  Do

12   you see that?

13         A.       Yes.

14         Q.       So the 20,000 that was taken out of the

15   pension fund account was used to pay Short Hills West,

16   correct?

17         A.       Yes.

18         Q.       What is Short Hills West?

19         A.       It's a -- I think it's an LLC.  LLC.

20   It's a real estate property.

21         Q.       Okay.  Who are the members?

22         A.       Casella, me, Dr. Viscusco, Dr. Trenk.

23   Who else?  Some of my nephews.  Some of my nephews.

24         Q.       Was this money to make a capital call?

25         A.       Yes.

1          Q.        Okay.   Any particular reason you took it

2     from the pension fund account at Sovereign Bank?

3          A.        I took it as a loan.

4          Q.        And eventually you treated it as a

5     distribution?

6          A.        Right.

7          Q.        Once again, you're not aware of any

8     separate Form 1099 for that, right?

9          A.        No, sir.

10          Q.        And you got the full 20,000 from

11     Sovereign, they didn't withhold anything?

12          A.        No, sir.

13          Q.        Gets go to Page 34 of the same fax.

14     There is a savings withdrawal of $100,000, and you see

15     it says "Diagnostic & Clinical Cardiology, Mario

16     Criscito, trustee"?

17          A.        Yes.

18          Q.        By the way, did you print that?

19          A.        No.

20          Q.        That's not your printing?

21          A.        No.

22          Q.        Do you know whose it is?

23          A.        No.

24          Q.        Okay.   Do you know whose signature that

25     is?

1      Q.      Do you have any doubt that the bank gave

2  you these amounts?

3      A.      I don't look.  I don't look.

4      Q.      Okay.  I think I left off with -- yes.  I

5  think I left off with 34, which was a savings

6  withdrawal for 100,000.

7              (There is a discussion off the record.)

8      Q.      Page 33 is a deposit slip for $100,000.

9  Once again, you withdrew 100,000 from the pension plan

10  and you put 100,000 into your personal checking

11  account, right?

12     A.      On --

13     Q.      On 33.

14     A.      Yes.

15     Q.      And you eventually treated that as a

16  distribution?

17     A.      Yes.

18     Q.      Okay.  But to your knowledge, no Form

19  1099 was issued for that specific amount?

20     A.      Correct.

21     Q.      Look at Page 32.  32 is a withdrawal in

22  the amount of $67,000, but this is a different --

23             MR. KERN: 66.

24     Q.      I'm sorry.  $66,000.  And then if you

25  look at Page 31, there is a deposit slip.  Is that

134

1  your signature on the deposit slip, where it says

2  sign?

3          A.      Maybe.   Yes.

4          Q.      Do you know what this transaction was?

5          A.      Yeah, it was -- I put monies back into

6  the fund.

7          Q.      Okay.   And you took the money from where?

8          A.      My checking account.

9          Q.      Is there a reason you put it back in?

10         A.      Yeah, every once in a while I would put

11 small or large amounts in.

12         Q.      How did you decide how much to put back?

13         A.      (The witness nods in the negative.)

14         Q.      No rhyme or reason?

15         A.      (The witness nods in the negative.)

16         Q.      You have to say yes or no.

17         A.      No.

18         Q.      Take a look, please, at Page 30, which is

19 a withdrawal for $35,000, and then take a look at Page

20 29, which is a deposit slip for $35,000.   There is a

21 reference on Page 30 to Mira Cocoziello (phonetic.)

22 Do you know who that is?

23         A.      She worked at the bank.

24         Q.      Was she your contact at the bank?

25         A.      Well, they all were.

135

```
 1          Q.      Is there anyone else at Independence

 2  later known as Sovereign that you dealt with besides

 3  her?

 4          A.      A lot of people.

 5          Q.      Can you name any of them?

 6          A.      No.   No.

 7          Q.      Okay.   What was this transaction?

 8          A.      It was a loan.   I took a loan and then I

 9  put it into Home Theater.

10          Q.      What is Home Theater?

11          A.      It's a business of Home Theater.

12          Q.      Was this a business you owned?

13          A.      Yes.

14          Q.      Was this like to design home theaters for

15  homes?

16          A.      Yes.

17          Q.      Okay.   Where is the business located?

18          A.      In Fairfield.

19          Q.      Is it still in existence?

20          A.      Yes.

21          Q.      Is it a corporation?

22          A.      Yes.

23          Q.      Who is the president?

24          A.      Well, my brother, but he passed away.

25          Q.      Who is the president now?
```

1      A.      I am, I think.  I think.

2      Q.      Are there any other officers?

3      A.      Indirectly, all the people that work

4  there verbally have a -- it's really their business,

5  but verbally --

6      Q.      But in writing it's not?

7      A.      No.

8      Q.      Was the $35,000 also a distribution?

9      A.      Yes.

10     Q.      Okay.  Once again, no Form 1099, right?

11     A.      Correct.

12     Q.      And the bank didn't withhold any part of

13  it, you got the full 35,000, right?

14     A.      Yes.

15     Q.      Take a look at Page 28, which is a

16  withdrawal for 15,000.

17     A.      Yes.

18     Q.      And then there is a deposit on Page 27

19  for the same 15,000.  Was this more money that Home

20  Theater needed?

21     A.      Yes.

22     Q.      Do you know, I see so far 35,000 and

23  $15,000 deposits.  What was that $50,000 used for?

24     A.      What?

25     Q.      Yes.

1  could have been my account.

2       Q.       You don't know sitting here today?

3       A.       No, sir.

4       Q.       And the account number that's on Page 25,

5  do you know whose account that is?

6       A.       On Page 25?

7       Q.       Yes.

8       A.       Yes, that's mine.

9       Q.       It's yours.  Okay.  Can you think of any

10  reason why in January of '06 you would have

11  transferred money from one of your private accounts to

12  another private account?

13       A.       No.

14       Q.       Okay.   On Page 24, there is a withdrawal

15  of $150,000, and on Page 23, there is a deposit of

16  $150,000.  Page 24 does have the pension plan account

17  number.  Page 23 has a different account number.  What

18  was this transaction?

19       A.       Probably taking out a loan.

20       Q.       When you say taking out a loan, but you

21  didn't repay the $150,000 to the pension plan, right?

22       A.       I did.  I took it as a distribution.

23       Q.       Okay.  Let me just clarify something.

24  When you say taking things as a loan, I want to make

25  clear, you then, in your mind, were not saying I'm

1    Q.      Okay.  So sitting here today, you don't

2  know whether you paid all or any of this money back to

3  the plan, you don't know whether it was a distribution

4  or not, the $150,000?

5    A.      I took, I paid -- I paid back -- I took a

6  distribution, if you add up a whole bunch of stuff,

7  of, I think, about four and a half million dollars,

8  and I paid --

9    Q.      I'll get to that in a minute.  Okay.

10         Take a look, please, at Page 22, it's a

11  withdrawal for $100,000, Page 21 is a deposit for

12  $100,000.

13    A.      Right.

14    Q.      This is a transfer from the pension plan

15  account into your personal account, right?

16    A.      Correct.

17    Q.      Okay.  Take a look, please, at Page --

18  hang on one minute -- Page 20.  Is that your

19  handwriting?

20    A.      It appears to be yes.

21    Q.      And it appears to be your signature?

22    A.      Yes.

23    Q.      I can't read who it's addressed to.  It

24  says dear somebody.

25    A.      You got me.

1    Q.      Okay.  Can you read for me what the body
2  of the letter says?

3    A.      It says transfer --

4    Q.      Just read it word for word.

5    A.      "Please be so kind as to transfer
6  $100,000 from my account number 01108007053001 into
7  Home Theater Architect's account 1106011727."

8    Q.      Okay.  That $100,000 was in addition to
9  the 15 and the 35 we saw before, correct?

10   A.      Correct.

11   Q.      Do you know what that money was used for?

12   A.      The same.

13   Q.      More renovation?

14   A.      Not renovation.  This is -- I mean, the
15  word "renovation," it was a new store that we were
16  putting together.

17   Q.      So let me use a term landlords use.  Was
18  it used for a build out of the new store?

19   A.      Correct.

20   Q.      Okay.  Take a look, please, at Page 19,
21  which is a withdrawal for $100,000, and Page 18, which
22  is a deposit of 100,000.  Is this the transaction that
23  you were referring to in your letter that's dated
24  September 14th?

25   A.      Yes.

1    Q.    Okay.  Take a look, please, at Page 17,

2    which is a withdrawal for 166,706 point, is that 87?

3    A.    Yes.

4    Q.    And then Page 16 is a deposit slip for

5    that.  This was a transfer of that amount of money

6    from the pension plan account to your personal

7    account?

8    A.    A loan, yes.

9    Q.    A loan.  Do you know if it ultimately was

10   treated as a distribution?

11   A.    Yes.

12   Q.    Okay.  Take a look, please, at Page 15,

13   which is a withdrawal for $100,000, and Page 14, which

14   is a deposit for $100,000.   This is again a transfer

15   of money from the pension plan account to your

16   personal account?

17         MR. KERN:  Hold on.  Hold on.  Okay.

18   Q.    Yes, Dr. Criscito?

19   A.    I believe so.

20   Q.    Do you know which account number this is

21   on the deposit, because it's different than some of

22   the other deposit numbers.

