**EXHIBIT 39**

1           UNITED STATES DISTRICT COURT
            DISTRICT OF NEW JERSEY
2           CIVIL ACTION CASE NO. 2:08-CV-1567
    -------------------------------------------:
3   DR. FADI CHAABAN; DR. SABINO R. TORRE, DR.  :
    CONSTANTINOS A. COSTEAS and DR. ANTHONY J.   :
4   CASELLA, as Trustee of Diagnostic & Clinical :
    Cardiology, P.A. Profit Sharing Plan,       :
5                                               :
6             Plaintiffs,                       :
                                                :                ORIGINAL
7        vs.                                    :
                                                :
8   DR. MARIO A. CRISCITO,                      :
                                                :
9             Defendant.                        :
    -------------------------------------------:
                         Tuesday, June 16, 2009
10

11           Deposition of BRIAN WARNOCK, VOLUME I, before

12   Nancy A. Miani, a Certified Court Reporter, License

13   No. XI00814, and a Notary Public of the State of New

14   Jersey at the offices of WITMAN, STADTMAUER, ESQS, 26

15   Columbia Turnpike, Florham Park, New Jersey, on

16   Tuesday, June 16, 2009, at 10 a.m.

17

18

19

20

21
                    MIANI COURT REPORTING
22              CERTIFIED COURT REPORTERS
                     1741 DANIEL COURT
23                   WALL, NJ  07719
                     (732) 681-4776
24

