**EXHIBIT 41**

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
2                    CIVIL ACTION CASE NO. 2:08-CV-1567
   ------------------------------------------:
3  DR. FADI CHAABAN; DR. SABINO R. TORRE, DR. :
   CONSTANTINOS A. COSTEAS and DR. ANTHONY J. :
4  CASELLA, as Trustee of Diagnostic & Clinical:
   Cardiology, P.A. Profit Sharing Plan,      :
5                                             :
                        Plaintiffs,           :
6                                             :     ORIGINAL
            vs.                               :
7                                             :
   DR. MARIO A. CRISCITO,                     :
8                                             :
                        Defendant.            :
9  ------------------------------------------:
                           Wednesday, July 15, 2009
10

11             Deposition of BRIAN WARNOCK, VOLUME II,

12    before Nancy A. Miani, a Certified Court Reporter,

13    License No. XI00814, and a Notary Public of the State

14    of New Jersey at the offices of WITMAN, STADTMAUER,

15    ESQS, 26 Columbia Turnpike, Florham Park, New Jersey,

16    on Wednesday, July 15, 2009, at 10:10 a.m.

17

18

19

20

21

22                    MIANI COURT REPORTING
                      CERTIFIED COURT REPORTERS
23                       1741 DANIEL COURT
                         WALL, NJ  07719
24                       (732) 681-4776

25

1    A P P E A R A N C E S:

2    WITMAN, STADTMAUER, ESQS.
     26 Columbia Turnpike
3    Florham Park, NJ 07932
     By:   STEPHEN M. CHARME, ESQ.
4    Attorneys for the Plaintiffs

5    KERN, CONROY & SCHOPPMANN, P.C.
     1120 Route 22 East
6    Bridgewater, NJ 08807
     BY:   STEVEN KERN, ESQ.
7    AND   CHARLES H. NEWMAN, ESQ.
     Attorneys for the Defendant
8
     ALSO PRESENT:
9
     Anthony Casella, M.D.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    B R I A N       W A R N O C K,

2    American Pension Corporation, 1375 Plainfield Avenue,

3    Watchung, New Jersey, resworn.

4    CONTINUED CROSS EXAMINATION BY MR. KERN:

5        Q.      I want to begin by turning to what's been

6    previously marked Warnock-8.

7        A.      Okay.

8        Q.      Can I start?  Okay.   Now, is this a copy

9    of the 5500 that was in your file?

10       A.      Yes.  Yes.

11       Q.      I note that on the third page of this

12   exhibit, marked 25958, there is no signature of the

13   employer or plan sponsor.  Do you know why that is?

14       A.      No, I don't.

15       Q.      And who was the plan sponsor?

16       A.      Well, the employer would be, so an

17   officer of Diagnostic would sign.

18       Q.      I also note on the first page of the

19   document that there is no signature of either the plan

20   administrator or of the employer, plan sponsor, right?

21       A.      That is correct.

22       Q.      That was 25946.  Would this have gone out

23   to the IRS in this form?

24       A.      No.  We send the forms to Dr. Criscito or

25   to the employer.  He signs it, sends it into the IRS.

1    We don't always necessarily get a signed copy.

2        Q.      How would you get a signed copy?

3        A.      We ask them to send us a signed copy just

4    so we have it in our file as evidence that it was

5    done, but some people send it back, some people don't.

6        Q.      If we go to Page 259 -- no number on this

7    one.  The fifth page, one, two, three, four -- fifth

8    page.

9        A.      25959.

10               MR. KERN:  Is there a stamp on this one?

11               MR. CHARME:  I don't see it.

12       Q.      It's the fifth page of what's been marked

13   Warnock-8.  It doesn't have a Bate stamp on it.

14       A.      All right.

15       Q.      Is it your testimony that this form would

16   have gone to Dr. Criscito unsigned, and he would have

17   returned it to you with a signature, a copy to you

18   with a signature?

19       A.      He would send us one page.  We send him

20   the forms to sign, send the whole package into the

21   IRS, and then we send one page, one blank first page

22   for him to sign and send back to us, and that way we

23   have it in the file, and it's really for if the IRS

24   ever asks, A, we didn't get the form or whatever, we

25   got it late, we can say no, he filed it on this day,

1    and he even sent us a copy saying -- with the same

2    date.  That's the reason we ask for it.

3         Q.       You see the signatures on the bottom of

4    this page?

5         A.       Yes, I do.

6         Q.       Do they appear to be two different

7    signatures, the signature of the second individual?

8         A.       I would think they were the same.

9         Q.       They don't look different to you?

10                 MR. CHARME:  Asked and answered.

11   Objection.

12        Q.       They don't look different to you?

13        A.       One has an A in it and one doesn't.

14        Q.       Let's go down two more pages.  This is

15   another page which is not Bate stamped, but on the

16   bottom page it says October 19th, 2004.  Do you have

17   that one?  Again, two signatures?

18        A.       Yes.

19        Q.       Do they appear to be the same signature

20   of the same person?

21        A.       They do look somewhat different, somewhat

22   the same.

23        Q.       Do you have any explanation for it?

24        A.       No idea.

25        Q.       Okay.  Let's go then to Warnock-9.

1      A.      Okay.

2      Q.      This is a report that you believe you

3  received from Dr. Criscito in 1998?

4      A.      Yes.

5      Q.      And it indicates that there are monies in

6  this commingled account in a number of different

7  repositories, correct?

8      A.      Correct.

9      Q.      Was there ever a time when there was a

10  determination that monies, for example, in Dean Witter

11  belonged to certain participants, and monies that

12  belonged in Schwab belonged to other participants, or

13  was this, for your purposes, treated as one pool of

14  money?

15              MR. CHARME:  I object to the form.

16      A.      It was one pool of money.

17      Q.      All right.  And did that hold true during

18  the entire period that you were involved in this

19  account?

20              MR. CHARME:  Same objection to the form.

21      A.      It would hold true for the commingled

22  account, yes.  We did get a separate report, for

23  example, for Dr. Casella, completely --

24      Q.      I'm just talking about the commingled

25  account.

1        A.        Right.

2        Q.        So whether the money was in Dean Witter,

3    in Schwab, in Smith Barney, in Morgan Stanley, your

4    only concern was the totality of the money, and it

5    wasn't as though one participant's money was part of

6    the Dean Witter account, and another person's money

7    was part of the Schwab account, the third

8    participant's money was part of the Morgan Stanley

9    account, right?

10                 MR. CHARME:  Objection to form.

11       A.        That is correct, it was all just one big

12   pot.

13       Q.        So when it came time to determining a

14   distribution number, or how much money was -- when it

15   came time to distributing money out of the commingled

16   account, it was the total pool of money that was at

17   issue, correct?

18       A.        Correct.

19       Q.        And in determining how much money was

20   still in the commingled account for an individual,

21   that was also based upon the totality of money in all

22   of the accounts, correct?

23                 MR. CHARME:  I object to the form.

24       A.        I'm not sure of the question.

25       Q.        If somebody didn't take a distribution,

1    we do, which shows the payouts.  So I don't think we

2    just got that 720,979.46.  I believe there is

3    additional information that we were provided saying

4    who that money went to.

5         Q.    Where would that information have come

6    from?

7         A.    It would have come from Dr. Criscito.

8         Q.    Dr. Criscito or Dr. Casella?

9         A.    Criscito.

10        Q.    Why would it have come  --

11        A.    Because he made the payouts, you know.

12   Dr. Casella didn't have access to this account.

13        Q.    Who would have told Criscito how much to

14   distribute?

15        A.    We told him when we did the 1999 report.

16        Q.    So the 720,000 number should have

17   initially come from you, correct?

18             MR. CHARME:  I object to the form.

19        A.    Yes, we did the 1999 report, broke out,

20   showed everybody what the account balances, he was

21   separating it, and was going to take those numbers and

22   pay it out to the individual people.

23        Q.    So there should be documentation in your

24   file instructing him to take out the $720,000?

25             MR. CHARME:  I object to the form.

250

1   in the same at 18.75.  Gonnella, she was, I was saying

2   before about the top heavy minimum benefits, and she

3   must have worked under a thousand hours or something

4   like that, then she went down to part-time, so she

5   wasn't entitled to the full contribution, so that's

6   why she only got three percent.

7        Q.      And then the top heavy report, if I read

8   correctly, indicates that as of 12/31/99, Dr.

9   Criscito's interest in that account was 85.51 percent

10  of the total?

11       A.      That's correct.

12       Q.      And I take it that when money was

13  distributed out of that account in 2000, even if the

14  distribution was less than the total amount that was

15  due to each of the remaining employees, that would

16  have resulted in Dr. Criscito's interest increasing,

17  percentage increase, increase --

18       A.      Give me that again.

19              MR. CHARME:  Objection to the form.

20       Q.      If Dr. Criscito is at 85 percent, round

21  the numbers, and let's say half of the total amount,

22  due to the other employees, was then segregated out

23  into individual accounts.

24       A.      Okay.

25       Q.      And half remained or should have remained

1    in the commingled account.

2         A.      Right.

3         Q.      So if half were removed out, instead of

4    Dr. Criscito then having an 85 percent interest, from

5    that point forward, his interest would have been

6    roughly 97 percent, correct?

7                 MR. CHARME:  I object to the form.

8         A.      That's correct.  That's correct.

9         Q.      Okay.  Going back then to Warnock-9, Page

10   25870.  Okay?

11        A.      Okay.

12        Q.      Is it your understanding that $721,000,

13   roughly, was monies that were distributed to

14   participants other than Dr. Criscito during the year

15   2000?

16        A.      Based on -- I would have to look at the

17   2000 report, but yes, basically, that's what it is.

18        Q.      And just for purposes of the

19   hypothetical, if all of the monies for all of these

20   people had been distributed out, that number, instead

21   of $720,000, should have been a million six, or

22   roughly $900,000 more, to the extent that those monies

23   remained in the commingled account, those monies were

24   available to be distributed at a future time to these

25   individuals, correct?

1   that you only get them annually rather than monthly?

2          A.     I'm not aware of any request like that,

3   no.

4          Q.     In this letter, you indicate that your

5   relationship with Dr. Criscito was always cordial,

6   both you and Dominique Eck.   Is that correct?

7          A.     That's correct.

8          Q.     And you previously testified that you

9   made note at one point to the effect that Dr. Criscito

10  said that if you gave out information to other people

11  concerning the value of the accounts, he was going to

12  beat you, and then you testified, and I'll quote you,

13  "I don't think he was going to beat me, but he would

14  -- he certainly would have been mad if it had

15  happened."  Is that correct?

16                 MR. CHARME:  I object to the form.   The

17  testimony speaks for itself.

18         A.     That is correct.

19         Q.     And despite that comment from him, you

20  continued to believe that your relationship with him

21  was always cordial, correct?

22         A.     Yes.

23         Q.     You didn't believe he was really coming

24  down and beat you, correct?

25         A.     I don't think he would have beat us.   I

1  think he would have fired us.

2      Q.      All right.  You certainly, you didn't

3  call the police or get worried that he was going to do

4  you physical harm?

5      A.      No, I did not feel physically threatened.

6      Q.      Okay.  Who would know what happened --

7  strike that.  Let me start again.  Break it down.

8              With regard to participants who were no

9  longer with DCC at the time that monies were

10 transferred in 2000, who would know where those monies

11 were transferred and what happened to those monies

12 after 2000?

13     A.      I lost you on that one.

14     Q.      Okay.  Participant Jones had a

15 distribution in March of 2000, hypothetically, of

16 $10,000 based upon the numbers that were provided to

17 Morgan Stanley.  That $10,000 either rolls over into

18 another account, is taken as a distribution, or

19 something, correct?

20     A.      Right.

21     Q.      Who would have the information concerning

22 where that money went?

23     A.      Morgan Stanley would have that.

24     Q.      You would not have any information

25 concerning that?

1    that actually happened or not, I could not say.

2         Q.       Page 126 of your last session, you were

3    asked --

4         A.       Which exhibit are we on?

5         Q.       Page 126 of the transcript.

6                  MR. CHARME:  He doesn't have a copy.

7         Q.       I'll read it to you.

8                  You testified that "we," being APC,

9    "would send the participant statements for the

10   commingled account to Dr. Criscito and then he would

11   hand them out to the participants."

12                 Do you have any knowledge that he

13   personally handed these out to the participants?

14        A.       No.

15        Q.       For all you know, he could have given

16   them to the secretary or to somebody else and say

17   here, give these out to the individual people?

18        A.       Right.  We gave them to him to provide to

19   the participants.  What he did with them, I don't --

20        Q.       You don't know what he did with them?

21        A.       Right.

22                 MR. KERN:  Mark this.

23                 (Exhibit Warnock-25 is received and

24   marked by the Reporter for Identification.)

25        Q.       Have you seen this document before?

295

1          A.       This is from our file.

2          Q.       Okay.   Why was this document created?

3          A.       This would have been done as part of the

4     closing out the commingled account, transferring it

5     into all separate accounts.  Everyone was being

6     advised that they have an account, they can now direct

7     their own investments, and they're all going to have

8     separate accounts.

9          Q.       Is this a result of the request of Dr.

10    Chaaban and Mr. Brown and others to maintain

11    segregated accounts?

12         A.       When you asked me that question, I

13    speculated that that is what the cause was, that a lot

14    of the doctors, people with bigger accounts wanted

15    their control.  So yeah, this was the whole thing,

16    that they were going to get rid of the segregated

17    accounts, split it all up.

18         Q.       Do you know what, in particular,

19    precipitated this November 23rd letter?  Did you get a

20    call?  If so, from whom?  Did you receive any letter,

21    e-mail, something?

22         A.       Well, because the letter.  It says the

23    letter you requested, it's a letter to Dr. Criscito,

24    for the active participants in the pension plan.  So

25    -- he's giving him the election forms.  You asked

1    a separate account with Morgan Stanley.

2         Q.     So they didn't have a choice, it happened

3    automatically?

4         A.     It happened automatically.   We gave them

5    this letter.

6         Q.     But this letter --

7         A.     Theoretically, they could have gone and

8    said I don't want Morgan Stanley, I would like an

9    account set up somewhere else, but that did not

10   happen.

11        Q.     And when did this notice go out to the

12   active plan participants?

13        A.     Well, we gave them the notice November

14   23rd, he had requested it, so I assume fairly soon,

15   fairly soon after that.

16        Q.     So --

17        A.     He was gearing it up.   Like I said, we

18   did the whole thing on January 13th, 2000, so, you

19   know, Doctor Criscito is moving forward to get this

20   done, and he wanted to get it accomplished.

21        Q.     According to this letter, the separate

22   account had already been established for each active

23   participant.

24        A.     Well, no, it's saying you have an

25   account, each participant can now direct their own

1              MR. KERN:  I have nothing else at this

2    time.  Hopefully we're finished.  I'm going to ask you

3    to get me these documents, and I may need to call you

4    back.

5              MR. CHARME:  Of course, I have a bunch of

6    stuff.

7    REDIRECT EXAMINATION BY MR. CHARME:

8         Q.    At your last deposition -- you realize

9    you're still under oath?

10        A.    Yes.

11        Q.    At your last deposition session, you were

12   asked if Dr. Criscito -- I'm sorry -- if you ever made

13   a specific request to Dr. Criscito for any backup that

14   he failed to provide.  You said, this is Page 118:  "I

15   don't believe so.  If he gave us a list of the assets,

16   we would take that."

17             Did you believe that the information you

18   were receiving from Dr. Criscito was accurate and

19   honest over the years?

20        A.    Yes.

21        Q.    Okay.  So had he ever done anything to

22   make you suspect that he was providing you with

23   information that was not accurate or honest?

24        A.    No.

25        Q.    And when he provided you information as

308

1    to the value of the assets in the commingled account

2    each year, you believed he was giving you accurate and

3    honest information, right?

4         A.     Yes.

5         Q.     Okay.  The only person from DCC who gave

6    you information as to the value of the assets in the

7    commingled account was Dr. Criscito, correct?

8         A.     That is correct.

9         Q.     Okay.  There was also -- withdrawn.

10               We previously looked at a document, you

11   know the one I'm referring to, where it says Dr.

12   Casella discovered this, it was the Morgan Stanley

13   2000 statement, said this is a big problem.  You

14   remember that document?

15        A.     Yes.

16        Q.     Okay.  Was that the first time that you

17   had reason to doubt the accuracy and honesty of the

18   year end values that Dr. Criscito had provided for

19   1999?

20        A.     Yes.

21        Q.     Okay.  So the reason you never asked Dr.

22   Criscito for any kind of backup information over the

23   years was you trusted him, right?

24        A.     Yes, we did.

25        Q.     You thought he was an honest person?

1     A.     Yes, we did.

2     Q.     And he had never done anything to make

3 you think otherwise, correct?

4     A.     Correct.

5     Q.     There was some discussion at your last

6 session about conversations you had with Dr. Casella

7 concerning contributions being made to the plan.  I

8 just want to make sure that I have something clear.

9          The value of the commingled account is

10 separate and apart from whatever contributions are

11 made to the plan, correct?

12     A.     Well, the only money that goes into it

13 affects the value.

14     Q.     Sure.  But the fact that certain amounts

15 of contributions goes into the plan doesn't guarantee

16 what value the plan will have at the end of the year,

17 does it?

18     A.     No.

19     Q.     So knowing the amount of contribution

20 that goes into the plan the end of the year is not a

21 substitute for someone giving you an accurate number

22 as to the year end values, is it?

