1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
 2              CIVIL ACTION CASE NO. 2:08-CV-1567
   ------------------------------------
 3 DR. FADI CHAABAN; DR. SABINO R. TORRE, DR.    :
   CONSTANTINOS A. COSTEAS and DR. ANTHONY J.    :
 4 CASELLA, as Trustee of Diagnostic & Clinical:
   Cardiology, P.A Profit Sharing Plan,          :
 5                                               :
                  Plaintiffs,                    :
 6                                               :
         vs.                                     :
 7                                               :
   DR. MARIO A. CRISCITO,                        :
 8               Defendant.                      :
 9 ------------------------------------
                        Tuesday, June 16, 2009
10
11      Deposition of BRIAN WARNOCK, VOLUME I, before
12 Nancy A. Miani, a Certified Court Reporter, License
13 No. XI00814, and a Notary Public of the State of New
14 Jersey at the offices of WITMAN, STADTMAUER, ESQS, 26
15 Columbia Turnpike, Florham Park, New Jersey, on
16 Tuesday, June 16, 2009, at 10 a.m.
17
18
19
20
21
22           MIANI COURT REPORTING
             CERTIFIED COURT REPORTERS
22              1741 DANIEL COURT
23              WALL, NJ  07719
                (732) 681-4776
24
25
```

2

APPEARANCES:

WITMAN, STADTMAUER, ESQS.
26 Columbia Turnpike
Florham Park, NJ 07932
By: STEPHEN M. CHARME, ESQ.
Attorneys for the Plaintiffs

KERN, AUGUSTINE, CONROY & SCHOPPMANN, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
BY: STEVEN KERN, ESQ.
AND CHARLES H. NEWMAN, ESQ.
Attorneys for the Defendant

ALSO PRESENT:

Anthony Casella, M.D.

3

I N D E X

WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
BRIAN WARNOCK
  BY MR. CHARME    6
  BY MR. KERN      114

E X H I B I T S

EXHIBIT NO.      DESCRIPTION              PAGE

Warnock-1   Loan Amortization Schedule,      28
            Four Pages

Warnock-2   Nine Page Document from          30
            American Pension Corporation
            Entitled "Money Purchase
            Retirement Plan"

Warnock-3   Seven Pages of Handwritten       33
            Notes

Warnock-4   Three Pages of Handwritten       39
            Notes

Warnock-5   Two Pages of Handwritten Notes   45

Warnock-6   One-Page Handwritten Letter with 50
            Attached Typewritten Letter to
            Dr. Criscito dated 1/7/91 from
            Brian Warnock

Warnock-7   Form 5500 for 1999, 18 Pages     54

Warnock-8   Form 5500 for 2000, 12 Pages     56

Warnock-9   One Pages of Handwritten Notes   57
            With Attached Three Pages of
            Typewritten Notes

Warnock-10  Two Pages of Typewritten Notes   63

Warnock-11  Two Pages Reconciliation of      69
            Trust Assets for 1999

4

E X H I B I T S

EXHIBIT NO.      DESCRIPTION              PAGE

Warnock-12  Reconciliation of Trust          71
            Assets for 2005, One Page

Warnock-13  Form 1096 for 2005, Two          75
            Pages

Warnock-14  Form 5498 for 2006, One          76
            Page

Warnock-15  Copy of Savings Withdrawal       76
            Slip, One Page

Warnock-16  Seven Pages of Handwritten       79
            Notes

Warnock-17  Memo from Brian Warnock          90
            Dated 9/14/07 with Two
            Page Attachment

Warnock-18  Two-Page Letter to Anthony       101
            Casella, M.D., from Brian
            Warnock dated August 28, 2007

Warnock-19  One-Page E-mail from Marysue     104
            McCarthy dated 7/28/06

Warnock-20  Two-Page Letter to Joy M.        107
            Mercer, Esq. From Brian
            Warnock dated 11/13/07

Warnock-21  Three-Page Letter to Joy M.      108
            Mercer, Esq., from Brian
            Warnock dated 12/6/07

5

1    <u>LITIGATION SUPPORT</u>
2
3    DIRECTION NOT TO ANSWER
4         (None)
5
6    MOTION TO STRIKE
7         (None)
8
9    DOCUMENT REQUEST
10        (None)
11
12   EXHIBIT ANALYSIS
13        Original Exhibits Attached to Original
          Transcript.
