```
                                                          187
            UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
            CIVIL ACTION CASE NO. 2:08-CV-1567

    DR. FADI CHAABAN; DR. SABINO R. TORRE, DR.
    CONSTANTINOS A. COSTEAS and DR. ANTHONY J.
    CASELLA, as Trustee of Diagnostic & Clinical
    Cardiology, P.A. Profit Sharing Plan,

                     Plaintiffs,

              vs.

    DR. MARIO A. CRISCITO,

                     Defendant.

                                    Wednesday, July 15, 2009

         Deposition of BRIAN WARNOCK, VOLUME II,
    before Nancy A. Miani, a Certified Court Reporter,
    License No. XI00814, and a Notary Public of the State
    of New Jersey at the offices of WITMAN, STADTMAUER,
    ESQS, 26 Columbia Turnpike, Florham Park, New Jersey,
    on Wednesday, July 15, 2009, at 10:10 a.m.




                 MIANI COURT REPORTING
                CERTIFIED COURT REPORTERS
                    1741 DANIEL COURT
                     WALL, NJ 07719
                     (732) 681-4776
```

```
                                                          188
APPEARANCES:

WITMAN, STADTMAUER, ESQS.
26 Columbia Turnpike
Florham Park, NJ 07932
By: STEPHEN M. CHARME, ESQ.
Attorneys for the Plaintiffs

KERN, CONROY & SCHOPPMANN, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
BY: STEVEN KERN, ESQ.
AND CHARLES H. NEWMAN, ESQ.
Attorneys for the Defendant

ALSO PRESENT:

Anthony Casella, M.D.
```

```
                                                          189
                      I N D E X
WITNESS             CROSS    REDIRECT    RECROSS
BRIAN WARNOCK
  BY MR. KERN        192        352
                                381
                                383

  BY MR. CHARME                 307
                       377
                       383
                       384

                    E X H I B I T S

EXHIBIT NO.       DESCRIPTION                  PAGE

Warnock-22   Diagnositc & Clinical              214
             Cardiology, PA, Annual Report
             And Participant Statement
             12/31/00

Warnock-23   Three-Page Letter from Brian       218
             Warnock dated 6/30/09 and
             Attachments

Warnock-24   DCC Plan Document 12/31/99         246

Warnock-25   One-Page Letter to Dr. Criscito    294
             From Dominique Eck dated
             11/23/99 and One-Page
             Attachment

Warnock-26   One-Page Letter from Peter         306
             Coughlan and One-Page
             Attachment

Warnock-27   Employee Census, 4/1/89 -          315
             3/31/90

Warnock-28   One-Page Letter to Dr. Casella     316
             From Donald Cuny dated 8/23/91
```

```
                                                          190
                    E X H I B I T S

EXHIBIT NO.       DESCRIPTION                  PAGE

Warnock-29   One Page of Handwritten Notes      318

Warnock-30   One-Page Memo to Mario Criscito    319
             From Brian Warnock dated 5/15/94
             And Three-Page Attachment

Warnock-31   One-Page Letter to Dr. Criscito    320
             From Peter Coughlan dated 10/7/93
             And One-Page Attachment

Warnock-32   Excerpt from DCC Money-Purchase    373
             Pension Plan effective 4/1/76

Warnock-33   Signature Page, Bate Stamp 7700    382
```

191

**LITIGATION SUPPORT**

DIRECTION NOT TO ANSWER
    (None)

MOTION TO STRIKE
    (None)

DOCUMENT REQUEST
    207-21   278-12   361-22
    236-22   279-7    362-8
    262-9    284-18   369-4
    270-13   293-2
    271-15   359-3

EXHIBIT ANALYSIS

    Original Exhibits Warnock 22 through Warnock-33 are attached to Original Transcript.

    Copies of exhibits attached to transcripts.

192

BRIAN WARNOCK, American Pension Corporation, 1375 Plainfield Avenue, Watchung, New Jersey, resworn.

CONTINUED CROSS EXAMINATION BY MR. KERN:

Q. I want to begin by turning to what's been previously marked Warnock-8.

A. Okay.

Q. Can I start? Okay. Now, is this a copy of the 5500 that was in your file?

A. Yes. Yes.

Q. I note that on the third page of this exhibit, marked 25958, there is no signature of the employer or plan sponsor. Do you know why that is?

