```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF NEW JERSEY
 3            CASE NO. 2:08-cv-1567 (JAG - MCA)
 4
 5   DR. FADI CHAABAN; DR. SABINO R.    :
 6   TORRE; DR. CONSTANTINOS A.         :
 7   COSTEAS and DR. ANTHONY J.         :
 8   CASELLA, as Trustees of            :
 9   Diagnostic & Clinical              :
10   Cardiology, P.A. Profit Sharing    :
11   Plan,                              :
12              Plaintiffs,             :
13        vs.                           :
14   DR. MARIO A. CRISCITO,             :
15              Defendant.              :
16   -   -   -   -   -   -   -   -   -
17              DEPOSITION OF:  SCOTT M. FEIT
18                WEDNESDAY, JULY 21, 2010
19
20            ROSENBERG & ASSOCIATES, INC.
21         Certified Court Reporters & Videographers
22    425 Eagle Rock Ave., Suite 201      575 Madison Ave.
23   Roseland, New Jersey 07068     New York, New York 10022
24     (973) 228-9100    1-800-662-6878    (212) 868-1936
25             www.rosenbergandassociates.com
```

2

```
 1        Deposition of SCOTT M. FEIT taken in the
 2   above-entitled matter before Gary M. Talpins, a
 3   Certified Court Reporter (License No. XI-000561) of
 4   the State of New Jersey, taken at the offices of
 5   WITMAN STADTMAUER, 26 Columbia Turnpike, Florham
 6   Park, New Jersey, on Wednesday, July 21, 2010,
 7   commencing at 10:40 a.m.
 8
 9
10   A P P E A R A N C E S:
11        WITMAN STADTMAUER
12        26 Columbia Turnpike
13        Florham Park, New Jersey 07932-2213
14        (973) 822-0220
15        Email:  Scharme@wsmesq.com
16        BY:  STEPHEN M. CHARME, ESQ.
17             -and-
18        CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART
19        & OLSTEIN, P.C.
20        5 Becker Farm Road
21        Roseland, New Jersey 07068-1751
22        (973) 994-1700
23        Email:  Jagnello@carellabyrne.com
24        BY:  JOHN M. AGNELLO, ESQ.
25        Attorneys for the Plaintiffs.
```

3

```
 1    APPEARANCES (Cont'd):
 2
 3         KERN, AUGUSTINE, CONROY & SCHOPPMANN
 4         1120 US Highway 22
 5         Bridgewater, New Jersey 08807-2944
 6         (908) 704-8585
 7         Email:  Sikern@drlaw.com
 8         BY:  STEVEN I. KERN, ESQ.
 9         Attorneys for the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                                    4

 1                            I N D E X

 2

 3   WITNESS                EXAMINATION BY                   PAGE

 4   SCOTT M. FEIT          MR. KERN                            5

 5

 6

 7

 8

 9

10

11                          E X H I B I T S

12

13   NUMBER                 DESCRIPTION                      PAGE

14   Feit 1       Document Bates stamped Feit 00001,

15                et seq.                                      16

16

17                 (Exhibit retained by counsel.)

18

19

20

21

22

23

24

25
```

```
1                    SCOTT M. FEIT,
2    25B Vreeland Road, Florham Park, New Jersey, having
3    been first duly sworn, was examined and testified as
4    follows:
5              MR. AGNELLO:  Housekeeping matters, I
6    spoke to Mr. Kern about this before we went on the
7    record.  We are delivering to Mr. Kern, pursuant to
8    his request, the documents reviewed and used by Mr.
9    Feit in connection with his expert report.  We have
10   marked them Bates stamp Feit 1 through 1761 so there
11   are 1,761 pages we are delivering.
12             In addition, it's been agreed in advance
13   that Mr. Feit will be paid by Mr. Kern today for the
14   time he spends during his deposition at the rate of
15   $400 an hour.  And with that said, I leave it to Mr.
16   Kern.
17             MR. KERN:  Thank you.  Bear with me for
18   another couple of minutes.
19
20                     EXAMINATION
21   BY MR. KERN:
22       Q.    Mr. Feit, my name is Steven Kern.  I
23   represent Dr. Mario Criscito in the case of Chaaban
24   v. Criscito.  I'm going to be asking you a number of
25   questions here today.  If at any time you don't
```

