```
 1              SUPERIOR COURT OF NEW JERSEY
 2              CHANCERY DIVISION:ESSEX COUNTY
 3              DOCKET NO. ESX-C-117-08
 4  - - - - - - - - - - - - - - - - - - - -
 5  DIAGNOSTIC and CLINICAL CARDIOLOGY, P.A.,    :
 6            Plaintiff,                         :
 7    vs.                                        :
 8  MARIO A. CRISCITO, M.D., ABC COMPANY, JOHN   :
 9  DOES 1-10, and XYZ COMPANIES 1-10,           :
10            Defendants.                        :
11    and                                        :
12  CAPTION CONTINUED ...                        :
13
14
15
16            DEPOSITION OF: ANTHONY CASELLA, M.D.
17                 MONDAY, JUNE 22, 2009
18
19
20              ROSENBERG & ASSOCIATES, INC.
21           Certified Court Reporters & Videographers
22    425 Eagle Rock Ave., Suite 201      575 Madison Ave.
23    Roseland, NJ 07068                  New York, NY 10022
24      (973) 228-9100   1-800-662-6878     (212) 868-1936
25              www.rosenbergandassociates.com
```

```
1  MARIO A. CRISCITO, M.D.,
2               Third Party Plaintiff
3     vs.
4  DIAGNOSTIC and CLINICAL CARDIOLOGY, P.A.,
5  GARY J. ROGAL, M.D., ANTHONY J. CASELLA,
6  M.D., KEITH A. HAWTHORNE, M.D., DONALD G.
7  RUBENSTEIN, M.D., MARC ROELKE, M.D., SABINO
8  R. TORRE, M.D., FADI N. CHAABAN, M.D.,
9  CONSTANTINOS A. COSTEAS, M.D., KAUSHIK C.
10 MODI, M.D., BRUCE J. HAIK, M.D., MARK BROWN
11 and JOHN DOES 1-10,
12              Third Party Defendants.
13 - - - - - - - - - - - - - - - - - - - - -
14    Deposition of ANTHONY CASELLA, M.D., taken in
15 the above-entitled matter before WINIFRED A.
16 HANDEL, a Certified Court Reporter (License No.
17 XI00421) of the State of New Jersey, taken at the
18 offices of WITMAN STADTMAUER, P.A., 26 Columbia
19 Turnpike, Florham Park, New Jersey, on Monday, June
20 22, 2009, commencing at 10:10 a.m.
21
22
23
24
25
```

```
 1  A P P E A R A N C E S:
 2
 3  WITMAN STADTMAUER, P.A.
 4  26 Columbia Turnpike
 5  Florham Park, New Jersey 07932
 6  (973) 822-0220   scharme@wsmesq.com
 7  BY:   STEPHEN M. CHARME, ESQ.
 8  Attorneys for Plaintiff and Third Party
 9  Defendants
10
11  KERN, AUGUSTINE, CONROY & SCHOPPMANN, PC
12  1120 Route 22 East
13  Bridgewater, New Jersey 08807
14  (908) 704-8585
15  BY:   STEVEN I. KERN, ESQ.
16  Attorneys for Defendant and Third Party
17  Plaintiff
18
19
20
21
22
23
24
25
```

```
1                        I N D E X
2
3   WITNESS                  EXAMINATION BY          PAGE
4   ANTHONY CASELLA, M.D.    MR. KERN                  5
5
```

```
10                       E X H I B I T S
11  NUMBER                 DESCRIPTION                PAGE
12                   (No exhibits marked.)
```

```
 1              ANTHONY CASELLA, M.D.,
 2   375 Mount Pleasant Avenue, West Orange, New Jersey
 3   07052, having been first duly sworn, was examined
 4   and testified as follows:
 5
 6                   EXAMINATION
 7   BY MR. KERN:
 8          Q.      Dr. Casella, as you know, my name is
 9   Steven Kern.  I represent Dr. Criscito in an action
10   brought by Diagnostic and Clinical Cardiology,
11   which I'll refer to during this deposition as DCC,
12   against Dr. Criscito.  You have been deposed
13   before, correct?
14          A.      Yes.
15          Q.      In fact, I've deposed you before,
16   correct?
17          A.      Yes.
18          Q.      Let me repeat a couple of the
19   directions.  I'm going to ask you a series of
20   questions here today.  If at any time you don't
21   understand my question or believe it to be
22   ambiguous or confusing, please let me know.
23   Otherwise, the answer you give will be deemed to be
24   responsive to the question I ask you.  Do you
25   understand that?
```