23   A.    That's this one, Home Theater.

24   Q.    Oh, Page 14 refers to Home Theater?

25   A.    Yes.

1          Q.      Okay.   Is that your signature where it
2    says signed?

3          A.      Maybe.

4          Q.      Was that treated as a distribution?

5          A.      Yes, sir.

6                  MR. KERN:   Hold on a second, only because
7    that first account number, charge to account number
8    3001, the last --

9                  THE WITNESS:   That's the pension.

10                 MR. KERN:   Okay.   That's the pension.
11   All right.

12         Q.      Let's see.   Let's go to Page 13, which is
13   a withdrawal for $100,000, and Page 12, is a deposit
14   for $100,000.   Once again, this is a transfer from the
15   pension fund account to a personal account?

16         A.      Correct.

17         Q.      You treated it as a distribution?

18         A.      Correct.

19         Q.      Take a look, please at Page 11, which is
20   a withdrawal of $200,000, and Page 10, which is a
21   deposit for $200,000.

22                 (There is a discussion off the record.)

23         Q.      This is a transfer from the pension fund
24   account into an account for Home Theater, right?

25         A.      Correct.

1      Q.      This was treated by you as a

2   distribution?

3      A.      Yes.

4      Q.      Okay.  Let's go to Page 9, which is a

5   withdrawal for $100,000, and a deposit on Page 8 of

6   $100,000.  This was a transfer from the pension fund

7   account to your personal checking account?

8      A.      Yes.

9      Q.      You treated it as a distribution?

10     A.      Correct.  Loan distribution.

11     Q.      When you say loan distribution, I think

12  what you said to me was that eventually, you said you

13  paid taxes on the distributions.

14     A.      Correct.

15     Q.      Let's go to Page 7, which is a withdrawal

16  for 650,000, and a deposit on Page 6 for $500,000.  Do

17  you see that?

18     A.      Correct.

19     Q.      Okay.  These account numbers are not the

20  pension account number.  Do you know what accounts

21  these are?

22     A.      One is mine, 650 that I took out of my

23  account, then I put it into the pension fund, 500.

24  53001.

25     Q.      I see what you're saying.  You put 500

1    into the pension.   Okay.   Is there any reason that you

2    put the money back?

3         A.      (The witness nods in the negative.)

4         Q.      No reason?

5         A.      Sporadic.

6         Q.      You have to say, there was no --

7         A.      No, I can't tell you why I did it.  I did

8    it.  Something told me to do it and I did it.

9         Q.      You think someone told you to do?

10        A.      No, something in my head.

11        Q.      Oh, okay.  Take a look, please, at Page

12   5.  Okay.  Page 5 is a deposit for Home Theater.  Is

13   that correct?

14        A.      Yes, sir.

15        Q.      Okay.  And if you look at Page 4 -- by

16   the way, let's go back for a second.  If you look at

17   Page 7, there's a withdrawal of 650.

18        A.      Right.

19        Q.      And on Page 6, there's a deposit of 500.

20   That leaves a balance of 150, right?

21        A.      Yes, sir.

22        Q.      And then if you look at Page 5, there's a

23   deposit of 150 into Home Theater.

24        A.      Right.

25        Q.      So did that come from the 650?

1      A.      Yes, sir.

2      Q.      Okay.   Take a look, please, at Page 4,

3  which says withdrawal, $50,000, Page 3, it says

4  deposit, there's a reference to Home Theater.   Was

5  this another transfer of $50,000 from the pension plan

6  to Home Theater?

7      A.      Yes, sir.

8      Q.      And that was treated as a distribution,

9  right?

10      A.      Correct.

11      MR. KERN: Ultimately.

12      MR. CHARME:  Ultimately.

13      A.      Yeah.

14      Q.      Well, let me just clarify something

15  because we keep saying loan distribution.   When you

16  say initially you felt it was a loan --

17      A.      Right.

18      Q.      -- who was the borrower and who was the

19  lender?

20      A.      The borrower was me.

21      Q.      The money was coming from the pension

22  fund account and it was going to Home Theater.   So

23  between Home Theater and the pension plan account, who

24  was the borrower, who was the lender?

25      MR. KERN:  You just asked.   He said he

1      C E R T I F I C A T I O N

2

3

4

5          I, NANCY A. MIANI, a Certified Court Reporter

6    and a Notary Public, License No. XI00814, do hereby

7    certify that the foregoing witness, MARIO CRISCITO,

8    M.D., was duly sworn by me on the date indicated, and

9    that the foregoing is a true and accurate

10   transcription of my stenographic notes.

11         I further certify that I am not employed by

12   nor related to any party to this action.

13

14

15

16   NANCY A. MIANI, C.S.R.
     LICENSE NO. XI00814

17

18

19

20

21

22

23

24

25

**EXHIBIT 33**

INDENTURE CREATING:

DIAGNOSTIC AND CLINICAL CARDIOLOGY, P.A.

MONEY-PURCHASE PENSION PLAN

GRANTOR:

DIAGNOSTIC AND CLINICAL CARDIOLOGY, P.A.

EFFECTIVE:

APRIL 1, 1976


PLAINTIFF'S EXHIBIT
CRISCITO 1
12-4-09

## TABLE OF CONTENTS

| ARTICLE NUMBER | TITLE OF ARTICLE | PAGE NUMBER |
|---|---|---|
| | Opening Paragraphs | |
| I | Designation of Trust | |
| II | Definitions | |
| III | Eligibility and Participation | |
| IV | Company Contributions | |
| V | Voluntary Contributions | |
| VI | Allocation Formula | |
| VII | Limitations on Allocations | |
| VIII | Retirement Benefits | |
| IX | Death & Disability Benefits | |
| X | Termination of Employment Benefits | |
| XI | Participant Loans & Withdrawals | |
| XII | Plan Administration and Claims Procedure | |
| XIII | Amendment of Plan | |
| XIV | Termination of Plan | |
| XV | Trust and Administration | |
| XVI | Insurance and Annuity Policies | |
| XVII | Miscellaneous Provisions | |
| | Signatures of Officers and Trustees | |

DIAGNOSTIC AND CLINICAL CARDIOLOGY, P.A.

MONEY-PURCHASE PENSION PLAN

ARTICLE I:                    PURPOSE

The DIAGNOSTIC AND CLINICAL CARDIOLOGY, P.A. (hereafter referred to as "Employer") establishes this plan for the benefit of its employees, to provide funds for their retirement, and to provide funds for their Beneficiaries in the event of death.  The benefits provided in this Plan shall be paid from the Trust established by the Employer.  The Plan and the Trust forming a part thereof are established and shall be maintained for the exclusive benefit of eligible Employees and their Beneficiaries. Except as provided in Article XVII 17.7, and Article VII 7.3(c), no part of the Trust funds shall revert to the Employer, or be used for or diverted to purposes other than the exclusive benefit of Employees or their Beneficiaries.

ARTICLE II:                          DEFINITIONS

       The following words and phrases, when used herein, unless their context clearly indicates otherwise, shall have the following respective meanings:

<u>The Parties Concerned</u>:

1.  EMPLOYER OR COMPANY:  DIAGNOSTIC AND CLINICAL CARDIOLOGISTS, P.A. or any successor or otherwise; and all corporations now or hereafter affiliated with it which may become signatories to this Agreement.

2.  BOARD OF DIRECTORS:  is the Board of Directors of the Company.

3.  TRUSTEES:  are the Trustees herein named, and any duly-appointed successor Trustees of this Trust Fund.

4.  EMPLOYEE:  is any person employed by the Company.

5.  PARTICIPANT:  shall mean and include all classifications as hereinafter defined:

    (a)  Active Participant - shall mean an Employee included in the Plan as provided under ARTICLE III.

(b)   Deceased Participant - shall mean a Participant who has died, but whose Account has not been fully distributed.

(c)   Retired Participant - shall mean a Participant who has retired under any of the provisions of Article VIII, but whose Account has not been fully distributed.

(d)   Vested Participant - shall mean a Participant who is no longer an Employee, but who is entitled to a benefit under Article IX.

6.   BENEFICIARY:  is any person, persons or legal entity designated in writing by a Participant to receive benefits which may be payable upon or after the Participant's death.  Wherever the rights of Participants are stated or limited herein, their Beneficiaries shall also be deemed bound thereby.

7.   INSURER:  shall mean any legal reserve life insurance company licensed to do business in the state in which this plan and trust is established.

**The Trust:**

8.   PLAN ADMINISTRATOR:  The Trustee.

9.   FIDUCIARY:  The Board of Directors of the Company, the Plan Administrator, and the Plan Fiduciary, but only with respect to the specific responsibilities of each for the Plan Administration as provided for herein.

10.   PLAN FIDUCIARY:  The Trustee

11.   TRUST AGREEMENT:  This Agreement, and if the same be amended, this
      Agreement as so amended.

12.   PLAN OR TRUST:  That to which effect is given by the Trust Agreement.

13.   TRUST FUND OR FUND:  The total of contributions made hereunder,
      increased by profits, income, refunds, and recoveries received; and
      decreased by losses and expenses incurred in administration, and by
      benefits paid.

Important Dates:

14.   EFFECTIVE DATE:  April 1, 1976.

15.   ANNIVERSARY DATE:  April 1 of each succeeding year.

16.   VALUATION DATE:  March 31, the last day of the plan fiscal year.

17.   NORMAL RETIREMENT DATE:  The participant's age 65.

18.   PLAN YEAR, OR FISCAL YEAR:  The 12 consecutive month period beginning
      on April 1 of each year and ending on March 31 of each succeeding year.

19.   LIMITATION YEAR:  The Plan Fiscal Year.

20.   YEAR OF SERVICE:  A 12 Consecutive month period during which the employee completes at least 1,000 Hours of Service.  Years of Service shall be computed by Plan Years.  However, in an Employee's first Year of Employment, or re-employment, and in the year of the participants separation, a Year of Service shall be credited if the employee completes at least the number of hours obtained by multiplying 1,000 by a fraction, the numerator of which is the number of calendar weeks during which the employee was employed in the fiscal year, and the denominator of which is 52.