25

```
 1    A P P E A R A N C E S:

 2    WITMAN, STADTMAUER, ESQS.
      26 Columbia Turnpike
 3    Florham Park, NJ 07932
      By:   STEPHEN M. CHARME, ESQ.
 4    Attorneys for the Plaintiffs

 5    KERN, AUGUSTINE, CONROY & SCHOPPMANN, P.C.
      1120 Route 22 East
 6    Bridgewater, NJ 08807
      BY:   STEVEN KERN, ESQ.
 7    AND   CHARLES H. NEWMAN, ESQ.
      Attorneys for the Defendant
 8
      ALSO PRESENT:
 9
      Anthony Casella, M.D.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      A.      To 1979, yeah.

2      Q.      Okay.  I'm sorry.  What was the next one?

3      A.      Bankers National Life Insurance Company.

4      Q.      What did you do there?

5      A.      Again, in the Pension Department.  The

6  ERISA Unit.

7      Q.      Is that what it was called?

8      A.      Yeah.

9      Q.      How long did you work there?

10      A.      Well, until 1981.

11      Q.      Okay.

12      A.      And then the present occupation, American

13  Pension Corporation.

14      Q.      So you joined -- I'm going to call them

15  APC.  Is that okay?

16      A.      Yes.

17      Q.      You joined APC in 1981?

18      A.      That's correct.

19      Q.      Let's go back to Mutual Benefit Life

20  Insurance.  Did you have any job title there?

21      A.      Reporting and disclosure technician,

22  actually.

23      Q.      What did your job consist of while you

24  were there?

25      A.      We prepared documents for pension plans,

1          A.        I was young back then.

2          Q.        How did you come to know APC had a

3     position available?

4          A.        A gentleman I worked with, named Ray

5     Miller, worked with me at Mutual Benefit Life, and he

6     had worked there, and he was leaving for another

7     position.

8          Q.        He was leaving APC?

9          A.        He was leaving APC and he called me and I

10    took his job, basically.

11         Q.        Okay.  What was the job that you took?

12         A.        Administering pension plans.

13         Q.        And since you joined APC in 1981, have

14    your job responsibilities changed at all?

15         A.        They've been increased.

16         Q.        Tell me how they've increased.

17         A.        Well, I'm the vice-president now.  When I

18    started there, it was the owner and me, a secretary

19    and a part-timer, and now we have nine people.  So

20    there's a president, myself, and one, two -- three

21    administrators, a part-time administrator.

22         Q.        Who is currently the president --

23         A.        And office staff.  Peter Coughlan,

24    C-O-U-G-H-L-A-N.  And he owns the company.

25         Q.        And you're the vice-president?

1    A.        Yes.

2    Q.        And then you said there were three, what,

3    administrators?

4    A.        Right.

5    Q.        Okay.

6    A.        Third party administrators we call them.

7    Q.        Who are they?

8    A.        Dominique Eck, Joyce Plesnarski, and

9    Stuart Tankenbaum.

10    Q.        Are the other employees just clerical

11    staff?

12    A.        Yes.

13    Q.        Okay.  What -- first of all, how long has

14    Dominique Eck been there?

15    A.        20 years.  20 plus.

16    Q.        And what about Joyce?

17    A.        About seven.

18    Q.        And Stuart --

19    A.        Right around the same.  I think it's

20    eight and seven.  Joyce would be eight, Stuart would

21    be seven.  I could be off.

22    Q.        Okay.  Do you do -- when you went to APC,

23    did you do Form 5500's again?

24    A.        Yes.  But more involved than just the

25    5500's.  We would also prepare the annual reports,

1    Q.    I thought APC, itself, was the third
2    party administrator.  Am I mistaken?
3    A.    Well, I mean, they have titles, but we
4    call them pension consultants.  There's no special
5    significance to their title.  I think one is called a
6    consultant, one is an analyst.
7    Q.    Do you know what a third party
8    administrator is for a pension plan?
9    A.    Yes.
10   Q.    Okay.  Tell me what your understanding of
11   that is.
12   A.    Third party administrator would be --
13   would assist the client, the plan trustees in
14   preparing the reports.  We don't have -- we are not
15   trustees.  We are not the plan administrators.  So we
16   are a little more than clerical, but we're basically
17   doing the paperwork for the employer as the third
18   party administrator.
19   Q.    Do you do work sometimes with the
20   trustees of plans?
21   A.    On -- 99 percent of our plans the trustee
22   is the owner of the company.
23   Q.    Have you heard of Diagnostic & Clinical
24   Cardiology?
25   A.    Yes.

1       Q.      When did you first hear of that company?

2       A.      We have been working on them, really

3   since I started in -- started at American Pension

4   Corporation.

5       Q.      You started there in 1981, correct?

6       A.      Yes.

7       Q.      At the time you started there, was

8   Diagnostic & Clinical Cardiology already a client of

9   APC?

10      A.      It was a client for, I believe, since

11  1980.  Right before I started.

12      Q.      Before you started, who was working on

13  the account?

14      A.      Probably Ray Miller.  I couldn't -- I

15  would say I don't know.

16      Q.      When you joined APC in 1981, did you

17  start doing work with Diagnostic & Clinical

18  Cardiology?

19      A.      I don't recall specifically --

20      Q.      Okay.

21      A.      -- if I worked on that plan or not.

22      Q.      At some point after you joined, whether

23  it was 1981, but at some point did you ever work on

24  that plan?

25      A.      Yes.

1          Were you aware whether Dr. Criscito was a
2    trustee of the DCC plan?

3          A.      Yes.  Yes.

4          Q.      Were you aware if there were any other
5    trustees besides him?

6          A.      I would have to look at the document.  I
7    believe he was the only trustee.

8          Q.      Okay.  Now, you told me before that when
9    you worked, I think at Mutual Benefit and you did Form
10   5500's, that you would get information from the owners
11   and the trustees to prepare those forms.  Is that
12   correct?

13         A.      Correct.

14         Q.      Did you get information from Dr.
15   Criscito, you or someone else at APC that you know in
16   order to prepare the Form 5500 for DCC?

17         A.      Yes.

18         Q.      You got that information from Dr.
19   Criscito as opposed to Dr. Casella.  Is that correct?

20         A.      That is correct.

21         Q.      Okay.

22         A.      There was a -- let me clarify.  Because
23   the information came from a few different sources.
24   With the individual accounts, there were about five
25   doctors with individual accounts, they would either

1    send it personally, they might have given it to Dr.

2    Casella to send to me, they might have given it to Dr.

3    Criscito to send to me, they might have sent it

4    themselves, but it was their own separate account so

5    that information could have come from whoever it was

6    convenient for them to do.  They might have mailed it

7    to me, they might have given it to Dr. Criscito, they

8    may have given it to Dr. Casella to send on those

9    separate accounts.

10          The statements that came for the, I'll

11   call it the rank and file employees for Morgan

12   Stanley, I believe Morgan Stanley sent them directly

13   to us.  Any information regarding the account that

14   Dr. Criscito was in came only from Dr. Criscito.

15        Q.     Okay.  You mentioned at some point in

16   time there was something called a commingled account.

17   Are you familiar with that term --

18        A.     Yes.

19        Q.     -- as it applies to DCC?

20        A.     Yes.

21        Q.     And as far as you knew, who was in the

22   commingled account?  I don't mean the individual

23   names, I mean generally, who comprised it?

24        A.     It was Mario Criscito, all of the rank

25   and file, clerical, whatever, and generally, the -- I

1    think the newer doctors were in the plan for the first

2    couple of years.