23     A.     No, you need the year end values.

24     Q.     You need the year end values, right?

25     A.     Yes.

1    A.    I don't know if they were handed out.

2    Q.    But they were supposed to be?

3    A.    They were supposed to be.

4    Q.    And it's your -- is it your understanding

5    that the trustee of a plan is supposed to insure that

6    summary annual reports are handed out to the

7    participants in the plan?

8                MR. KERN:   Objection.

9    A.    It's probably the plan administrator's

10   obligation more than the trustee's.

11   Q.    Do you know who the plan administrator of

12   --

13   A.    It's just the employer, it's Diagnostic &

14   Clinical Cardiology.

15   Q.    I believe you testified that Dr. Criscito

16   was the boss of Diagnostic?

17   A.    Yes.

18   Q.    Okay.  So if he was the boss of

19   Diagnostic, would it be your understanding that as

20   the boss, he would take steps to ensure that the

21   summary annual description -- I'm sorry -- summary

22   plan description was handed out to participants?

23   A.    Yes.

24   Q.    Now, you testified at your last

25   deposition session that before 2007, when Dr. Casella

314

1    came in, this is at Page 129, that you had never

2    requested any statements from Morgan Stanley on the

3    commingled account, correct?

4         A.      That's correct.

5         Q.      Okay.  And the reason you hadn't done so

6    was you trusted Dr. Criscito, didn't you?

7         A.      Yes.

8         Q.      You believed that he was giving you

9    accurate and honest information, didn't you?

10               MR. KERN:  You've now asked that about

11   six times.  You can ask it six more, it's your

12   deposiiton.

13        A.      Yes, yes, yes, yes, yes, yes.  Cover all

14   six.

15        Q.      Thank you.   You were asked both the last

16   time around and this time, you know, what your

17   understanding is as to the duties of a third party

18   administrator.  Is it your understanding that a third

19   party administrator is required to audit information

20   as to year end values that are given to you?

21        A.      We are not required to audit.

22        Q.      Is it your understanding that a third

23   party administrator is required to independently

24   verify year end values that are given to you?

25        A.      No.

1      Q.      Okay.  So basically, you rely on the

2  integrity of the person supplying that information to

3  you, correct?

4      A.      That is correct.

5      Q.      Okay.  Let me just, the last time around

6  there was some discussion as to your obtaining census

7  information, and on Page 155, you said it was probable

8  that back in 1990, maybe Dr. Casella wasn't the person

9  who was giving you the census information.  I'd like

10  to show you some documents to see if we can pin this

11  down.

12              MR. CHARME:  I'm going to ask the

13  reporter to mark as 27 a document Bate stamped 10599.

14              (Exhibit Warnock-27 is received and

15  marked by the Reporter for Identification.)

16      Q.      Mr. Warnock, have you seen that before?

17      A.      I don't particularly recall this, but

18  it's from our file.

19      Q.      Okay.  This is an employee census form?

20      A.      Yes.

21      Q.      Looking at the form, are you able to tell

22  who provided you with this information?

23      A.      Not really.

24      Q.      So you don't know whether it was from Dr.

25  Casella, Dr. Criscito, or somebody else?

1              Well, let me rephrase that.  Okay.

2  Because he wouldn't want me talking to anybody, but as

3  far as what a person had in their account, I don't

4  remember that being any problem with people saying we

5  don't know how much money is in our account, everybody

6  being mad about that.  We have plans like that, where

7  employers don't tell them anything, you know, I don't

8  even know about my account.  That was never an issue

9  with this plan, people calling me, begging me to tell

10  them how much money is in their account, and me having

11  to say go talk to Dr. Criscito.   I don't think that

12  happened.

13      Q.    Were you aware whether any participants

14  had asked Dr. Criscito for information about the value

15  of their accounts and were not satisfied with the

16  answer?

17      A.    No.  No.

18      Q.    So you don't know one way or the other --

19      A.    I don't know one way or the other.

20      Q.    -- what the story was with participants

21  getting information directly from Dr. Criscito, do

22  you?

23      A.    No.

24      Q.    Now, at your last deposition, this was

25  concerning a loan that was taken out.  At Page 141,

328

1   you testified that when Dr. Criscito said I paid it

2   off, that you assumed he had paid off the loan,

3   correct?

4        A.      That's correct.

5        Q.      But APC isn't an auditor, right?

6        A.      That's correct.

7        Q.      So am I correct that APC never performed

8   any kind of audit or any other kind of independent

9   verification to determine that Dr. Criscito did, in

10  fact, pay off the loan?

11       A.      We did not.

12       Q.      You did not?

13       A.      No.

14       Q.      So the only basis you have for saying

15  that the loan was paid off is because that's what Dr.

16  Criscito told you, correct?

17       A.      That is correct.

18       Q.      I want to talk to you about exhibits that

19  we marked the last time, Warnock-5 and Warnock-6.

20  Let's start with Warnock-5, which involved $25,531.60.

21  The last time -- this was at Page 141 -- you testified

22  that you had no reason to believe the extra money

23  that's referred to on Warnock-5 was a contribution,

24  that no one had complained, and that therefore, it was

25  okay to use that money to reduce Dr. Criscito's loan.

1  that you believe Dr. Criscito owned 85 percent of the

2  commingled account.  Is that right?

3       A.      Approximately.

4       Q.      Approximately that?

5       A.      Yeah.

6       Q.      What did you base that percentage on?

7       A.      On the annual reports.

8       Q.      Okay.  Was it your understanding that Dr.

9  Criscito was entitled, when the accounts were

10  segregated, to withhold money from participants to

11  which they were entitled?

12       A.      No.

13               MR. KERN:  Would you repeat that.

14               (The preceding question and answer are

15  read back by the Reporter.  )

16       A.      No.

17       Q.      So he wasn't entitled to hold back money

18  from participants on the theory that as long as he

19  kept it in the commingled account, he can keep  -- he

20  can give it to them one day, correct?

21       A.      No, the terminated participants would be

22  paid the full value of the account.

23       Q.      And in 2000, when the active participants

24  had individual segregated accounts, they were entitled

25  to be paid the full value, as well, correct?

347

1       A.      Yes.

2       Q.      Do you have your letter, which is Exhibit

3   23?  Here it is.  Okay.  Exhibit -- I'd like to look

4   at Warnock-23, which is your letter dated June 30,

5   2009, and the attachments.

6                 MR. KERN:  Can I have a second.  I need

7   to get my copy.

8                 Is this what you're looking at?  23.

9                 MR. CHARME:  Okay.

10      Q.      Your letter is not in the form of a sworn

11  statement, correct?

12      A.      That is correct.

13      Q.      You understand that you are under oath

14  today, correct?

15      A.      Yes.

16      Q.      I'm going to ask you now if you are

17  prepared to swear to the truth and accuracy as to the

18  contents of your letter as if this was an affidavit

19  that you were submitting under oath.  Are you prepared

20  to do that?

21      A.      Yes.

22      Q.      Okay.  I'm going to show you what was

23  marked as Warnock-13.  I believe there was some

24  testimony today about the letter "R" on the second

25  page indicates this was a rollover.  Is that correct?

1   trustee, to make sure the plan operates the way it's

2   supposed to?

3          A.     Yes.

4          Q.     Okay.  Now, with regard to active

5   participants, so we clear up any confusion, when the

6   accounts were segregated in 2000, the active

7   participants were entitled to have allocated to them

8   the full value to which they were entitled, correct?

9          A.     Right, allocated to their segregated

10  account.

11         Q.     Right.

12         A.     Not distributed from the plan.

13         Q.     Right.  And in order to have the correct

14  value allocated to their segregated account, you

15  needed to know the correct year end value for 1999,

16  correct?

17         A.     That is correct.

18         Q.     Since the year end value for 1999 was off

19  by millions of dollars, the active participants wound

20  up not having the correct value allocated to their

21  segregated accounts, correct?

22         A.     That is correct.

23                MR. CHARME:  I have no further questions.

24                MR. KERN:  I'm afraid we're going to

25  continue.

1      Q.      Finally, you previously testified that an

2  active participant could maintain monies in both the

3  commingled account and in the segregated account,

4  correct?

5      A.      It would be legal to do it, yes.

6      Q.      Nothing which would have precluded that,

7  correct?

8      A.      There's nothing to preclude that no.

9              MR. KERN:  I have nothing further.

10      A.      It would be unusual, but there's nothing

11  to preclude it, no.

12             MR. KERN:  I have nothing further.  Thank

13  you.

14             MR. CHARME:  I have one quick question.

15  REDIRECT EXAMINATION BY MR. CHARME:

16      Q.      Do you know if, in the case of

17  Diagnostic, anyone maintained both money in a

18  commingled account and in a segregated account?

19      A.      No, no one did.

20  RECROSS EXAMINATION BY MR. KERN:

21      Q.      Well, how do you know that?  If there

22  were monies sitting in the Smith Barney account that

23  hadn't been distributed for whatever reason, and those

24  monies belonged to active participants, then the fact

25  is that there would have been monies maintained in

1   both the commingled account and a segregated account

2   for that individual, right?

3        A.      That is correct.  But no one

4   intentionally was in both accounts.

5        Q.      As far as you know?

6        A.      As far as I know, for sure, no one was

7   intentionally in the commingled account and the

8   segregated account because nobody said keep half of my

9   money in the commingled account, put half of my money

10  in a separate account.

11       Q.      I understand.  That commingled account

12  was maintained at least through 1995 -- at least

13  through 2005, correct?

14       A.      Yes, it was a small balance left in the

15  2005.

16       Q.      You don't know how much was in the Smith

17  Barney account in 2005, though, do you?

18       A.      No.  What we had, it was just --

19       Q.      Do you know what the name on the Smith

20  Barney account is until this very day?

21       A.      No.

22              MR. KERN:  I have nothing further.

23              MR. CHARME:  I have one quick question.

24  REDIRECT EXAMINATION BY MR. CHARME:

25       Q.      Did anyone ever say to you that Dr.

1                    C E R T I F I C A T I O N

2

3

4

5              I, NANCY A. MIANI, a Certified Court Reporter

6      and a Notary Public, License No. XI00814, do hereby

7      certify that the foregoing witness, ^ , was duly sworn

8      by me on the date indicated, and that the foregoing is

9      a true and accurate transcription of my stenographic

10     notes.

11             I further certify that I am not employed by

12     nor related to any party to this action.

13

14

15

16                        NANCY A. MIANI, C.S.R.

17                        LICENSE NO. XI00814

18

19

20

21

22

23

24

25

**EXHIBIT 42**

**DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.**

**FOR THE PLAN YEAR ENDING:**

**12/31/99**



11708

# American Pension Corporation

1375 PLAINFIELD AVENUE ● WATCHUNG, NEW JERSEY 07060
(908) 757-5151 ● Facsimile (908) 757-9644

January 13, 2000

Mario A. Criscito, M.D.
11 Chadwick Road
Livingston, NJ  07039

RE:  Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan

Dear Dr. Criscito:

I am enclosing the report for the plan year ending December 31, 1999.

Please note I have re-instated the forfeitures to Wisteria Banks and Mary Ann Dimitrion.  A portion of their accounts were erroneously forfeited in 1998.  Everyone in the plan is 100% vested and their accounts should not have been partially forfeited.  In addition, I used $1,159.15 of the 1999 trust earnings to make up for the earnings not allocated to their accounts in 1998.

Please give me a call if you have any questions.

Regards,

Dominique Sandra Eck
Pension Consultant

DSE/dml
Enclosure:

*C ANALES*
*βω*
*4-2007*

11709

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A. MONEY PURCHASE PLAN

BALANCE SHEET

DECEMBER 31, 1999

ASSETS:

| | | |
|---|---|---|
| 1999 Company Contribution Receivable | $ | 28,996.88 |
| Dean Witter | | 4,017,942.57 |
| Solomon Smith Barney | | 798,425.50 |
| North America Venture | | 50,000.00 |

TOTAL ASSETS: $4,895,364.95

LIABILITIES:

None

TOTAL LIABILITIES: $ .00

PARTICIPANTS' NET WORTH:

Participant Accounts $4,895,364.95

TOTAL NET WORTH: $4,895,364.95

AMERICAN PENSION CORPORATION

11710

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A. MONEY PURCHASE PLAN

## RECONCILIATION OF TRUST ASSETS

### JANUARY 1, 1999 TO DECEMBER 31, 1999

TOTAL ASSETS - January 1, 1999:                                    $3,955,218.00

INCOME:

1999 Company Contribution                          $118,996.88
Net Trust Earnings                                  821,150.07 *

    TOTAL INCOME:

    TOTAL INCOME & OPENING BALANCE:                     940,146.95

                                           $4,895,364.95

EXPENSES & LOSSES:

None

    TOTAL EXPENSES & LOSSES:                                   .00

TOTAL ASSETS - December 31, 1999:                                  $4,895,364.95

  * $819,990.92 allocated to accounts for 1999, and $1,159.15 used
    to allocate 1998 earnings to Banks and Dimitrion.

**AMERICAN PENSION CORPORATION**

## DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.

### 1 9 9 9 – 1 9 0 0

### F I D E L I T Y     B O N D     R E Q U I R E M E N T S

The Government requires that a Fidelity Bond be maintained on the Plan Fiduciaries, to insure the Plan against losses as a result of fraud, theft, or the misappropriation of the Trust Funds.

The Bond must be for at least 10% of the total asset value of the Trust Fund, but does not have to exceed a total Face Amount of $ 500,000.00.

Assuming an increase in the Trust values on the basis of last year's experience, you should assure that a Bond is in place for at least:

$500,000.00
***********

11712

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.


S U M M A R Y    O F    K E Y    F A C T S

| | |
|---|---|
| PLAN YEAR: | 1999 |
| NUMBER OF PARTICIPANTS: | 20 |
| TOTAL COMPENSATION: | $653,922.00 |
| OPENING BALANCE: | $3,956,377.15 |
| NEW FORFEITURES: | .00 |
| PLAN DISBURSEMENTS: | .00 |
| ADJUSTED BALANCES: | $3,956,377.15 |
| TRUST EARNINGS: | $819,990.92 |
| PERCENT EARNINGS: | 20.73 % |
| COMPANY CONTRIBUTION: | $118,996.88 |
| AS A % OF SALARIES: | 18.20 % |
| CLOSING BALANCES: | $4,895,364.95 |
| TRUST CORPUS: | $4,895,364.95 |

11713

**DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.**
**YEAR END: 1999**

# INTEGRATION DATA

| | |
|---|---|
| NUMBER OF PARTICIPANTS: | 20 |
| TOTAL COMPENSATION: | $653,922.00 |
| S.S. LEVEL: | $72,600.00 |
| SALARIES ABOVE S.S. LEVEL: | 4 |
| TOTAL OF EXCESS SALARIES: | $280,480.00 |
| PERCENT ON EXCESS: | 5.70 % |
| ALLOCATION TO EXCESS SALARIES: | $15,987.36 |
| PERCENT ON TOTAL: | 17.00 % |
| ALLOCATION TO TOTAL SALARY: | $103,009.52 |
| TOTAL COMPANY CONTRIBUTION: | $118,996.88 |
| AS A % OF SALARIES: | 18.20 % |

CENSUS REPORT
1999

PAGE  1 OF  1

## DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.

| SOCIAL SECURITY # | EMPLOYEE NAME | DATE OF BIRTH | DATE OF EMPLOY | 1999 ANNUAL COMPENSATION | DATE LEFT |
|---|---|---|---|---|---|
| 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 | BROWN, MARK | __/__/__ | 02/01/95 | 90,880.00 | |
| 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 | CORTES, MARIA | 01/31/56 | 04/01/92 | 38,452.00 | |
| 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 | CRISCITO, MARIO | 05/22/39 | 04/01/76 | 160,000.00 | |
| 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 | HAWTHORNE, KEITH | 02/04/54 | 10/01/91 | 160,000.00 | |
| 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 | ROBERTS, KIM | 05/26/56 | 03/11/96 | G O N E | |
| 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 | ROELKE, MARC | 08/12/61 | 07/01/94 | | |
| | CHAABAN, FADI | __/__/__ | __/__/__ | 160,000.00 | |
| | McALLISTER, CHARESE | __/__/__ | __/__/__ | 33,077.00 | |
| 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 | CRISCITO, MARIO | __/__/__ | 04/01/76 | ROLLOVER $ | |
| | FOGGIO, ANTOINETTE | __/__/__ | 03/28/83 | ROLLOVER $ | |
| | HAYES, BARBARA | __/__/__ | 05/01/79 | ROLLOVER $ | |
| 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 | GONNELLA, RENEE | 07/03/70 | 10/02/91 | 11,513.00 | |
| | BANKS, WISTERIA | __/__/__ | 12/01/94 | G O N E | 07/16/98 |
| | CANALES, MARY ANN | 12/28/65 | 05/03/93 | G O N E | 04/12/96 |
| 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 | CRUZ, LINDA | 05/28/59 | 07/01/88 | G O N E | 01/15/98 |
| 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 | DIMITRION, MARIANNE | __/__/__ | 11/01/94 | G O N E | |
| 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 | DiFAZIO, LISA | 06/18/68 | 02/01/89 | G O N E | |
| | FOGGIO, ANTOINETTE | __/__/__ | 03/28/83 | G O N E | |
| 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 | FOX (VITALE), DIANNE | 09/20/66 | 07/01/87 | G O N E | 05/17/96 |
| | HAYES, BARBARA | __/__/__ | 05/17/79 | G O N E | 06/13/85 |