14
          Copies of All Exhibits attached to
15        All Transcripts.
16
17
18
19
20
21
22
23
24
25

6

1    B R I A N     W A R N O C K,
2    American Pension Corporation, 1375 Plainfield Avenue,
3    Watchung, New Jersey, sworn.
4    DIRECT EXAMINATION BY MR. CHARME:
5         Q.    Good morning, Mr. Warnock.  My name is
6    Stephen Charme.  I represent the plaintiffs in the
7    lawsuit in which you were subpoenaed.
8              Are you represented by counsel today?
9         A.    No.
10        Q.    Okay.  Are you aware that you have a
11   right to be represented by counsel?
12        A.    Yeah.
13        Q.    You've chosen --
14        A.    I didn't --
15        Q.    So you've chosen not to be represented by
16   counsel.  Is that correct?
17        A.    That's correct.
18        Q.    Okay.  Have you ever had your deposition
19   taken before?
20        A.    Yes.
          Q.    How recently was the last time?
22        A.    Maybe 2 or 3 years ago.
23        Q.    What kind of case?
24        A.    About 2 or 3 years ago.  It was a case
25   involving work.

7

1         Q.    Okay.  Let me just give you some
2    instructions then.
3         A.    Sure.
4         Q.    I'm going to be asking you questions,
5    your answers are going to be recorded.  If I ask you
6    something and you don't understand the question,
7    please tell me and I will do my best to clarify it for
8    you.  Do you understand that?
9         A.    Uh-hum.
10        Q.    If you understand the question, I would
11   appreciate if you would give me a complete and honest
12   answer to it.  Do you understand that?
13        A.    Yes.
14        Q.    If at some point you feel you need to
15   take a break, please tell me and I will try to
16   accommodate you.  Do you understand that?
17        A.    Yes.
18        Q.    I have to ask you the last question.
19              Are you taking any kind of medicine or do
20   you have any kind of physical condition that would
21   stop you from understanding my questions and giving me
22   complete and honest answers?
23        A.    No.
24        Q.    Okay.  Could you tell me your educational
25   background, if any, beyond high school.

8

1         A.    I have a degree in sociology from
2    Montclair State College.
3         Q.    Is that a BA?
4         A.    I guess a Bachelor of Science, actually.
5    Social sciences.
6         Q.    And what year did you get that?
7         A.    1976.
8         Q.    Okay.  Could you state your date of
9    birth, please.
10        A.    April 6th, 1954.
11        Q.    Besides the bachelor's degree from
12   Montclair -- was it Montclair State?
13        A.    Yes.
14        Q.    Have you taken any other advanced
15   courses?
16        A.    No.
17        Q.    Would you tell me your employment
18   background starting when you graduated from college,
19   please.
20        A.    I worked for Mutual Benefit Life
21   Insurance Company in their Pension Department for two
22   and a half years.  Then I worked in Bankers National
23   Life Insurance Company.
24        Q.    So it's two and a half years, say, to
25   what, 1979?

9

1    A.    To 1979, yeah.
2    Q.    Okay. I'm sorry. What was the next one?
3    A.    Bankers National Life Insurance Company.
4    Q.    What did you do there?
     A.    Again, in the Pension Department. The
6  ERISA Unit.
7    Q.    Is that what it was called?
8    A.    Yeah.
9    Q.    How long did you work there?
10   A.    Well, until 1981.
11   Q.    Okay.
12   A.    And then the present occupation, American
13  Pension Corporation.
14   Q.    So you joined -- I'm going to call them
15  APC. Is that okay?
16   A.    Yes.
17   Q.    You joined APC in 1981?
18   A.    That's correct.
19   Q.    Let's go back to Mutual Benefit Life
20  Insurance. Did you have any job title there?
21   A.    Reporting and disclosure technician,
22  actually.