A. No, I don't.

Q. And who was the plan sponsor?

A. Well, the employer would be, so an officer of Diagnostic would sign.

Q. I also note on the first page of the document that there is no signature of either the plan administrator or of the employer, plan sponsor, right?

A. That is correct.

Q. That was 25946. Would this have gone out to the IRS in this form?

A. No. We send the forms to Dr. Criscito or to the employer. He signs it, sends it into the IRS.

193

We don't always necessarily get a signed copy.

Q. How would you get a signed copy?

A. We ask them to send us a signed copy just so we have it in our file as evidence that it was done, but some people send it back, some people don't.

Q. If we go to Page 259 -- no number on this one. The fifth page, one, two, three, four -- fifth page.

A. 25959.

MR. KERN: Is there a stamp on this one?

MR. CHARME: I don't see it.

Q. It's the fifth page of what's been marked Warnock-8. It doesn't have a Bate stamp on it.

A. All right.

Q. Is it your testimony that this form would have gone to Dr. Criscito unsigned, and he would have returned it to you with a signature, a copy to you with a signature?

A. He would send us one page. We send him the forms to sign, send the whole package into the IRS, and then we send one page, one blank first page for him to sign and send back to us, and that way we have it in the file, and it's really for if the IRS ever asks, A, we didn't get the form or whatever, we got it late, we can say no, he filed it on this day,

194

and he even sent us a copy saying -- with the same date. That's the reason we ask for it.

Q. You see the signatures on the bottom of this page?

A. Yes, I do.

Q. Do they appear to be two different signatures, the signature of the second individual?

A. I would think they were the same.

Q. They don't look different to you?

MR. CHARME: Asked and answered. Objection.

Q. They don't look different to you?

A. One has an A in it and one doesn't.

Q. Let's go down two more pages. This is another page which is not Bate stamped, but on the bottom page it says October 19th, 2004. Do you have that one? Again, two signatures?

A. Yes.

Q. Do they appear to be the same signature of the same person?

A. They do look somewhat different, somewhat the same.

Q. Do you have any explanation for it?

A. No idea.

Q. Okay. Let's go then to Warnock-9.

Page 195

1  A.  Okay.
2  Q.  This is a report that you believe you
3  received from Dr. Criscito in 1998?
4  A.  Yes.
5  Q.  And it indicates that there are monies in
6  this commingled account in a number of different
7  repositories, correct?
8  A.  Correct.
9  Q.  Was there ever a time when there was a
10 determination that monies, for example, in Dean Witter
11 belonged to certain participants, and monies that
12 belonged in Schwab belonged to other participants, or
13 was this, for your purposes, treated as one pool of
14 money?
15     MR. CHARME:  I object to the form.
16 A.  It was one pool of money.
17 Q.  All right.  And did that hold true during
18 the entire period that you were involved in this
19 account?
20     MR. CHARME:  Same objection to the form.
21 A.  It would hold true for the commingled
22 account, yes.  We did get a separate report, for
23 example, for Dr. Casella, completely --
24 Q.  I'm just talking about the commingled
25 account.

Page 196

1  A.  Right.
2  Q.  So whether the money was in Dean Witter,
3  in Schwab, in Smith Barney, in Morgan Stanley, your
4  only concern was the totality of the money, and it
5  wasn't as though one participant's money was part of
6  the Dean Witter account, and another person's money
7  was part of the Schwab account, the third
8  participant's money was part of the Morgan Stanley
9  account, right?
10     MR. CHARME:  Objection to form.
11 A.  That is correct, it was all just one big
12 pot.
13 Q.  So when it came time to determining a
14 distribution number, or how much money was -- when it
15 came time to distributing money out of the commingled
16 account, it was the total pool of money that was at
17 issue, correct?
18 A.  Correct.
19 Q.  And in determining how much money was
20 still in the commingled account for an individual,
21 that was also based upon the totality of money in all
22 of the accounts, correct?
23     MR. CHARME:  I object to the form.
24 A.  I'm not sure of the question.
25 Q.  If somebody didn't take a distribution,