1   A.   Correct.
2   Q.   Any reason to believe the $3,557,000
3   wouldn't have been enough to cover that plus
4   interest?
5   A.   No, that would have covered it.
6   Q.   With a lot left over, correct?
7   A.   Yes.
8   Q.   Are you aware of the fact that APC was
9   in possession of actual statements from Morgan
10  Stanley indicating the amount, the actual amount of
11  money in that commingled account during the year
12  2000?
13  A.   I don't know it was in their possession.
14  Q.   If a third party administrator had
15  received bank statements which clearly indicated a
16  discrepancy between the amount which had been
17  reported by the trustee and the amount that actually
18  existed in the bank, what would the responsibility of
19  the third party administrator have been?
20  A.   To let the plan sponsor know that there
21  was a discrepancy and that the participants are due
22  additional amounts to be transferred into their
23  self-directed accounts at that time and those amounts
24  would be calculated using the online calculator,
25  those amounts, the principal amounts plus lost

```
 1  earnings.
 2       Q.     It could have been done using the online
 3  calculator or it could have been done by some other
 4  means, right?
 5       A.     No, based on my experience, it would
 6  have been to use the online calculator.
 7       Q.     Let me ask you a question. Assuming
 8  that the amount in the commingled fund during the
 9  course of 2000 had increased in value by a hundred
10  percent, so there was a hundred percent return on
11  investment during 2000, would you use the hundred
12  percent return on investment to calculate the amount
13  that continued to be owed to those individuals or
14  would you have used the online calculator?
15            MR. AGNELLO:  Objection as to form.
16  What commingled account?
17            MR. KERN:  The commingled account in the
18  name of Salomon SmithBarney.
19            MR. AGNELLO:  There is no testimony on
20  the record that there is a commingled account in
21  2000.
22            MR. KERN:  Same name.
23            MR. AGNELLO: Then your question has to
24  deal with the same name because there is no testimony
25  that there is a commingled account.
```

1  and how much of it is considered profit sharing
2  money.  So if you add those two numbers, I don't have
3  a calculator but I assume it's going to total the 4.1
4  million dollars, which is just a breakdown.  Just
5  because it says rollover, it doesn't mean rolled
6  money was rolled out of the plan, it was money
7  previously rolled into the plan by Dr. Criscito.
8       Q.     It's your understanding that Dr.
9  Criscito rolled $690,000 into the plan?
10      A.     I don't know the exact amount but
11 according to these notes, this is what they are
12 saying it's worth as of January 1, 2000.
13      Q.     Do you know why Foggio had money
14 remaining in the account?
15      A.     I don't.
16      Q.     Do you know whether it was a result of
17 any action or inaction by Dr. Criscito?
18      A.     I don't.
19      Q.     At Abar, when you are acting as third
20 party administrator, do you review bank statements
21 that come in on the various accounts?
22      A.     For all small plans, yes.
23      Q.     And if there is a discrepancy between
24 the bank statement and the amount that was reported
25 by the trustee with regard to the amount in the

57

1  account, would you investigate that?
2     A.    Yes.
3     Q.    A hundred percent of the time?
4     A.    Yes.
5     Q.    Is it Abar's practice to rely solely on
6  the trustee to provide year end valuations?
7     A.    No.
8     Q.    How did you determine year end
9  valuations?
10    A.    We ask the trustees to complete a form
11 that shows the value of the assets at the end of the
12 year but on the same documents, we have a note that
13 says that we require to receive hard copies of
14 statements supporting the numbers that they are
15 putting down on the form.
16    Q.    Is it your understanding that that is
17 standard within the industry?
18    A.    That is standard within the industry,
19 what we do.
20    Q.    And had that been done in this case, the
21 problems that we are facing here would not have
22 transpired, correct?
23    A.    I don't know.
24    Q.    Had you had the bank statements that you
25 require, the bank statements would have had different