1   A.   Yes.
2   Q.   I need you to answer verbally. Nods
3 of the head, shakes, things like that, can't be
4 taken down by the court reporter. Okay?
5   A.   I understand.
6   Q.   Any questions before we begin?
7   A.   No.
8   Q.   Is there any reason why you can't
9 give full and honest answers today?
10   A.   No.
11   Q.   Doctor, let's start by going through
12 your educational background beginning with medical
13 school, please. Where did you go to medical school?
14   A.   I went to medical school at New York
15 Medical College. I graduated in 1970. It's a four
16 year program. My degree was M.D. I then went to
17 Cornell New York hospital for medical internship
18 for one year and also residency in medicine for two
19 years. Following that, I spent two years in the
20 Public Health Service as my military, and that
21 finished in 1975, and at that time I went to
22 Columbia-Presbyterian for cardiology fellowship
23 from 1975 to 1977.
24   Q.   You are Board certified in cardiology?
25   A.   Yes.

```
 1        Q.      What did you do after graduating from
 2  your cardiology program?
 3        A.      I joined Dr. Criscito in practice in
 4  July of 1977.
 5        Q.      Where was he practicing?
 6        A.      West Orange, New Jersey.
 7        Q.      What was the name of his practice?
 8        A.      I'm not sure what the entity was when
 9  I began, but my first recollection is it was
10  Diagnostic and Clinical Cardiology.  He might have
11  had a different business name before I joined him.
12        Q.      But at the time you joined, as far as
13  you know, it was DCC.
14        A.      As far as I remember, yes.
15        Q.      Who is the owner of DCC?
16        A.      He was the owner.
17        Q.      What were your duties when you joined?
18        A.      I shared the call with him, and I
19  shared the work with him, clinical cardiology.
20        Q.      How long had Dr. Criscito been in
21  practice before you joined him?
22        A.      I believe he was in practice two
23  years.
24        Q.      Did you bring any patient base with
25  you?
```

```
 1        A.    No.
 2        Q.    When you began working there, whose
 3   patients did you see?
 4        A.    I saw patients that he had been
 5   seeing and patients referred by the doctors in the
 6   hospitals.
 7        Q.    Which hospitals?
 8        A.    At that time I believe it was just
 9   St. Barnabas and Clara Maass.
10        Q.    Before you started work there, did
11   you have any relationship with any of the referring
12   doctors?
13        A.    No.
14        Q.    When you began your employment, in
15   what capacity were you?  An employee?
16        A.    Yes.
17        Q.    What was your salary?
18        A.    $235,000.
19        Q.    Did your status as an employee
20   change over time?
21        A.    Yes.  I became a partner in 1980.
22        Q.    In 1980?
23        A.    Yes.
24        Q.    How did that happen?  What suddenly
25   made you a partner?
```

1  able to spend money in addition to their salaries.
2  That's part of the overhead, though.
3       Q.    I'm sorry.  Say that again?
4       A.    I'm saying the partners had expense
5  accounts.
6       Q.    Shareholders?
7       A.    They were able to spend money over
8  and above their salary, and that should be
9  reflected in the expenses -- overhead.
10      Q.    Was there a point in time when your
11 duties at DCC extended beyond just providing
12 clinical services?
13      A.    Yes.  When key employees left, I took
14 over the checkbook.  I did the accounting, and then
15 as time went on, I tracked all the expenses of the
16 doctors.  I managed -- I kept track of their
17 expense accounts.  I kept track of deductions from
18 their salaries.  I kept track of their outside
19 income.  I tried to keep track of all that stuff.
20 That was not -- the only thing that the accountants
21 actually did were -- they would audit my accounting
22 every three months, and they would prepare the
23 year-end tax forms.
24            They would ask me questions.  I would
25 answer their questions on the -- on my accounting

```
 1  during the year.  If a doctor spent too much from
 2  his expense account, I subtracted it from his
 3  salary.  I helped out with the pension fund as far
 4  as giving the numbers to the pension corporation
 5  each year, and there was a time I was doing --
 6  well, there was a time I was doing billing for some
 7  of the doctors, and there was a time when I was
 8  training the staff on billing procedures and
 9  collections.
10              Then I also did some work for the EKG
11  interpretation group at St. Barnabas, for which I
12  get a small salary each year.
13         Q.   How much do you get?
14         A.   Presently I get $10,000.
15         Q.   Per year?
16         A.   Yes.
17         Q.   How much time does that take you?
18         A.   It takes about four hours a month.
19         Q.   Tell me about how you began picking
20  up all these additional duties.  Give me some idea
21  of the time period, if you would.
22              MR. CHARME:  Object to the form.
23         A.   Well, when I joined Criscito in 1977,
24  he had two key employees working for him, Ms.
25  Bulkowski and Ms. Hayes.  I think Bulkowski did all
```