21.   BREAK IN SERVICE:  Any 12 consecutive month period during which the Participant does not complete more than 500 hours of service with the Employer.  A Break in Service shall not occur while an Employee is on an authorized Leave of Absence from the Company.

22.   HOUR OF SERVICE:

(a)   is each hour for which an employee is paid, directly or indirectly, or entitled to payment for the performance of duties for the employer during the fiscal year.

(b)   is an hour for which an employee is paid, or entitled to payment by the employer on account of a period of time during which no duties are performed (irrespective of whether employment has terminated) due to vacation, holiday, illness, disability, layoff, jury duty, military, or authorized leave of absense. However, no more than 501 hours of service shall be credited in a computation period under this paragraph to an employee during which he performs no duties.

(c)   is each hour for which back pay, irrespective of mitigation damages, is either award or agreed to by the employer.  These hours shall be credited to the employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement, or payment was made.

<u>Other Definitions</u>:

23.   ACCOUNT:  shall mean the interest of the Participant in the Trust Fund derived from the employers contributions, as determined as of each valuation date and reflected in the records maintained by the Trustee.

24. VOLUNTARY ACCOUNT:  shall mean the participant's separately maintained voluntary contributions account.  A participant shall always have a 100% vested and nonforfeitable interest in such voluntary accounts.

25. VESTED INTEREST:  shall mean the unconditional and legally enforceable right to which the participant (or his beneficiary) is entitled.

26. ACCRUED BENEFIT:  shall mean the participants vested interest in his account.

27. SUSPENSE ACCOUNT:  An account established pursuant to Article VII 7.3(c) in which company contributions and forfeitures will be held until allocated.  No interest shall accrue on such account.

28. COMPENSATION:  A Participant's total salary, wages, and other amounts received for personal services rendered to the Employer as an Employee which are actually paid during the Limitation Year.  This term shall not include deferred compensation, stock options, and other distributions which receive special Federal income benefit.

29. TAXABLE WAGE BASE:  shall mean, with respect to any fiscal year, the maximum amount of earnings which may be considered wages under Section 3121(a)(1) of the Internal Revenue Code, plan year end.

30. PROFITS, OR NET PROFITS:  Current and accumulated profits determined in accordance with generally accepted accounting principles, before the contribution to this plan is accounted for, and before deductions for federal income taxes, state franchise taxes, or other taxes measured by annual net income.

31. DISABILITY:  A physical or mental impairment which in the opinion of the Plan Administrator is of such permanence and degree that a Participant is unable because of such impairment to perform any gainful activity for which he is suited by virtue of his experience, training, or education.  The permanence and degree of such impairment shall be supported by medical evidence.

32. JOINT AND SURVIVOR ANNUITY:  means an annuity for the life of the participant with a survivor annuity for the life of his spouse which is not less than one-half, nor greater than, the amount of the annuity payable during the joint lives of the participant and his spouse and which is the actuarial equivalent of a single life annuity for the life of the participant.

33. E.R.I.S.A.:  Public Law #93-406, the Employee Retirement Income Security Act of 1974, as amended from time to time.

ARTICLE III:               ELIGIBILITY AND PARTICIPATION

3.1      All full-time employees shall be eligible to participate here-under immediately upon becoming employees.

No Company Contribution shall be allocated to an employee who is employed on a part-time basis.  For these purposes, "part-time" shall mean an employee who does not complete a year of service as heretofore defined in Article II, in the fiscal year.

Any employee who is customarily employed for less than 1,000 hours a year, but who completes a year of service in any year shall participate as an active employee in the plan for that year, and shall share in the Company Contribution for that year.

3.2      Notwithstanding the above, an employee shall not participate in the plan if he is a member of a Union with which the Employer has a collective bargaining agreement directly or through an Employers' Associa- tion, provided that retirement benefits have been a subject of good faith bargaining between the Employer, or Employee Association, and the Union, or its representative.

3.3      A former Participant shall become a participant immediately upon his return to the Employ of the employer if

(1)     such former Participant had a nonforfeitable right

to all or a portion of his account balance derived

from employer contributions at the time of his termination, or

(2) the former Participant's Years of Service before his termination exceed the number of consecutive one year Breaks in Service after such termination.

A former Participant who did not have a nonforfeitable right to any portion of his account balance derived from employer contributions at the time of his termination shall be considered a new employee, for eligibility purposes, if the number of consecutive one year Breaks in Service equal or exceed the aggregate number of Years of Service before such Break.

In the event a Participant becomes ineligible to participate because he is no longer a member of an eligible class of employees, but has not incurred a Break in Service, such employee shall participate immediately upon his return to an eligible class of employees.

3.4     As soon as practical after the Effective Date of the Plan, and on each subsequent Anniversary Date, the Employer shall give the Trustees such information as may be required to determine eligibility of Employees. The Trustees shall thereupon determine which Employees will become eligible on such date and shall notify each Employee of his eligibility and of any applications or requirements for participation.

3.5      To become a Participant, each Employee must execute such application forms as are required.  By signing such forms, an Employee agrees to be bound by all terms, conditions and covenants of this Plan as then in effect or as thereafter amended.

3.6      Every Employee, in his application shall have the right to designate a Beneficiary or Beneficiaries for any death benefits.  Such designation of a Beneficiary or Beneficiaries and the methods of settlement may be changed from time to time by the Participant by filing new designations with the Trustees.

Upon receipt of such designation, or change in designation, the Trustees shall forthwith take such action as may be required as to effectuate such designation, or change in designation.

Upon the death of a Participant, if:

(i)   no beneficiary is designated, or

(ii)   all beneficiaries predecease the Participant, or

(iii)   the Plan Administrator is unable to locate the designated beneficiary,

then, the Trustee shall be empowered to designate the beneficiary for the Participant, but only from among the following, in the order named;

(i)   spouse,

(ii)   lawful children of the Participant, equally, per stirpes,

(iii)   or the estate of the Participant.

ARTICLE IV:                    CONTRIBUTIONS

4.1     For each Plan Year, the Company will contribute to the Trustee an amount, when adding forfeitures which have become available for allocation as of the end of the year, which is equal to 7% by which each Participant's compensation exceeds $15,000, plus an additional 19% of total compensation.  Notwithstanding the above, the Company shall limit its contributions to that allowed under Article VI, Limitations on Allocations.

4.2     Notwithstanding any provision to the contrary, a contribution shall not be made on behalf of an Employee who completes 1000 Hours of Service but terminates employment before the end of the year.

4.3     If a shareholder-employee of an Employer who is an electing small business corporation under Section 137(b) of the Internal Revenue Code is covered under the Plan, only the first $100,000 of compensation of each employee covered under the Plan shall be taken into account for the purposes of determining contributions or benefits under the Plan.

4.4     The Company's contribution for any Plan Year shall be due on the last day of that year and, unless paid before, shall be payable then or as soon thereafter as practicable, but in any event not later than the time prescribed by law for filing the Company's federal income tax return, without interest.  Upon making any Company contributions, the Company shall promptly inform the administrator of such contribution.

4.5     All contributions made under the Plan by the Company shall be delivered to the Trustee.  The Trustee shall be accountable for all Company contributions received by it, but shall have no duty to require any contributions to be delivered to it or to determine if contributions received comply with the Plan.


4.6     In addition to its contributions under the Plan, the Employer shall pay all the administrative expenses of the Plan and all fees and retainers of the Plan's Trustees, consultants, auditors and counsel so long as the Plan remains in effect, except that any expenses directly relating to the investments of the Trust Fund such as taxes, brokerage commissions, registration charges, etc., shall be paid from the Trust Fund.  In the event of the failure of the Employer to pay such fees and retainers, the Trustees have the right to charge such amounts against the Trust Fund.


4.7     All amounts forfeited by terminated Participants, in accordance with Article X, shall be used to reduce the Company's contribution for the next following plan year.  In no event will forfeitures be used to increase the benefits to which a Participant is otherwise entitled under the Plan.


4.8     In no even shall any contribution made by the Employer to this Trust, or income therefrom, revert to the Employer except as provided in

Article VII 7.3(c) and Article XVII 17.7.  All amounts paid by the Employer to this Trust shall be used and applied for the exclusive benefit of the Participants or their Beneficiaries.

ARTICLE V:                    VOLUNTARY CONTRIBUTIONS

5.1      For the purpose of increasing his retirement benefits, each
Participant, with the consent of the Employer, uniformly applied to all
Participants, may each year voluntarily contribute up to 10% of compensa-
tion which is reportable for Federal Income Tax purposes.  Such contri-
butions may be made to the Trustee in cash or in kind, intermittenly or
by regular payroll deductions, in a manner designated by the Trustee.

5.2      "10% of the compensation" means 10% of a Participant's aggregate
compensation for all periods of his participation under this Plan and Trust
and under all other qualified plans of the Employer reduced by his prior
voluntary contributions under this Plan and Trust and under all other
qualified plans with respect to his aggregate compensation for all periods
of his participation under all such plans.

5.3      A contribution in kind may be made only in the form of a security
acceptable to the Trustees and such security shall be valued for the
purpose of calculating the limitations described in Section 5.2 hereof at
its fair market value on the date of contribution.

5.4      The Trustees shall establish and maintain a Voluntary Account for
each Participant who makes a contribution pursuant to this Article which

shall be credited and debited as herein provided to appropriately reflect each such Participant's interest in the Fund.  The contribution made by each Participant pursuant to this Article shall be credited to his Voluntary Contribution Account.