3         Q.    And am I correct that to get the

4    information for the Form 5500 as to the valuation of

5    the commingled account in which Dr. Criscito and other

6    DCC employees were, you got that from Dr. Criscito?

7         A.    Yes.

8         Q.    And you got that from no one else?

9         A.    Only from Dr. Criscito.

10        Q.    Okay.  Are you aware that at some point,

11   Dr. Criscito took a loan from the plan?

12        A.    I am aware of it because Dr. Casella told

13   me that in the last year or something.  I was not --

14        Q.    Okay.  I'm going --

15        A.    We did a statement then, certainly we

16   were aware of it.

17        Q.    I'll show it to you.  Give me a second.

18             MR. CHARME:  I'm going to have the

19   reporter mark as Warnock Exhibit 1 a document that is

20   entitled "Loan Amortization Schedule."

21             (Exhibit Warnock-1 is received and marked

22   by the Reporter for Identification.)

23        Q.    Mr. Warnock, take a look at that and tell

24   me if you've seen that before.

25        A.    This would have been prepared by our

1    office.   I'm sure I did see it at some point in time.

2        Q.       That was something prepared by APC?

3        A.       By APC, yes.

4        Q.       Okay.   According to this it says

5    "initial amount borrowed, $250,000."  Do you see that?

6        A.       Yes.

7        Q.       Were you aware whether there was any

8    limitation in the plan documents as to the amount of

9    money that could be borrowed?

10       A.       Back in 1982, the limit -- you would have

11   been able to take a very high loan.  I don't recall

12   exactly what the law was at the time, but he would

13   have needed enough in his account to cover that.  Now

14   it's a $50,000 limit.  But that changed several years

15   later.

16       Q.       Did you recall reviewing the plan

17   documents before this loan was taken out by Dr.

18   Criscito to see if he could borrow this?

19       A.       I don't specifically remember that.  That

20   would have been our normal practice.

21       Q.       You don't remember doing that?

22       A.       Do I remember doing this?  No.

23       Q.       Okay.  I'm going to show you a series of

24   documents that I'm going to mark as Warnock-2, have

25   the reporter mark it before I give it to you.

1    APC, though?

2                    THE WITNESS:  Oh, yeah.

3         A.       If I had access to all the files, I would

4    be able to tell you.

5         Q.       What would you have to look at to tell me

6    who prepared those?

7         A.       I would probably have backup sheets that

8    I could recognize the handwriting of who did it.

9                    MR. CHARME:  Okay.  I'm going to show

10   you what I'm asking the reporter to mark as Warnock-3,

11   which is a series of sheets.  They're not in Bate

12   stamped order.

13                    Steve, do you want me to read the Bate

14   stamps into the record?

15                    MR. KERN:  Wouldn't be a bad idea.

16                    MR. CHARME:  Okay.

17                    (Warnock-3 is received and marked by the

18   Reporter for Identification.)

19                    MR. CHARME:  Just for the record, the

20   first page is Bate stamped 25430, the second is 25432.

21   The third is 25473.  The next is 25475.  The next is

22   25493.  The next is 25527.  The next is 25550.

23        Q.       Do you have all those pages, Mr. Warnock?

24        A.       The last page I don't have.

25                    MR. KERN:  25550?

1    Q.    You got it?

2    A.    Yes.

3    Q.    Once again, in an effort to save time, I
4    would like you to look through these, and if any of
5    the handwriting is yours, please tell me and then
6    we'll go through which handwriting is yours.

7    A.    On the last page.

8    Q.    The very last page, which is 25550?

9    A.    Yes.

10    Q.    What handwriting is yours?

11    A.    Where it says "loan all paid."

12    Q.    That's in the middle of the page?

13    A.    Right.

14    Q.    That is your handwriting?

15    A.    That is my handwriting.  And then where
16    it says "deposited before," looks like "March 31st,"
17    that's my handwriting, and the parentheses on the
18    sides, "30 plus 30 plus 5 for," and that would be
19    referring to the $65,000.

20    Q.    Do you know whose handwriting it is at
21    the bottom right where it says "loan has been paid
22    off"?

23    A.    No.

24    Q.    Okay.  Aside from what you identified on
25    the last page, none of the other handwriting on these

54

1    recall him being.  I think it was just Dr. Criscito.

2              MR. CHARME:  Okay.  I'm going to ask the

3    reporter to mark as Warnock-7 a document that is not

4    Bate stamped, that is entitled Form 5500, and it has

5    the year 1999 on it.

6              (Exhibit Warnock-7 is received and marked

7    by the Reporter for Identification.)

8         Q.    I want you to take a look at this form,

9    and tell me if you've seen it before.

10        A.    This would be a 5500 form prepared by our

11   company.

12        Q.    For Diagnostic?

13        A.    For Diagnostic & Clinical Cardiology.

14        Q.    Okay.  You joined APC in 1981, correct?

15        A.    Yes.

16        Q.    Was APC preparing the Form 5500 for

17   Diagnostic & Clinical Cardiology as of the time you

18   joined in 1981?

19        A.    Yes.

20        Q.    Okay.  As far as you know, between 1981

21   and the year 2005, were there any years in which APC

22   did not prepare the Form 5500 for DCC?

23        A.    No.  We prepared it every year.

24        Q.    Okay.  On the first page of this

25   document, typewritten is the word "Mario Criscito,

1    either from the broker or from the individuals?

2        A.       Yes.

3        Q.       Okay.  Do you recall how long the

4    commingled account existed?

5        A.       It existed until it was distributed.  It

6    was either  -- I think it was either -- that would

7    have been in 2005, when it was paid out.  You can see

8    there's a benefit paid of 400 -- $4,528,235.  I think

9    the bulk of that, maybe not all of that, but the bulk

10   of that was Mario Criscito's.

11       Q.       And all during this time period, 2000

12   through 2005, the information as to the commingled

13   account came from Dr. Criscito?

14       A.       That's correct.

15       Q.       It came from no one else, correct?

16       A.       No one else.

17              MR. CHARME:  Okay.  I'd ask the reporter

18   to mark as Warnock-9 a group of documents.  The first

19   page is not Bate stamped.  At the bottom handwritten

20   is 9/14/98.  The second page is 25870, the third page

21   is 25957, and the next page is 25997.

22              (Warnock-9 is received and marked by the

23   Reporter for Identification.)

24       Q.       I'd like you to take a look at the first

25   page.  There is fax information at the bottom which

1    has Dr. Criscito's name.  And I'm going to ask you if

2    you recall whether you received this page from Dr.

3    Criscito around the time that the fax information is

4    dated, which is September 14, 1998.

5         A.    That would be right.

6         Q.    Okay.  Do you recognize this as Dr.

7    Criscito's handwriting or not?

8         A.    Well, as I said before, I'm not intimate

9    with his handwriting, but it's signed from Dr.

10   Criscito, so my assumption is it is his.  His

11   handwriting.

12        Q.    And what is this information that's on

13   this piece of paper?

14        A.    This is basically the questionnaire, the

15   response to the questionnaire again.  This is the list

16   of the assets as of December 31st, 1997.

17        Q.    And in fact, it says from Dr. Mario

18   Criscito to Brian.  Do you see that?

19        A.    Yes.

20              MR. KERN:  To Brain.

21        A.    To Brain.  I do see that.

22        Q.    So there is no doubt that you -- that Dr.

23   Criscito sent this to you, correct?

24              MR. KERN:  Objection.  He already said --

25              MR. CHARME:  You can't direct a non-party

1    witness not to answer.   You stated your objection.