Total Salaries:        $    653,922.00

11715

**DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.**
**YEAR END: 1999**

## I N I T I A L   D A T A

| LAST NAME | FIRST NAME | DATE OF EMPLOY | STAT | 1999 ANNUAL SALARY | INITIAL OPENING BALANCE |
|---|---|---|---|---|---|
| BROWN | MARK | 02/01/95 | ACTV | 90,880.00 | 29,997.39 |
| CORTES | MARIA | 04/01/92 | ACTV | 38,452.00 | 41,473.79 |
| CRISCITO | MARIO | 04/01/76 | ACTV | 160,000.00 | 2,870,456.32 |
| HAWTHORNE | KEITH | 10/01/91 | ACTV | 160,000.00 | 220,054.94 |
| ROBERTS | KIM | 03/11/96 | TERM | .00 | 3,847.27 |
| ROELKE | MARC | 07/01/94 | ACTV | .00 | 613.12 |
| CHAABAN | FADI | / / | NEW | 160,000.00 | .00 |
| McALLISTER | CHARESE | / / | NEW | 33,077.00 | .00 |
| CRISCITO | MARIO | 04/01/76 | ROLL | .00 | 572,045.08 |
| FOGGIO | ANTOINETTE | 03/28/83 | ROLL | .00 | 9,731.36 |
| HAYES | BARBARA | 05/01/79 | ROLL | .00 | 6,655.36 |
| GONNELLA | RENEE | 10/02/91 | P.T. | 11,513.00 | 16,993.98 |
| BANKS | WISTERIA | 12/01/94 | TERM | .00 | 4,761.72 |
| CANALES | MARY ANN | 05/03/93 | TERM | .00 | 11,674.94 |
| CRUZ | LINDA | 07/01/88 | TERM | .00 | 54,582.19 |
| DIMITRION | MARIANNE | 11/01/94 | TERM | .00 | 8,853.81 |
| DiFAZIO | LISA | 02/01/89 | TERM | .00 | 42,969.75 |
| FOGGIO | ANTOINETTE | 03/28/83 | TERM | .00 | 7,027.14 |
| FOX (VITALE) | DIANNE | 07/01/87 | TERM | .00 | 28,183.36 |
| HAYES | BARBARA | 05/17/79 | TERM | .00 | 26,455.63 |

TOTALS:    20                                      $ 653,922.00 $3,956,377.15

11716

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.
YEAR END: 1999

## CONTRIBUTION  ALLOCATION

| EMPLOYEE NAME | 1999 ANNUAL SALARY | EXCESS SALARY | EXCESS CONTRIB | CONTRIB BALANCE | 1999 TOTAL CONTRIB |
|---|---|---|---|---|---|
| BROWN, M | 90,880.00 | 18,280.00 | 1,041.96 | 15,449.60 | 16,491.56 |
| CORTES, M | 38,452.00 | .00 | .00 | 6,536.84 | 6,536.84 |
| CRISCITO, M | 160,000.00 | 87,400.00 | 4,981.80 | 25,018.20 | 30,000.00 |
| HAWTHORNE, K | 160,000.00 | 87,400.00 | 4,981.80 | 25,018.20 | 30,000.00 |
| CHAABAN, F | 160,000.00 | 87,400.00 | 4,981.80 | 25,018.20 | 30,000.00 |
| McALLISTER, C | 33,077.00 | .00 | .00 | 5,623.09 | 5,623.09 |
| GONNELLA, R | 11,513.00 | .00 | .00 | 345.39 | 345.39 |
| TOTALS: | $653,922.00 | $280,480.00 | $15,987.36 | $103,009.52 | $118,996.88 |

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.
YEAR END: 1999

## C O S T   C O M P A R I S O N

| EMPLOYEE NAME | 1999 ANNUAL SALARY | 1999 ANNUAL ADDITION | DEPOSIT AS A % OF TOTAL | DEPOSIT AS A % OF SALARY |
|---|---|---|---|---|
| BROWN, M | 90,880.00 | 16,491.56 | 13.86% | 18.15% |
| CORTES, M | 38,452.00 | 6,536.84 | 5.49% | 17.00% |
| CRISCITO, M | 160,000.00 | 30,000.00 | 25.21% | 18.75% |
| HAWTHORNE, K | 160,000.00 | 30,000.00 | 25.21% | 18.75% |
| CHAABAN, F | 160,000.00 | 30,000.00 | 25.21% | 18.75% |
| McALLISTER, C | 33,077.00 | 5,623.09 | 4.72% | 17.00% |
| GONNELLA, R | 11,513.00 | 345.39 | .29% | 3.00% |
| TOTALS:   7 | $653,922.00 | $118,996.88 | 100.00% | 18.20% |

11718

**DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.**
**YEAR END: 1999**

## A N N U A L     S U M M A R Y

| EMPLOYEE NAME | ADJUSTED OPENING BALANCES | 1999 TRUST EARNINGS | 1999 COMPANY CONTRIB | 1999 CLOSING BALANCE |
|---|---|---|---|---|
| BROWN, MARK | 29,997.39 | 6,217.20 | 16,491.56 | 52,706.15 |
| CORTES, MARIA | 41,473.79 | 8,595.78 | 6,536.84 | 56,606.41 |
| CRISCITO, MARIO | 2,870,456.32 | 594,925.11 | 30,000.00 | 3,495,381.43 |
| HAWTHORNE, KEITH | 220,054.94 | 45,608.15 | 30,000.00 | 295,663.09 |
| ROBERTS, KIM | 3,847.27 | 797.38 | .00 | 4,644.65 |
| ROELKE, MARC | 613.12 | 127.07 | .00 | 740.19 |
| CHAABAN, FADI | .00 | .00 | 30,000.00 | 30,000.00 |
| McALLISTER, CHARES | .00 | .00 | 5,623.09 | 5,623.09 |
| CRISCITO, MARIO | 572,045.08 | 118,560.93 | .00 | 690,606.01 |
| FOGGIO, ANTOINETTE | 9,731.36 | 2,016.90 | .00 | 11,748.26 |
| HAYES, BARBARA | 6,655.36 | 1,379.38 | .00 | 8,034.74 |
| GONNELLA, RENEE | 16,993.98 | 3,522.14 | 345.39 | 20,861.51 |
| BANKS, WISTERIA | 4,761.72 | 986.90 | .00 | 5,748.62 |
| CANALES, MARY ANN | 11,674.94 | 2,419.73 | .00 | 14,094.67 |
| CRUZ, LINDA | 54,582.19 | 11,312.60 | .00 | 65,894.79 |
| DIMITRION, MARIANN | 8,853.81 | 1,835.02 | .00 | 10,688.83 |
| DiFAZIO, LISA | 42,969.75 | 8,905.83 | .00 | 51,875.58 |
| FOGGIO, ANTOINETTE | 7,027.14 | 1,456.43 | .00 | 8,483.57 |
| FOX (VITALE), DIAN | 28,183.36 | 5,841.23 | .00 | 34,024.59 |
| HAYES, BARBARA | 26,455.63 | 5,483.14 | .00 | 31,938.77 |
| TOTALS: | $3,956,377.15 | $819,990.92 | $118,996.88 | $4,895,364.95 |

11719

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.
YEAR END: 1999

## T O P   H E A V Y   R E P O R T

| NAME OF EMPLOYEE | 12/31/99 ANNUAL SALARY | 12/31/99 CLOSING BALANCE | ACCOUNT AS A % OF TOTAL |
|---|---|---|---|
| HAWTHORNE, K | 160,000.00 | 295,663.09 | 6.04% |
| CRISCITO, M | 160,000.00 | 3,495,381.43 | 71.40% |
| CHAABAN, F | 160,000.00 | 30,000.00 | .61% |
| BROWN, M | 90,880.00 | 52,706.15 | 1.08% |
| ROELKE, M | .00 | 740.19 | .02% |
| CORTES, M | 38,452.00 | 56,606.41 | 1.16% |
| McALLISTER, C | 33,077.00 | 5,623.09 | .11% |
| GONNELLA, R | 11,513.00 | 20,861.51 | .43% |
| DIMITRION, M | .00 | 10,688.83 | .22% |
| CRISCITO, M | .00 | 690,606.01 | 14.11% |
| CRUZ, L | .00 | 65,894.79 | 1.35% |
| BANKS, W | .00 | 5,748.62 | .12% |
| ROBERTS, K | .00 | 4,644.65 | .09% |
| HAYES, B | .00 | 8,034.74 | .16% |
| FOGGIO, A | .00 | 11,748.26 | .24% |
| FOGGIO, A | .00 | 8,483.57 | .17% |
| CANALES, M | .00 | 14,094.67 | .29% |
| DiFAZIO, L | .00 | 51,875.58 | 1.06% |
| HAYES, B | .00 | 31,938.77 | .65% |
| FOX (VITALE), D | .00 | 34,024.59 | .70% |

TOTALS:   20      $653,922.00    $4,895,364.95      100.00%
PARTICIPANTS IN THIS REPORT ARE ORDERED BY SALARY
AND BY KEY EMPLOYEE & HIGHLY COMPENSATED STATUS

11720

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.
YEAR END: 1999

## S E R V I C E   A N D   V E S T I N G

| NAME OF EMPLOYEE | 12/31/99 CLOSING BALANCE | DATE EMPLOYED | PERCENT VESTED | 12/31/99 VESTED CREDITS |
|---|---|---|---|---|
| CHAABAN, F | 30,000.00 | / / | 100 % | 30,000.00 |
| McALLISTER, C | 5,623.09 | / / | 100 % | 5,623.09 |
| CRISCITO, M | 3,495,381.43 | 04/01/76 | 100 % | 3,495,381.43 |
| HAWTHORNE, K | 295,663.09 | 10/01/91 | 100 % | 295,663.09 |
| GONNELLA, R | 20,861.51 | 10/02/91 | 100 % | 20,861.51 |
| CORTES, M | 56,606.41 | 04/01/92 | 100 % | 56,606.41 |
| ROELKE, M | 740.19 | 07/01/94 | 100 % | 740.19 |
| BROWN, M | 52,706.15 | 02/01/95 | 100 % | 52,706.15 |

THIS REPORT IS ORDERED BY D.O.E. (ACTIVE EMPLOYEES ONLY)

11721

12/31/99

## DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.

### TERMINATED EMPLOYEES' BENEFITS

| SOCIAL SECURITY # | EMPLOYEE NAME | DATE OF BIRTH | DATE OF EMPLOY | DATE LEFT | 12/31/99 ACCOUNT BALANCE |
|---|---|---|---|---|---|
| | HAYES, BARBARA | __/__/__ | 05/17/79 | 06/13/85 | 31,938.77 |
| | CANALES, MARY ANN | 12/28/65 | 05/03/93 | 04/12/96 | 14,094.67 |
| 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 | FOX (VITALE), DIANNE | 09/20/66 | 07/01/87 | 05/17/96 | 34,024.59 |
| 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 | CRUZ, LINDA | 05/28/59 | 07/01/88 | 01/15/98 | 65,894.79 |
| | BANKS, WISTERIA | __/__/__ | 12/01/94 | 07/16/98 | 5,748.62 |

Termination Liabilities:     $   151,701.44

11722



**MORGAN STANLEY DEAN WITTER:**          $4,017,942.57
**SCHWAB    TRANSFERRED TO DEAN WITTER**        0.00
**SALOMON SMITH BARNEY**              $   798,425.50
**NORTH AMERICAN VENTURE:**          $    50,000.00
                              **TOTAL:**   $ 4,728067.59

*98,300.48 OF WHICH 8300.48*
*was for 1998*
*+ 28,996.88 RCV*

**INCLUDED IN DEAN WITTER MONIES IS $~~93,500.48~~**
**CONTRIBUTIONS HOWEVER DCC PA STILL OWES PENSION PLAN**
**$~~25,696.40~~ FOR THE YEAR 1999.**

*4 90,000 IS FOR 1999*

*28, 996.88*

**MARIO A. CRISCITO, M.D.**
**11 CHADWICK ROAD**
**LIVINGSTON, N.J. 07039**

*98 RCV*

*118, 996.88*
*~~96000 DEP IN 99~~*
*28, 996.88 DUE*

*1-8-99 5800*
*2  99*
*put in 3,300.48*

*98*

*4-99 30000*
*8-99 15000*

11723



| MORGAN STANLEY DEAN WITTER: | $4,017,942.57 |
| SCHWAB   TRANSFERRED TO DEAN WITTER | 0.00 |
| SALOMON SMITH BARNEY | $  798,425.50 |
| NORTH AMERICAN VENTURE: | $   50,000.00 |
| TOTAL: | $ 4,728067.59 |

INCLUDED IN DEAN WITTER MONIES IS $98,300.48 OF WHICH $8,300.48 IS FOR THE YEAR 1998 CONTRIBUTIONS HOWEVER DCC PA STILL OWES PENSION PLAN $28,996.88 FOR THE YEAR 1999.

MARIO A. CRISCITO, M.D.
11 CHADWICK ROAD
LIVINGSTON, N.J. 07039

11724

DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.
ANNUAL REPORT AND
PARTICIPANT STATEMENT
------------------------

PLAN YEAR ENDING:   12/31/99

FOR:   MARK BROWN

YOUR OPENING ACCOUNT BALANCE
AS OF 01/01/99 WAS:                        $     29,997.39

THE TRUST FUND EARNINGS WERE 20.73 %
YOUR SHARE AMOUNTED TO:                          6,217.20

THE COMPANY CONTRIBUTION MADE TO
YOUR ACCOUNT FOR THIS YEAR WAS:                 16,491.56
                                              ------------

YOUR TOTAL ACCOUNT ON 12/31/99
NOW AMOUNTS TO:                            $     52,706.15

YOUR VESTING ON 12/31/99 WAS:                      100 %

YOUR VESTED ACCOUNT BALANCE:               $     52,706.15
                                              ************

YOUR ACCOUNT IS PAYABLE ONLY UNDER THE TERMS OF THE
PLAN AND TRUST DOCUMENT

11725

**EXHIBIT 43**

IMPORTANT

EVERYTHING MUST
BE MAILED DIRECTLY TO
HIS HOME ADDRESS

Diagnostic Clinical
Cardiology, P.A.

"Diagnostic & Clinical Cardiology, P.A.
Money Purchase Pension Plan

1st Year of the Trust Ended:
May 31, 1986

Dear: Mario Piccito, MD
11 Chadwick Rd.
Irvington, NJ. 07039

PAY APT

PREPARATION OF FILM

720
-100
820

Administration of Diagnostic Clinical Cardiology ...
Pension Plan, Year Ending March 31, 1986 ...

# KEEP ON
## TOP    5-20-94

accept for Dr Casellas
individual report, EVERYTHING
goes to Dr Cruscito's
House. Nothing goes
direct to anyone else, even
accountants. All info goes
through Dr Cruscito !    EXCEPT BR ROCH
                         DR CASELLA
                         & DR. GOLDSTEIN

PER CRISCITO DO NOT SPEAK TO ANYONE REGARDING

10905

HE IS IT . NO ONE

FALSE. NOT EVEN

DR. CASELLA.

10906

9-10-03

PER MARIO CRISCITO
RE DIAGNOSTIC & CLINICAL
CARDIOLOGY

MAIL EVERYTHING

TO DR MARIO CRISCITO AT HIS

HOME, NOT TO CASELLA

MARIO'S HAIR NOT TO, BUT, ALSO
SEND MARIO A COPY LABELED
COPY FOR DR CASELLA

25021

DR CRISCITO SAID IF

ANYTHING GOES TO

OFFICE OR CASELLA

HE WILL PERSONALLY COME

DOWN HERE & BEAT

ME! [HE HAS BEEN SAYING

THIS FOREVER]

TC 10-10-85

Philip Cruscito

from 12 year bill

Dr Cruscito

deposited 41,000 in 2004

assets as of 12-31-04

= 122,000 LESS THAN

YEAR BEFORE as 12-31-03.

Dr Criscito ( so loss was 163,000 )

Dr Criscito 2004

26051

# American Pension Corporation

1375 Plainfield Avenue
Watchung, New Jersey 07069
(908) 757-5151 • Facsimile (908) 757-9644

TO: _ALL STAFF_          DATE: _8-11-06_

FROM: _BRIAN & DOMINIQUE_     RE: _DIAGNOSTIC &_

_CLINICAL CARDIOLOGY_

_URGENT_

NEW RULES

ANY REPORT THAT INCLUDES
THE VALUE OF DR MARIO CRISCITO'S
ACCOUNT OR DISTRIBUTIONS FROM HIS
ACCOUNT ARE TO GO ONLY TO
MARIO AT HIS HOME (32 CHASER DRIVE)
THIS INCLUDES 2005 & 2006
5500 FORMS & SUMMARY ANNUAL REPORTS,
2006 1099 R'S, & ANY REPORT
SHOWING TOTAL VALUE OF PLAN
ASSETS

MARK BROWN CAN ONLY GET
THINGS LIKE PLAN DOCUMENT. CONTRIBUTION
CALCULATIONS CAN GO TO MARK BROWN
ONLY IF THE CENSUS CAME FROM MARK BROWN.
CLAIMS ON OTHER DOCTORS CAN GO TO MARK BROWN.
CHECK WITH BRIAN AND DOMINIQUE BOTH
BEFORE MAILING OF FAXING ANYTHING ON
DIAGNOSTIC & CLINICAL.                    26055
IF UNSURE, CALL MARIO. ANY COMPLAINTS,
REFER COMPLAINER TO MARIO.           BRIAN

1—12-2006

76— 08 10 627

NEW TRUST IR#

FOR DIAGNOSTIC
& CLINICA
CARDIOLOGY

DON'T FORGET,
EVERY THING GOES
= MARIO CRISCITOS
TO HOUSE

Chelsea Trust
33 Chelsea NJ
Irvington 07039-3420

( I changed it
on greendale
on Hyperprop)
sellers

13071

**EXHIBIT 44**

COPY

# American Pension Corporation

### 1375 PLAINFIELD AVENUE ● WATCHUNG, NEW JERSEY 07069
### (908) 757-5151 ● Facsimile (908) 757-9644

December 6, 2007

Joy M. Mercer, Esq.
Joy M. Mercer, P.C.
30 Columbia Turnpike
Florham Park, New Jersey 07932



Re: Diagnostic & Clinical Cardiology, P.A.
    Profit Sharing Plan

Dear Ms. Mercer:

In response to your correspondence dated November 27, 2007, enclosed is the information requested in Item 5 of your letter. As we previously advised Dr. Casella, we were unable to retrieve from storage copies of the Annual Reports from 1996 and 1997, and believe those files were destroyed. However, we were able to retrieve a copy of the 1995 Annual Report.