23   Q.    What did your job consist of while you
24  were there?
25   A.    We prepared documents for pension plans,

10

1  ERISA documents. And the 5500 forms.
2    Q.    Okay.
3    A.    Which is the annual report you file for a
4  pension plan.
5    Q.    When you say -- who do you file that
6  annual report with?
7    A.    It's the IRS and Department of Labor.
8    Q.    So you worked on preparing Form 5500's
9  while you were at Mutual Benefit Life?
10   A.    Yes.
11   Q.    Okay. Why did you leave that company?
12   A.    I guess more money.
13   Q.    Good. Okay. What did you do when you
14  went to Bankers National Life?
15   A.    I was the head of the Keogh Unit.
16   Q.    Head of the Keogh Unit?
17   A.    ERISA Department slash Keogh, and they
18  had a number of Keogh plans, which is a pension plan
19  for self-employed individuals, and we did not do 5500
20  forms there. But it was mostly involved with
21  annuities, maintaining the annuities, which we used to
22  fund the plans.
23   Q.    Okay. How come you left there?
24   A.    More money.
25   Q.    Okay.

11

1    A.    I was young back then.
2    Q.    How did you come to know APC had a
3  position available?
4    A.    A gentleman I worked with, named Ray
5  Miller, worked with me at Mutual Benefit Life, and he
6  had worked there, and he was leaving for another
7  position.
8    Q.    He was leaving APC?
9    A.    He was leaving APC and he called me and I
10  took his job, basically.
11   Q.    Okay. What was the job that you took?
12   A.    Administering pension plans.
13   Q.    And since you joined APC in 1981, have
14  your job responsibilities changed at all?
15   A.    They've been increased.
16   Q.    Tell me how they've increased.
17   A.    Well, I'm the vice-president now. When I
18  started there, it was the owner and me, a secretary
19  and a part-timer, and now we have nine people. So
20  there's a president, myself, and one, two -- three
21  administrators, a part-time administrator.
22   Q.    Who is currently the president --
23   A.    And office staff. Peter Coughlan,
24  C-O-U-G-H-L-A-N. And he owns the company.
25   Q.    And you're the vice-president?

12

1    A.    Yes.
2    Q.    And then you said there were three, what,
3  administrators?
4    A.    Right.
5    Q.    Okay.
6    A.    Third party administrators we call them.
7    Q.    Who are they?
8    A.    Dominique Eck, Joyce Plesnarski, and
9  Stuart Tankenbaum.
10   Q.    Are the other employees just clerical
11  staff?
12   A.    Yes.
13   Q.    Okay. What -- first of all, how long has
14  Dominique Eck been there?
15   A.    20 years. 20 plus.
16   Q.    And what about Joyce?
17   A.    About seven.
18   Q.    And Stuart --
19   A.    Right around the same. I think it's
20  eight and seven. Joyce would be eight, Stuart would
21  be seven. I could be off.
22   Q.    Okay. Do you do -- when you went to APC,
23  did you do Form 5500's again?
24   A.    Yes. But more involved than just the
25  5500's. We would also prepare the annual reports,

13

1  participant statements.
2      Q.    Tell me if you would, please, what an
3  annual report is.
4      A.    Annual report, you're basically doing
5  reconciliation of the assets for the year.  Very short
6  one.  It's not an audit.
7      Q.    Okay.
8      A.    And then we would prepare a report
9  allocating -- we would calculate the contribution, and
10 the report would then allocate the contribution, the
11 proportionate share of the plan earnings or losses.
12     Q.    The annual report would do that?
13     A.    It's the annual report, and out of the
14 annual report, the participant statements would come.
15     Q.    Okay.  From whom do you get the
16 information to prepare annual reports?
17     A.    We get it from the client.
18     Q.    Now, you say it's not an audit.
19     A.    It's not an audit, no.
20     Q.    Do you verify the information you get
21 from the client?