Page 197

1  that was still money for that person in the account?
2  A.  If no one took a distribution, yes.
3  Q.  Speaking of that, was there anything in
4  the plan documents which precluded somebody from
5  participating both in a segregated account and in a
6  commingled account?
7  A.  No.
8  Q.  They could have money in both?
9  A.  Could be.
10 Q.  All right.  Let's go to the next page.
11 Do you know when this was received by APC?
12 A.  I don't know exactly, but it would have
13 been part of the 2000 report.  So it would have been
14 received sometime in 2001.
15 Q.  Do you know who crossed out '99 and put
16 in 2000?
17 A.  That's my cross out, yes.
18 Q.  That's your handwriting?
19 A.  Yes.
20 Q.  Do you know who prepared this document?
21 A.  This would have come from Dr. Criscito.
22 Q.  Do you know how it was received?
23 A.  Could have been mailed, could have been
24 faxed.  Either one.
25 Q.  Was there a cover page that came with it?

Page 198

1  A.  Looking at that one page, I don't know.
2  Q.  So how would you know it came from Dr.
3  Criscito?
4  A.  Because that's the information that he
5  would send us, we would use that format.  If I went
6  back in the files, and -- probably, not necessarily,
7  but I might find the cover page with it.
8  Q.  Well, this wasn't the format that he used
9  in 1999, correct?
10 A.  He did -- I'd have to look at the '99
11 file.
12 Q.  Warnock-10.
13 A.  Warnock-10.  No.  It's not exactly the
14 same.
15 Q.  And there's no fax stamp on this,
16 correct?
17 A.  25870 there is not.  There is one on
18 25957.  And on 25997.
19 Q.  You say there's a fax on 25957?
20 A.  No.  25957 there is a fax stamp on the
21 bottom.
22 Q.  Not on my copy.  Okay.  And 997?
23 A.  997 there is also a fax stamp with Mario
24 Criscito.
25 Q.  But none on 25870?

## Page 383

1  Q. Finally, you previously testified that an
2  active participant could maintain monies in both the
3  commingled account and in the segregated account,
4  correct?
5  A. It would be legal to do it, yes.
6  Q. Nothing which would have precluded that,
7  correct?
8  A. There's nothing to preclude that no.
9  MR. KERN: I have nothing further.
10  A. It would be unusual, but there's nothing
11  to preclude it, no.
12  MR. KERN: I have nothing further. Thank
13  you.
14  MR. CHARME: I have one quick question.
15  REDIRECT EXAMINATION BY MR. CHARME:
16  Q. Do you know if, in the case of
17  Diagnostic, anyone maintained both money in a
18  commingled account and in a segregated account?
19  A. No, no one did.
20  RECROSS EXAMINATION BY MR. KERN:
21  Q. Well, how do you know that? If there
22  were monies sitting in the Smith Barney account that
23  hadn't been distributed for whatever reason, and those
24  monies belonged to active participants, then the fact
25  is that there would have been monies maintained in

## Page 384

1  both the commingled account and a segregated account
2  for that individual, right?
3  A. That is correct. But no one
4  intentionally was in both accounts.
5  Q. As far as you know?
6  A. As far as I know, for sure, no one was
7  intentionally in the commingled account and the
8  segregated account because nobody said keep half of my
9  money in the commingled account, put half of my money
10  in a separate account.
11  Q. I understand. That commingled account
12  was maintained at least through 1995 -- at least
13  through 2005, correct?
14  A. Yes, it was a small balance left in the
15  2005.
16  Q. You don't know how much was in the Smith
17  Barney account in 2005, though, do you?
18  A. No. What we had, it was just --
19  Q. Do you know what the name on the Smith
20  Barney account is until this very day?
21  A. No.
22  MR. KERN: I have nothing further.
23  MR. CHARME: I have one quick question.
24  REDIRECT EXAMINATION BY MR. CHARME:
25  Q. Did anyone ever say to you that Dr.

## Page 385

1  Criscito maintained an individual segregated account
2  at Smith Barney?
3  A. For himself?
4  Q. For himself.
5  A. No.
6  MR. CHARME: No further questions.
7  MR. KERN: No further questions.
8  (At 4:40 p.m., the deposition is
9  adjourned.)

## Page 386

### CERTIFICATION

I, NANCY A. MIANI, a Certified Court Reporter and a Notary Public, License No. XI00814, do hereby certify that the foregoing witness, ^ , was duly sworn by me on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

NANCY A. MIANI, C.S.R.
LICENSE NO. XI00814