58

1  numbers than the numbers provided by Dr. Criscito,
2  correct?
3       A.   My firm would have picked that up.  I
4  can't speculate what APC would have done if they have
5  even reviewed those bank statements if they had them.
6       Q.   You just said your firm, the community
7  standard, would have picked that up and you would
8  have required the information?
9       A.   And then --
10      Q.   It would have required the information?
11      A.   We would have required the information.
12      Q.   How often have you found discrepancies
13 between amounts reported and the hard copy?
14      A.   Minimal.
15      Q.   That's because the hard copy comes with
16 it, I take it?
17      A.   We request both at the same time so
18 there is supporting documentation.
19      Q.   And I take it you do that because you
20 are concerned that without the hard copy, there would
21 be a greater chance of having disparate numbers?
22      A.   We like to verify the amounts are
23 correct using supporting documentation, not just
24 relying on the word of the trustee who is supplying
25 the information.

                                                                    59

```
 1          Q.      The trustee of a plan is not necessarily
 2    a person well versed in finances, correct?
 3          A.      Some are, some not.
 4          Q.      That's why I say not necessarily.
 5    Similarly, they are not necessarily well versed in
 6    the purposes or needs for certain data or the need
 7    for accuracy reporting that data, correct?
 8                  MR. AGNELLO:  Objection as to form.
 9          A.      Most of our clients understand why they
10    are sending us the backup or the supporting
11    documentation.
12          Q.      They understand why they are sending
13    supporting documentation?
14          A.      Yes.
15          Q.      Okay.  By the way, did Abar ever receive
16    or verify account statements directly from Salomon
17    SmithBarney and Morgan Stanley?
18          A.      If we had authority and we were listed
19    on the account, yes.
20          Q.      Do you ask for that authority?
21                  MR. AGNELLO:  Objection.
22          A.      No.
23          Q.      When would you get it and when would you
24    not get it?
25          A.      If the client doesn't want to go ahead
```

60

1  and send us statements every year because there is
2  some administrative work that has to be done, they
3  will ask is it okay if we ask the third party, the
4  investment company, to copy us on statements and in
5  that case, we will take it.
6       Q.    But one way or another, you get the
7  statements?
8       A.    Yes, again, for small plans.
9       Q.    Would this be a small plan?
10      A.    Yes.
11      Q.    Are we finished with this first batch?
12      A.    We went through the documents.
13      Q.    All right, let's go to the second batch.
14      A.    We are looking at Feit 0103, which says
15 1999 on the cover.  Feit 0104 shows my reconciliation
16 of the assets as of December 31, 1999.  Should I
17 continue?
18      Q.    Please.
19      A.    Feit 0105 shows the total assets which
20 consists of the pooled accounts and those with the
21 self-directed accounts.  Feit 01 --
22      Q.    Hang on a second.
23      A.    Yes.
24      Q.    Okay.
25      A.    Feit 0105 through Feit 0106 shows the

```
1                    C E R T I F I C A T E
2
3         I, GARY M. TALPINS, a Certified Court
4   Reporter of the State of New Jersey, do hereby
5   certify that prior to the commencement of the
6   examination, the witness was duly sworn by me to
7   testify the truth, the whole truth and nothing but
8   the truth.
9         I DO FURTHER CERTIFY that the foregoing is a
10  true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth, to the
13  best of my ability.
14        I DO FURTHER CERTIFY that I am neither a
15  relative nor employee nor attorney nor counsel of any
16  of the parties to this action, and that I am neither
17  a relative nor employee of such attorney or counsel,
18  and that I am not financially interested in the
19  action.
20
21
22                              _____
23
24                              Gary M. Talpins
25                              CCR No. XI-000561
```

Case 2:08-cv-01567-GEB -MCA   Document 58-14   Filed 09/17/10   Page 13 of 13 PageID: 1928

ROSENBERG & ASSOCIATES, INC.    (800) 662-6878
www.rosenbergandassociates.com