1  of the checkbook work.  She did all the bank
2  deposits.  She kept track of all the accounts
3  receivable and payments, accounts payable, payable
4  and receivable.  She did all the accounting in the
5  practice.  Barbara Hayes, she had -- she did most
6  of the clinical work.  I'm not sure who did the
7  billing actually, but they were both very
8  knowledgeable in running the office.
9            They both left in the Eighties, and
10 when they left, there was a void because Criscito
11 was not good -- he was not good at keeping accurate
12 numbers.  He was sloppy.  He couldn't -- he really
13 couldn't track expenses, categorize expenses for
14 the accountants.  He really had no interest in
15 doing that.  So, I was given the task of taking
16 care of the checkbook and doing the accounting.
17           Then as the years went on, I was
18 interested in billing and collections and
19 optimizing the income of the practice.  So, I
20 helped take care of that, and I helped make sure
21 the doctors billed correctly.  The doctors had very
22 little interest in billing, and because -- as the
23 practice grew larger and the expense accounts
24 became more complicated, I tried to make sure that
25 everybody was treated equally.  So, I managed that

1  myself.
2        I also opened the mail in the office.
3  I made a lot of the deposits to the bank for a long
4  period of time, and I would keep -- by looking at
5  the statements that came in the mail, I would keep
6  track of what we were being paid.  Whenever I had
7  questions, I would, you know, bring it up to the
8  staff.
9        I also wrote the contracts for most
10 of the doctors.  At practice meetings, we would
11 discuss what we wanted to offer someone, and I was
12 delegated to write the contracts.  They weren't
13 done by attorneys.  That's most of the stuff that I
14 was doing up until 2005.
15      Q.   I take it you did this with the
16 approval of Dr. Criscito?
17      A.   He was aware of what I was doing,
18 yes.
19      Q.   Did he ever object to you doing it?
20      A.   No.  The only thing he didn't want me
21 to touch was the pension fund.
22      Q.   Just so we're clear, you are the one
23 who decided what contributions would go into the
24 pension fund?
25      A.   I didn't decide.  I reported the

1  salaries of all the employees and the demographics
2  to APC, and they decided how much each person got
3  paid based on the document, the plan document.
4      Q.    Who prepared that plan document?
5      A.    APC created -- I'm not sure of the
6  initial one in 1976, but everyone after that was
7  created by APC.
8      Q.    Who interacted with APC on those plan
9  documents?
10     A.    Criscito.
11     Q.    You had nothing to do with it?
12     A.    No. Actually, let me take that back.
13 The only thing that I had something to do with was
14 the group wanted to change from a money -- from a
15 money purchase plan to a profit sharing plan in
16 2005, and they asked me to get numbers from APC to
17 see whether that would be beneficial for the group,
18 numbers meaning percentage that would go to
19 employees versus the doctors.
20     Q.    With a goal to maximize the
21 contributions of the doctors and minimize the
22 contributions of the employees?
23     A.    Yes.
24     Q.    Did you do it?
25     A.    Yes.

```
 1        Q.    Beginning in the Eighties, who wrote
 2  the checks for DCC?
 3        A.    In the early Eighties, they were
 4  written by Ms. Bulkowski.
 5        Q.    When she left?
 6        A.    When she left, Criscito and myself.
 7        Q.    What percentage of checks did you
 8  write and what percentage did he write?
 9        A.    That long ago I can't tell you.  He
10  was only in the office one day a week, and the
11  checkbook was in that office.  I was there more
12  often.  I would -- I'd rather not guess.  I wrote
13  the majority of the checks.
14        Q.    Would it be fair to say that for the
15  most part you were responsible for handling the
16  financial aspects of the practice?
17              MR. CHARME:  Object to the form.
18        A.    Yes.
19        Q.    Were there ever any disagreements
20  between you and Dr. Criscito, let's say, through
21  2005 concerning your handling of the finances?
22        A.    Well, we had some arguments about
23  some of his expenses that really shouldn't have
24  been taken on the business, and he did not agree
25  that they shouldn't be taken.  So, he just ignored
```

```
 1              C E R T I F I C A T E
 2
 3        I, WINIFRED A. HANDEL, a Certified Court
 4   Reporter of the State of New Jersey, do hereby
 5   certify that prior to the commencement of the
 6   examination, the witness was duly sworn to
 7   testify to the truth, the whole truth and
 8   nothing but the truth.
 9        I DO FURTHER CERTIFY that the foregoing
10   is a true and accurate transcript of the
11   testimony as taken stenographically by and
12   before me at the time, place and on the date
13   hereinbefore set forth, to the best of my
14   ability.
15        I DO FURTHER CERTIFY that I am neither a
16   relative nor employee nor attorney nor counsel
17   of any of the parties to the action, and that
18   I am neither a relative nor employee of such
19   attorney or counsel, and that I am not
20   financially interested in the action.
21
22   The foregoing certification of this transcript
     does not apply to any reproduction of the same
23   in any respect unless under the direct control
     and/or direction of the certifying reporter.
24
            _____
25          WINIFRED A. HANDEL, CCR NO. XI00421
```