5.5      All contributions made pursuant to this Article shall be placed in the Participant's Voluntary Contribution Account.  The assets of the Voluntary Contribution Account may be co-mingled with the assets of the regular accounts established pursuant to the terms of this Plan, but the provisions of Article XV shall otherwise be fully applicable to the administration of the Voluntary Contribution Fund.  There shall be a separate accounting for each participant's voluntary account.

5.6      Each Participant's Voluntary Contribution Account may be separately invested and the income, expenses, gains and losses arising in each such account shall be debited or credited thereto as of the date of each such occurrence.

5.7      Each Participant shall have a fully (100%) vested and nonforfeitable interest at all times in his Voluntary Account.  A Participant's interest in the Voluntary Contribution Fund on any day shall be the balance in his Voluntary Contribution Account on such day.

5.8      A Participant shall, upon written notice to the Trustee, be entitled to withdraw at any time the lesser of the dollar amount of his aggregate voluntary contributions (less the sum of all his voluntary contributions previously withdrawn), or the current value attributable to such contributions.  The Participant's interest in such amount shall be nonforfeitable at all times.

5.9      Any earnings and gains on such contributions cannot be withdrawn or distributed until the Participant's termination, death, disability, or retirement.

5.10     Upon a Participant's retirement, death, disability, or termination from employment, 100% of his Voluntary Account wil be paid to him in a manner selected by the Participant, except that the Trustees, for adminis-trative convenience, may require that the distribution be made in a lump sum within ninety days from his separation from service.

ARTICLE VI:                    ALLOCATION FORMULA

6.1      Participants' Accounts - A separate bookkeeping account shall be maintained by the Trustee for each Participant.  A Participant's account will reflect the Participant's share of Company contributions, and the income, losses, appreciation and depreciation attributable to such contributions.  The Trustee shall not be required to maintain separate investments for any account.

6.2      Company Contributions Considered Made on Last Day of Fiscal Year - For purposes of this Article, the Company's contribution under the Plan for any Fiscal Year will be considered to have been made on the last day of that year, regardless of when paid to the Trustee.

6.3      Charging of Payments and Distributions - As of each Valuation Date, all payments and distributions made under the Plan since the last Valuation Date to or for the benefit of a Participant (or his Beneficiary) will be charged to the proper account of such Participant.

6.4      Allocating and Crediting of Company Contributions - Subject to the limitations of Article VII, as of each Valuation Date the Company's contribution for the Plan Year ending on that date shall be allocated among and credited to the Accounts of Participants entitled to share in the

Company's contribution for the Plan Year (as provided in Section 6.5) in the manner provided below:

    (a)  Allocation and Crediting:  The Company's contributions shall be allocated to the Accounts of the Active Participants in an amount equal to 7% by which each Participant's compensation exceeds $15,000, plus 19% of each Participant's total compensation.

    (b)  Such total allocation shall be limited to no more than 25% of the compensation of each such Participant.

6.5     Participants to Whom Company Contributions Will Be Allocated – The Company's contribution for any Plan Year will be allocated among and credited to the accounts of:

    (a)  Active Participants who are on the payroll of the Company at the end of the Plan Year; and

    (b)  Participants who died, retired or became permanently and totally disabled during the Plan Year;

    (c)  Provided, however, that all such active deceased, disabled, or retired Participants complete a Year of Service during the Plan Year.

6.6     For purposes of this part, the forfeitures used to reduce the actual company contribution for the year shall be considered a part of the company contribution for that year.

6.7   Accounting Steps - As of each Valuation Date, the Trustee shall:

(a)   First, charge to the proper accounts and voluntary accounts, all payments or distributions made from Participants' accounts since the last Valuation Date that have not been charged previously, as provided in Section 6.4.  After such adjustments, the balance shall be known as the Net Credit Balance.

(b)   Second, after all plan assets valued at fair market value, in accordance with Article XV, adjust the Net Credit Balances in Participants' accounts upward or downward, pro rata, according to the Net Credit Balances so that the totals of the Net Credit Balances will equal the then Adjusted Net Worth of the Trust Fund.

(c)   Third, allocate and credit any Voluntary Contributions to their respective voluntary accounts.

(d)   Fourth, allocate and credit Company contributions that are to be allocated and credited as of that date to the appropriate accounts, in accordance with Section 6.4; provided, however, that:

(e)   If Segregated Accounts are applicable, the adjustments of subparagraph (b) above shall be made independently for each such Segregated Account; the remaining Regular Accounts shall then be adjusted in accordance with subparagraph (b); and

2231

(f)   If any Voluntary Accounts are invested in accordance with the individual Participant's directives, then similar adjustments for such accounts shall be made as with subparagraph (e) above.

ARTICLE VII:                  LIMITATIONS ON ALLOCATIONS

7.1       In no case shall the annual additions allocated to a Participant's
Account for the Limitation Year exceed the lesser of:

(a)   the amount specified in Section 415(c)(1)(A) of the

Internal Revenue Code ($25,000) as adjusted annually

for increases in the cost of living in accordance with

Section 415(d) of the Code, as in effect on the last day

of the Limitation Year, or

(b)   twenty-five percent (25%) of the Participant's Compensation

for such year.

(c)   The limits established in (a) and (b) above, shall be

reduced by any annual additions (as herein defined) for the

year under any other plan of the Employer.

7.2       Annual Addition - With respect to any participant, an annual
addition shall be the sum for the limitation year of:

(a)   all employer contributions allocated to his account

(b)   all forfeitures allocated to his account, and

(c)   the lesser of:

(1)   one-half of the employee contributions allocated to

his account, or

(2)   the amount of employee contributions allocated to his

account in excess of six percent (6%) of his compensa-

tion for the limitation year.

7.3      If, as a result of paragraphs 1 and 2 above, the allocation of additions is reduced, such reduction shall be treated as follows:

(a)   The amount of such reduction consisting of employee contributions shall be paid to the Employee as soon as administratively feasible.

(b)   The amount of such reduction consisting of employer contributions and forfeitures shall be allocated and reallocated to other Participants' accounts in accordance with the Plan formula for allocating Employer contributions and forfeitures to the extent that such allocations do not cause the additions to any such other Participant's account to exceed the lesser of the maximum permissible amount or any other limitation provided in the Plan.

(c)   To the extent that the reductions described in paragraph (b) cannot be allocated to other Participants' accounts, such reductions shall be allocated to a suspense account as forfeitures and held therein until the next succeeding date on which forfeitures could be applied under this Plan. In the event of termination of the Plan the suspense account shall revert to the Employer to the extent it may not then be allocated to any Participant's account.

ARTICLE VIII:                    RETIREMENT BENEFITS

8.1      Normal Retirement - A Participant shall have a 100% vested and Nonforfeitable Interest in his entire account if he is employed on or after his Normal Retirement Date.  No forfeiture shall thereafter arise under Article X.

8.2      The Normal Retirement Benefit under this Plan shall be payable in the form of an Annuity to a Participant who retires on his Normal Retirement Date.  The amount of the retirement benefit shall be that which can be provided by applying the value of his Account at his Normal Retirement Date to the applicable settlement option or annuity purchase rate.

8.3      If the Participant and his spouse are married to each other on the annuity starting date, he shall receive his benefit at his Normal Retirement Date, Deferred Retirement Date, Early Retirement Date or Disability Retirement Date, in the form of a qualified Joint and Survivor Annuity unless he elects otherwise.  Otherwise, a Participant who retires at his Normal Retirement date shall be entitled to receive a monthly retirement income which shall continue for 120 months certain and thereafter for the rest of his life.

8.4      At retirement a Participant may, in lieu of the joint and one-half survivor retirement annuity or the monthly income with 120 months

certain and life thereafter, elect payment of benefits as a single lump sum or under any of the methods of settlement permitted by the Internal Revenue Code and E.R.I.S.A., except that no election shall be made which would provide for payment of interest only, and further no election shall be made which provides that such benefits be payable over a period which exceeds (a) the life of the Participant or the life of the Participant and his spouse, or (b) the life expectancy of the Participant or the life expectancies of the Participant and his spouse.

8.5     With the approval of the Employer, an active Participant may continue in the active employ of the Employer after his Normal Retirement Date and retire or be retired, on the first day of any subsequent month. In which event, he shall continue as an Active Participant of the Plan until his actual retirement, such date to be known as his deferred retirement date.  Such Participant shall at all time have a 100% vested and nonforfeitable interest in his Account.  A participant who continues active employment beyond his Normal Retirement Age but dies before actual retirement shall, unless otherwise elected in writing, have a survivor annuity payable on his death.  The benefit payable to the Participant's spouse under such annuity shall be the greater of:

(a)   The amount that would have been payable if the
      Participant had retired on the day before his death
      and had elected to receive a JOINT AND SURVIVOR ANNUITY

providing for payments to his spouse equal to 50%
of the annuity payable during the joint lives of the
Participant and his spouse; or

(b)   The death benefit otherwise payable under the Plan.
Notwithstanding the above, the beneficiary may elect to have the death
benefit paid under a different settlement option.

8.6     If, on the first day of any month, an Active Participant is
totally and permantntly disabled, he shall thereupon be retired, such
date to be known as his Disability Retirement Date.   Such Participant
shall have a 100% vested and nonforfeitable interest in his Account.