2                MR. KERN:   You just characterized the

3    testimony.

4        Q.      Mr. Warnock, there's no doubt in your

5    mind that this fax was sent to you by Dr. Criscito, is

6    there?

7        A.      No.

8        Q.      Okay.  I want you to take a look at the

9    first page of Exhibit 3, which originally you said you

10   thought was Dr. Criscito's handwriting, then you said

11   you weren't sure it was his handwriting.  Now that

12   I've shown you Exhibit 9, which you've identified as

13   coming from Dr. Criscito, do you think the handwriting

14   on the first page of Exhibit 3 is his, too?  Only if

15   you can answer.

16       A.      I can't answer for sure.

17       Q.      Okay.  I'd like you to go to Page 25870.

18               MR. KERN:   Of which?

19               MR. CHARME:  Warnock-9, it's the second

20   page.

21       Q.      It looks like there might have been fax

22   information, but it's cut off on my copy.  If you turn

23   to the next two pages, you will see fax information

24   that has Dr. Criscito's name.  Do you see that at the

25   bottom of 25957 and 25997?

1       A.      Yes, I do.

2       Q.      Okay.  As to those two pages, those were,

3  as far as you know, were those faxed to you from Dr.

4  Criscito?

5       A.      Yes.

6       Q.      Okay.   Do you believe that Page 25870

7  was also faxed to you by Dr. Criscito?

8       A.      Yes.

9       Q.      What was the purpose in faxing these

10  different pages to you?

11       A.      This would be so we could complete the

12  annual report and 5500 forms.

13       Q.      When you say complete the annual report

14  and 5500 forms, is there a difference between the

15  annual report and the 5500?

16       A.      They -- they go together.  It's all one

17  thing.

18       Q.      But I just want the record to be clear.

19  Is there a separate document you prepared called

20  annual report that is different from the Form 5500?

21       A.      We -- we produced participant statements,

22  which would be part of the annual report.  That is

23  different from the 5500 forms.

24       Q.      Those are called participant statements?

25       A.      Uh-hum.

1              (Exhibit Warnock-10 is received and

2    marked by the Reporter for Identification.)

3         Q.      Mr. Warnock, I have marked both pages

4    together because while it appears to be the same

5    document, there is information on one page that you

6    can see that you can't see on the other.

7         A.      Okay.

8         Q.      Have you seen this before?

9         A.      Yes.

10        Q.      Okay.  Is this something that Dr.

11   Criscito faxed to you?

12        A.      Yes.

13        Q.      Okay.  The fax date on the top of the

14   first page, as well as on the top of the second page,

15   is January 13th, 2000.  Do you see that?

16        A.      Yes.

17        Q.      Is that the date that you believe it was

18   faxed to you by Dr. Criscito?

19        A.      Yes.

20        Q.      Okay.  Can you, on the first page that I

21   marked, as well as on the second page, there is

22   handwriting in the upper right hand corner.  Is that

23   yours?

24        A.      Where it says "do Mario's" --

25        Q.      Yes.  Could you read that, please.

1          A.        "Do Mario's report ASAP and send to Mario
2    so he can transfer to separate accounts."

3          Q.        Do you know what that refers to?

4          A.        Yes.   They were going to take the money
5    out of the commingled account and set up separate
6    accounts for everyone.

7          Q.        Okay.   Did Dr. Criscito tell you why he
8    wanted to set up segregated accounts in 2000?

9          A.        I don't remember him specifically talking
10   about it.

11         Q.        Do you remember whether you had any
12   conversations with him before then talking about the
13   possibility of taking the commingled account and just
14   having everyone set up separate segregated accounts?

15         A.        We mentioned it a few times over the
16   years that it would be a good idea, it's much cleaner,
17   much easier, and particularly since some of the
18   doctors had separate accounts, everyone should really
19   have the right to a separate account.

20         Q.        When you say it was much cleaner and much
21   easier to have segregated accounts, how so?

22         A.        Well, usually a plan either has one
23   commingled account for everybody or everybody has a
24   separate account.   In this case, we had, you know,
25   five doctors with their own separate accounts, putting

1   the money wherever they felt like it, two or three

2   places, generally because they had larger accounts.

3   Then we had the rank and file employees with -- well,

4   eventually it went to that regular account with Morgan

5   Stanley.  In this case they were part of this account,

6   so it was almost like we were doing two reports.  It

7   was extra work involved, and splitting out just one

8   piece of the plan, it was almost like a plan within a

9   plan.  So yeah, it's more -- more convoluted.  Usually

10  you do one or the other, you don't do both.

11      Q.      Okay.  Did Dr. Criscito tell you why, in

12  2000, he had decided to do segregated accounts?

13      A.      I don't recall if he said that.  I know

14  at the time, you know, in speaking to Mark Brown, who

15  was -- Mark Brown wanted his own separate account.  I

16  think it may have been a -- the other people wanted

17  it.  Maybe the other trustees were pushing for it,

18  also.

19      Q.      You don't know?

20      A.      I think after the fact I know that the

21  trustees wanted it, the newer doctors wanted separate

22  accounts.

23      Q.      Well, let me --

24      A.      Well, I do know.  I do know, for example,

25  Dr. Chaaban had his money in the commingled account,

1        Q.       In the middle left of the page, it says

2    "for Mario."  Is that your handwriting?

3        A.       Per Mario.

4        Q.       Per Mario.

5        A.       Uh-hum.

6        Q.       What is that referring to?

7        A.       Including -- well, when we do the report,

8    there is the plan assets, and then a contribution can

9    still be owed to the plan, which is receivable, but

10   it's included when you split all the money out, so he

11   was telling me these are the plan assets, and there

12   was still another, looks like we made a minor

13   adjustment, I don't know exactly why, but there was

14   another 25,696 due to still be deposited.

15       Q.       You don't know how that arose?

16       A.       The discrepancy between the 25 and the

17   28?

18       Q.       Yes.

19       A.       It looks like I have it written --

20                MR. KERN:  Looks like what?

21       A.       That I have it written at the bottom.  Or

22   I have a break out that it was 118,996.88 and 90,000

23   was deposited and that would leave 28,996.88 due.

24       Q.       Let me ask you a question.  On the first

25   page, because it's more legible than on the second

1    page, it says "DCC PA pension fund."  Are you able to

2    read the time period underneath that?

3        A.        January 1st, 1999, to December 31st,

4    1999.

5        Q.        So was it your understanding that on this

6    fax, Dr. Criscito was telling you the year end value

7    of the commingled account?

8        A.        Yes.

9        Q.        Okay.  Did he send you any brokerage

10   statements to back up the numbers on this piece of

11   paper?

12       A.        No.

13       Q.        Previously, we marked a series of faxes

14   as Exhibit 9.  Do you recall if Dr. Criscito sent you

15   any brokerage statements to back up the information on

16   any of those faxes?

17       A.        No, he did not.

18       Q.        In fact, all during your dealings with

19   Dr. Criscito, did he ever send you any brokerage

20   statements to back up financial information that he

21   gave you about the commingled account?

22       A.        He may have in the very earliest years,

23   way back, like in early 1980, but he hasn't for years.

24       Q.        So when you say he hasn't for years, at