I compared the December 31, 1995 account balance for each participant in the commingled account to the opening balance on the 1998 report. The numbers all track, using estimated contributions and a total two year return on investments for 1996 and 1997 of 8.5%. There were no distributions in 1996 or 1997.

Accordingly, enclosed is a copy of the 1995 commingled account annual summary listing the value of the participants' accounts as of December 31, 1995. In addition, I am enclosing copies of the annual summaries from 1998 through December 31, 2005. There were no commingled accounts after December 31, 2005, when Dr. Criscito took his lump sum distribution, other than A. Foggio's account. Please see the footnote on the 2005 Annual Summary regarding Foggio's account balance.

Also enclosed is a list of the transfers and payouts from the commingled account in 2000. The values were based on the account balances as of December 31, 1999. The 1999 report was completed on January 13, 2000, and the transfers were made soon thereafter as the paperwork for opening the separate accounts was processed by Morgan Stanley. The December 31, 1999 value of the commingled accounts was based on information provided by Mario Criscito.

I have made notes on the reports to advise you of the miscellaneous adjustments made on the reports.

In preparing the Annual Reports, we relied on the employee census data provided by Dr. Casella, and the financial information provided by Dr. Criscito on the commingled accounts. Accumulating the data on all the separate accounts has proven to be a difficult challenge. While

**25185**

# American Pension Corporation

- 2 -

the Morgan Stanley statements on the separate accounts are provided by Morgan Stanley, for any accounts held outside of Morgan Stanley we have had to rely on the doctors to provide their account balances, often at the "eleventh hour." The information on the commingled accounts or some of the separate accounts was often provided at the last minute, resulting in rushed reports.

The bottom line is, the reports were completed accurately, based on the data provided. As indicated on the enclosed reports, occasional minor adjustments were required and were made.

As I am sure you have been made aware, the major question seems to apply to the commingled accounts. The annual value of the commingled accounts was provided by Dr. Criscito, with no backup statements. Most years it was provided in writing, but occasionally it was provided verbally. We had no reason to believe that Dr. Criscito was providing us with incorrect information.

When Dr. Casella came to our office this summer, he spent a great deal of time going through every file. He indicated that he did not fully trust Dr. Criscito, and suspected that he had been manipulating information on the commingled accounts for his own benefit. I commented to Dr. Casella that while Dr. Criscito was certainly protective of his privacy, and had a very forceful personality, I would find it surprising that an extremely successful, and very wealthy, cardiovascular surgeon like Dr. Criscito would provide misinformation to inflate his own benefit at the expense of the other participants. Dr. Casella, on the other hand, was not of that mindset, and apparently for some time.

In the beginning of 2000, when separate accounts were set up for all the employees, Morgan Stanley apparently started sending us copies of the monthly statements on the newly established separate accounts. Up until that time, we were not receiving monthly statements on the commingled account. Instead, Dr. Criscito would provide the end of year values each year (note, the commingled account previously was not all at Morgan Stanley). But it turns out that monthly statements on the commingled account also started to be mailed at the time the separate accounts started (I assume that was an error, because they later stopped). All statements were filed as they came in by a filing clerk, and we did not realize they were being mailed to us (the file is very thick, and contains all of the other participants' Morgan Stanley statements, so the commingled account statements did not stand out). And, Dr. Crisito had called us with the total value for the commingled accounts for that year, as before, which is the value we used.

When Dr. Casella carefully reviewed every file, however, he came across the Morgan Stanley statements from 2000 for the commingled accounts. They do not agree with the numbers personally provided to us by Dr. Crisito for that year.

25186

# American Pension Corporation

### - 3 -

Obviously, at some point in time, Dr. Criscito will need to explain the discrepancies to the new Trustees. We at American Pension Corporation are not at all happy that we appear to have been receiving incorrect information from Dr. Criscito, and would also like to find out what exactly happened so we can determine if any of the participants in the commingled account have been short-changed. I do not want to speculate on whether it is a case of poor bookkeeping by Dr. Criscito, or a deliberate attempt on Dr. Criscito's part to enrich himself, or if there is some reasonable explanation that we are not aware of. Either way, the responsibility to provide American Pension Corporation with accurate information clearly belonged to the Practice and the Plan Trustee, Dr. Criscito. We are not auditors, and we trust our clients to provide us with accurate information.

I do not recall either Dominique Eck (who primarily worked on the plan) or myself ever actually meeting Dr. Criscito in person. Our relationship was professional, but always cordial. Dr. Criscito always emphasized that he was the "boss," and that <u>everything</u> was to be sent directly to him at his home. In our business, this is not a totally uncommon behavior by small business owners, who do not want financial information floating around the office. He also indicated that any requests should be referred to him, and he would handle them. We respected his wishes, as we had no reason to believe his motives were anything other than protecting his privacy.

Please let me know if we can be of further assistance to you. We share the desire of the new Trustees to be sure the accounts have been correctly valued, and will do whatever we can to assist them in the process.

Sincerely,

Brian P. Warnock
Vice-President

BPW/sjl
Enclosures

cc: Mr. Mark Brown
Anthony Casella, M.D.
Fadi Chaaban, M.D. (Plan Trustee)
Constantinos A. Costeas, M.D. (Plan Trustee)
Mr. Peter V. S. Coughlan, President
Charles S. Detrizio, Esq.
Ms. Dominique Eck, Pension Consultant
Gary Rogal, M.D., President
Sabino R. Torre, M.D. (Plan Trustee)

**25187**

q/brian/d&cc/1

**EXHIBIT 45**

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3          CASE NO. 2:08-CV-1567 (JAG-MCA)

4   DR. FADI CHAABAN, DR. SABINO R.       :

5   TORRE, DR. CONSTANTINOS A.            :

6   COSTEAS, and DR. ANTHONY J.           :

7   CASELLA AS TRUSTEES OF DIAGNOSTIC     :

8   & CLINICAL CARDIOLOGY, P.A.           :

9   PROFIT SHARING PLAN,                  :

10              Plaintiffs,               :

11          -V-                           :

12  DR. MARIO A. CRISCITO,                :

13              Defendant.                :

14  - - - - - - - - - - - - - -

15

16          DEPOSITION OF  MARK BROWN

17          WEDNESDAY, JUNE 17, 2009

18

19

20          ROSENBERG & ASSOCIATES, INC.

21      Certified Court Reporters & Videographers

22  425 Eagle Rock Ave., Suite 201      575 Madison Ave.

23  Roseland, NJ 07068              New York, NY 10022

24   (973) 228-9100    1-800-662-6878   (212) 868-1936

25          www.rosenbergandassociates.com

3

1   A P P E A R A N C E S:

2

3   WITMAN STADTMAUER, P.A.

4   BY:  STEPHEN M. CHARME, ESQ.

5   26 Columbia Turnpike

6   Florham Park, New Jersey 07932-2246

7   (973) 822-0220

8   scharme@wsmesq.com

9   Attorneys for Plaintiffs

10

11  KERN AUGUSTINE CONROY & SCHOPPMANN, P.C.

12  BY:  STEVEN I. KERN, ESQ.

13  1120 Route 22 East

14  Bridgewater, New Jersey 08807

15  (908) 704-8585

16  kacs@drlaw.com

17  Attorneys for Defendant

18

19

20

21

22

23

24

25

7

```
 1              (Discussion off the record.)
 2      Q.      Who was the employee?
 3      A.      I don't recall.
 4      Q.      This is someone who terminated
 5 employment and wanted the money rolled over?
 6      A.      Right.  Morgan Stanley sent us the
 7 check to pay the tax.  That was my only
 8 involvement.  I brought the 945 form and the
 9 check to the bank and deposited it.
10      Q.      And there was tax to be paid why?
11      A.      I think it's a penalty if you
12 withdraw early.
13      Q.      Okay.
14      A.      So that was my involvement.
15      Q.      So this wasn't a rollover, it was a
16 withdrawal?
17      A.      Right, correct, withdrawal.
18      Q.      Were there any irregularities as
19 far as you know with this transaction?
20      A.      Not to my knowledge.
21              And the only other time I had
22 contact with them prior to, with American
23 Pension prior to was I tried getting a copy of
24 the actual plan document or where the money, my
25 particular, my money was being allocated, this
```

8

```
 1   was sometime in 1999 I did that, and I was told
 2   that they couldn't release that information to
 3   me.
 4        Q.      Did they tell you why?
 5        A.      They told me that only Dr. Criscito
 6   is allowed to have that information, and they
 7   weren't allowed to send it to anybody.
 8        Q.      Did you ask Dr. Criscito for it?
 9        A.      Yes.
10        Q.      And what did he say?
11        A.      He told me that it was -- "Don't
12   ask Mario.  You're fine.  Uncle Mario is taking
13   care of you."
14              And I stated to him I'm sitting
15   down with my financial advisors and I really
16   need to know what's in the account, I don't have
17   any idea what's in the account, what it's
18   invested in, and he got very irate with me and
19   started yelling at me, took my hand and was
20   about to write it out on my hand, and then I
21   pulled my hand back, and he wrote a number out
22   on a napkin, and I left.
23        Q.      What was the number?
24        A.      I don't recall.
25        Q.      Was it a good number or a bad
```

11

1     Q.    Before this letter in 2000, were

2 you aware of the fact that your monies were part

3 of an account at Morgan Stanley?

4     A.    Yeah.  I knew there was one big

5 account.

6     Q.    Did you ever make a request of

7 Morgan Stanley for information concerning the

8 account?

9     A.    I believe I did.  That was the same

10 year.

11     Q.    Who did you talk to at Morgan

12 Stanley?

13     A.    Mary Sue McCarthy.

14     Q.    And what were you told?

15     A.    That it would have to come from Dr.

16 Criscito.

17     Q.    Did you make that request in

18 writing or verbally?

19     A.    That would be verbally.  Both.

20 Both to American Pension, to Mario, and to all

21 three.

22     Q.    Were monies ultimately segregated

23 into a personal account for you?

24     A.    Yes.

25     Q.    Did you ever question the amount of

20

C E R T I F I C A T E

    I, JEAN C. KIBALO, a Certified Court Reporter and Notary Public of the State of New Jersey, do hereby certify that prior to the commencement of the examination, the witness was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

    I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

    I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to the action; and that I am neither a relative nor employee of such attorney or counsel; and that I am not financially interested in the action.

_____

JEAN C. KIBALO, CCR
LICENSE NO. XI01968

**EXHIBIT 46**

PLAINTIFF'S
EXHIBIT
*Warnock 9*
6-16-09

D. C. C   P A

Pension   Fund

Jan — Dec 31, 1997

Dean W. Han :            1,553, 424.17
Schwaab                  1,186, 447.20
Salomon Smith Barney       624, 446.33
North America Venture       50, 000. —
Deposited                  136, 000. —

                         3,550, 367.70

From  Dr Mario  A  Criscito

To   Brian

908. 757. 9644

9/14/98

## DCC,P.A. PENSION FUND
### December 31, 1999 ~~2000~~

|                              |                    |
|------------------------------|--------------------|
|                              | $4,895,364.95      |
|                              | - $720,979.46      |
| OPENING BAL. FOR YEAR 2000   | $ 4,174,385.49     |
| DEPOSIT FOR Mario A. Criscito| $30,000.00         |
| NORTH AMERICA VENTURE        | $50,000.00         |
| SOLOMON SMITH BARNEY         | $1,185,438.00      |
| DEAN WITTER                  | $5,655,250.00      |
| TOTAL FOR 2000               | $6,920,688.00      |

## DCC,P.A. PENSION FUND
### December 31,2000

| | |
|---|---|
| OPENING BAL. FOR YEAR 2000 | $ 6,920,688.00 |
| DEPOSIT  FOR Mario A. Criscito | $30,000.00   34007.20 |
| NORTH AMERICA VENTURE | $50,000.00 |
| SOLOMON SMITH BARNEY | $ 725,846.00 |
| DEAN WITTER | $4,176,345.00 |
| TOTAL  FOR 2000 | $4,982,191.00 |

25957

## DCC, P.A. PENSION FUND
### December 31, 2002

| | |
|---|---|
| **OPENING BAL. FOR YEAR 2002** | $ 4,982,191.00 |
| **DEPOSIT  FOR Mario A. Criscito** | $40,000.00 |
| **NORTH AMERICA VENTURE** | $50,000.00 |
| **SOLOMON SMITH BARNEY** | $ 739,125.00 |
| **DEAN WITTER** | $4,222,065.00 |
| **TOTAL  FOR 2002** | $5,051,190.00 |

**25997**

**EXHIBIT 47**



**MORGAN STANLEY DEAN WITTER:**       $4,017,942.57

**SCHWAB    TRANSFERRED TO DEAN WITTER**      0.00

**SALOMON SMITH BARNEY**       $   798,425.50

**NORTH AMERICAN VENTURE:**       $    50,000.00

                  **TOTAL:**       $ 4,728067.59

**INCLUDED IN DEAN WITTER MONIES IS** ~~$93,300.48~~ **CONTRIBUTIONS HOWEVER DCC PA STILL OWES PENSION PLAN** ~~$25,696.40~~ **FOR THE YEAR 1999.**

     28,996.88

            **MARIO A. CRISCITO, M.D.**

            **11 CHADWICK ROAD**

            **LIVINGSTON, N.J. 07039**

*to Mario's*
*report ASAP &*
*send to Mario*
*he can to*
*Mario's accounts.*

| | |
|---|---|
| **MORGAN STANLEY DEAN WITTER:** | **$4,017,942.57** |
| **SCHWAB   TRANSFERRED TO DEAN WITTER** | **0.00** |
| **SALOMON SMITH BARNEY** | **$  798,425.50** |
| **NORTH AMERICAN VENTURE:** | **$   50,000.00** |
| **TOTAL:** | **$ 4,728067.59** *RCV* |

*+ 28,996.88*

*98,300.48 OF WHICH 8300.48*
*WAS FOR 1998*
*$ 90,000 IS*
*FOR 1999*

**INCLUDED IN DEAN WITTER MONIES IS $93,500.48**
**CONTRIBUTIONS HOWEVER DCC PA STILL OWES PENSION PLAN**
**$25,696.40 FOR THE YEAR 1999.**

*for*
*Mario*

*28, 996. 88*

**MARIO A. CRISCITO, M.D.**
**11 CHADWICK ROAD**
**LIVINGSTON, N.J. 07039**

*98 RCV*

*118, 996.88*

*- 90,000 DEP IN 99*

*28, 996.88 DUE        98*

*1-8-99  5800*
*2 1899*
*put in 3, 300.48*

*4-99  30000*
*4-99  15000*
*4-99  45000*   11723

# EXHIBIT 48



## Memo From

**BRIAN WARNOCK**

9-14-07



LOOK WHAT

DR CASELLA

FOUND IN THE

Joot FILE.

HOW COULD

WE MISS

THIS?

BIG PROBLEM

PLAINTIFF'S EXHIBIT

**Change in Asset Value for 2000**

| | |
|---|---|
| Value of Priced Assets 1/01/00 | 612,919,403.12 |
| Securities Bought | 4,941,879.70 |
| Securities Received | 0.00 |
| Securities Sold/Redeemed | -13,739,647.00 |
| Securities Delivered | 0.00 |
| Transactions at Fund Company | 0.00 |
| Change in Value of Priced Assets | -2,065,354.22 |
| Value of Priced Assets 12/31/00 | 1,065,280.00 |

| | |
|---|---|
| Net Change in Asset Value | -11,465,122.32 |

25040

$441,167.27
592.00
0.00
1,546.22
5,675.00
0.00
0.00
0.00

$46,979.49

$46,979.49
$0.00

RGAN STA.

**Summary**

Market Funds
pal Bonds
rate Fixed Income
nment Securities
I Funds
vestment Trusts
cates of Deposit
ted/Insurance

Value

Asset Value

**Summary**

Market Funds
pal Bonds
rate Fixed Income
nment Securities
I Funds
vestment Trusts
cates of Deposit

ncome

e Income
empt Income

Dean Witter is a service mark of Morgan Stanley Dean Witter & Co.