22     A.    Not necessarily.  We ask them, we send a
23 questionnaire, we say give us the information.
24 There's a questionnaire for them to fill it out, we
25 ask them to provide backup, copies of the brokerage

14

1  statements.  Sometimes they do, sometimes they don't.
2  We don't, you know, insist on it.
3      Q.    So if they don't provide copies of the
4  brokerage statements as backup, you don't insist on
5  that?
6      A.    No.
7      Q.    And based on your experience, are you
8  able to say, you know, what percentage of clients do
9  provide you with brokerage statements as backup versus
10 what percentage don't?
11     A.    I'd say more do.  Probably 75, 80 percent
12 do.
13     Q.    Do provide you with brokerage statements?
14     A.    Do provide that, yes.
15     Q.    Okay.  Are you aware why the other, say,
16 remaining 20 percent do not?
17     A.    No, usually it's just a time thing, that
18 they're trying to get it done quickly and don't want
19 to take the time to copy them.
20     Q.    Okay.  And if they don't want to take the
21 time to copy them, you don't ask them to send you
22 those statements later on when they do have the time?
23     A.    No.
24     Q.    Okay.
25     A.    No.  They provide the questionnaire, they

15

1  fill it out, then that's enough.  You know, we don't
2  insist on the backup.
3      Q.    Okay.
4      A.    I should just add that a lot of
5  companies, they have the brokerage statements sent to
6  us automatically so we just receive them.
7      Q.    So you've worked on the annual report,
8  which includes participant statements, the Form
9  5500's?
10     A.    Right.
11     Q.    What else?
12     A.    We prepare plan documents.  On defined
13 benefit plans it's a little bit different.  There's an
14 actuarial report that you have to prepare.
15     Q.    Anything else that you do there?
16     A.    We provide the forms for termination
17 claims.  If somebody terminates employment, we would
18 give them the forms.  The employee completes the forms
19 saying what they want done with their money, whether
20 they want it rolled over, they want it in cash, taxes
21 withheld, that kind of thing.
22     Q.    I think earlier when you were talking
23 about Dominique, Joyce, and Stuart, you told me they
24 were third party administrators.
25     A.    Right.

16

1      Q.    I thought APC, itself, was the third
2  party administrator.  Am I mistaken?
3      A.    Well, I mean, they have titles, but we
4  call them pension consultants.  There's no special
5  significance to their title.  I think one is called a
6  consultant, one is an analyst.
7      Q.    Do you know what a third party
8  administrator is for a pension plan?
9      A.    Yes.
10     Q.    Okay.  Tell me what your understanding of
11 that is.
12     A.    Third party administrator would be --
13 would assist the client, the plan trustees in
14 preparing the reports.  We don't have -- we are not
15 trustees.  We are not the plan administrators.  So we
16 are a little more than clerical, but we're basically
17 doing the paperwork for the employer as the third
18 party administrator.
19     Q.    Do you do work sometimes with the
20 trustees of plans?
21     A.    On -- 99 percent of our plans the trustee
22 is the owner of the company.
23     Q.    Have you heard of Diagnostic & Clinical
24 Cardiology?
25     A.    Yes.

17

1    Q.    When did you first hear of that company?
2    A.    We have been working on them, really
3  since I started in -- started at American Pension
4  Corporation.
5    Q.    You started there in 1981, correct?
6    A.    Yes.
7    Q.    At the time you started there, was
8  Diagnostic & Clinical Cardiology already a client of
9  APC?
10   A.    It was a client for, I believe, since
11 1980.  Right before I started.
12   Q.    Before you started, who was working on
13 the account?
14   A.    Probably Ray Miller.  I couldn't -- I
15 would say I don't know.
16   Q.    When you joined APC in 1981, did you
17 start doing work with Diagnostic & Clinical
18 Cardiology?
19   A.    I don't recall specifically --
20   Q.    Okay.
21   A.    -- if I worked on that plan or not.
22   Q.    At some point after you joined, whether
23 it was 1981, but at some point did you ever work on
24 that plan?