ARTICLE IX:              DEATH & DISABILITY BENEFITS

Death Benefit:

9.1      Upon the death of an Active Participant prior to actual retire-
ment, or a Vested Participant prior to the complete distribution of any
accrued benefit, his Beneficiary shall be entitled to one hundred (100%)
percent of such Deceased Participant's Account, including the face amount
of any ordinary or term life insurance policy in force on the life of the
Deceased Participant which was purchased for his account, in accordance
with Article XVI.  If a retirement annuity has been issued, the death
benefit of such annuity shall be as determined by the provisions of the
contracts and shall be paid to the Beneficiary.

9.2      If a Participant dies after becoming eligible for a Policy but
before the Policy is in effect, the death benefit in respect to such Policy
shall be limited to the premium which would have been payable to put such
Policy in force.

9.3      Should a Retired Participant die while receiving distributions
from the Plan, his Beneficiary shall be entitled to any death benefit
provided for in the method of distribution.

9.4     A Participant who is employed during the period beginning on the later of

(a)   the date the Participant reaches the earliest retirement date under the Plan, or

(b)   10 years before the Participant reaches Normal Retirement Age,

shall be given an opportunity to elect in writing within a reasonable time, to have a survivor annuity payable on his death.  If the Participant elects the survivor annuity, the payment under such annuity shall be the greater of:

(a)   The amount that would have been payable if the Participant had retired on the day before his death and had elected to receive a JOINT AND SURVIVOR ANNUITY providing for payments to his spouse equal to 50% of the annuity payable during the joint lives of the Participant and his spouse; or

(b)   The death benefit otherwise payable under the Plan.

Notwithstanding the above, the beneficiary may elect to have the death benefit paid under any settlement option which is not in conflict with the provisions of this Plan, and the Internal Revenue Code, as amended.

9.5     Death benefit payments to a beneficiary must commence within five (5) years of the date of the Participant's death.

9.6      Each participant shall have the right to designate a Beneficiary for this account, in accordance with Article III.

**Disability Benefit:**

9.7      If prior to death, retirement or termination of employment with the Employer, a Participant becomes totally and permanently disabled as defined in Article II, he will have a 100% vested and nonforfeitable right to his Account and the funds shall be held until his Normal Retirement Age, at which time his account as adjusted for annual earnings, will be paid to him as a Joint & Survivor Annuity, in accordance with Article VIII, or, at his election, in cash, or any settlement option not in conflict with this Plan, or the Internal Revenue Code, as amended.

9.8      Distributions called for in this Article may be made as soon as practical after the occurance of the event causing the distribution, but in no event shall such distribution start later than sixty (60) days after the close of the Plan Year of the Participant's Normal Retirement Date.

ARTICLE X:        TERMINATION OF EMPLOYMENT BENEFITS

10.1     If an Active Participant has a Break in Service and his employment is terminated prior to his Normal Retirement Date for reasons other than death or disability, he shall become a Vested Participant and shall have a nonforfeitable interest in a portion of his Account according to the vesting schedule set forth below:

| YEARS OF SERVICE | VESTED INTEREST |
|---|---|
| 1 | -0-% |
| 2 | 50% |
| 3 | 50% |
| 4 | 50% |
| 5 | 50% |
| 6 | 100% |
| and thereafter | 100% |

For the purposes of determining Years of Service and Breaks in Service when computing an employee's nonforfeitable right to his account balance derived from employer contributions, the 12-month period shall be the Play Year.

10.2     A former Participant who had a nonforfeitable right to all or a portion of his account balance derived from employer contribution at the

time of his termination shall receive credit for all Years of Service prior to his Break in Service upon completing a Year Of Service after his return to the employ of the employer.

10.3    A former Participant who did not have a nonforfeitable right to any portion of his account balance derived from employer contribution at the time of his termination shall receive credit for Years of Service prior to his Break in Service if:

        (1)  he completes a Year of Service after his return to the employ of the employer, and

        (2)  the number of consecutive one year Breaks in Service is less than the aggregate number of Years of Service before such break.

10.4    All Years of Service after a Break in Service shall be disregarded for purposes of determining the Participant's nonforfeitable percentage in his account balance attributable to employer contributions that accrued before such break.

10.5    The Participant shall always have a 100% vested and nonforfeitable interest in his employee contributions, and his Voluntary Account.

10.6    Upon termination of employment and Break in Service, the Trustee shall distribute the nonforfeitable (vested) portion of the Participant's

2242

account in the form of a qualified Joint and Survivor Annuity unless otherwise selected in the manner and form provided in Article VIII.

The forfeitable portion of the Participant's account shall be used to reduce the Company contribution, as heretofore provided for in Article IV.

When life insurance policy cash values are forfeited, the Trustee shall surrender it to the Insurer for its cash value or offer the policy to the terminating Participant for an amount equal to the forfeitable cash value. Any forfeited values resulting from the surrender or purchase by the Participant shall be allocated in the manner herein before stated.

10.7    No amendment to the Vesting Schedule shall deprive a Participant of his nonforfeitable rights to benefits accrued to the date of the amendment. Further, if the Vesting Schedule of the Plan is amended, each Participant with at least 5 Years of Service with the Employer may elect, within a reasonable period after the adoption of the amendment, to have his nonforfeitable percentage computed under the plan without regard to such amendment. The period during which the election may be made shall commence with the date the amendment is adopted and shall end on the later of:

      (a)   120 days after the amendment is adopted;

      (b)   120 days after the amendment becomes effective; or

      (c)   120 days after the Participant is issued written notice of the amendment by the employer or plan administrator.

(5)

ARTICLE XI:                    LOANS & WITHDRAWALS

**Participant Loans:**

11.1     Loans may be made to active Participants of the Plan on a non-discriminatory basis.  The primary purpose of this Plan is to accumulate funds for each Participant's eventual retirement.  Loans will not be encouraged, but all Participants in similar circumstances shall be treated alike.

11.2     Upon application of any Participant, the Administrator, in accordance with its uniform, non-discriminatory policy, may direct the Trustee to make a non-renewable loan or loans to such Participant.  In no event may the total of such loan or loans exceed 70% of the Participant's vested interest in the Trust Fund.

11.3     The Trustee shall pay the proceeds of the loan directly to the Participant.  No loan shall be made to a Participant until he shall have completed two (2) full years of participation.

11.4     All such loans shall be considered investments of the Trust Fund, and interest shall be charged thereon at the rate equal to nine percent (9%) per annum, but in no case shall the Participant pay more than the legal rate

of interest.  Every loan applicant shall receive a clear statement of the charges involved in each loan transaction.  This statement shall include the dollar amount and annual interest rate of the finance charge.

11.5     Any such loan or loans shall be repaid by the Participant in such manner as the Administrator shall determine, but in no event shall the term of the loan exceed two (2) years from the end of the Participant's taxable year in which such loan was granted.  In the event that the Participant does not repay such loan within the time prescribed by the Administrator, the Administrator may deduct the total amount of such loan, or any portion thereof (including interest due) from the vested interest of the Participant's account, and such deduction shall be charged against him as a distribution.

In the event that such adjustment is not sufficient to repay the remaining balance of any such laon, the Participant shall be liable for and continue to make payments on any balance still due from him.

Withdrawals For Hardship:

11.6     The primary purpose of this Plan being the accumulation of funds for retirement and other benefits, it shall be the expressed policy to hold withdrawals to a minimum.

11.7     No withdrawal shall be made under the provisions of this Section except in the event of undue hardship resulting from accident or to sickness of such Participant or his dependants.  Payments in such cases shall be limited to payment on behalf of such Participant of actual expenses incurred for hospitalization, doctor or surgery bills, and funeral expenses.

11.8     Neither the application for, nor payment of, any withdrawal in accordance with this Section shall have the effect of terminating a Participant's participation in the Plan.

11.9     Upon the application of any Participant, the Administrator in accordance with its uniform, non-discriminatory policy, may direct the Trustee to permit such Participant to make a withdrawal of part of the amount then credited to his account.  Except as provided in Section 11.10, in no event shall the amount of any such withdrawal be more than 70% of the excess of the vested interest of the Participant at the time of withdrawal over the amounts credited to his account from Employer contributions made to the Plan during the two-year period preceding the withdrawal.

11.10    A Participant who has participated in the Plan for 60 consecutive months or more, may be permitted to withdraw all amounts credited to his account, including amounts credited out of Employer contributions made within the two-year period preceding the payment of the withdrawal.

11.11    Any Participant who makes a withdrawal under the provisions of this Section shall not be allowed to participate in the Plan during the six-month period following the withdrawal.  No part of any Employer contributions shall be allocated to such Participant's account during the six-month suspension of participation.

ARTICLE XII:        PLAN ADMINISTRATION AND CLAIMS PROCEDURE

12.1       The Trustee shall be the "Named Fiduciary" within the meaning of Section 402 of E.R.I.S.A. and shall have such powers and duties as shall be necessary to administer the Plan including the following:

        (i)   The Administrator may make rules and regulations for the administration and interpretation of this Plan, provided that the same are not inconsistent with the terms and provisions hereof.

      (ii)   The Administrator shall have authority to determine any and all questions which may arise as to the eligibility of any Employee to become a Participant or as to his rights as a Participant.

      The Administrator shall have the power to delegate specific fiduciary responsibilities, other than those normally assigned to the Trustee, to employees of the Employer or to other individuals, all of whom shall serve at the pleasure of the Administrator and, if full-time employees of the Employer, without compensation.  Any such person may resign by delivering written notice of such resignation to the Administrator. Vacancies created by resignation, death, or other cause may be filled by the Employer or the assigned responsibilities may be reabsorbed or re-delegated by the Administrator.

The Employer shall provide the Administrator with the necessary information to allow him to fulfill his proper duties.