25   least starting in the 1990's?

1   the number.  That's when we were given the number,

2   yeah.  Now, he said it was '05.  It's possible that it

3   actually was done in the beginning of '06.

4           Q.      Do you believe this $3,000,000 some plus

5   dollars is part of what you filed on that 1099?

6           A.      It's possible.

7           Q.      You don't know?

8           A.      I don't know.  I don't know.

9           Q.      Can I have that.

10          A.      (The witness complies.)

11          Q.      If this withdrawal of $3,388,916.11 had

12  come from the commingled accident, you would have

13  expected Dr. Criscito to advise you of that so you

14  could file a 1099 in that amount, correct?

15          A.      Yes.

16          Q.      Okay.  He never advised you of any such

17  thing, did he?

18          A.      Of this amount?

19          Q.      Yes.

20          A.      No.

21                  MR. CHARME:  Okay.  I ask the reporter to

22  mark as Warnock-16 a group of documents with different

23  Bate stamp numbers, which I'll read for the record.

24  The first page is 10266.  The second page is 10905.

25  The third page is 10906.  The fourth page is 25021.

1    The next page is 26051.  The next page after that is

2    26055.  The last page is 13971.

3                    (Exhibit Warnock-16 is received and

4    marked by the Reporter for Identification.)

5         Q.        In the interest of time, I've marked all

6    of this stuff as a single exhibit.  What I'd like to

7    do is go through this with you page by page, and tell

8    me if any of the handwriting is yours.

9                    Let's start with the first page.  At the

10   top it says:  "Important, everything must be mailed

11   directly to his home address."  Is that your

12   handwriting?

13        A.        No.

14        Q.        Do you know whose it is?

15        A.        No.  I'm not sure.

16        Q.        Do you know who it's referring to when it

17   says "his home address"?

18        A.        Dr. Criscito.

19        Q.        When you were working at APC, had you

20   heard from either Dr. Criscito or someone at APC that

21   everything had to be mailed directly to him at his

22   home address?

23        A.        No, Dr. Criscito told me that.

24        Q.        He told you that?

25        A.        Several times.  Yes.

1    Q.    Okay.  Did he tell you why?

2    A.    He said he didn't want the stuff going to

3    the office, and that he was trustee, and it was

4    supposed to come to him.

5    Q.    Did he tell you whether you could send

6    copies of what you send to him to any of the other

7    doctors?

8    A.    He said we could not.

9    Q.    So you could not send copies of what you

10   sent to him to Dr. Casella, for example?

11   A.    No.

12   Q.    You couldn't send it to any of the other

13   doctors, right?

14   A.    No.

15   Q.    And you certainly couldn't send it to any

16   of the employees, right?

17   A.    No.  No.

18   Q.    Okay.   There's a lot of handwriting on

19   this first page.  Is any of it yours?

20   A.    The only -- the small piece at the

21   bottom, where it says "pay APT, preparation of final

22   5500," that is our bill.  That is someone, not me,

23   writing that to give to our secretary to type up a

24   bill, and I changed it to to "for defined benefit

25   plan."

1    Unless he has one in his office.

2         A.      No, but I would say that's a -- I would

3    agree that that's probably what it says.

4         Q.      Let me ask you this:  Did Dr. Criscito

5    ever tell you not to speak to anyone about his account

6    or the pension plan?

7         A.      Yes.

8         Q.      Okay.  And if Dr. Criscito told you that

9    except as to the individuals' segregated accounts, as

10   far as all other information concerning the commingled

11   account, he was the sole person to get information?

12        A.      He was the sole person -- other than Dr.

13   Casella giving us the salaries, so we could calculate

14   the contribution.

15        Q.      Right.

16        A.      Yes.  That's right.

17        Q.      Read the next page, please.

18        A.      "He is it, no one else, not even Dr.

19   Casella."

20        Q.      So aside from Dr. Casella giving you

21   information concerning salaries, you could not then

22   turn around and give Dr. Casella information about the

23   assets and the commingled account, correct?

24        A.      I could not.

25        Q.      Is there a reason you wrote this note?

1    A.    Well, he would tell me --I can't say he

2    told me it every year, but he told me often enough to

3    remind me, you know, Brian, make sure it goes to my

4    house.  He would tell me every year.   We didn't speak

5    every time.  We would speak about once a year.

6    Q.    Did you do this note also so that if

7    anyone else looked at the file, they would understand

8    that only Dr. Criscito was to get information on the

9    commingled account?

10    A.    Yes.  Yes.

11    Q.    Okay.  Look at the next page, which is

12    Bate stamped 25021.  Is that your handwriting?

13    A.    Yes.

14    Q.    Would you read what's on that page,

15    please.

16    A.    "September 3rd -- September 10, 2003, Per

17    Mario Criscito, reference Diagnostic & Clinical

18    Cardiology, mail everything to Dr. Mario Criscito at

19    his home, not to Casella.  Mario said not to, but also

20    send Mario a copy labeled copy for Dr. Casella.  Dr.

21    Criscito said if anything goes to office or Casella,

22    he will personally come down here and beat me.  He has

23    been saying this forever.  Brian."

24    Q.    Did Dr. Criscito say to you specifically

25    that if anything went to the office or to Dr. Casella,

1    he would personally come down and beat you?

2         A.       He did say that.

3         Q.       I --

4         A.       I don't think he was going to beat me.

5    But he certainly would have been very mad if it

6    happened.

7         Q.       Did he say it?

8         A.       He did say it.

9         Q.       Did he say it more than once?

10        A.       I think that was the only time he said he

11   was going to beat me, actually, but he told me more

12   than once, absolutely, everything goes to him, nobody

13   else but him.  That was always the order.

14        Q.       Okay.  The only thing that could go to

15   the individuals was information on their individual

16   segregated accounts?

17        A.       Individual segregated accounts could go

18   to the individuals, yes.  No problem with that.

19        Q.       So anything else went only to Dr.

20   Criscito, correct?

21        A.       Yes.

22        Q.       It says "Brian" at the bottom of this

23   page.  Is that -- did you write that?

24        A.       Yes.

25        Q.       Okay.  Turn to the next page, please,

1          A.       Yes, I am the boss, so other doctors

2     would come along, but he was the boss, yes.

3          Q.       And as long as he was the trustee and as

4     long as he was the boss, no one else but him got

5     access to information on the commingled account,

6     correct?

7          A.       That would be correct, yes.

8          Q.       When was the first time that you recall

9     Dr. Casella came to the office of APC and had access

10    to information about the commingled account?

11         A.       I don't remember the exact date.  I think

12    it was last summer, I believe.  I don't know if I'm

13    allowed to ask him that.   I think it was the summer

14    of 2008 that he came in.  I would have to check on it.

15         Q.       Was it 2008 or 2007?

16                  Let me show you some papers.

17         A.       I don't remember.  It's not a secret, I

18    just don't remember, you know.

19         Q.       Okay.  Let me show you some papers.

20                  MR. CHARME:  Let me mark as 17 a group of

21    pages that are Bate stamped 25040, 12276 and 11954.

22                  (Exhibit Warnock-17 is received and

23    marked by the Reporter for Identification.)

24         Q.       Let's start with the first page.  Have

25    you seen that before?