# DIAGNOSTIC & CLINICAL CARDIOLOGY, P.A.

## FOR THE PLAN YEAR ENDING:

### 12/31/0

THESE ARE
COMINGLED ACCOUNT
STATEMENTS RCD
FOR 2001 - APC WAS
NOT AWARE OF THEM ( WE WERE
USING #S PROVIDED BY
MARIO CRISCITO ) ) STATEMENTS
WERE FOUND BY DR COSOLA
WHEN HE REVIEWED ALL
FILES IN SUMMER OF 2007.
#S DO NOT TIE INTO DR CRISCITO'S
#S THAT HE GAVE US

DIAGN01.MP

12276

2007

THESE ARE STATEMENTS
THAT PR COSELLA LOCATED IN
FILE (APC WAS UNAWARE OF THEM-
USED INFO PROVIDED BY DR CRISCITO)
THAT DO NOT THE INTO
MARIOS HS USED TO
SEPARATE ACCOUNTS AS OF
12-31-99 VERVERBANN

1195

**EXHIBIT 49**

# DCC,P.A. PENSION FUND
## December 31, 1999 2000

|                                      |                  |
| ------------------------------------ | ---------------- |
|                                      | $4,895,364.95    |
|                                      | - $720,979.46    |
| **OPENING BAL. FOR YEAR 2000**       | $ 4,174,385.49   |
| **DEPOSIT  FOR Mario A. Criscito**   | $30,000.00       |
| **NORTH AMERICA VENTURE**            | $50,000.00       |
| **SOLOMON SMITH BARNEY**             | $1,185,438.00    |
| **DEAN WITTER**                      | $5,655,250.00    |
| **TOTAL  FOR 2000**                  | $6,920,688.00    |



PLAINTIFF'S
EXHIBIT
CRISCITO 28
12-11-09

25870

# MORGAN STANLEY DEAN WITTER

DUPLICATE

Your Financial Advisor
HERBERT A MENDEL
SENIOR VICE PRESIDENT - INVESTMENTS
MORGAN STANLEY DEAN WITTER
FIVE CONCOURSE PARKWAY STE 2000
ATLANTA, GA    30328
(770) 698-2100
For Account Of:
MARIO A CRISCITO TTEE

## ACTIVE ASSETS ACCOUNT®
### FOR YEAR ENDING DECEMBER 31, 2000

PAGE 1 OF 10

Account Number
769 086347                    FA
                              070

AAA Customer Service
1-800-869-3326

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK
DIAG-CLIN-CARD PRIMARY ACCOUNT      001389
1373 PLAINFIELD AVE                 769
WATCHUNG NJ 07060

## Activity Summary

Total Asset Value January 01, 2000                            $12,952,936.43
Cash/Money Market Activity for 2000

| | |
|---|---|
| Credits To Your Account | |
| Dividend and Interest | 444,979.49 |
| Deposits | 111,975.49 |
| Sales Proceeds/Redemptions | 13,739,647.00 |
| Other Credits | 489.00 |
| **Total Credits** | **14,299,592.50** |
| Debits To Your Account | |
| Checking | 0.00 |
| Visa Card | 0.00 |
| Withdrawals | 2,454,694.00 |
| Funds to Purchase Securities | 4,341,879.76 |
| Other Debits | -45.00 |
| **Total Debits** | **6,796,689.50** |

### Changes In Asset Value for 2000
| | |
|---|---|
| Value of Priced Assets 1/01/00 | $12,919,403.12 |
| Securities Bought | 4,341,879.70 |
| Securities Received | 0.00 |
| Securities Sold/Redeemed | -13,739,647.00 |
| Securities Delivered | 0.00 |
| Transactions at Fund Company | 0.00 |
| Change in Value of Priced Assets | -2,945,884.22 |
| Value of Priced Assets 12/31/00 | 1,656,280.00 |
| Net Change In Asset Value | -11,463,122.52 |
| **Total Asset Value as of December 31 2000** | **$8,992,297.41** |

## Asset Summary

| | Value | % of Assets |
|---|---|---|
| Money Market Funds | $7,534,016.61 | 83.8% |
| Stocks | 1,404,219.30 | 15.6 |
| Municipal Bonds | 0.00 | 0.0 |
| Corporate Fixed Income | 0.00 | 0.0 |
| Government Securities | 59,062.50 | 0.6 |
| Mutual Funds | 0.00 | 0.0 |
| Unit Investment Trusts | 0.00 | 0.0 |
| Certificates of Deposit | 0.00 | 0.0 |
| Annuities/Insurance | 0.00 | 0.0 |
| Other | 0.00 | 0.0 |
| **Asset Value** | **$8,992,297.41** | **100.0%** |
| Cash | 0.00 | |
| **Total Asset Value** | **$8,992,297.41** | |

## Income Summary

| | Year To Date |
|---|---|
| Money Market Funds | $441,167.27 |
| Stocks | 592.00 |
| Municipal Bonds | 0.00 |
| Corporate Fixed Income | 1,345.22 |
| Government Securities | 3,875.00 |
| Mutual Funds | 0.00 |
| Unit Investment Trusts | 0.00 |
| Certificates of Deposit | 0.00 |
| Other | 0.00 |
| **Total Income** | **$446,979.49** |
| Taxable Income | $446,979.49 |
| Tax Exempt Income | $0.00 |

*Morgan Stanley Dean Witter is a service mark of Morgan Stanley ...*

25873

Case 2:08-cv-01567-GEB -MCA   Document 57-10   Filed 09/17/10   Page 84 of 119 PageID: 1408

# MORGAN STANLEY DEAN WITTER

**DUPLICATE**

## ACTIVE ASSETS ACCOUNT®
### FOR YEAR ENDING DECEMBER 31, 2000

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK

Account Number
769 086347

FA
070

## ASSET DETAILS

### Cash and Money Market Funds

| | Amount | Pct of Assets | Est Yrly Income |
|---|---|---|---|
| CASH | .00 | | |
| AAA PREMIER MONEY TRUST | 7,536,016.61 | 83.6% | 477,029 |

**Total Cash and Money Market Funds** 7,536,016.61 83.6% 477,029

Net Change Since January 1, 2000

#### Annualized 30 Day Yields

AAA Premier Money Trust........... 6.53%
AAA Institutional Money Trust....... 6.47%

### Stocks

#### Common Stocks

| | Current Price | Value | Pct of Assets | Est Yrly Income | Dividend Yield | Current Yield | Symbol | Additional Information |
|---|---|---|---|---|---|---|---|---|
| 1,800 AMERICA ONLINE INC | 34.80 | 62,640.00 | 0.7% | 0 | 0.00% | | AOL | |
| 500 NYCAL CP | .01100 | 5.50 | N/A | 0 | 0.00% | | NYCL | |
| 10,000 QUALCOMM INC | 82.18750 | 821,875.00 | 9.1% | 0 | 0.00% | | QCOM | |
| 18,900 SANDISK CORP | 27.75000 | 821,700.00 | 5.8% | 0 | 0.00% | | SNDK | |

**Total Stock**

Net Change Since January 1, 2000

### Government Securities

#### Treasury Securities

| | Current Price | Value | Pct of Assets | Est Yrly Income | Current Yield | Accruing Interest | Additional Information |
|---|---|---|---|---|---|---|---|
| 50,000 UNITED STATES TREASURY NOTE 7.750% FEB/AUG 15 DUE 02/15/01 | 100.12500 | 50,062.50 | 0.6% | 3,875 | 7.74% | 1,453 | YIELD TO MATURITY .5.9590%<br>MOODY AAA   S&P AAA<br>ISSUE 02/15/91 CUSIP 912827ZX3 |

**Total Government Securities**

Net Change Since January 1, 2000

### Asset Summary

| | Value | Est Yrly Income |
|---|---|---|

**Total Asset Value**

Total Net Change in Priced Assets Since January 1, 2000

25874



# MORGAN STANLEY DEAN WITTER

**DUPLICATE**

## ACTIVE ASSETS ACCOUNT®
FOR YEAR ENDING DECEMBER 31, 2000

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK

Account Number
769 086347

FA
070

## CREDITS TO YOUR ACCOUNT

### Dividends and Interest

| Activity | Description | Amount | Income Category |
|---|---|---|---|
| Dividend | AAA PREMIER MONEY TRUST | 290,331.95 | Money Market Funds |
| Dividend | MSDW LIQUID ASSET FUND | 150,835.32 | Money Market Funds |
| | Total Money Market Funds | 8441,167.27 | |
| Dividend | LUCENT TECHNOLOGIES | 592.00 | Stocks |
| Taxable Interest | DIVIDEND ADJUSTMENT MUTUAL FD | 1,348.22 | Corporate Fixed Income |
| Taxable Interest | US TSY NOTE 775 01FR15 | 3,675.00 | Government Securities |
| | | | |

### Deposits

| Date | Activity | Description | Amount | Additional Information |
|---|---|---|---|---|
| 01-21 | Branch Deposit | FUNDS RECEIVED | 15,830.44 | |
| 01-21 | Branch Deposit | FUNDS RECEIVED | 1,102.92 | |
| 04-18 | Branch Deposit | FUNDS RECEIVED | 45,043.92 | |
| 05-23 | Branch Deposit | FUNDS RECEIVED | 15,000.00 | |
| 07-25 | Branch Deposit | FUNDS RECEIVED | 15,000.00 | |
| | | Total Deposits | | |

### Sales Proceeds/Redemptions

| Date | Activity | Quantity | Description | Price | Amount | Additional Information |
|---|---|---|---|---|---|---|
| 03-09 | Sold | 29,600 | LUCENT TECHNOLOGIES | 71.7500 | 2,122,264.85 | |
| 01-05 | Sold | 2,125 | VERITAS SOFTWARE DE | 139.5600 | 296,321.40 | |
| 01-05 | Sold | 5,000 | VERITAS SOFTWARE DE | 139.7500 | 698,476.73 | |
| 01-05 | Sold | 5,000 | VERITAS SOFTWARE DE | 140.1250 | 700,351.47 | |
| 01-05 | Sold | 5,000 | VERITAS SOFTWARE DE | 140.3750 | 701,601.63 | |
| 01-05 | Sold | 6,000 | VERITAS SOFTWARE DE | 139.2500 | 835,149.86 | |
| 01-05 | Sold | 7,000 | VERITAS SOFTWARE DE | 140.0625 | 980,054.64 | |
| 01-05 | Sold | 16,000 | VERITAS SOFTWARE DE | 140 | 2,239,125.40 | |
| 01-05 | Sold | 21,000 | VERITAS SOFTWARE DE | 139.6250 | 2,930,977.31 | |
| 01-12 | Sold | 6,000 | VERITAS SOFTWARE DE | 110.3750 | 662,564.20 | |

Case 2:08-cv-01567-GEB -MCA   Document 57-10   Filed 09/17/10   Page 86 of 119 PageID: 1410

# MORGAN STANLEY DEAN WITTER

**DUPLICATE**

## ACTIVE ASSETS ACCOUNT®

FOR YEAR ENDING DECEMBER 31, 2000

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK

Account Number 769 086347    FA 070

### Sales Proceeds/Redemptions

| Date | Activity | Quantity | Description | Price | Amount | Additional Information |
|---|---|---|---|---|---|---|
| 01-12 | Sold | 12.000 | VERITAS SOFTWARE DE | 113.5000 | 1,352,754.21 | |
| | | | **Total Sales Proceeds/Redemptions** | | **1,352,754.21** | |

### Other Credits

| Date | Activity | Description | Amount | Additional Information |
|---|---|---|---|---|
| 05-22 | Journal In | LOCKBOX | 699.02 | AS OF 03-20-00 |
| | | **Total Other Credits** | **699.02** | |
| | | **Total Credits To Your Account** | **1,353,453.23** | |

### DEBITS TO YOUR ACCOUNT

#### Withdrawal

| Date | Activity | Description | Amount | Additional Information |
|---|---|---|---|---|
| 01-05 | Transfer | FUNDS TRANSFERRED | 950,000.00 | PER LETTER OF AUTHORIZATION TO 769-070250-1 |
| 01-05 | Transfer | FUNDS TRANSFERRED | 150,000.00 | PER LETTER OF AUTHORIZATION TO 769-200624-1 |
| 01-25 | Check | FUNDS PAID | 51,975.58 | PAID TO CHASE MANHATTAN BANK |
| 01-25 | Check | FUNDS PAID | 740.19 | PAID TO MARK ROELKE MD |
| 01-25 | Transfer | TRANSFER OF FUNDS | 20,661.51 | ROLLOVER TO 769-015116-0 |
| 01-25 | Transfer | FUNDS TRANSFERRED | 52,706.15 | PER LETTER OF AUTHORIZATION TO 769-015122-0 |
| 01-25 | Transfer | FUNDS TRANSFERRED | 50,000.00 | PER LETTER OF AUTHORIZATION TO 769-015124-0 |
| 01-25 | Transfer | FUNDS TRANSFERRED | 295,665.09 | PER LETTER OF AUTHORIZATION TO 769-015125-0 |
| 01-26 | Transfer | TRANSFER OF FUNDS | 65,894.79 | ROLLOVER TO 769-015157-0 |
| 02-02 | Transfer | TRANSFER OF FUNDS | 5,623.09 | PER LETTER OF AUTHORIZATION TO 769-015381-0 |
| 02-03 | Transfer | TRANSFER OF FUNDS | 34,024.59 | ROLLOVER TO 769-015399-0 |
| 02-03 | Transfer | TRANSFER OF FUNDS | 10,688.83 | ROLLOVER TO 769-015423-0 |
| 02-10 | Transfer | TRANSFER OF FUNDS | 39,973.51 | ROLLOVER TO 769-015565-0 |
| 02-16 | Transfer | FUNDS TRANSFERRED | 4,833.78 | PER LETTER OF AUTHORIZATION TO 769-015718-0 |
| 02-24 | Transfer | TRANSFER OF FUNDS | 4,644.65 | ROLLOVER TO 769-015941-0 |

Morgan Stanley Dean Witter is a service mark of Morgan Stanley Dean Witter & Co. ... ervices are offered through Dean Witter Reynolds Inc., member SIPC.

# MORGAN STANLEY DEAN WITTER

DUPLICATE

**ACTIVE ASSETS ACCOUNT®**
FOR YEAR ENDING DECEMBER 31, 2000

PAGE 5 OF 10

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK

Account Number
769 086347

FA
070

## Withdrawal

| Date | Activity | Description | Amount | Additional Information |
|---|---|---|---|---|
| 03-09 | Transfer | FUNDS TRANSFERRED | | |
| 03-29 | Check | FUNDS PAID | 54,606.41 | PER LETTER OF AUTHORIZATION — |
| 03-29 | Check | FUNDS PAID | 4,598.90 | TO 769-014500-0 |
| | | | 1,149.75 | PAID TO WISTERIA BANKS |
| 05-01 | Transferred | | | PAID TO INDEPENDENCE BANK |
| 09-25 | Transferred | WIRED FUNDS SENT | 75,000.00 | BENE: EVELYN LANGLIEB GREER |
| | | | | ACCT: 4601205697 |
| 11-06 | Transferred | WIRED FUNDS SENT | 150,000.00 | BENE: MARIO A CRISCITO |
| | | | | ACCT: 570034504 |
| | | WIRED FUNDS SENT | 250,000.00 | BENE: POSTX CORP |
| | | | | ACCT: 1000020405 |

Total Withdrawals

## Funds to Purchase Securities

| Date | Activity | Quantity | Description | Price | Amount | Additional Information |
|---|---|---|---|---|---|---|
| 01-07 | Bought | 10,000 | QUALCOMM INC | 162.4375 | 1,624,077.35 | |
| 01-07 | Bought | 1,000 | VERITAS SOFTWARE DE | 137 | 137,050.00 | |
| 01-07 | Bought | 2,000 | VERITAS SOFTWARE DE | 137.2500 | 274,600.00 | |
| 01-07 | Bought | 3,000 | VERITAS SOFTWARE DE | 137.5000 | 412,650.00 | |
| 01-07 | Bought | 4,000 | VERITAS SOFTWARE DE | 154.0625 | 554,452.35 | |
| 01-07 | Bought | 4,000 | VERITAS SOFTWARE DE | 137.7500 | 551,200.00 | |
| 01-07 | Bought | 6,000 | VERITAS SOFTWARE DE | 154.1250 | 805,050.00 | |

Total Funds to Purchase Securities

## Other Debits

| Date | Activity | Description | Amount | Additional Information |
|---|---|---|---|---|
| 05-01 | Charge | WIRED FUNDS FEE | -15.00 | |
| 09-25 | Charge | WIRED FUNDS FEE | -15.00 | |
| 11-06 | Charge | WIRED FUNDS FEE | -15.00 | |

Total Other Debits

Total Debits To Your Account

# MORGAN STANLEY DEAN WITTER

DUPLICATE

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK

## ACTIVE ASSETS ACCOUNT®
FOR YEAR ENDING DECEMBER 31, 2000

PAGE 6 OF 10

Account Number
769 086347

FA 070

## ADDITIONAL ACCOUNT INFORMATION

### Securities Received

| Date | Activity | Quantity | Description | Price | Amount | Additional Information |
|------|----------|----------|-------------|-------|--------|------------------------|
| 09-25 | Received | 350,000 | AAA PREMIER MONEY TRUST | | | |
| 09-26 | Received | 15 | AAA PREMIER MONEY TRUST | | | |
| 11-06 | Received | 250,000 | AAA PREMIER MONEY TRUST | | | |
| 11-07 | Received | 15 | AAA PREMIER MONEY TRUST | | | |
| 02-22 | Stock Dividend | 9,400 | SANDISK CORP | | | |

Total Securities Received   0.00

### Securities Delivered

| Date | Activity | Quantity | Description | Price | Amount | Additional Information |
|------|----------|----------|-------------|-------|--------|------------------------|
| 06-01 | Delivered | 7,621,109 | AAA PREMIER MONEY TRUST | | | |
| 06-05 | Delivered | 6,531 | AAA PREMIER MONEY TRUST | | | |
| 06-27 | Delivered | 1,545 | AAA PREMIER MONEY TRUST | | | |
| 06-29 | Delivered | 39,654 | AAA PREMIER MONEY TRUST | | | |
| 07-27 | Delivered | 15,000 | AAA PREMIER MONEY TRUST | | | |
| 07-28 | Delivered | 42,741 | AAA PREMIER MONEY TRUST | | | |
| 08-16 | Delivered | 1,937 | AAA PREMIER MONEY TRUST | | | |
| 08-30 | Delivered | 45,018 | AAA PREMIER MONEY TRUST | | | |
| 09-28 | Delivered | 40,043 | AAA PREMIER MONEY TRUST | | | |
| 10-30 | Delivered | 42,714 | AAA PREMIER MONEY TRUST | | | |
| 11-29 | Delivered | 39,244 | AAA PREMIER MONEY TRUST | | | |
| 12-29 | Delivered | 42,914 | AAA PREMIER MONEY TRUST | | | |

Total Securities Delivered   0.00

### Morgan Stanley Dean Witter Fund Summary

| | Ytd Dividends | Ytd Cap Gains | Ytd Taxes | Features |
|---|---------------|---------------|-----------|----------|
| MSDW LIQUID ASSET FUND | 150,833.52 | 0.00 | 0.00 | Reinvest Dividends |
| Totals | 150,833.52 | 0.00 | 0.00 | |

For Morgan Stanley Dean Witter Mutual Fund Account Information, call 1-800-869-NEWS(6397).