25   A.    Yes.

18

1    Q.    Okay.  When you worked on that plan, tell
2  me what kinds of things you did.
3    A.    We would calculate the contributions for
4  the employee census --
5    Q.    Let's start with that.  Tell me what an
6  employee census is, please.
7    A.    Employee census is a list of everybody
8  working there, their names, dates of birth, dates of
9  employment, dates of termination.
10   Q.    Okay.  And why do you need that
11 information?
12   A.    We need it to calculate the contribution.
13   Q.    Okay.  Do you need any other information
14 to calculate the contribution?
15   A.    No -- well, the plan document would have
16 the formula.  The formula for calculating the
17 contribution is in the document.
18   Q.    You would need the compensation for the
19 employees, right?
20   A.    Right, names, dates of birth, dates of
    employment, and their annual compensation.
22   Q.    And APC would do the calculations?
23   A.    We would do the calculation.  Originally
24 it was a money purchase plan, which had a fixed
25 contribution, it was like 15 percent, something like

19

1  that.  That's an example.  So then we would, everybody
2  would just get a straight 15 percent.  It was amended
3  over the years to a profit sharing plan, and they call
4  it a new comparability plan, where it's a
5  discretionary contribution.  So then we would work
6  with, in this case, Dr. Casella, and he would give us
7  the census, and basically tell us what he's looking
8  for in terms of the contribution, which would be
9  typically, if you want to maximize the doctors, we
10 want to give the rest of the employees 5 percent.
11   Q.    Do you recall when it changed over to a
12 profit sharing plan?
13   A.    Not -- no, I don't.  No.  I'd be
14 guessing.
15   Q.    If I told you that it changed over
16 sometime around 2005, would that refresh your
17 recollection?
18   A.    No, I don't think that would be correct.
19   Q.    You don't think that would be correct?
20   A.    That would not be correct.  Before then,
21 certainly before 2005.
22   Q.    You think it changed over to a profit
23 sharing plan before 2005?
24   A.    For sure, yes.
25   Q.    Do you think it changed over to a profit

20

1  sharing plan before 2000?
2    A.    Yes.
3    Q.    Okay.  But you don't remember the year?
4    A.    I don't remember the year, no.
5    Q.    You said -- I'm going to refer to
6  Diagnostic & Clinical Cardiology as DCC for short.
7  Okay?
8    A.    Yes.
9    Q.    You said you would get information to
10 prepare an employee census, correct?
11   A.    We would send the census from the year
12 before, generally from our computer, which has
13 everybody we know of from the year before, and
14 then we would send it and they would fill out the
15 census, basically just updating.  It's already got the
16 names, dates of birth, dates of employment.  Then they
17 would provide us with the current year's salary and
18 any new people, any terminations.
19   Q.    Okay.  Is there anyone at DCC who you --
20 withdrawn.
21         Were you, yourself, personally involved
22 in preparing employee censuses for DCC as opposed to
23 someone else in the office?
24   A.    When you say preparing the census, the
25 census was completed by Diagnostic, not by us.

21

1    Q.    Let me say it differently.
2          After you sent Diagnostic, you said the
3    old census and asked them to update names, addresses,
4    and compensation, correct?
5    A.    Right.
6    Q.    Is that something that you did?
7    A.    Did I mail it out?
8    Q.    Yes.
9    A.    No.
10   Q.    So was someone assigned to the DCC
11   account to do that?
12   A.    Well, that would just be a clerical
13   function, you know.
14   Q.    Okay. And when it came back, whose job
15   was it to review the updated information?
16   A.    Primarily Dominique's. I may have done
17   it. Sometime over the last, you know -- since 1981, I
18   may have been involved with a year or something, but
19   general Dominique was the one who did it.
20   Q.    If there were any questions about the
21   information that was received, do you know who APC
22   spoke to at DCC?
23   A.    Dr. Casella.
24   Q.    And that was in connection with the
25   employee census?