12.2    Any discretionary acts to be taken under the terms and provisions of this Plan by the Administrator shall be uniform in their nature and application to all those similarly situated, and no discretionary acts shall be taken which shall be discriminatory under the provisions of the Internal Revenue Code relating to employees' pension plans as such provisions now exist or may from time to time be amended.

12.3    The Administrator shall promptly notify the Trustee in writing of the death, retirement, or termination of a Participant and shall execute and deliver to the Trustee such forms as may be required to carry out the provisions of this Plan. At the proper time, the Trustee shall take appropriate action based on such notification and forms. All notices, instructions and certifications by the Employer and the Administrator to effectuate the administration of the Plan shall be in writing signed by a duly authorized representative of the Employer on behalf of the Employer.

12.4    An Insurer may issue any Contract for which application is made by the Trustee without any responsibility for determining whether the application is proper or whether the proposed Participant is eligible to participate in this Plan. Any instrument executed by the Employer,

Administrator, or a Participant or a Beneficiary of a Participant hereunder shall be received by the Trustee and by the Insurer as conclusive evidence of any of the matters pertinent to such instrument.  The Insurer shall be fully protected in taking, permitting or omitting any action on the faith thereof and shall incur no liability or responsibility for so doing.

12.5     The Administrator shall keep a record of all its proceedings and acts, and shall keep all such books of account, records and other data as may be necessary for proper administration of the Plan.  The Employer shall notify the Trustee of any action taken by the Employer and, when required, shall notify any other interested person or persons.  The Administrator shall file or cause to be filed all such annual reports, financial and other statements as may be required by any Federal or State statute, agency or authority within the time prescribed by law or regulation for filing such documents.  The Administrator and the Employer shall furnish such reports, statements and other documents to such participants and beneficiaries of the Plan as may be required by any Federal or State statute or regulation within the time prescribed for furnishing such documents.

12.6     Any person who thinks that he is entitled to a benefit under the Plan shall have the right to file with the Administrator a written notice of claim for such benefit.

Within 60 days after its receipt of such written notice of claim, the Administrator shall either grant or deny such claim provided, however,

that any delay on the part of the Administrator in arriving at a decision shall not adversely affect benefits payable under a granted claim. A decrease in the value of an Account due to market value depreciation during the processing of a claim shall not be deemed to be an adverse effect attributable to Administrator delay. The Administrator shall provide to each claimant:

(a)  The specific reasons for such denial;

(b)  Specific reference to the pertinent Plan provisions of which the denial is based;

(c)  A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(d)  An explanation of the Plan's claim review procedure.

12.7   Each claimant shall have the right to appeal the denial of his claim to the Administrator for a full and fair review at any time within 75 days after the claimant received written notice of such denial. The Administrator shall thereby afford the claimant or his duly authorized representative the opportunity

(i)  to review documents pertinent to the claim,

(ii)  to submit issues and comments in writing, and

(iii)  to discuss such documents and issues with the Administrator.

The final decision of the Administrator shall be made promptly, and not later than 60 days after its receipt from the claimant of a request for review unless circumstances beyond the control of the Administrator require an extension of time for processing, in which case a decision shall be made as soon as possible but not later than 120 days after receipt of a request for review.  Such decision shall be made in writing and shall include specific reasons for the decision, written in a manner calculated to be understood by the claimant, and specific references to pertinent Plan provision on which the decision is based.

ARTICLE XIII:             AMENDMENT OF PLAN

13.1     Except as herein limited, the Company and the Trustees shall have the right to amend this Agreement at any time to any extent that they may deem advisable.  Such amendment shall be stated in an Instrument in writing, executed by the Company and the Trustees.

Upon execution of such Instrument, this Agreement shall be deemed to have been amended in the manner therein set forth, and all participants shall be bound thereby, provided however:

(a)   that no amendment shall increase the duties or liabilities of the Trustees without their respective written consents;

(b)   that no amendment shall have the effect of vesting in the Company any interest in, or control over, any contracts issued pursuant thereto, or any other property subject to the terms of this Trust;

(c)   that no amendment shall have any retroactive effect so as to deprive any participant of any benefit already accrued, provided however, that any amendment may be made retroactively which is necessary to bring the Plan into conformity with Federal Government Regulations in order to qualify same for tax exemption.

13.2     No plan amendment may change the schedule of vesting applicable to a Participant so as to reduce the nonforfeitable percentage for such Participant on the date such amendment is adopted.  In the event the vesting schedule is amended, Section 10.4 of Article X shall be effective.

13.3     No merger or consolidation of this Plan with any other plan, nor transfer of the assets or liabilities of this Plan to any other plan may take place unless immediately following such action each Participant in the Plan would be entitled to a benefit not less than that to which he was entitled prior to such action.  For the purpose of making such determination, it shall be assumed that the Plan had terminated immediately before and immediately after such merger, consolidation or transfer.

13.4     In case any provisions of this Agreement shall be held illegal or invalid for any reason, such determination shall not affect the remaining parts of this Agreement, but this Agreement shall be construed and enforced as if said illegal and invalid provisions had never been inserted herein.

ARTICLE XIV:              TERMINATION OF THE PLAN

14.1    It is the expectation of the Company that it will continue this Plan and the payment of its contributions hereunder for the remainder of its corporate existence; but continuance of the Plan is not assumed as a contractual obligation of the Company; and the right is reserved by the Company at any time, to reduce, suspend, or discontinue its contributions hereunder.

14.2    This Plan shall terminate upon the happening of any of the following events:

    (a)  legal adjudication of the Company as bankrupt; a general assignment by the Company to or for the benefit of, its creditors; or dissolution of the Company;

    (b)  discontinuance by the Company upon notice executed by the Company and delivered to the Trustees;

    (c)  legal termination of the Plan and Trust;

    (d)  merger or consolidation of the Company without any provisions being made for the continuance of the Plan;

    (e)  failure of the Employer to maintain the qualified status of the Plan under Section 401 of the Internal Revenue Code;

    (f)  complete discontinuance of Company contributions.

14.3     Upon termination of the Plan, or upon complete discontinuance of contributions hereunder for reasons other than as set forth in Section 13.4, each Participant shall have a 100% nonforfeitable interest in his Account.  In no event shall any funds ever revert to the Employer, except as in Article XVII, Section 17.7, or Article VII, Section 7.3(c).

14.4     If the Employer notifies the Trustee in writing:

    (i)   that it has established another profit sharing plan providing comparable benefits to this Plan,

    (ii)  that such other Plan is qualified under Section 401 of the Internal Revenue Code

    (iii) and that it intended to discontinue contributions under this Plan due to the liabilities created under the new plan,

then, upon further written direction from the Employer, the Trustee shall cause all Trust funds to be transferred to such newly created plan. Thereafter, notwithstanding the provision of Section 14.3, all further obligations to Participants, their Beneficiaries, or the Employer under this Plan shall cease.  The Trustee shall be required to ascertain the proper applicability of such fund after the transfer is effectuated.

14.5     In the event of any merger or consolidation with, or the transfer of assets or liabilities to, any other plan, each Participant in

the Plan would (if the Plan then terminated) receive a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (if the Plan then terminated).

14.6    Any Participant under this Trust, who does not become an Employee of such other corporation or business organization as may assume the liability of this Plan, shall be entitled to receive from the Trustees the full amount of his credits, less expenses, in cash, plus his proportionate share of any interest or earnings which may have accumulated as of such discontinuance or amendment, as heretofore mentioned, as soon thereafter as possible.

14.7    Upon the termination of the Plan, the Trustees shall distribute all Assets remaining in the Trust after the payment of any expenses properly chargeable against the Trust to the Participants, in accordance with the value of the credits allocated to such Participants as of the date of such termination, in cash, and in such manner, as the Trustees shall determine.

14.8    For the purposes of this Article, the Insurance policy on the life of any Participant, shall be deemed to be an Asset credited under the Plan to the account of such insured Participant.

14.9     The Employer shall have the right at any time to suspend contributions hereunder.  In such event, it shall advise the Trustee to take such action on the Policies as are considered proper in the circumstances in accordance with the rules of the Insurer.  Should such suspension ripen into a complete discontinuance of contributions, each Participant shall have 1 100% nonforfeitable interest.

Should the Company discontinue or suspend company contributions to the Plan for three (3) years, all Participants shall have a 100% vested and nonforfeitable interest in their accounts.

14.10     If a partial termination of the Plan has occurred, the foregoing provisions shall apply to those persons affected by such partial termination.

ARTICLE XV:                    TRUST AND ADMINISTRATION


15.1      It shall be the duty of the Trustees:

          (i)   to hold, to invest, and to reinvest the Fund, and

          (ii)  to pay monies as provided for in the Trust,

                including payments to Employees and their

                Beneficiaries.

The Trustees shall be under no duty to enforce payment of any contribution

to the Fund, and shall not be responsible for the adequacy of the Fund to

meet and discharge liabilities under the Trust.


15.2      The Trustees shall have the power and duty to:

          (a)   Invest and reinvest the Funds without distinction

                between principal and income in any and all common

                stocks, preferred stocks, bonds, notes, debentures,

                mortgages, equipment trust certificates, real and

                personal property wherever situated, and in such

                other property, investments, and securities of any

                kind, class or character as the Trustees may deem

                suitable for the Fund and such investments by the

                Trustees under any present or future law.  The

                Trustees may use the Fund to purchase insurance

                policies or annuity contracts issued by an Insurer

                as provided in the Plan.