```
 1          A.        The memo, that would have been a note
 2   from me to Dominique.
 3          Q.        Okay.  And it's dated September 14, 2007?
 4          A.        Yes, which would answer the question of
 5   when Dr. Casella came in.
 6          Q.        When do you believe Dr. Casella came in
 7   to look at the APC files?
 8          A.        About probably -- could be that day.
 9   Dr. Casella would have given me this and said look
10   what I found in the file, you know.
11          Q.        Okay.
12                    MR. KERN:  Do we have the actual
13   document, the statement, itself?
14                    MR. CHARME:  It's among the Morgan
15   Stanley documents.
16          Q.        What is it that Dr. Casella found in the
17   file that you called a "big problem"?
18          A.        Well, Dr. --
19          Q.        One moment.
20                    MR. CHARME:  Also, Steve, I think there's
21   another copy in APC's files.
22          A.        What Dr. Casella found in the thing was a
23   statement we didn't even know was in there, which was
24   a statement, Morgan Stanley statement for the
25   commingled account, because what happens in our office
```

1   is the statements come in for all kinds of clients,

2   hundreds of statements we get, and we have a filing

3   clerk and she files them away.   When Dominique does

4   the annual reports and she goes to get the separate

5   accounts, what she does is she looks at the census,

6   which has all the people that are in the plan, and

7   then she looks through the pile of statements, grabs

8   the statement, matches them up.  She says she always

9   does it that way.  She didn't even look.  This one,

10  this looks like it's a December statement, so we

11  wouldn't have even gotten this until 2001, which was

12  well after we had done everything and split up the

13  account as of December, 1999.

14          Q.      Mr. Warnock, what was the big problem

15  that the statement was --

16          A.      The big problem is a big problem for

17  Mario, that this statement is showing there's like 12

18  million bucks in there.

19          Q.      In the Morgan Stanley account?

20          A.      In the Morgan Stanley account alone, and

21  there's only five million dollars.

22          Q.      Now, going back to plaintiff's -- rather,

23  Warnock Exhibit 10, on here there is a reference to

24  Morgan Stanley Dean Witter, and it says 4,017,942.57.

25  Do you see that?

1       A.      Yes.

2       Q.      So the big problem was, according to the

3  Morgan Stanley statement, there was something like 12

4  million dollars in that account?

5       A.      That's a big problem.

6       Q.      On this fax, there's also a reference to

7  Salomon Smith Barney, and it says $798,425.50.  Did it

8  come to your attention that, in fact, there was almost

9  4 million dollars in that account?

10      A.      No.

11      Q.      Okay.

12      A.      No.

13      Q.      Did you ever learn that the number on

14  Exhibit 10, the fax that was sent on January 13, 2000,

15  for Salomon Smith Barney was wrong?

16      A.      For which one?

17      Q.      Salomon Smith Barney, did you ever learn

18  that that number was wrong?

19      A.      No.

20      Q.      Okay.  So before --

21      A.      The only thing, and I never learned that

22  it was wrong, Dr. Casella has spoken with Dominique a

23  couple of times and mentioned finding an account from

24  way back when, and she mentioned it the other day,

25  that he had found this account, and it was now

1    was basically a note to the attorneys who were copying

2    the entire file.  It was put on, you know, put on the

3    top.  That was a sticky that was stuck on the top.  It

4    was Joy Mercer, I think, who asked for all the

5    accounts, so we got all the accounts and I put a

6    sticky note on the top telling her what that is.

7         Q.      Turn to the next page, which is Bate

8    stamped 11954.  Is that your handwriting?

9         A.      Yes, I think -- is that the same one?

10   They do not tie in.  Yes, that is my handwriting.

11        Q.      Am I correct, that's not the same as the

12   note on the other page?

13        A.      It's not the exact note, but it seems to

14   mean the same thing.

15        Q.      Could you read it.

16        A.      "These are statements that Dr. Casella

17   located in file.  APC was unaware of them.  Use info

18   provided by Dr. Criscito -- used info provided by Dr.

19   Criscito, that do not tie into Mario's numbers.  Used

20   to separate accounts as of 12/31/99 valuation."

21        Q.      Do you know who you wrote that note for?

22        A.      I believe that was also put in the file,

23   it was a note for the attorneys.  It's on a sticky, a

24   little sticky on the top.

25        Q.      I want to show you again what we marked

1    as Warnock-7, which is the Form 5500 for 1999.

2        A.      Okay.

3        Q.      The information that's on --

4                MR. KERN:  What number is that again?

5    I'm sorry.  Warnock-7.

6        Q.      The information --

7                MR. KERN:  Can you hang on for one

8    second?

9                MR. CHARME:  Sure.

10               MR. KERN:  Okay.

11       Q.      The information that's on Schedule I of

12   that form is information that you got based on the fax

13   that was sent to you as Warnock-10.  Is that correct?

14       A.      This is -- well, that would have been

15   part of it.

16       Q.      That would have been part of it.

17       A.      It includes the other accounts.

18       Q.      Right, it includes the other accounts,

19   but Schedule I includes the information that you

20   received from Dr. Criscito on Warnock-10, correct?

21       A.      Yes.

22       Q.      So if the information on Warnock-10 is

23   incorrect, that means the numbers on the Form 5500

24   Schedule I are incorrect also?

25       A.      That is correct.

1          Q.       Okay.  When you filed a Form 5500 for the

2     year 2000, you used, on the Schedule I for 2000 -- and

3     I will show it to you again -- we marked this as

4     Warnock-8, you used the year end values from the

5     previous Form 5500, did you not?

6          A.       They would tie in.

7          Q.       They would tie in, correct?

8          A.       Yes.

9          Q.       So am I correct, it's kind of like a

10    domino effect; if the numbers are wrong on your 1999

11    Form 5500, then the numbers are going to be wrong on

12    each 5500 going forward because they rely on those

13    earlier numbers?

14         A.       Yes.  This is a -- here is the 2000.

15    Yes.  That is correct.

16         Q.       Okay.

17         A.       Yes.

18         Q.       Do you know what would be required in

19    order to correct the Form 5500 starting in 1999?

20         A.       Well, it would be a lot of work, but we

21    would file amended returns, amended 5500 forms.

22         Q.       You said it would be a lot of work.

23    Tell me specifically what would have to be done.

24         A.       To amend the 5500?  We would have to go

25    back and get the true values, the correct values that

1    should have been on there, and re-file, prepare new --

2    excuse me.   Can I get a drink of water?

3                MR. CHARME:   Sure.

4                (There is a discussion off the record.)

5         A.       We would have to get the correct

6    information, and then most of the 5500 would not

7    change, but the Schedule I, that's the one that's got

8    all the numbers, then we would have to redo them each

9    year.

10        Q.       So you would have to redo Schedule I for

11   each year starting in 1999 going forward, correct?

12        A.       That is correct.

13        Q.       Do you know if there are any interest or

14   penalties that would occur?

15        A.       There's no -- for filing an amended

16   return, there's no penalty that goes with it, no.

17        Q.       If you understated the true amount?   If

18   you know.

19        A.       No, I'm not aware of any penalty that

20   would go with an amended form.   There's no excise tax

21   or any form that you would attach.   No.

22        Q.       Okay.

23                (Luncheon recess.)

24        Q.       Mr. Warnock, in order to redo the Form

25   5500's, would it also be necessary to know all

1    distributions that were made?

2        A.        Yes.

3        Q.        If you re-did the Form 5500's without

4    including distributions that had been made, the Form

5    5500's would still be wrong, correct?

6        A.        They would be wrong.

7        Q.        Okay.

8                  MR. CHARME:   I'm going to have marked as

9    Warnock-18 a letter dated August 28, 2007, Bate

10   stamped 25031 and 25032.

11                 (Exhibit Warnock-18 is received and

12   marked by the Reporter for Identification.)

13       Q.        Mr. Warnock, take a look at that, please,

14   and tell me if that's your signature on the second