25878



# MORGAN STANLEY DEAN WITTER

## ACTIVE ASSETS ACCOUNT®

### FOR YEAR ENDING DECEMBER 31, 2000

PAGE 7 OF 10

Account Number
769 086347

FA
070

DUPLICATE

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK

## Morgan Stanley Dean Witter Fund Summary

**MSDW LIQUID ASSET FUND**
Following are the Fund's 30-day average annualized yields during the past quarter: October 6.06%, November 6.03% and December 6.07%.

### Message

Please note that sell trades executed, checks written and debit card transactions made in 2000, and which settle early in 2001, will be reflected as 2000 transactions under the Assets, Checking and Debit Card sections of the Activity Details portion of the statement.

25879

# MORGAN STANLEY DEAN WITTER

**ACTIVE ASSETS ACCOUNT®**
FOR YEAR ENDING DECEMBER 31, 2000

Your Financial Advisor
HERBERT A MENDEL
SENIOR VICE PRESIDENT - INVESTMENTS
MORGAN STANLEY DEAN WITTER
FIVE CONCOURSE PARKWAY STE 2000
ATLANTA, GA        30328
(770) 698-2100
For Account Of:
MARIO A CRISCITO TTEE

**DUPLICATE**

Account Number   FA
769 06347        070

AAA Customer Service
1-800-869-3326

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK
DIAC-CLIN-CARD PRIMARY ACCOUNT
1375 PLAINFIELD AVE
WATCHUNG NJ  07060

## GAIN AND LOSS SUMMARY

The Gain and Loss Summary is provided for information purposes only and should not be used for tax preparation. The data required to estimate a gain or loss, including cost basis (purchase price), has been provided for most securities purchased through Dean Witter Reynolds Inc. after 1985. Information unavailable through Dean Witter Reynolds Inc. trade history has been or will need to be provided by you through your Financial Advisor. Dean Witter Reynolds Inc. makes every effort to adjust cost basis for capital changes from the day of enrollment and/or the time information is provided. Cost basis is not adjusted for certain events, such as amortization of non-Municipal Bond premiums, exercise of stock options, and receipt of cash in lieu of fractional shares. (Please see your Gain and Loss Summary brochure for more details.) Dean Witter Reynolds Inc. does not guarantee nor will it independently verify the accuracy of this information. Again, the Summary does not conform to tax preparation standards and should not be used for tax To correct any information or provide missing information, please contact your Financial Advisor.

| Unrealized Gain/(Loss) | Quantity | Date Acquired | Unit Cost | Adjusted Total Cost | Market Value | Unrealized Gain/(Loss) | Additional Information |
|---|---|---|---|---|---|---|---|
| **Stocks** | | | | | | | |
| **Common Stocks** | | | | | | | |
| AMERICA ONLINE INC | 1,000 | 01-08-99 | 35.5500 | 65,990.00 P | 62,440.00 | (11,550.00) | Long Term ADJUSTED 04/07/00 |
| NYCAL CP | 500 | 03-13-97 | | please provide | 5.50 | | |
| QUALCOMM INC | 10,000 | 01-04-00 | 162.4077 | 1,624,077.35 | 821,875.00 | (805,002.35) | Short Term |
| SANDISK CORP | 3,600 | 08-06-98 | 4.9651 | 17,867.34 | 99,900.00 | 82,032.66 | Long Term |
| | 1,000 | 08-07-98 | 5.6511 | 11,302.34 | 55,500.00 | 44,197.66 | Long Term |
| | 10,000 | 08-11-98 | 4.6377 | 46,377.40 | 277,500.00 | 229,122.60 | Long Term |
| | 5,300 | 08-12-98 | 3.1807 | 16,402.35 | 88,500.00 | 72,317.66 | Long Term |
| | 10,800 | | | 94,029.44 | 521,700.00 | 427,670.56 | |
| **Government Securities** | | | | | | | |
| **Treasury Securities** | | | | | | | |
| US TSY NOTE | 775   01F015   $5,000 | 05-13-97 | | please provide | 50,062.50 | | |

This summary is not part of your account statement. It is for information purposes only and should not be used for tax preparation.

25880

Morgan Sta...  ... Dean Witter is a service mark of Morgan Stanley Dean Witter & Co. a...  ...ervices are offered through Dean Witter Reynolds Inc. member SIPC



# MORGAN STANLEY DEAN WITTER

**ACTIVE ASSETS ACCOUNT®**
FOR YEAR ENDING DECEMBER 31, 2000

PAGE 9 OF 10

Account Number
769 086347

FA
070

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK

DUPLICATE

**Unrealized Gain/(Loss)**

Total Market Value for all positions

P - You have provided the trade history for this transaction; it was not available through Dean Witter Reynolds Inc. records.

The "Total Cost" and "Unit Cost" for Fixed Income Unit Trusts, Mortgage-Backed Securities, and Zero Coupon Bonds has been adjusted to reflect any partial return of principal or capital that may have been paid to you, or accreted interest earned, since your purchase date. In the event that the accumulated total return of principal or capital is greater than the provided original cost, the adjusted cost will be "0.00".

**Realized Gain/(Loss)**

| Quantity | Date Acquired | Date Sold | Unit Cost | Adjusted Total Cost | Proceeds | Realized Gain/(Loss) | Additional Information |
|---|---|---|---|---|---|---|---|
| LUCENT TECHNOLOGIES | | | | | | | |
| 5,000 | 07-22-98 | 03-06-00 | | 251,377.35 | 358,487.64 | 107,110.29 | Long Term |
| 4,000 | 07-23-98 | 03-06-00 | | 190,727.36 | 284,790.11 | 94,062.75 | Long Term |
| 3,000 | 07-23-98 | 03-06-00 | | 145,950.00 | 215,092.59 | 69,142.59 | Long Term |
| 6,000 | 07-24-98 | 03-06-00 | | 364,282.32 | 573,540.23 | 189,377.91 | Long Term |
| 4,000 | 09-16-98 | 03-06-00 | | 172,164.10 | 329,686.63 | 157,622.53 | Long Term |
| 5,000 | 09-16-98 | 03-06-00 | | 192,625.00 | 358,487.64 | 165,862.64 | Long Term |
| 3,000 | 01-04-00 | 01-07-00 | | 856,452.32 | 450,916.07 | (85,834.25) | Short Term |
| 3,000 | 01-04-00 | 01-07-00 | | 412,650.00 | 350,188.55 | (74,461.45) | Short Term |
| 3,000 | 01-04-00 | 01-07-00 | | 402,525.00 | 358,188.55 | (64,334.45) | Short Term |
| 1,000 | 01-04-00 | 01-07-00 | | 134,175.00 | 225,485.04 | (42,690.96) | Short Term |
| 2,000 | 01-04-00 | 01-07-00 | | 344,860.00 | 275,002.54 | (68,697.44) | Short Term |
| 2,000 | 01-04-00 | 01-07-00 | | 275,600.00 | 220,442.08 | (85,957.93) | Short Term |
| 1,000 | 01-04-00 | 01-07-00 | | 206,710.00 | 165,483.54 | (41,216.46) | Short Term |
| 1,000 | 01-04-00 | 01-07-00 | | 137,050.00 | 110,321.03 | (26,728.97) | Short Term |

Totals for Closing transactions with cost data available

This summary is not part of your account statement. It is for information purposes only and should not be used for tax preparation.

25881

# MORGAN STANLEY DEAN WITTER

## ACTIVE ASSETS ACCOUNT

**FOR YEAR ENDING DECEMBER 31, 2000**

PAGE 10 OF 10

Account Number
769 086347

FA
070

AMERICAN PENSION CORP
ATTN: DOMINIQUE ECK

DUPLICATE

### Summary

| | Short Term | Long Term | Total |
|---|---|---|---|
| Unrealized gain/(loss) | (8883,882.55) | 8426,320.56 | (8376,661.79) |
| Realized gain/(loss) year to date | (8443,679.99) | 8785,176.71 | 8385,498.81 |

25882

STATEMENT OF YOUR ACCOUNT
FOR MONTH ENDING MARCH 31, 2000

Your Financial Advisor
HERBERT A MENDEL
SENIOR VICE PRESIDENT - INVESTMENTS
MORGAN STANLEY DEAN WITTER
FIVE CONCOURSE PARKWAY STE 2000
ATLANTA, GA     30328
(770) 698-2100

PAGE 1 OF

Account Number      PA
769 086347          070

(070391903116)

MARIO A CRISCITO TTEE
DIAGNOSTIC & CLINICAL CARDIOLOGY MP
U/A DTD 04/01/76
11 CHADWICK ROAD
LIVINGSTON NJ 07039 1903

## Asset Summary

| | Value | % of Assets |
|---|---|---|
| Money Market Funds | $7,769,221.67 | 66.1% |
| Stocks | 3,937,512.50 | 33.5 |
| Municipal Bonds | 0.00 | 0.0 |
| Corporate Fixed Income | 0.00 | 0.0 |
| Government Securities | 50,562.50 | 0.4 |
| Mutual Funds | 0.00 | 0.0 |
| Unit Investment Trusts | 0.00 | 0.0 |
| Certificates of Deposit | 0.00 | 0.0 |
| Annuities/Insurance | 0.00 | 0.0 |
| Other | 0.00 | 0.0 |
| Asset Value | $11,737,296.67 | 100.0% |
| Cash | 0.37 | |
| Total Asset Value | $11,737,297.04 | |

## Activity Summary

| | |
|---|---|
| Total Asset Value February 29 2000 | $10,690,369.59 |
| Cash/Money Market Activity for March | |
| Closing Balance 2/29 | $5,674,769.59 |
| Credits To Your Account | |
| Dividends and Interest | 33,871.62 |
| Deposits | 0.00 |
| Sales Proceeds/Redemptions | 2,122,246.85 |
| Other Credits | 683.02 |
| Total Credits | 2,156,807.49 |
| Debits To Your Account | |
| Withdrawals | -62,355.04 |
| Funds to Purchase Securities | 0.00 |
| Other Debits | 0.00 |
| Total Debits | -62,355.04 |
| Closing Balance 3/31 | 7,769,222.04 |

## Income Summary

| | This Month | Year To Date |
|---|---|---|
| Money Market Funds | $33,279.62 | $77,653.33 |
| Stocks | 592.00 | 592.00 |
| Municipal Bonds | 0.00 | 0.00 |
| Corporate Fixed Income | 0.00 | 0.00 |
| Government Fixed Income | 0.00 | 1,937.50 |
| Mutual Funds | 0.00 | 0.00 |
| Unit Investment Trusts | 0.00 | 0.00 |
| Certificates of Deposit | 0.00 | 0.00 |
| Other | 0.00 | 0.00 |
| Total Income | $33,871.62 | $80,182.83 |
| Taxable Income | $33,871.62 | $80,182.83 |
| Tax Exempt Income | $0.00 | $0.00 |

Net Change Cash/Money Market Activity | 2,094,452.45

Changes in Asset Value for March

| | |
|---|---|
| Value of Priced Assets 2/29 | $5,015,600.00 |
| Securities Bought | 0.00 |
| Securities Received | 0.00 |
| Securities Sold/Redeemed | -2,122,246.85 |
| Securities Delivered | 0.00 |
| Transactions at Fund Company | 0.00 |
| Change in Value of Priced Assets 3/31 | 1,074,721.85 |
| Value of Priced Assets 3/31 | 3,968,075.00 |
| Net Change in Asset Value | -1,047,525.00 |
| Total Asset Value as of March 31 2000 | $11,737,297.04 |

# SALOMON SMITH BARNEY

A member of citigroup

Ref: 00010776 00093850

## Preferred Client Consolidation Summary

Page 1 of 5

October 30 - December 31, 2000

416L000730833000010776 300364AP01 WEB00416A
DIAGNOSTIC AND CLINICAL
CARDIOLOGY
PA MONEY PURCHASE PENSION PLAN
4/1/76
11 CHADWICK ROAD
LIVINGSTON NJ 07039-1903

SALOMON SMITH BARNEY INC.
*Your Financial Consultant*

ALLAN YARKIN
1000 E. HALLANDALE
BEACH BLVD
HALLANDALE   FL 33009
954-457-1500

Preferred Client Service Center: 800-232-4454
Branch: 800-604-0063

### Quarterly Summary

We have enclosed statements for the following accounts in your consolidated household. "Total Value Comparison" and "Year to Date Summary" may contain information for previously existing accounts which have been recently consolidated. Unpriced securities are not included in the "Net Value" columns. Unless otherwise indicated, values shown are for "This Period".

| Account Number | Abbreviated Name | Account Type | Net Value Last period | Net Value This period | Net Securities Dep/Withdrwn | Net Capital Deps/Wthdls | Total Income Txbl/Non-Txbl | Asset Appreciation | Unrealized Gain or (Loss) | Adjusted YTD Realized Gain or (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|
| 416-30833 | DIAGNOSTIC AND CLINICAL CARDIOLOGY | PCA | $ 5,719,777.15 | $ 3,557,061.06 | $ 0.00 | $ 0.00 | $ 43.32 | ($ 2,162,769.42) | $ 2,698,893.45 | $ 0.00 ST / $ 0.00 LT |
| Total | | | $ 5,719,777.15 | $ 3,557,061.06 | $ 0.00 | $ 0.00 | $ 43.32 | ($ 2,162,769.42) | $ 2,698,893.45 | $ 0.00 ST / $ 0.00 LT |

| Year to Date Summary | | |
|---|---|---|
| Beginning total net value as of 12/31/99 | | $ 3,924,549.92 |
| Net security deposits/withdrawals (year to date) | | 0.00 |
| Net cash deposits/withdrawals (year to date) | | 0.00 |
| Total income (year to date) | | 183.92 |
| Asset appreciation (year to date) | | (367,682.79) |
| Ending total net value | 12/29/00 | $ 3,557,061.06 |
| Year to date total return | | (367,498.87) |

**Current Total Asset Allocation Summary**

100.0% Equities

Cash represents less than 0.5% of total assets.



**Total Value Comparison**

| | | |
|---|---|---|
| 12/99 | 3.92 | |
| 3/00 | 5.36 | |
| 6/00 | 4.63 | |
| 9/00 | 5.78 | |
| 12/00 | 3.56 | |

Units in multiples of 1 million.

# SALOMON SMITH BARNEY

*A member of citigroup*

## Preferred Client Statement

October 30 - December 31, 2000

Page 2 of 5

Account number 416-30833-16 007

416L0000730833000010776 300364AP01 WEB00416A
DIAGNOSTIC AND CLINICAL
CARDIOLOGY
PA MONEY PURCHASE PENSION PLAN
4/1/76
11 CHADWICK ROAD
LIVINGSTON NJ 07039-1903

**SALOMON SMITH BARNEY INC.**
*Your Financial Consultant*

ALLAN YARKIN
1000 E.HALLANDALE
BEACH BLVD
HALLANDALE  FL 33009
954-457-1600

Preferred Client Service Center: 800-232-4454
Branch: 800-624-0263

### Account value

| | Last period | This period | % |
|---|---|---|---|
| Money funds | $ 2,121.65 | $ 2,148.45 | .06 |
| Accrued money fund dividends | 4.92 | 0.00 | |
| Common stocks & options | 5,717,650.58 | 3,564,901.80 | 99.94 |
| Net value | $ 5,719,777.15 | $ 3,567,061.05 | 100 |

### Earnings summary

| | This period | This year |
|---|---|---|
| Dividends | $ 15.52 | $ 62.06 |
| Money funds earnings | 27.80 | 121.86 |
| Total | $ 43.32 | $ 183.92 |

### Gain/loss summary

| | This period | This year |
|---|---|---|
| Unrealized gain or (loss) | $ 2,888,893.46 | *Not applicable* |

# EXHIBIT 50

# American Pension Corporation

1375 PLAINFIELD AVENUE  ●  WATCHUNG, NEW JERSEY 07060
(908) 757-5151  ●  Facsimile (908) 757-9644

November 23, 1999

Mario A. Criscito, MD
11 Chadwick Road
Livingston, NJ  07039

RE:  Money Purchase Plan

Dear Dr. Criscito:

I am enclosing the letter you requested for the active participants in the pension plan.

In addition, I have enclosed election forms for all terminated employees.  As we discussed, the forms must be completed prior to any distribution.  If someone requests a lump sum distribution, you will be required to withhold 20% for federal taxes.

Please give me a call if you have any questions.

Regards,

Dominique Sandra Eck
Pension Consultant

DSE/dml
Enclosures:

P.S. You may want your broker to speak with your employees and have their accounts set up with him to make things a little easier for you as well as us.