22

1    A.    Yes.
2    Q.    What else did APC do for DCC?
3    A.    Okay. We would, once we received the
4    census back, it was kind of a two step thing. First
5    we would calculate the contribution. Okay. And the
6    contribution, like I said, once it turned to a profit
7    sharing plan especially, we would calculate it, give
8    it to Dr. Casella, he would look at it and say, you
9    know, yes, sounds okay, you know, because profit
10   sharing is a discretionary contribution.
11   Q.    Let me understand. After you got the
12   employee census back, you would calculate the
13   contributions, and then the contributions that had
14   been calculated would be sent to Dr. Casella for his
15   review?
16   A.    Right.
17   Q.    And who did that?
18   A.    Dominique.
19   Q.    Okay.
20   A.    Okay. Then.
          MR. KERN: Is Dominique a woman or a man?
          THE WITNESS: A female.
23        MR. KERN: So it's D-O-M-I-N-I-Q-U-E?
24        THE WITNESS: Yes, Eck, E-C-K.
25   A.    And Dr. Casella would see it, say that's

23

1    okay, and they would make the contribution to the
2    plan.
3    Q.    Let me ask you a question. When you say
4    he would receive it and say that's okay, did you ever
5    speak to Dr. Casella personally about calculations of
6    employee contributions?
7    A.    I'm sure I did. Yeah.
8    Q.    When you say you're sure you did, do you
9    mean you can actually recall something, or you think
10   you may have?
11        MR. KERN: I'm going to object. You've
12   already asked the question, he already answered it.
13   He's your own witness.
14        MR. CHARME: He's not my witness, he's a
15   third party witness.
16        You can answer.
17   A.    I don't recall any specific conversation
18   with Dr. Casella about calculating the contribution.
19   Q.    Okay. Now, you said that was step one,
20   getting the census back and calculating the
21   contribution. What was the next step?
22   A.    The next step would be preparing the 5500
23   forms, the participant statements. In this case,
24   there was -- it was a little bit different because
25   several -- five or six of the doctors had separate

24

1    accounts where they had their own investments, and
2    then they would -- they would provide us the
3    information on their own personal account, how they
4    invested the money. The participants -- and this
5    changed. Eventually it changed where the
6    participants all have a separate brokerage account.
7    Prior to that, the participants, their assets were in
8    one commingled account with several of the doctors,
9    which would be the newer ones, the other participants
10   and Mario Criscito so we did --
11   Q.    Let me just stop you for a minute so we
12   can clarify some things.
13   A.    Sure.
14   Q.    When you joined APC in 1981, were you
15   personally involved in preparing the Form 5500 for
16   DCC?
17   A.    I don't recall if I ever did it. I
18   probably did at some point in time as people, you
19   know, staff changed and everything, you know.
20   Q.    Do you recall when you, you personally,
21   first got involved in preparing a Form 5500 for DCC?
22   I don't mean doing actually typing, I mean just
23   gathering information.
24   A.    I don't recall that I ever actually did
25   the full annual report on Diagnostic. I would have

157

1  APC had in its files the year end statement from
2  Morgan Stanley for the year 1999, correct?
3      A.    Year end statement of 1999. No, that is
4  not correct.
              (There is a discussion off the record.)
6      Q.    Did you have any statements for the year
7  2000 prior to the filing of this Form 5500?
8      A.    Yes, we did. They didn't realize they
9  were in the file.
10     Q.    What did you have?
11     A.    We had monthly statements that were
12 coming in, starting, I believe it was March of 2000.
13     Q.    When you looked at those statements, did
14 it suggest a discrepancy between what was reported on
15 Warnock-7 and what was most likely in the account at
16 the end of 1999?
17           MR. CHARME: I object to the form. At
18 what point in time?
19     A.    That would be my question, too. At what
20 point in time? When we did this report, no, we had
21 not even looked at those pages at all.
22     Q.    My question is had you looked at the
23 March statement and February statement from 2000,
24 would that have set off any kind of bells or whistles
25 or alarms in anybody's head concerning the accuracy of

158

1  the report which was ultimately filed in October of
2  2000?