(b)  To sell for cash or on credit, to grant options, convert, redeem, exchange for other securities or other property, or otherwise to dispose of, any securities or other property at any time held by them.

(c)  To settle, compromise or submit to arbitration, any claims, debts, or damages, due or owing to or from the Trust, to commence or defend suit or legal proceedings and to represent the Trust in all suits or legal proceedings.

(d)  To exercise any conversion privilege and/or subscription right available in connection with any securities or other property at any time held by them; to oppose or to consent to the organization, consolidation, merger or readjustment of the finances of any corporation, company or  association, or to the sale, mortgage, pledge or lease of the property of any corporation, company or association, any of the securities of which may at any time be held by them, and to do any act with reference thereto, including the exercise of options, the making of agreements or subscriptions and the payment of expenses, assessments or subscriptions which may be deemed necessary or advisable in connection therewith, and

to hold and retain any securities or other property which they may so acquire.

(e) To exercise personally, or by general or by limited power of attorney, any right, including the right to vote, appurtenant to any securities or other property held by them at any time.

(f) To borrow money from any lender in such amounts and upon such terms and conditions as shall be deemed advisable or proper to carry out the purposes of the Trust and to pledge any securities or other property for the repayment of any such loan.

(g) To manage, administer, operate, lease for any number of years, regardless of any restrictions on leases made by fiduciaries, develop, improve, repair, alter, demolish, mortgage, pledge, grant options with respect to, or otherwise deal with any real property or interest therein at any time held by the Trustee, and to hold any such real property in their own names or in the name of a nominee, with or without the addition of words indicating that such property is held in a fiduciary capacity, and to cause to be formed a corporation or trust to hold title to any such real property with the aforesaid powers, all upon such terms and conditions as may be deemed advisable.

(h)  To renew or extend, or participate in the renewal or extension of any mortgage upon such terms as may be deemed advisable; and to agree to a reduction in the rate of interest on any mortgage or to any other modification or change in the terms of any mortgage or guarantee pertaining thereto, in any manner and to any extent that may be deemed advisable for the protection of the Trust Fund or the preservation of the value of the investment; to waive any default whether in the performance of any covenant or condition of any mortgage or in the performance of any guarantee, or to enforce any such default in such manner and to such extent as may be deemed advisable; to exercise and enforce any and all rights of foreclosure, to bid in property for foreclosure, to take a deed in lieu of foreclosure with or without paying a consideration therefor and in connection therewith, to release the obligation on the bond secured by such mortgage, and to exercise and endorse in any action, suit or proceedings at law or in equity and rights or remedies in respect to any such mortgage or guarantee.

(i)  To diversify the investments of the Fund so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so.

(j)  To hold part or all of the Fund uninvested, without being

liable for interest on such Funds.

(k)  To employ suitable agents and counsel and to pay

their reasonable expenses and compensation.

(l)  To form corporations and to create trusts to hold

title to any securities or other property, all upon

such terms and conditions as may be deemed advisable.

(m)  To make, execute and deliver as Trustees, any and all

deeds, leases, mortgages, conveyances, contracts,

waivers, releases or other instruments in writing

necessary or proper for the accomplishment of any

of the foregoing powers.

(n)  To open and maintain any bank account or accounts in

the name of the Trustees in any bank or banks as the

Trustees shall determine.

(o)  To do all acts that the Trustees may deem necessary

to carry out any of the powers set forth herein or

otherwise in the best interest of the Trust Fund.

15.3    The Trustees may delegate any of their ministerial powers or

duties hereunder, including the signing of any checks drawn on their

account, to any one of their agents or employees, including one or more

Trustees.  In addition, the Trustees may delegate investment powers to a corporate Trustee or custodian which is a duly licensed bank; or to an investment manager.

15.4     Upon such delegation of investment management to a bank, corporate Trustee or custodian, or investment manager, the Plan Trustee shall not be liable for the acts or omissions of such manager, or be under an obligation to invest or otherwise manage any asset of the Plan which is subject to the management of such investment manager, corporate Trustee, custodian, or bank.

15.5     In the case where a Participant or Beneficiary exercises control over the assets in his account, the Trustee shall not be liable for any loss, or by reason on any breach of fiduciary duty, which results from such Participant's or Beneficiaries' exercise of control.

15.6     In the exercise of all powers granted to the Trustees originally names in this Agreement, each action shall be approved by such Trustees. In the event that an additional Trustee or Trustees shall be named by the Board of Directors to act hereunder, the action of a majority of the individuals acting as Trustees shall suffice.  If there be only one Trustee acting hereunder, his action alone shall be sufficient.  Any instrument to be executed in behalf of the Trustees, including any check issued by

or to the order of the Trustees, may be made, executed, signed, endorsed or delivered by any one of the Trustees, and any person, firm or corporation, including any bank, may rely upon and shall be protected in relying upon the signature of any Trustee so signing with the same force and effect as though all Trustees had signed.

15.7    The expense incurred by the Trustees in the performance of their duties including fees for legal, accounting and investment services rendered to the Trustees, and such compensation to the Trustees as may be agreed upon in writing from time to time between the Employer and the Trustees, shall be paid from the Fund unless paid by the Employer. All taxes of any and all kinds whatsoever that may be levied or assessed under existing or future laws upon, or in respect of, the Trust Fund or the income thereof shall be paid from the Trust Fund.

15.8    The individuals named herein as the Trustees and any successor Trustees shall not be liable for the making, retention or sale of any investment or reinvestment made by them as herein provided, nor for any loss to or diminution of the Fund, provided that they act with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in his conduct of an enterprise of like character and with like aims.  The Trustees may, from time to time, consult with counsel who may be counsel to the Employer, and shall be fully protected in acting upon the advice of such counsel.

15.9     A Trustee shall not be liable for any act or omission, or breach of duty of a co-trustee, unless:

      (a)   he participates knowingly in, or knowingly undertakes to conceal such act or omission of such other Trustee, knowing such act or omission is a breach of duty;

      (b)   upon becoming aware of a breach of a co-trustee, does not make reasonable efforts under the circumstances to remedy the breach;

      (c)   in the administration of his specific responsibilities, he has enabled such other Trustee to commit a breach.

15.10    The Trustees shall keep accurate and detailed accounts of all investments, receipts, disbursements, and other transactions hereunder, and all accounts, books and records relating thereto shall be open to the Employer. Within two hundred and ten (210) days following the close of each fiscal year, and within one hundred and twenty (120) days after the removal or resignation of a Trustee, as provided in Section 14.8 hereof, the Trustees shall file with the Employer a written account setting forth all investments, receipts, disbursements and other transactions effected by them during such fiscal year, or during the period from the close of the last fiscal year to the date of removal or resignation.

15.11    A Trustee may be removed by the Employer at any time upon five (5) days' notice in writing to the Trustee. A Trustee may resign

at any time upon five (5) days' notice in writing to the Employer.  At
any time, the Employer may reduce or increase the number of Trustees.
Upon the death, removal or resignation of a Trustee, the Employer may
appoint a successor Trustee, and if it so elects, successor Trustees or
additional Trustees, who shall have the same powers and duties as those
conferred upon the Trustees hereunder.  Upon acceptance of such appointment
by a successor or an additional Trustee or Trustees, the removed Trustee,
successor Trustee and the continuing Trustee or Trustees, the removed Trustee,
successor Trustee and the continuing Trustee, if any, shall make an account-
ing to the Employer of the funds and properties then constituting the Trust
Fund.  The resigned or removed Trustee is authorized however, to reserve
such sums of money as he may deem advisable for payment of fees and expenses
in connection with settlement of his account, if such settlement be
necessary.  Any balance of such reserve remaining after the payment of such
fees and expenses shall be paid over to the continuing Trustee, if any, and
the successor Trustee.

15.12    The Trustees shall pay all amounts payable pursuant to the
Plan only to Participants and Beneficiaries, and no payment shall be made
into the hands of any other person or corporation whatsoever.  So that
said payments may not be liable for the debts, contracts or engagements
of any such designated person, no person shall have the right to alienate,
arbitrate, execute, pledge, encumber or assign any such payments or
the benefits, proceeds or avails thereof.  If the person entitled to receive

payments be a minor or a person of unsound mind, whether or not adjudicated incompetent, the Trustees may make such payments to such person or persons, corporation or corporations as may be or be acting as parent or legal or natural guardian of such infant or person of unsound mind.  The receipt of such person or corporation shall be a full and complete discharge to the Trustee for any such payments.

15.13    The Trustee is specifically authorized to make loans and other distributions to the Participants in accordance with Article XI.

15.14    The Trustee shall be bonded as required by law.

15.15    On each Valuation Date, the Trustee shall determine the net worth of the Trust Fund.  In determining such net worth, the Trustee shall value the assets of the Investment Fund at their fair market value as of such Valuation Date and shall deduct all expenses for which the Trustee has not obtained reimbursement from the Employer or from the Trust Fund.  Such valuation shall not include any contribution to be credited to the Participants on such Valuation Date.  Any increase or decrease in such valuation shall be allocated to the Account of each Participant in the same ratio that the value of the Participant's Account bears to the total value of all Participants' Accounts as of the last Valuation Date, adjusted by disbursements, payments, and charges against the Account, as stated in Article VI.

ARTICLE XVI:          INSURANCE AND ANNUITY POLICIES

16.1     The Trustees may purchase a life insurance or annuity policy on the life of each Participant.  Such policy shall be for the face amount stipulated by the Participant, or the amount purchaseable by allocating a percentage of each contribution to such purchase as specified by the Participant.