15   page.

16       A.        Yes, it is.

17       Q.        Okay.  This letter makes reference to a

18   Mary Ann Canales.   Do you want to read the letter to

19   refresh yourself?

20       A.        Sure.

21       Q.        Okay.  I want to direct your attention to

22   the third paragraph.  The third sentence says:  "The

23   1999 report was prepared January 13, 2000.  The report

24   was prepared early in 2000 to enable Dr. Criscito to

25   distribute benefits and transfer account balances to

1    segregated accounts."

2                  Did Dr. Criscito tell you that he wanted

3    to distribute the money from the commingled account as

4    soon as he could?

5          A.      To transfer it to separate accounts, yes.

6          Q.      Did he tell you why?

7          A.      They were -- it goes back to the answer I

8    said before.  The doctors, everybody wanted separate

9    accounts, they did not want this commingled account.

10   The new doctors did not want to be part of that

11   account, so I believe there was a general agreement in

12   the company that that's what was going to get done,

13   they were going to finish it and get everything -- get

14   everything transferred.

15         Q.      Take a look at the fourth paragraph.  In

16   the middle it says:  "Dominique advised Dr. Criscito

17   that Mary Ann was entitled to an additional $9,424.70.

18   At that point, Dr. Criscito indicated that he was only

19   going to pay her $4,669.97, and he instructed

20   Dominique to zero out the $9,424.70 adjustment, which

21   she did."

22                  Do you know why Dr. Criscito told

23   Dominique not to pay a plan participant all of the

24   money to which she was entitled?

25         A.      I don't know.

1        Q.        Do you know as of today whether Mary Ann

2    Canales was ever paid that extra money?

3        A.        As far as I know, she was not.

4        Q.        When did you find out that Dr. Criscito

5    instructed Dominique not to pay Mary Ann Canales the

6    additional $9,424.70 that she was entitled to?

7        A.        That would have been when she was

8    working, it would have been when she was working on

9    the 2000 report, which would have been due in, again,

10    the 5500's are due October 15th, 2001, so it would

11    have been at that point.

12        Q.        Did you and Dominique have any discussion

13    whether it was appropriate to zero out, the phrase

14    that's used in this letter, Mary Ann's account?

15        A.        No.

16        Q.        You just did it, APC just zeroed it out?

17        A.        APC did it at Dr. Criscito's

18    instructions.

19        Q.        And APC did not challenge Dr. Criscito's

20    instructions when it came to the plan?

21        A.        No, I spoke to Dominique about it and she

22    said what happened, she told him about it, she told

23    him there were two people to be affected, and the

24    other one, it was only Mary Ann's that he changed.  As

25    you see in the letter, there were two people affected,



1   but the other one, Wisteria Banks, the way Dominique

2   corrected it stood and he didn't zero her out, she got

3   paid the corrected amount.  And Dominique told him,

4   you didn't pay her this, and he said, zero it out.

5   And she told him, again, you know, this was an error,

6   she should get the money, and he, according to what

7   Dominique told me, very forcefully, said zero it out,

8   so then that's what she did.

9        Q.      Do you know what happened to this

10   additional $9,424.70?

11        A.      Well, it was part of the commingled

12   account, so it just got absorbed as a plan earning, I

13   guess.  Yeah.  So at this point, you know, the effect

14   being the only two people left then were Dr. Criscito

15   and Foggio, so it would have have been getting

16   allocated to them as an earning, most of it going to

17   Dr. Criscito.

18        Q.      So that most of this additional $9,424.70

19   ultimately went to Dr. Criscito, correct?

20        A.      That's correct.

21             MR. CHARME:  Okay.  I'm going to have

22   marked the next exhibit, which is Bate stamped 14305,

23   as Warnock-19.

24             (Exhibit Warnock-19 is received and

25   marked by the Reporter for Identification.)

1          A.      If he did get another 7,000, he should

2     have got a 1099 for that.

3          Q.      You didn't prepare one, did you?

4          A.      No.

5               MR. CHARME:  We're going to mark as

6     Warnock-20 a letter dated November 13th, 2007, Bate

7     stamped 25118 and 25119.

8               (Exhibit Warnock-20 is received and

9     marked by the Reporter for Identification.)

10          Q.      Mr. Warnock, is that your signature on

11    the second page?

12          A.      Yes, it is.

13          Q.      You've seen this before?

14          A.      Yes.

15          Q.      Okay.  If you go to the fourth paragraph,

16    in the middle of it, it says:  "The only distribution

17    for Dr. Criscito that we were aware of was the

18    distribution of $4,510,543.84."  Sitting here today,

19    are you aware of any other distribution?

20          A.      I'm aware that Dr. Casella has told me

21    there were several other distributions.  I don't have

22    -- and looking at that statement, there were

23    disbursements that we don't know who they were for,

24    but no.

25          Q.      Let me ask it this way.  At the time you

1    wrote the letter, the only distribution you were aware

2    of was the $4,510,543.84?

3         A.     Yes.

4         Q.     So to the extent that you became aware of

5    any other distributions, that's based on conversations

6    you had with Dr. Casella?

7         A.     Yes.

8         Q.     What about your own review of APC's

9    files?

10        A.     The only -- well, the statement that you

11   showed me, the December, 2000 statement, now that

12   shows several disbursements.  Most of them were for

13   the commingled accounts going to the different

14   participants, but there were other disbursements on

15   there.  I don't know the amounts without looking at

16   it, but they just said distributions; we don't know

17   what they were for.

18        Q.     Okay.  As of today, you don't know what

19   they were for, correct?

20        A.     As of today, I still don't know what they

21   were for, no.

22               MR. CHARME:  I'm going to mark as

23   Warnock-21 a letter dated December 6, 2007, Bate

24   stamped 25185 through 25187.

25               (Warnock-21 is received and marked by the

1    letter.   The second full paragraph reads:   "As I am
2    sure you have been made aware, the major question
3    seems to apply to the commingled accounts.   The annual
4    value of the commingled accounts was provided by Dr.
5    Criscito, with no backup statements.   Most years it
6    was provided in writing, but occasionally it was
7    provided verbally.   We had no reason to believe that
8    Dr. Criscito was providing us within correct
9    information."
10              Were those correct statements when you
11   wrote them?
12       A.     Yes.
13       Q.     When was the first time that you had
14   reason to believe that Dr. Criscito provided incorrect
15   information?
16       A.     When Dr. Casella came into the office and
17   went through all the files.
18       Q.     Okay.   Further down in the letter, it
19   says:   "In the beginning of 2000, when separate
20   accounts were set up for all the employees, Morgan
21   Stanley apparently started sending us copies of the
22   monthly statements on the newly established separate
23   accounts.   Up until that time, we were not,"
24   underscored, "receiving monthly statements on the
25   commingled account."   Are those correct statements?

1      A.      Yes.

2      Q.      Okay.  So that I understand, before the

3  accounts were segregated, Morgan Stanley sent you no

4  brokerage statements on the commingled account?

5      A.      That's correct.

6      Q.      Am I correct that no other financial

7  institution sent you any statements on the commingled

8  account?

9      A.      That's correct.

10      Q.      The last sentence of that paragraph says:

11  "And, Dr. Criscito had called us with a total value

12  for the commingled accounts for that year, as before,

13  which is the value we used."

14              Was that telephone call in addition to

15  the fax that he sent for the 1999 year end values?

16      A.      I'm not sure why I said he called us.  He

17  may have.  That may be a miswrite or whatever.  My

18  point was that we received this information from Dr.

19  Criscito, which we did get on the fax.

20      Q.      Just so the record is clear, the

21  financial information that you received from Dr.

22  Criscito for the 1999 year end values was on the fax

23  that we marked as Warnock-10, correct?

24      A.      That is correct.  Yes.

25      Q.      In the next to last paragraph, it says:

```
 1    "Dr. Criscito always emphasized that he was the 'boss'
 2    --
 3         A.      Where are you reading?
 4         Q.      The next to last paragraph of your
 5    letter.   I'm sorry.  On the last page.
 6         A.      Middle paragraph?
 7         Q.      I'll start again.  This is the next to
 8    last full paragraph -- I'm sorry.  It is the second
 9    paragraph, starting with the words "I do not recall."
10    Do you see that?
11         A.      Okay.
12         Q.      And three lines down, it says:   "Dr.
13    Criscito always emphasized that he was the 'boss,' and
14    that everything," underscored, "was to be sent
15    directly to him at his home."
16              You had no doubt in your mind at all
17    times while you worked at APC that Dr. Criscito was
18    the boss, did you?
19         A.      No.  There was no doubt about that.
20         Q.      And there was no doubt in your mind that
21    everything concerning the commingled account was to be
22    sent to Dr. Criscito at his home, correct?
23         A.      That is correct.
24         Q.      And you had no doubt in your mind that
25    you were not permitted to share any information on the
```

1    commingled account with anyone else at Diagnostic,

2    correct?

3        A.        That is correct.

4                  MR. CHARME:   Two minute break.)

5                  (There is a discussion off the record.)

6        Q.        Mr. Warnock, do you know who prepared the

7    original plan document for Diagnostic?

8        A.        Not without looking at it.  It may have

9    been our office.  I don't know.

10       Q.        You don't know?

11       A.        Without looking at it, I don't know.

12       Q.        Once you joined APC and there were any

13   additional amendments or changes to the plan, as far

14   as you know, is APC the organization who did it for

15   DCC?

16       A.        We would prepare the amendments, yes.

17       Q.        As far as you know, from 1981, when you

18   joined the office, through, let's say, well, through

19   today, has APC been the third party administrator for

20   Diagnostic?

21       A.        Yes.

22       Q.        Okay.  And that's been for each and every

23   year, correct?

24       A.        Yes.

25       Q.        There weren't any years where Diagnostic

1    used a different third party administrator?

2         A.    No.

3               MR. CHARME:  I have no further questions

4    now.

5               MR. KERN:  My turn.

6               (There is a discussion off the record.)

7    CROSS EXAMINATION BY MR. KERN:

8         Q.    Mr. Warnock, my name is Steven Kern.  I

9    represent Dr. Criscito.  I'm going to ask you some

10   questions, as well, today.

11        A.    Sure.

12        Q.    You testified earlier today that each

13   year you sent out a questionnaire to obtain the

14   information concerning the various plans.  I haven't

15   seen a copy of that questionnaire.  Can you tell me

16   what the questionnaire asks?

17        A.    It asks for the census, it asks for a

18   list of the plan assets as of the end of the year.

19   The cover letter does ask, if possible, to provide

20   backup copies.  And it asks for a list of any

21   disbursements to any participants terminated, which

22   means they were paid out.  It also asks for a list of

23   the contributions to the plan.

24        Q.    Okay.  And with regard to DCC, let's take

25   them one at a time.  First of all, who was this

1    questionnaire mailed to?

2         A.      I would have to check whether it went to

3    Dr. Criscito or the office.   Presumably Dr. Criscito,

4    but I could not swear to that right now.

5         Q.      How would you be able to check that?

6         A.      I would check our file, although it may

7    not say.   Because it's just a blank questionnaire put

8    in an envelope, it's not typed up, there's no cover.

9    It's not individually addressed to the client.

10        Q.      Would you be able to provide us with a

11   copy of that blank questionnaire?

12        A.      Yes.

13        Q.      So I take it those blank questionnaires

14   would not be maintained in the file of a particular

15   client, correct?

16        A.      No, no, they would not.

17        Q.      You already testified, I believe, that

18   the census information came from Dr. Casella, correct?

19        A.      That's correct.

20        Q.      The list of plan assets came from who?

21        A.      For the commingled account it came from

22   Dr. Criscito.   For the individual accounts, there were

23   either five or six doctors who had individual

24   accounts, they would personally send them to us,

25   either they would mail them directly or give them to

1      Q.      How long were those conversations?

2      A.      Not long, you know.

3      Q.      Five minutes?

4      A.      Yeah, at most, yeah.

5      Q.      At most.  How many times a year did you

6  talk to Dr. Casella?

7      A.      It was once or twice.  Just to obtain the

8  financial information -- or the census information.

9      Q.      And how long --

10     A.      And I didn't necessarily speak to them

11  every year, either, because sometimes they would call

12  Dominique directly and sometimes they would call me.

13     Q.      How about Mr. Brown, how often did he

14  speak with him?

15     A.      Not often.

16     Q.      Let's go back to the questionnaire.  We

17  talked about the census, we talked about the plan

18  assets.  The cover letter asks that backup be

19  provided, if possible.

20     A.      I would have to read the writing on that.

21  It may not say if possible.

22     Q.      Did you ever make a specific request to

23  Dr. Criscito for any backup that he failed to provide?

24     A.      I don't believe so.  If he gave us a list

25  of the assets, we would take that.

1    Q.    Okay.

2    A.    Then we would provide that to Dr.

3 Casella.  I don't know if Dr. Criscito got the list of

4 who got what and when.

5    Q.    Do you know if Dr. Criscito ever got a

6 list of who was still participating in the plan, in

7 the commingled account?

8    A.    Yes.  Yes.  Yes, he got a list of

9 everybody that was in the commingled account, and he

10 would say how much the value of each of their accounts

11 was.

12    Q.    How do you know that?

13    A.    Because that's what we prepared.  That

14 was part of the annual report.

15    Q.    That's the annual report?

16    A.    Yes.

17    Q.    Who received that annual report?

18    A.    The commingled account, Dr. Criscito did.

19    Q.    How about the individual participants?

20    A.    We would send the participant statements

21 for the commingled account to Dr. Criscito, and then

22 he would hand them out to the participants.

23    Q.    Did you do that every year?

24    A.    Yes.

25    Q.    When were you first asked, or when was

1    client?

2                        MR. CHARME:   I object to the form.

3          A.      You have to repeat the question.

4          Q.      You were the plan administrator?

5          A.      Third party administrator.

6          Q.      Third party administrator.   Who did you

7    view as your client?

8          A.      Diagnostic & Clinical Cardiology.

9          Q.      Diagnostic & Clinical Cardiology?

10         A.      Yes, DCC was the client.

11         Q.      As third party administrator, what are

12   your duties to your client?

13         A.      What our agreement was was to provide an

14   annual, annual report, which would include calculating

15   the contribution, providing, separating out the

16   assets, and allocating among the participants in a

17   commingled account, preparing the 5500 forms and you

18   know, providing the election forms so that

19   distributions could be paid to terminated

20   participants.  We also assisted them with the plan

21   document, keeping it updated for various changes in

22   the law, and that would be generally it.

23         Q.      Would it be fair to say that your duties

24   would have included taking reasonable steps to assure

25   that the information that you were providing by way of

1    as to why?

2         A.      We didn't even know they were in there

3    until Dr. Casella found them.  So there was a one year

4    window to find them in doing that 2000 report.  If it

5    wasn't found in that year, we wouldn't have found

6    them.

7         Q.      To your knowledge, did Dr. Criscito ever

8    advise Morgan Stanley that they were not to send you

9    these reports?

10        A.      Somebody told Morgan Stanley to stop

11   sending them.  I don't know who.

12        Q.      Well, during the year you got them, were

13   they sent contrary to the direction from Dr. Criscito,

14   as far as you know?

15        A.      Morgan Stanley was supposed to send us

16   all the new separated accounts for all the

17   participants.  That's what they were supposed to send

18   us.  Whether Dr. Criscito told them to send us this or

19   not, you would have to ask Morgan Stanley that.

20        Q.      Okay.  Let's play with some nomenclature

21   for a while.

22               By the middle of 2000, as I understand

23   it, all of the monies belonging to participants other

24   than Dr. Criscito were supposed to be out of this

25   commingled account, correct?

1        A.        That is correct.  And they all were other

2    than that Foggio.

3        Q.        And that was not Dr. Criscito's fault,

4    correct?

5        A.        I don't know why an account was not set

6    up for Foggio.  I don't know.

7        Q.        Do you have any reason to believe that it

8    had anything to do with anything Dr. Criscito did or

9    did not do?

10       A.        No.

11       Q.        Do you have any reason to believe that

12   Dr. Criscito was even aware of the fact that Foggio

13   was not paid from that account?

14       A.        He was aware that she was supposed to get

15   a distribution from that account.

16       Q.        That was in 2007?

17       A.        No.  No.  There was a list when we did

18   the December 31st, 1999, report, there was a list of

19   all the participants in all the accounts, and Foggio

20   was on that list.  Everybody else on the list had

21   their money go into a commingled account -- or

22   separate account.  Foggio did not go into a separate

23   account.  I don't know why.  Possibly Morgan Stanley

24   just didn't have an address on her.  It could have

25   been a paperwork thing.  But Dr. Criscito was aware

1    that Foggio had an account in there.

2         Q.      And that that account was supposed to be

3    removed into a segregated account?

4         A.      Yes.

5         Q.      And my question then is to your

6    knowledge, was he ever made aware prior to 2007 that

7    that didn't take place?

8         A.      Yes, he was made aware.

9         Q.      When was he made aware?

10        A.      He was made aware of it the next year,

11   there's no account for Foggio.

12        Q.      Explain that to me.

13        A.      At the end of 2000, when we had separate

14   accounts for everybody, we had statements.  We saw the

15   money came out of this account, into that account.

16   There was no new account set up with the name Foggio

17   on it.  There was none.  So that money, the money was

18   still there in that account.

19        Q.      How would he have known?

20        A.      Dominique told him that Foggio --

21        Q.      I'm sorry?

22        A.      Dominique told him that Foggio had not

23   been paid out.

24        Q.      In 2000?

25        A.      She would have told him in 2001.

C E R T I F I C A T I O N

5    I, NANCY A. MIANI, a Certified Court Reporter
6 and a Notary Public, License No. XI00814, do hereby
7 certify that the foregoing witness, BRIAN WARNOCK, was
8 duly sworn by me on the date indicated, and that the
9 foregoing is a true and accurate transcription of my
10 stenographic notes.

11    I further certify that I am not employed by
12 nor related to any party to this action.

NANCY A. MIANI, C.S.R.
LICENSE NO. XI00814