Diagnostic & Clinical Cardiology, PA
769 Northfield Avenue
West Orange, New Jersey  07052
RE:  Diagnostic & Clinical Cardiology, PA Money Purchase Plan

Dear Participant:

You have an account in the Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan.

Under Internal Revenue Code Sec. 404(c), each participant can now direct their own investments.

The Plan has now been amended to establish separate accounts for each participant, and to allow each participant to self-direct their account (investments).  The account must be set up under the name of the plan with Dr. Criscito as the Trustee, and the plan ID #22-2323990 FBO (your name).

Sincerely yours,


Mario Criscito, M.D.

11687

**EXHIBIT 51**

08/28/2007  15:50      908-757-9644                    AMERICAN PENSION CRP                    PAGE  01

# American Pension Corporation

1375 PLAINFIELD AVENUE  ●  WATCHUNG, NEW JERSEY 07069
(908) 757-5151  ●  Facsimile (908) 757-9644

August 28, 2007

Anthony Casella, M.D.
Diagnostic & Clinical Cardiology, P.A.
769 Northfield Avenue, Suite 220
West Orange, New Jersey 07052



Re:  Mary Ann Canales

Dear Dr. Casella:

After you left, Dominique and I looked over the files to find out what happened with Mary Ann Canales. To the best of my knowledge, the situation is this:

When we prepared the 1998 report, we inadvertently forfeited part of Mary Ann's account. As you know, the plan previously had a Vesting Schedule, but in 1995 the Vesting Schedule was changed, and everyone was 100% vested. As a result of the forfeiture, Mary Ann's account balance listed on the December 31, 1998 Report was $4,669.97.

When we did the 1999 Report, we realized the mistake and restored the forfeiture, plus interest, to Mary Ann's account. We advised Dr. Criscito that we had made an error and that Maryann was entitled to an additional $9,424.70. The 1999 Report was prepared January 13, 2000. The Report was prepared early in 2000 to enable Dr. Criscito to distribute benefits and transfer account balances to segregated accounts.

On October 10, 2001, Dr. Criscito FAX'd a list of distributions that were made from the plan in 2000. This information was required for us to complete the 2000 Report. The list indicated that $4,669.97 was distributed to Mary Ann Canales' IRA. Dominique advised Dr. Criscito that Mary Ann was entitled to an additional $9,424.70. At that point, Dr. Criscito indicated that he was only going to pay her $4,669.97, and he instructed Dominique to zero out the $9,424.70 adjustment, which she did.

I am enclosing a copy of Dominique's cover letter dated January 13, 2000 advising Dr. Criscito of the adjustment. Unfortunately, to add to the confusion, the cover letter and report incorrectly mention Maryann Dimitrion instead of Mary Ann Canales. The adjustment was, however, on Mary Ann Canales' account and Dr. Criscito was aware of that. There was no adjustment to Maryann Dimitrion's account. We simply used the wrong last name on the cover letter.

25031

08/28/2007  15:50    908-757-9644    AMERICAN PENSION CRP    PAGE  02

# American Pension Corporation

## - 2 -

Please note that the cover letter also mentions an adjustment on the account of Wisteria Banks. Wisteria's account was corrected and she did receive her proper distribution.

If you have any questions, please feel free to call me or Dominique.

Best regards,

Brian P. Warnock
Vice-President

BPW/sjl

Enclosure

25032

**EXHIBIT 52**

# Abar Pension Services, Inc.

PENSION, PROFIT SHARING, 401(K) PLAN
DESIGN AND ADMINISTRATION

MIKEL R. UCHITEL, FSA, EA, MSPA
MARK SHEMTOB, ASA, EA, MSPA
SCOTT M. FEIT, CPC, CPA, QKA
PHILIP D. COFIELD, EA, MSPA

May 28, 2009

25B VREELAND ROAD - SUITE 209
FLORHAM PARK, NJ 07932-1900
(973) 660-2100
FAX: (973) 660-2111
abar@abarpensioninc.com

Stephen M. Charme, Esq.
Witman, Stadtmauer & Michaels, P.A.
26 Columbia Turnpike
Florham Park, NJ 07932

Re:    Diagnostic & Clinical Cardiology, P.A.
       Profit Sharing Plan

Dear Mr. Charme:

The following is a summary of the work performed by my office with regard to the Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan (formerly the Diagnostic and Clinical Cardiology, P.A Money Purchase Pension Plan, which was converted into the profit sharing plan in 2005). For the plan year ending December 31, 1995, we determined the ending balance of each participant's account. We started with the participants' balances as of December 31, 1994, which we obtained from the 1994 valuation of American Pension Corporation, whom you have advised was the third party administrator for the plan. We updated each participant's account with any contributions and distributions for the year. A gain (or loss) was allocated to each participant's account based upon the performance of the funds in the plan. We then performed the same procedure for the plan years ending December 31, 1996, 1997, 1998 and 1999. The summaries of the participants' accounts for the years 1995 to 1999 are attached (Exhibit 1). We based the fair market value of the assets for each year upon the investment company's brokerage statements if they were available, or if not we used the valuations of American Pension Corporation.

The 1999 valuation has been revised subsequent to the original report prepared by my office. Since the initial report was prepared, information was obtained on two investments that should have been included in the valuation of the commingled account. These investments, the AIM Global Telecomm Fund and the Latin American Fund had market values of $107,221 and $43,254.45, respectively, as of December 31, 1999.

For the 2000 plan year, we updated each participant's account to reflect the distributions made from the pooled account to their segregated account (Exhibit 2). For those participants who did not receive the full amount of their distribution to which they were entitled, and therefore still had a balance in the pooled account after the distributions were made, we updated their account balance with interest to March 31, 2009. The interest was calculated using the Voluntary Fiduciary Correction Program (VFCP) Online Calculator provided by the U.S. Department of Labor. The interest calculation was updated since the last calculation prepared to reflect a distribution of $26,202.74 on May 5, 2008 to a participant in the plan.

Based upon our analysis, we concluded that the participants in the pooled account, excluding Dr. Mario A. Criscito, were entitled to an additional $1,681,572.65 as of the beginning of 2000. As of March 31 2009, the value of their portion of the pooled account, together with interest, accumulated to $3,674,844.26. (Exhibit 3).

Please call if you should have any questions.

Sincerely,

ABAR PENSION SERVICES, INC.

Scott M. Feit, CPC, CPA, QPA, QKA

/sf

# EXHIBIT 1

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 1995 to December 31, 1995

| Participant Name | Prior Balance | Contribution | Gains/Losses | Ending Balance | % | Vested Balance |
|---|---|---|---|---|---|---|
| **Campos, Mary Ann** | | | | | | |
| Employer | 3,870.90 | 3,897.08 | 547.30 | 8,315.28 | 100% | 8,315.28 |
| **Cortes, Maria** | | | | | | |
| Employer | 8,151.38 | 6,188.00 | 1,152.50 | 15,491.88 | 100% | 15,491.88 |
| **Criscito, Mario** | | | | | | |
| Employer | 1,998,874.30 | 30,000.00 | 282,615.86 | 2,311,490.16 | 100% | 2,311,490.16 |
| Rollover | 418,316.33 | 0.00 | 59,144.70 | 477,461.03 | 100% | 477,461.03 |
| Total | 2,417,190.63 | 30,000.00 | 341,760.56 | 2,788,951.19 | | 2,788,951.19 |
| **Cruz, Awylda** | | | | | | |
| Employer | 22,648.23 | 5,599.12 | 3,202.18 | 31,449.53 | 100% | 31,449.53 |
| **Difazio (Gencarelli), Lisa** | | | | | | |
| Employer | 9,682.73 | 5,399.20 | 1,369.02 | 16,450.95 | 100% | 16,450.95 |
| **Foggio, Antoinette** | | | | | | |
| Employer | 5,138.70 | 0.00 | 726.55 | 5,865.25 | 100% | 5,865.25 |
| Rollover | 7,116.20 | 0.00 | 1,006.14 | 8,122.34 | 100% | 8,122.34 |
| Total | 12,254.90 | 0.00 | 1,732.69 | 13,987.59 | | 13,987.59 |
| **Fox (Vitale), Dianne** | | | | | | |
| Employer | 16,986.58 | 2,919.41 | 2,401.69 | 22,307.68 | 100% | 22,307.68 |
| **Gonnella, Renee** | | | | | | |
| Employer | 971.75 | 2,704.36 | 137.39 | 3,813.50 | 100% | 3,813.50 |
| **Hawthorne, Keith** | | | | | | |
| Employer | 60,729.54 | 30,000.00 | 8,586.39 | 99,315.93 | 100% | 99,315.93 |
| **Hayes, Barbara** | | | | | | |
| Employer | 19,346.07 | 0.00 | 2,735.29 | 22,081.36 | 100% | 22,081.36 |
| Rollover | 4,866.83 | 0.00 | 688.11 | 5,554.94 | 100% | 5,554.94 |
| Total | 24,212.90 | 0.00 | 3,423.40 | 27,636.30 | | 27,636.30 |
| **Grand Total** | 2,576,699.54 | 86,707.17 | 364,313.12 | 3,027,719.83 | | 3,027,719.83 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 1996 to December 31, 1996

| Participant Name | Prior Balance | Contribution | Gains/Losses | Ending Balance | % | Vested Balance |
|---|---|---|---|---|---|---|
| **Campos, Mary Ann** | | | | | | |
| Employer | 8,315.28 | 1,299.48 | 561.75 | 10,176.51 | 100% | 10,176.51 |
| **Cortes, Maria** | | | | | | |
| Employer | 15,491.88 | 6,545.00 | 1,046.58 | 23,083.46 | 100% | 23,083.46 |
| **Criscito, Mario** | | | | | | |
| Employer | 2,311,490.16 | 30,000.00 | 156,157.06 | 2,497,647.22 | 100% | 2,497,647.22 |
| Rollover | 477,461.03 | 0.00 | 32,255.78 | 509,716.81 | 100% | 509,716.81 |
| Total | 2,788,951.19 | 30,000.00 | 188,412.84 | 3,007,364.03 | | 3,007,364.03 |
| **Cruz, Awylda** | | | | | | |
| Employer | 31,449.53 | 7,055.00 | 2,124.63 | 40,629.16 | 100% | 40,629.16 |
| **Difazio (Gencarelli), Lisa** | | | | | | |
| Employer | 16,450.95 | 6,562.00 | 1,111.37 | 24,124.32 | 100% | 24,124.32 |
| **Foggio, Antoinette** | | | | | | |
| Employer | 5,865.25 | 0.00 | 396.24 | 6,261.49 | 100% | 6,261.49 |
| Rollover | 8,122.34 | 0.00 | 548.72 | 8,671.06 | 100% | 8,671.06 |
| Total | 13,987.59 | 0.00 | 944.96 | 14,932.55 | | 14,932.55 |
| **Fox (Vitale), Dianne** | | | | | | |
| Employer | 22,307.68 | 1,122.00 | 1,507.04 | 24,936.72 | 100% | 24,936.72 |
| **Gonnella, Rence** | | | | | | |
| Employer | 3,813.50 | 4,420.00 | 257.63 | 8,491.13 | 100% | 8,491.13 |
| **Hawthorne, Keith** | | | | | | |
| Employer | 99,315.93 | 30,000.00 | 6,709.48 | 136,025.41 | 100% | 136,025.41 |
| **Hayes, Barbara** | | | | | | |
| Employer | 22,081.36 | 0.00 | 1,491.75 | 23,573.11 | 100% | 23,573.11 |
| Rollover | 5,554.94 | 0.00 | 375.27 | 5,930.21 | 100% | 5,930.21 |
| Total | 27,636.30 | 0.00 | 1,867.02 | 29,503.32 | | 29,503.32 |
| **Roelke, Marc** | | | | | | |
| Employer | 0.00 | 30,000.00 | 0.00 | 30,000.00 | 100% | 30,000.00 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 1996 to December 31, 1996

| Participant Name | Prior Balance | Contribution | Gains/Losses | Ending Balance | % | ----Vested---- Balance |
|---|---|---|---|---|---|---|
| **Grand Total** | 3,027,719.83 | 117,003.48 | 204,543.30 | 3,349,266.61 | | 3,349,266.61 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
## Summary of Participant Accounts
### From January 1, 1997 to December 31, 1997

| Participant Name | Prior Balance | Contribution | Gains/Losses | Ending Balance | % | -----Vested----- Balance |
|---|---|---|---|---|---|---|
| **Banks, Wisteria** | | | | | | |
| Employer | 0.00 | 4,142.22 | 0.00 | 4,142.22 | 100% | 4,142.22 |
| **Brown, Mark** | | | | | | |
| Employer | 0.00 | 13,500.14 | 0.00 | 13,500.14 | 100% | 13,500.14 |
| **Campos, Mary Ann** | | | | | | |
| Employer | 10,176.51 | 0.00 | 1,235.57 | 11,412.08 | 100% | 11,412.08 |
| **Cortes, Maria** | | | | | | |
| Employer | 23,083.46 | 6,790.48 | 2,802.65 | 32,676.59 | 100% | 32,676.59 |
| **Criscito, Mario** | | | | | | |
| Employer | 2,497,647.22 | 30,000.00 | 303,248.77 | 2,830,895.99 | 100% | 2,830,895.99 |
| Rollover | 509,716.81 | 0.00 | 61,886.64 | 571,603.45 | 100% | 571,603.45 |
| Total | 3,007,364.03 | 30,000.00 | 365,135.41 | 3,402,499.44 | | 3,402,499.44 |
| **Cruz, Awylda** | | | | | | |
| Employer | 40,629.16 | 7,283.14 | 4,932.94 | 52,845.24 | 100% | 52,845.24 |
| **Difazio (Gencarelli), Lisa** | | | | | | |
| Employer | 24,124.32 | 7,130.82 | 2,929.02 | 34,184.16 | 100% | 34,184.16 |
| **Dimitrion, Marianne** | | | | | | |
| Employer | 0.00 | 4,667.52 | 0.00 | 4,667.52 | 100% | 4,667.52 |
| **Foggio, Antoinette** | | | | | | |
| Employer | 6,261.49 | 0.00 | 760.23 | 7,021.72 | 100% | 7,021.72 |
| Rollover | 8,671.06 | 0.00 | 1,052.79 | 9,723.85 | 100% | 9,723.85 |
| Total | 14,932.55 | 0.00 | 1,813.02 | 16,745.57 | | 16,745.57 |
| **Fox (Vitale), Dianne** | | | | | | |
| Employer | 24,936.72 | 0.00 | 3,027.66 | 27,964.38 | 100% | 27,964.38 |
| **Gonnella, Renee** | | | | | | |
| Employer | 8,491.13 | 4,260.03 | 1,030.94 | 13,782.10 | 100% | 13,782.10 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 1997 to December 31, 1997

| Participant Name | Prior Balance | Contribution | Gains/Losses | Ending Balance | % | Vested Balance |
|---|---|---|---|---|---|---|
| **Hawthorne, Keith** | | | | | | |
| Employer | 136,025.41 | 30,000.00 | 16,515.36 | 182,540.77 | 100% | 182,540.77 |
| **Hayes, Barbara** | | | | | | |
| Employer | 23,573.11 | 0.00 | 2,862.10 | 26,435.21 | 100% | 26,435.21 |
| Rollover | 5,930.21 | 0.00 | 720.01 | 6,650.22 | 100% | 6,650.22 |
| Total | 29,503.32 | 0.00 | 3,582.11 | 33,085.43 | | 33,085.43 |
| **Roelke, Marc** | | | | | | |
| Employer | 30,000.00 | 30,000.00 | 3,642.41 | 63,642.41 | 100% | 63,642.41 |
| **Grand Total** | 3,349,266.61 | 137,774.35 | 406,647.09 | 3,893,688.05 | | 3,893,688.05 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
## Summary of Participant Accounts
### From January 1, 1998 to December 31, 1998

| Participant Name | Prior Balance | Contribution | Gains / Losses | Transfers | Distributions | Ending Balance | % | Balance |
|---|---|---|---|---|---|---|---|---|
| **Banks, Wisteria** | | | | | | | | |
| Employer | 4,142.22 | 0.00 | 566.15 | 0.00 | 0.00 | 4,708.37 | 100% | 4,708.37 |
| **Brown, Mark** | | | | | | | | |
| Employer | 13,500.14 | 14,478.21 | 1,845.16 | 0.00 | 0.00 | 29,823.51 | 100% | 29,823.51 |
| **Campos, Mary Ann** | | | | | | | | |
| Employer | 11,412.08 | 0.00 | 1,559.77 | 0.00 | 0.00 | 12,971.85 | 100% | 12,971.85 |
| **Cortes, Maria** | | | | | | | | |
| Employer | 32,676.59 | 7,144.42 | 4,466.15 | 0.00 | 0.00 | 44,287.16 | 100% | 44,287.16 |
| **Criscito, Mario** | | | | | | | | |
| Employer | 2,830,895.99 | 30,000.00 | 373,251.61 | 0.00 | (100,000.00) | 3,134,147.60 | 100% | 3,134,147.60 |
| Rollover | 571,603.45 | 0.00 | 78,125.24 | 0.00 | 0.00 | 649,728.69 | 100% | 649,728.69 |
| Total | 3,402,499.44 | 30,000.00 | 451,376.85 | 0.00 | (100,000.00) | 3,783,876.29 | | 3,783,876.29 |
| **Cruz, Awylda** | | | | | | | | |
| Employer | 52,845.24 | 0.00 | 7,222.75 | 0.00 | 0.00 | 60,067.99 | 100% | 60,067.99 |
| **Difazio (Gencarelli), Lisa** | | | | | | | | |
| Employer | 34,184.16 | 7,119.09 | 4,672.20 | 0.00 | 0.00 | 45,975.45 | 100% | 45,975.45 |
| **Dimitrion, Marianne** | | | | | | | | |
| Employer | 4,667.52 | 3,488.23 | 637.94 | 0.00 | 0.00 | 8,793.69 | 100% | 8,793.69 |
| **Foggio, Antoinette** | | | | | | | | |
| Employer | 7,021.72 | 0.00 | 959.71 | 0.00 | 0.00 | 7,981.43 | 100% | 7,981.43 |
| Rollover | 9,723.85 | 0.00 | 1,329.03 | 0.00 | 0.00 | 11,052.88 | 100% | 11,052.88 |
| Total | 16,745.57 | 0.00 | 2,288.74 | 0.00 | 0.00 | 19,034.31 | | 19,034.31 |
| **Fox (Vitale), Dianne** | | | | | | | | |
| Employer | 27,964.38 | 0.00 | 3,822.10 | 0.00 | 0.00 | 31,786.48 | 100% | 31,786.48 |
| **Gonnella, Renee** | | | | | | | | |
| Employer | 13,782.10 | 2,223.26 | 1,883.70 | 0.00 | 0.00 | 17,889.06 | 100% | 17,889.06 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 1998 to December 31, 1998