3            MR. CHARME: I object to the form.
4      A.    Well, for one thing, the statements would
5  have been in 2000, in our file for the year 2000,
6  which is how we keep our filing, so we would not have
7  even looked in that file when we were preparing the
8  1999 5500 forms.
9      Q.    How about when you were preparing the
10 2000 5500 report, would you have that information
11 available to you then?
12     A.    It was then in there, and it just was
13 overlooked. We did not even realize they were in the
14 file.
15     Q.    If somebody had looked at it, would that
16 have, at a minimum, set off an inquiry as to a
17 possible discrepancy between the 1999 filing and the
18 true amount in the account?
19     A.    Had it been looked at, yes, it would have
20 raised a question.
21     Q.    When you started getting these
22 statements, did anyone inquire as to why you were
23 getting them or why you hadn't gotten them in the
24 past?
25     A.    No, the statements come in from Morgan

159

1  Stanley, there's a stack of them that come in like
2  this for each month for each participant, and they
3  just get filed away. The reason we knew they were
4  getting these statements, they were coming in, because
5  they were getting, they had just set up these separate
6  accounts for the new employees, that's why we were
7  getting statements. We saw them come in, that's good,
8  we're getting them. No one looked at them.
9      Q.    But you also got them for the commingled
10 account?
11     A.    We did get them. We didn't know we were
12 getting them for the commingled account, but yes, we
13 did get them.
14     Q.    Nobody was hiding them from anybody?
15           MR. CHARME: I object to the form.
16     A.    They came to us.
17     Q.    Let me put it to you this way: You had
18 all of the information you needed in your file by, at
19 the earliest, March of 2000, and certainly by the
20 beginning of 2001, had somebody looked, to realize
21 that there was probably an error or some discrepancy
22 in that 1999 5500 filing, correct?
23     A.    Had we looked at the statement, the
24 December 31st, 2000 statement, then we would have, we
25 would have realized it was a mistake. We didn't look

160

1  at it. We never received them before, thought we were
2  only getting the new ones. Sounds easy to say, gee,
3  how did you miss that. We did. We have a
4  participant's report, we went through, here's the
5  guy's name, check, check, never even noticed there was
6  a pile of papers this thick, but, yes, had we looked
7  at it, had we realized it was in there, we had an
8  extra statement in there and that that was it, it
9  would have raised a question.
10     Q.    The note on Warnock-7 is attached to the
11 statement from Morgan Stanley. Do you know which
12 statement that was?
13           MR. CHARME: Did you mean 17?
14           MR. KERN: Is this 17?
15           MR. CHARME: This is 7.
16           (There is a discussion off the record.)
17     Q.    Look at Warnock-17.
18     A.    Okay.
19     Q.    You got it?
20     A.    Yes.
21     Q.    Do you know what statement that was, that
22 note was attached to?
23     A.    That's the December 31st, 2000 statement,
24 we received that in January of 2001.
25     Q.    Before filing the 2000 5500, correct?

161

1    A.    Yes.

2    Q.    And before filing the annual, before

3  preparing the annual reports, correct?

4    A.    For 2000, yes.

5    Q.    Is this your handwriting?

6    A.    That's my handwriting.

7    Q.    You say how could we miss that, correct?

8    A.    Yeah.

9    Q.    Why did you write "how could we miss

10  this"?

11    A.    How could we miss this. Dr. Casella

12  found this in the file, and I said to Dominique, how

13  did we miss this.

14    Q.    This was an important document?

15    A.    Well, if we had found it, as your

16  questions previously were, it would have certainly set

17  off an alarm, yes.

18    Q.    And whatever issues we're dealing with

19  today could possibly have been addressed and resolved

20  at that time?

21       MR. CHARME: I object to the form.

22    A.    I certainly would have asked what's this,

23  you know.

24    Q.    And I take it if you couldn't get

25  adequate or reasonable answers to your questions that

162

1  you would have raised in 2000, had you not missed this

2  document, you would have taken steps to let

3  appropriate people know that there was a problem,

4  correct?