16.2     If the Insurer classifies a Participant as not insurable at standard rates, the death benefit payable to the designated Beneficiary prior to the Participant's Normal Retirement Date provided under any life insurance policy may be a reduced death benefit equivalent in value, on the basis of the Participant's classification, to the death benefit that would have been provided if the Participant had been considered a standard risk by the insurer.  Alternatively, a Retirement Annuity may be purchased for the premium that otherwise would have purchased a life insurance policy.

16.3     If a Participant is determined by the Insurer to be uninsurable, a Retirement Annuity may be provided for such Participant, instead of a Life insurance policy, in the amount that can be purchased for an annual premium equal to the sum that would have been used to provide a life insurance policy as described in Section 10.01 if the Participant were insurable at standard rates.

16.4      The following rules shall be applicable to the acquisition, handling and disposition of all policies:

    (a)  The basic options, cash surrender values and other material features of all policies shall be as nearly uniform as possible and no option shall be used that will in any way be in violation of the Internal Revenue Code, as amended, or any provision of this Plan.

    (b)  The Trustees shall be designated the sole owners of all Policies purchased hereunder; but all benefits, rights, privileges and options under such policies and all dividends payable or refunds made by the insurance company on such Policies shall be exercised and dealt with for the sole benefit of such Participants (or their Beneficiaries) on whose behalf the Policies were purchased.

    (c)  Payments made to the Insurer with respect to any Policy purchased on behalf of an Active Participant shall constitute an investment of the funds credited to such Participant's Account, and his Account shall accordingly be reduced by any such payments.

    (d)  If the Policy purchased on behalf of an Active Participant is ordinary life insurance, the aggregate premium paid for such Policy shall be less than

one-half of the aggregate Employer contributions and forfeitures allocated to the Account of such Participant.

    (e)  If the Policy purchased on behalf of an Active Participant is term insurance, the aggregate premium paid for such Policy shall be less than one-quarter (1/4) of the aggregate Employer contributions and forfeitures allocated to the Account of such Participant.

16.5    Upon the retirement of an Active Participant, the Trustees shall transfer and deliver any Policy held on behalf of such Participant to the Participant (with such endorsements as the Trustee may direct); convert such Policy to an annuity; or surrender such Policy, in which case the cash proceeds thereof shall be included as part of the Account of such Participant and distributed accordingly.  Notwithstanding anything to the contrary in this Plan, in the event that Policies are distributed to a Participant such Policies shall be endorsed as nontransferable.·

16.6    All death benefits payable under any Policy held on behalf of an Active Participant shall be paid to the Beneficiary designated by such Participant pursuant to Article III.  Such benefits may, as the Trustees shall determine, be paid directly by the insurance company to the designated Beneficiary in a lump sum; paid to the Trust Fund, in which case the cash proceeds thereof shall be included as part of the Account of such Participant

and distributed accordingly; or paid under the settlement options contained in any such Policy as elected by the Participant, or, in the absence of such election, by the Trustees.

16.7    The Trustees shall have the power, which shall be exercised upon direction of the Employer, to invest in life insurance policies on the lives of key employees of the employer, payable upon death to the Trust as Beneficiary.  Such policies shall be vested exclusively in the Trustees for the benefit of the Trust and death proceeds received under any such policy shall be considered income to the Trust and shall be allocated according to Article VI.

16.8    In the event of any conflict between the pensions of this Plan and the terms of any policy or contract, the provisions of the Plan shall prevail.

ARTICLE XVII:                    MISCELLANEOUS

17.1     The adoption and maintenance of the Plan shall not be deemed
to constitute a contract between the Employer and any Employee or to be
a consideration for or inducement or condition of the employment of any
person.  Nothing herein contained shall be deemed to give to any Employee
the right to be retained in the employ of the Employer or to interfere
with the right of the Employer to discharge any Employee at any time, nor
shall it be deemed to give the Employer the right to require an Employee
to remain in its employ nor shall it interfere with the Employee's right
to terminate his employment at any time.

17.2     All benefits payable under the Plan shall be paid or provided
for solely from the Trust, and the Employer assumes no liability or
responsibility therefor.  The Employer is under no legal obligation to
make any contribution to the Trust, other than as stipulated in Article IV.
No action or suit shall be brought by an Employee, or Beneficiary, or by
the Trustee, against the Employer for any such contribution.

17.3     The right of any Participant or his Beneficiary to any benefit
or to any payment hereunder shall not be subject to alienation or
assignment and no Participant shall attempt to assign, transfer or dispose
of any such right.

17.4     In the event any benefit is payable to a minor, or incompetent, or to a person under legal disability, or (in the sole discretion of the Employer) is by reason of advanced age, illness or other physical or mental incapacity incapable of handling the disposition of his property, the Employer may apply the whole or any part of such benefit, directly to the care, comfort, maintenance, support, education or use of such person or pay or distribute the whole or any part of such benefit to:

     (i)   the parent of such person,

     (ii)  the guardian, committee or other legal representative wherever appointed, of such person,

     (iii) the person with whom such person shall reside,

     (iv)  any person having the care and control of such person, or

     (v)   such person personally, the receipt of the person to whom any such payment or distribution is to be so made,

being sufficient discharge therefor.

17.5     Any payment to a Participant or his legal representative or Beneficiary, in accordance with the provisions of this Agreement shall, to the extent thereof, be in full satisfaction of all claims hereunder against the Trustees and the Company; either of whom may require such Participant,

legal representative, or Beneficiary, as a condition precedent to such payment, to execute a receipt and release therefor in such form as shall be determined by the Trustees or the Company as the case may be.

The Trustees shall have complete authority to deny, revoke, or withhold any payment of benefits if, in their opinion, the proofs do not justify the same; and the Participants or their Beneficiaries may be required or called upon to give satisfactory evidence that they are entitled to a continuance of any of the benefits granted herein, and provided for.

17.6    If the Trustees are unable to make any payment to any person to whom a payment is due under the Plan because they cannot ascertain the identity or whereabouts of such person and if any such payment is due, a notice of the payment due is mailed to the last known address of such person as shown on the records of the Company and within twelve (12) months after such mailing such person has not made written claim therefore, the Trustees may direct that such payment and all remaining payments with respect to such Participant be held in Trust until the Participant's normal retirement age, or (in the sole discretion of the Trustees) paid to the Participant's Beneficiary, or legal representative in accordance with the provisions of Section 17.4 and 17.5 of this Article. Expenses and Administrative Fees may be charged directly against the account for its

settlement or annual administration and maintenance. At the Participant's Normal Retirement Date, said account may be paid to his named Beneficiary, or otherwise distributed or disposed of in accordance with appropriate federal laws at that time.

This Indenture and each and every provision thereof shall be binding on the parties hereto, and their respective heirs, executors, and administrators, and upon all persons having or claiming to have any interest of any kind or nature, in or under this Indenture or any contract issued pursuant thereof.

17.7     The Plan is amended with the intent that it shall qualify under Section 401 of the Internal Revenue Code, as amended, and that it shall comply with the Employee Retirement Income Security Act of 1974 as amended, and all other applicable federal and state laws, regulations and rulings. Notwithstanding any other provision herein to the contrary, if the Internal Revenue Service initially determines that the Plan does not so qualify, and if the Plan is not amended as required to so qualify, before the time allowed by law for the Employer to file its corporate federal tax return for the taxable year, the restatement shall be considered to be rescinded and of no force and effect. In such event the market value of all assets attributable to this year's contribution held hereunder, after payment of incurred expense, shall be returned to the Employer and the Employer shall refund to the Employee contributions, if any, made by the Employee to the Plan. The Plan shall then be terminated in accordance with the provisions for termination.

17.8    Wherever appropriate, words used in the Trust Agreement in the singular, may include the plural, or the plural may be read as the singular; and the masculine may include the feminine.

17.9    The headings and sub-headings in this Agreement are inserted for convenience of reference only, and are not to be considered in connection with the provisions of this Trust.

17.10    The definitions in this Plan and Trust relating to Normal Retirement Date, Early Retirement Date, Disability, or Termination of Employment shall apply only to this Plan, and shall not be interpreted as the personnel policy of the Company.

17.11    This Agreement has been executed in six (6) counterparts, each of which shall be deemed an original and each counterpart shall constitute but one and the same Instrument, which may be sufficiently evidenced by any one counterpart.

17.12    This Agreement and the Trust hereby created, shall be construed, administered and governed in all respects under the Laws of the State in which this Plan is administered.

17.13   The Trustees shall make available for examination in the principal offices of the Plan, by any Participant or by his Beneficiary, copies of the Trust Instrument, and any amendments made thereto.

A description of this Plan shall be given to each eligible Employee within the time prescribed by law, after he becomes eligible to participate in the Trust, and in event of any amendments to the Trust, each eligible Participant shall receive a description of such amendment.

17.14   If, for any reason the Plan is no longer qualified, and if the Trustee has commingled the Trust assets with assets belonging to other exempt employees' trusts, the funds attributable to this Plan shall be segregated by the Trustee separately invested within 60 days from the date notice of disqualification is received from the Internal Revenue Service.

Should a Plan or Trust with which these Trust Funds are commingled be found no longer qualified, the assets attributable to this Plan shall be segregated, and separately invested within 60 days.

17.15   The Trustees shall use a uniform, non-discriminatory policy in interpreting this Trust Instrument.

2278

IN WITNESS WHEREOF:  the Company has caused this Indenture to be executed by its duly-authorized Officers, and has affixed its Corporate Seal; and the Trustees have hereunto affixed their signatures, all on the day and year first above set forth.

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.

BY: _____

(SEAL)

TRUSTEE: _____

TRUSTEE: _____

2279