| Participant Name | Prior Balance | Contribution | Gains / Losses | Transfers | Distributions | Ending Balance | % | Vested Balance |
|---|---|---|---|---|---|---|---|---|
| **Hawthorne, Keith** | | | | | | | | |
| Employer | 182,540.77 | 30,000.00 | 24,949.18 | 0.00 | 0.00 | 237,489.95 | 100% | 237,489.95 |
| **Hayes, Barbara** | | | | | | | | |
| Employer | 26,435.21 | 0.00 | 3,613.10 | 0.00 | 0.00 | 30,048.31 | 100% | 30,048.31 |
| Rollover | 6,650.22 | 0.00 | 908.93 | 0.00 | 0.00 | 7,559.15 | 100% | 7,559.15 |
| Total | 33,085.43 | 0.00 | 4,522.03 | 0.00 | 0.00 | 37,607.46 | | 37,607.46 |
| **Roberts, Kim** | | | | | | | | |
| Employer | 0.00 | 3,847.27 | 0.00 | 0.00 | 0.00 | 3,847.27 | 100% | 3,847.27 |
| **Roelke, Marc** | | | | | | | | |
| Employer | 63,642.41 | 0.00 | 497.84 | (60,000.00) | 0.00 | 4,140.25 | 100% | 4,140.25 |
| **Grand Total** | 3,893,688.05 | 98,300.48 | 510,310.56 | (60,000.00) | (100,000.00) | 4,342,299.09 | | 4,342,299.09 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 1999 to December 31, 1999

| Participant Name | Prior Balance | Contribution | Gains / Losses | Distributions | Ending Balance | % | Vested Balance |
|---|---|---|---|---|---|---|---|
| **Banks, Wisteria** | | | | | | | |
| Employer | 4,708.37 | 0.00 | 14,450.61 | 0.00 | 19,158.98 | 100% | 19,158.98 |
| **Brown, Mark** | | | | | | | |
| Employer | 29,823.51 | 16,491.56 | 91,532.33 | 0.00 | 137,847.40 | 100% | 137,847.40 |
| **Campos, Mary Ann** | | | | | | | |
| Employer | 12,971.85 | 0.00 | 39,812.34 | 0.00 | 52,784.19 | 100% | 52,784.19 |
| **Chaaban, Fadi** | | | | | | | |
| Employer | 0.00 | 30,000.00 | 0.00 | 0.00 | 30,000.00 | 100% | 30,000.00 |
| **Cortes, Maria** | | | | | | | |
| Employer | 44,287.16 | 6,536.84 | 135,923.19 | 0.00 | 186,747.19 | 100% | 186,747.19 |
| **Criscito, Mario** | | | | | | | |
| Employer | 3,134,147.60 | 30,000.00 | 9,235,474.85 | (125,000.00) | 12,274,622.45 | 100% | 12,274,622.45 |
| Rollover | 649,728.69 | 0.00 | 1,994,103.90 | 0.00 | 2,643,832.59 | 100% | 2,643,832.59 |
| Total | 3,783,876.29 | 30,000.00 | 11,229,578.75 | (125,000.00) | 14,918,455.04 | | 14,918,455.04 |
| **Cruz, Awylda** | | | | | | | |
| Employer | 60,067.99 | 0.00 | 184,356.66 | 0.00 | 244,424.65 | 100% | 244,424.65 |
| **Difazio (Gencarelli), Lisa** | | | | | | | |
| Employer | 45,975.45 | 0.00 | 141,104.78 | 0.00 | 187,080.23 | 100% | 187,080.23 |
| **Dimitrion, Marianne** | | | | | | | |
| Employer | 8,793.69 | 0.00 | 26,989.01 | 0.00 | 35,782.70 | 100% | 35,782.70 |
| **Foggio, Antoinette** | | | | | | | |
| Employer | 7,981.43 | 0.00 | 24,496.07 | 0.00 | 32,477.50 | 100% | 32,477.50 |
| Rollover | 11,052.88 | 0.00 | 33,922.76 | 0.00 | 44,975.64 | 100% | 44,975.64 |
| Total | 19,034.31 | 0.00 | 58,418.83 | 0.00 | 77,453.14 | | 77,453.14 |
| **Fox (Vitale), Dianne** | | | | | | | |
| Employer | 31,786.48 | 0.00 | 97,556.94 | 0.00 | 129,343.42 | 100% | 129,343.42 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 1999 to December 31, 1999

| Participant Name | Prior Balance | Contribution | Gains / Losses | Distributions | Ending Balance | Vested % | Vested Balance |
|---|---|---|---|---|---|---|---|
| **Gonnella, Renee** | | | | | | | |
| Employer | 17,889.06 | 345.39 | 54,903.91 | 0.00 | 73,138.36 | 100% | 73,138.36 |
| **Hawthorne, Keith** | | | | | | | |
| Employer | 237,489.95 | 30,000.00 | 728,888.30 | 0.00 | 996,378.25 | 100% | 996,378.25 |
| **Hayes, Barbara** | | | | | | | |
| Employer | 30,048.31 | 0.00 | 92,222.26 | 0.00 | 122,270.57 | 100% | 122,270.57 |
| Rollover | 7,559.15 | 0.00 | 23,200.04 | 0.00 | 30,759.19 | 100% | 30,759.19 |
| Total | 37,607.46 | 0.00 | 115,422.30 | 0.00 | 153,029.76 | | 153,029.76 |
| **McAllister, Charese** | | | | | | | |
| Employer | 0.00 | 5,623.09 | 0.00 | 0.00 | 5,623.09 | 100% | 5,623.09 |
| **Roberts, Kim** | | | | | | | |
| Employer | 3,847.27 | 0.00 | 11,807.78 | 0.00 | 15,655.05 | 100% | 15,655.05 |
| **Roelke, Marc** | | | | | | | |
| Employer | 4,140.25 | 0.00 | 12,706.98 | 0.00 | 16,847.23 | 100% | 16,847.23 |
| **Grand Total** | 4,342,299.09 | 118,996.88 | 12,943,452.71 | (125,000.00) | 17,279,748.68 | | 17,279,748.68 |

# EXHIBIT 2

### Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 2000 to December 31, 2000

| Participant Name | Prior Balance | Contribution | Gains / Losses | Transfers | Distributions | Ending Balance | % | Vested Balance |
|---|---|---|---|---|---|---|---|---|
| **Banks, Wisteria** | | | | | | | | |
| Employer | 19,158.98 | 0.00 | 0.00 | 0.00 | (5,748.63) | 13,410.35 | 100% | 13,410.35 |
| **Brown, Mark** | | | | | | | | |
| Employer | 137,847.40 | 0.00 | 0.00 | (52,706.15) | 0.00 | 85,141.25 | 100% | 85,141.25 |
| **Campos, Mary Ann** | | | | | | | | |
| Employer | 52,784.19 | 0.00 | 0.00 | (4,669.97) | 0.00 | 48,114.22 | 100% | 48,114.22 |
| **Chaaban, Fadi** | | | | | | | | |
| Employer | 30,000.00 | 0.00 | 0.00 | (30,000.00) | 0.00 | 0.00 | 100% | 0.00 |
| **Cortes, Maria** | | | | | | | | |
| Employer | 186,747.19 | 0.00 | 0.00 | (56,606.41) | 0.00 | 130,140.78 | 100% | 130,140.78 |
| **Criscito, Mario** | | | | | | | | |
| Employer | 12,274,622.45 | 0.00 | 0.00 | 0.00 | (1,775,000.00) | 10,499,622.45 | 100% | 10,499,622.45 |
| Rollover | 2,643,832.59 | 0.00 | 0.00 | 0.00 | 0.00 | 2,643,832.59 | 100% | 2,643,832.59 |
| Total | 14,918,455.04 | 0.00 | 0.00 | 0.00 | (1,775,000.00) | 13,143,455.04 | | 13,143,455.04 |
| **Cruz, Awylda** | | | | | | | | |
| Employer | 244,424.65 | 0.00 | 0.00 | 0.00 | (65,894.79) | 178,529.86 | 100% | 178,529.86 |
| **Difazio (Gencarelli), Lisa** | | | | | | | | |
| Employer | 187,080.23 | 0.00 | 0.00 | 0.00 | (51,875.58) | 135,204.65 | 100% | 135,204.65 |
| **Dimitrion, Marianne** | | | | | | | | |
| Employer | 35,782.70 | 0.00 | 0.00 | 0.00 | (10,688.83) | 25,093.87 | 100% | 25,093.87 |
| **Foggio, Antoinette** | | | | | | | | |
| Employer | 32,477.50 | 0.00 | 0.00 | 0.00 | 0.00 | 32,477.50 | 100% | 32,477.50 |
| Rollover | 44,975.64 | 0.00 | 0.00 | 0.00 | 0.00 | 44,975.64 | 100% | 44,975.64 |
| Total | 77,453.14 | 0.00 | 0.00 | 0.00 | 0.00 | 77,453.14 | | 77,453.14 |
| **Fox (Vitale), Dianne** | | | | | | | | |
| Employer | 129,343.42 | 0.00 | 0.00 | 0.00 | (34,024.59) | 95,318.83 | 100% | 95,318.83 |
| **Gonnella, Renee** | | | | | | | | |
| Employer | 73,138.36 | 0.00 | 0.00 | 0.00 | (20,861.51) | 52,276.85 | 100% | 52,276.85 |

## Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
### Summary of Participant Accounts
### From January 1, 2000 to December 31, 2000

| Participant Name | Prior Balance | Contribution | Gains / Losses | Transfers | Distributions | Ending Balance | % | Vested Balance |
|---|---|---|---|---|---|---|---|---|
| **Hawthorne, Keith** | | | | | | | | |
| Employer | 996,378.25 | 0.00 | 0.00 | (295,663.09) | 0.00 | 700,715.16 | 100% | 700,715.16 |
| **Hayes, Barbara** | | | | | | | | |
| Employer | 122,270.57 | 0.00 | 0.00 | 0.00 | (39,973.51) | 82,297.06 | 100% | 82,297.06 |
| Rollover | 30,759.19 | 0.00 | 0.00 | 0.00 | 0.00 | 30,759.19 | 100% | 30,759.19 |
| Total | 153,029.76 | 0.00 | 0.00 | 0.00 | (39,973.51) | 113,056.25 | | 113,056.25 |
| **McAllister, Charese** | | | | | | | | |
| Employer | 5,623.09 | 0.00 | 0.00 | (5,623.09) | 0.00 | 0.00 | 100% | 0.00 |
| **Roberts, Kim** | | | | | | | | |
| Employer | 15,655.05 | 0.00 | 0.00 | 0.00 | (4,644.65) | 11,010.40 | 100% | 11,010.40 |
| **Roelke, Marc** | | | | | | | | |
| Employer | 16,847.23 | 0.00 | 0.00 | (740.19) | 0.00 | 16,107.04 | 100% | 16,107.04 |
| **Grand Total** | 17,279,748.68 | 0.00 | 0.00 | (446,008.90) | (2,008,712.09) | 14,825,027.69 | | 14,825,027.69 |

This summary excludes any contributions and earnings allocation for the 2000 plan year.

Dr. Criscito's balance net of the pooled account distributions that took place in the year 2000 = $13,143,455.04
All other participant balances net of the pooled account distributions that took place in the year 2000 = $ 1,681,572.65
Total   $14,825,027.69

# EXHIBIT 3

Diagnostic & Clinical Cardiology, P.A. Money Purchase Plan
Calculation of Lost Interest

| Start | End | Days | Present Value | Interest Rate | Future Value |
|---|---|---|---|---|---|
| 1/1/2000 | 3/31/2000 | 90 | $1,681,572.65 | 10% | $1,723,429.61 |
| 3/31/2000 | 6/30/2000 | 91 | $1,723,429.61 | 11% | $1,771,208.14 |
| 6/30/2000 | 9/30/2000 | 92 | $1,771,208.14 | 11% | $1,820,858.33 |
| 9/30/2000 | 12/31/2000 | 92 | $1,820,858.33 | 11% | $1,871,900.30 |
| 12/31/2000 | 3/31/2001 | 90 | $1,871,900.30 | 11% | $1,923,359.35 |
| 3/31/2001 | 6/30/2001 | 91 | $1,923,359.35 | 10% | $1,971,907.62 |
| 6/30/2001 | 9/30/2001 | 92 | $1,971,907.62 | 9% | $2,017,145.81 |
| 9/30/2001 | 12/31/2001 | 92 | $2,017,145.81 | 9% | $2,063,421.82 |
| 12/31/2001 | 3/31/2002 | 90 | $2,063,421.82 | 8% | $2,104,524.49 |
| 3/31/2002 | 6/30/2002 | 91 | $2,104,524.49 | 8% | $2,146,916.37 |
| 6/30/2002 | 9/30/2002 | 92 | $2,146,916.37 | 8% | $2,190,642.20 |
| 9/30/2002 | 12/31/2002 | 92 | $2,190,642.20 | 8% | $2,235,258.58 |
| 12/31/2002 | 3/31/2003 | 90 | $2,235,258.58 | 7% | $2,274,170.87 |
| 3/31/2003 | 6/30/2003 | 91 | $2,274,170.87 | 7% | $2,314,204.31 |
| 6/30/2003 | 9/30/2003 | 92 | $2,314,204.31 | 7% | $2,355,394.10 |
| 9/30/2003 | 12/31/2003 | 92 | $2,355,394.10 | 6% | $2,391,283.15 |
| 12/31/2003 | 3/31/2004 | 91 | $2,391,283.15 | 6% | $2,427,220.84 |
| 3/31/2004 | 6/30/2004 | 91 | $2,427,220.84 | 7% | $2,469,830.74 |
| 6/30/2004 | 9/30/2004 | 92 | $2,469,830.74 | 6% | $2,507,359.87 |
| 9/30/2004 | 12/31/2004 | 92 | $2,507,359.87 | 7% | $2,551,864.58 |
| 12/31/2004 | 3/31/2005 | 90 | $2,551,864.58 | 7% | $2,596,288.48 |
| 3/31/2005 | 6/30/2005 | 91 | $2,596,288.48 | 8% | $2,648,586.07 |
| 6/30/2005 | 9/30/2005 | 92 | $2,648,586.07 | 8% | $2,702,529.30 |
| 9/30/2005 | 12/31/2005 | 92 | $2,702,529.30 | 9% | $2,764,528.92 |
| 12/31/2005 | 3/31/2006 | 90 | $2,764,528.92 | 9% | $2,826,556.80 |
| 3/31/2006 | 6/30/2006 | 91 | $2,826,556.80 | 9% | $2,890,689.00 |
| 6/30/2006 | 9/30/2006 | 92 | $2,890,689.00 | 10% | $2,964,465.99 |
| 9/30/2006 | 12/31/2006 | 92 | $2,984,465.99 | 10% | $3,040,125.93 |
| 12/31/2006 | 3/31/2007 | 90 | $3,040,125.93 | 10% | $3,116,009.25 |
| 3/31/2007 | 6/30/2007 | 91 | $3,116,009.25 | 10% | $3,194,661.67 |
| 6/30/2007 | 9/30/2007 | 92 | $3,194,661.67 | 10% | $3,276,196.73 |
| 9/30/2007 | 12/31/2007 | 92 | $3,276,196.73 | 10% | $3,359,812.75 |
| 12/31/2007 | 3/31/2008 | 91 | $3,359,812.75 | 9% | $3,435,833.48 |
| 3/31/2008 | 5/5/2008 | 35 | $3,435,833.48 | 8% | $3,462,216.45 |
| 5/5/2008 | distribution of $26,202.74 to Antoinette Andriola | | | | $3,436,013.71 |
| 5/5/2008 | 6/30/2008 | 56 | $3,436,013.71 | 8% | $3,478,325.83 |
| 6/30/2008 | 9/30/2008 | 92 | $3,478,325.83 | 7% | $3,540,064.83 |
| 9/30/2008 | 12/31/2008 | 92 | $3,540,064.83 | 8% | $3,611,965.68 |
| 12/31/2008 | 3/31/2009 | 90 | $3,611,965.68 | 7% | $3,674,844.26 |

Interest =        $1,993,272

Interest was calculated using the Voluntary Fiduciary Correction Program (VFCP)
Online Calculator provided by the U.S. Department of Labor - EBSA.
Using IRC 6621(c)(1) underpayment rates