5    A.    If we were off seven million dollars,

6  yes. We wouldn't have just said, well, I guess that's

7  4,000 that went in by accident, yes. We're talking

8  about a difference.

9    Q.    What would you have done, if you --

10    A.    Well, I would have first -- well, I would

11  have asked Mario what's this. That's what I would

12  have done.

13    Q.    And if you couldn't get adequate,

14  responsible responses, what would you have done?

15    A.    If he had said mind your own business,

16  then I think I would have -- well, I'm sure I would

17  have gone to Dr. Casella and said something to him.

18    Q.    Certainly, by this point in time, you had

19  all the information you needed had you looked at it to

20  initiate an inquiry in an attempt to resolve the

21  discrepancy between the information you received as to

22  the 1999 year end balance and the monies in the Morgan

23  Stanley account, correct?

24    A.    If we had noticed this, we probably would

25  have raised the question.

163

1    Q.    Probably --

2    A.    Well, we would have, but unless we were

3  examining each statement, we wouldn't have asked the

4  question on January 1st, 2001, but when we were doing

5  the annual report, which would probably have been

6  October, 2001, at that point, we would have said

7  something is wrong here and we would have raised the

8  question, yes.

9    Q.    No question about that, correct?

10    A.    There's no question about that. We would

11  definitely have raised the question.

12    Q.    Are you aware of any efforts by Dr.

13  Criscito to keep you from becoming aware of the

14  information on the statements that you received on the

15  commingled -- received from Morgan Stanley concerning

16  the commingled account?

17    A.    I don't think it was his intention that

18  we receive these, but I don't know that. They did

19  stop coming. They didn't continue to come.

20    Q.    But they came for a while, correct, for

21  about a year?

22    A.    They came for about a year, and I think

23  -- I would have to check the file, but I have a

24  feeling that's the last one we got.

25    Q.    When they stopped coming, did you inquire

164

1  as to why?

2    A.    We didn't even know they were in there

3  until Dr. Casella found them. So there was a one year

4  window to find them in doing that 2000 report. If it

5  wasn't found in that year, we wouldn't have found

6  them.

7    Q.    To your knowledge, did Dr. Criscito ever

8  advise Morgan Stanley that they were not to send you

9  these reports?

10    A.    Somebody told Morgan Stanley to stop

11  sending them. I don't know who.

12    Q.    Well, during the year you got them, were

13  they sent contrary to the direction from Dr. Criscito,

14  as far as you know?

15    A.    Morgan Stanley was supposed to send us

16  all the new separated accounts for all the

17  participants. That's what they were supposed to send

18  us. Whether Dr. Criscito told them to send us this or

19  not, you would have to ask Morgan Stanley that.

20    Q.    Okay. Let's play with some nomenclature

21  for a while.

22       By the middle of 2000, as I understand

23  it, all of the monies belonging to participants other

24  than Dr. Criscito were supposed to be out of this

25  commingled account, correct?

185

1   answered.

2       A.      No, that -- the contribution receivable,

3   yes, that came from us.

4               MR. KERN:  We're going to need to stop

5   now and have to come back.

6               (There is a discussion off the record.)

7               (At 3:45 p.m., the deposition is

8   adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

186

1       C E R T I F I C A T I O N

2

3

4

5       I, NANCY A. MIANI, a Certified Court Reporter

6   and a Notary Public, License No. XI00814, do hereby

7   certify that the foregoing witness, BRIAN WARNOCK, was

8   duly sworn by me on the date indicated, and that the

9   foregoing is a true and accurate transcription of my

10  stenographic notes.

11      I further certify that I am not employed by

12  nor related to any party to this action.

13

14

15

        _____

16      NANCY A. MIANI, C.S.R.
        LICENSE NO. XI00814

17

18

19

20

22

23

24

25