**KERN AUGUSTINE**
**CONROY & SCHOPPMANN, P.C.**
1120 Route 22 East
Bridgewater, New Jersey 08807
(908) 704-8585
Attorneys for Defendant
RC-8060

| | |
|---|---|
| DR. FADI CHAABAN; DR. SABINO R. TORRE; DR. CONSTANTINOS A. COSTEAS and DR. ANTHONY J. CASELLA, as Trustees of Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan, <br><br> Plaintiffs, <br><br> v. <br><br> DR. MARIO A. CRISCITO, <br><br> Defendant. | ) UNITED STATES DISTRICT COURT <br> ) DISTRICT OF NEW JERSEY <br> ) <br> )           Civil Action <br> ) <br> ) Case No. 2:08-cv-1567 (GEB - MCA) <br> ) <br> ) RETURN DATE: To be Set by Court <br> ) <br> ) <br> ) DEFENDANT'S STATEMENT OF <br> ) UNDISPUTED MATERIAL FACTS, <br> ) PURSUANT TO L. CIV. R. 56.1(a) <br> ) <br> ) |

The undersigned, counsel for the defendant, Mario A. Criscito, M.D., hereby submits the following statement of undisputed material facts pursuant to L. Civ. R. 56.1(a), in support of defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56.

> KERN AUGUSTINE
> CONROY & SCHOPPMANN, P.C.
> Attorneys for Defendant
>
>
> By: /s/ Robert J. Conroy
>         Robert J. Conroy

Dated: Bridgewater, New Jersey
       September 17, 2010

Under the standards applicable pursuant to Fed. R. Civ. P. 56 to motions for summary judgment, all material facts as to which there is a genuine dispute must be construed in favor of the non-moving party, in this case, the plaintiffs. Therefore, in this statement of undisputed material facts pursuant to L. Civ. R. 56.1(a), the defendants states the following undisputed material facts construed most favorably to the plaintiffs. The defendants admit these facts for the purposes of this summary judgment motion only, and do not concede any facts stated herein in the event this motion is denied and the matter goes to trial. All exhibits referred to in this statement are appended to the accompanying Declaration of Robert J. Conroy ("Conroy Dec.").

1) Diagnostic and Clinical Cardiology, P.A. ("DCC") was established in 1976 by the Defendant, Mario A. Criscito, M.D. ("Dr. Criscito"). *See* Complaint, ¶16.

2) Dr. Criscito is a cardiologist who was employed by DCC from in or about April, 1976 until August 2, 2007. *See* Complaint, ¶12.

3) In or about 1976, the "Diagnostic and Clinical Cardiology, P.A. Money Purchase Pension Plan" (the "Plan") was created. *See* Complaint, ¶16.

4) 1 In or about January 2005, for tax reasons unrelated to this litigation, DCC converted the Plan into a profit sharing plan named "Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan." As used herein, the term Plan refers to both the original Money Purchase Pension Plan and the Profit Sharing Plan into which it was converted. *See* Complaint, ¶17.

5) The plaintiffs are four cardiologists ("Plaintiffs") who are employed by DCC. *See* Complaint, ¶¶8–11.

6) Dr. Criscito was the sole trustee of the Plan from 1976 until he was removed as trustee on July 2, 2007. *See* Complaint, ¶2.

7)      Plaintiffs Chaaban, Torre and Costeas have been trustees of the Plan since July 11, 2007. *See* Complaint, ¶¶8-10.

8)      The Plaintiff, Anthony Casella, M.D. ("Dr. Casella"), has been a trustee of the Plan since November 15, 2007.  *See* Complaint, ¶11.

9)      Dr. Casella is also the longest serving physician now with DCC, having joined the practice some two years after it was founded, and became a partner in 1980. *See* Exhibit "N," Casella Dep., T6/22/09; 6:14 – 8:21.

10)     After certain key employees left the practice in the 1980's, Dr. Casella took over accounting functions for the practice, such as controlling the checkbook, tracking the doctor's expenses, salary deductions and outside income, as well as looking after billings and collections.  *See* Exhibit "N," Casella Dep., T6/22/09; 42:10 – 43:9; 43:23 – 45:1; 47:1 - 18.

11)     Dr. Casella agreed that, "for the most part, [he] was responsible for handling the financial aspects of the practice."  *See* Exhibit "N," Casella Dep., T6/22/09; 47:14 – 18.

12)     Dr. Casella also reported salary and demographic information to the Plan's third-party administrator, American Pension Corporation ("APC"), and was involved with APC in 2005, when the Plan was converted from a money purchase pension plan into a profit sharing plan. *See* Exhibit "N," Casella Dep., T6/22/09; 45:22 – 46:25.

13)     Plaintiffs bring the complaint in this action as Trustees of the Plan.  *See* Complaint.

14)     The Plaintiffs' complaint sets forth causes of action allegedly arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.  *See* Complaint.

15)     The *gravamen* of the Plaintiff's complaint is based upon conduct on the part of Dr. Criscito

alleged to have taken place "in early January 2000" when Dr. Criscito was the Plan's trustee. *See* Complaint, ¶3.

16)    Specifically, Plaintiffs allege that, as of December 31, 1999, the Plan included two comingled accounts – one maintained at Dean Witter Morgan Stanley (the "Morgan Stanley Account"), and the other maintained at Salomon Smith Barney (the "Smith Barney Account") – in which funds were held for the benefit of Dr. Criscito and at least fourteen other employees. *See* Complaint, ¶¶20 - 36.

17)    Plaintiffs further allege that on or about January 13, 2000, (i) Dr. Criscito misrepresented to the Plan's third party administrator that the values of the Morgan Stanley and Smith Barney accounts as of December 31, 1999, were approximately $4,000,000, *see* Complaint, ¶¶25 – 27, and $800,000, *see* Complaint, ¶35, respectively, when in fact they were approximately $13,000,000 and $4,000,000, *id.*, and (ii) arranged for the distribution of plan assets from the comingled accounts to individually directed accounts of participants other than Dr. Criscito based on the lower numbers provided to the third party administrator, "drastically shortchanging the participants [other than Dr. Criscito] and keeping the difference for his [Dr. Criscito's] personal account balance in the Plan. *See* Complaint, ¶¶3-5.

18)    As of December 31, 1999, the value of the assets that remained in the Smith Barney account was $3,924,549.92, *see* Exhibit "E."

19)    Plaintiffs acknowledge that "no portion of the Smith Barney account was ever distributed to any Plan participant . . .", but wrongly allege that Dr. Criscito "had the balance in that account transferred to his personal IRA account in or about September 2007." *See* Complaint, ¶36.

20)    Plaintiff, Dr. Casella, testified that Dr. Criscito *attempted* to transfer the funds in this account, but that the Plan "recouped" the money.  *See* Exhibit "F," Casella dep., T5/31/09; 83:17 – 84:25.

21)    Whatever Dr. Casella may believe to have occurred in 2007, the evidence conclusively demonstrates that no funds were removed from the Smith Barney account, and the assets that were in the account on December 31, 1999 remain there until this day.  *See* Exhibit "F," Casella dep., T5/31/09; 84:5 – 7 ("Q.  So the money still stays in the account?  A.  Yes.").

22)    Furthermore, the October 1 – October 31, 2007 Smith Barney statement produced in discovery shows that nothing was removed from the Smith Barney account in September, 2007.  *See* Exhibit "G."

23)    The plaintiffs' expert, Scott M. Feit, CPC, CPA, QPA, OKA, of Abar Pension Services, Inc. ("Mr. Feit"), concluded in his expert report that the interest of the Plan participants in the comingled accounts, as of December 31, 1999, exceeded the amount that was distributed to their individual accounts by $1,681,572.65.  *See* Exhibit A.

24)    However, at that time, assets valued at $3,924,549.92 remained in the Smith Barney account, undistributed.  *See* Exhibit "E."

25)     Mr. Warnock, Vice President of the Plan's third-party administrator, APC, testified that it was permissible for a participant in the Plan to have funds in both a segregated account and a commingled account. *See* Exhibit "H," Warnock dep., T7/15/09; 197:3 – 9.

26)    Plaintiffs allege in their complaint that "it was not until after defendant's removal as the sole trustee in July 2007, that the current trustees of the Plan had access to information and documents that disclosed defendant's massive fraud and wrongdoing . . ." *See* Complaint,

¶6.

27) However, in discovery, Mr. Warnock admitted that APC was in possession of brokerage account statements from early 2000 which revealed the disparity between the December 31, 1999 values that had been reported by Dr. Criscito on January 13, 2000, and the actual value of the Plan accounts.  *See* Exhibit "B," Warnock Dep., T6/19/09; 157:6 - 163:11.

28) The plaintiffs' expert, Scott M. Feit, CPC, CPA, QPA, OKA, of Abar Pension Services, Inc. ("Mr. Feit"), confirmed that the failure of Warnock and APC to verify the data submitted by Dr. Criscito was a violation of the standards of practice required of a Third Party Administrator. *See* Exhibit "J" Feit Dep., T7/21/10; 39:14 – 23.

29) The plaintiffs' expert, Mr. Feit, testified that the "standard within the industry" requires third party administrators, such as APC, to obtain hard copies of statements supporting the numbers that trustees put down on a form for year end valuations.  *See* Exhibit "M," Feit Dep., T7/21/10; 56:19 – 57:19.

30) Standards within the industry require that the amounts used to establish year end valuations require verification by supporting documentation, not just the word of the trustee who is supplying the information. *See* Exhibit "M," Feit Dep., T7/21/10; 57:24 – 58:25

31) It is the responsibility of a third party administrator to let the plan administrator know that there is a discrepancy and that participants are due additional amounts to be transferred into their self-directed accounts, at the time the third party administrator had received bank statements indicating a discrepancy between the amount which had been reported by the trustee and the amount that actually existed at the bank.  *See* Exhibit "M," Feit Dep., T7/21/10; 39:14 – 40:1.

32) Mr. Warnock admitted that APC received statements directly from Morgan Stanley as early as March of 2000 which demonstrated a discrepancy with the numbers reported by Dr. Criscito, but did not realize these documents were in its files. *See* Exhibit "B," Warnock Dep., T6/19/09; 157:6 – 12.

33) Mr. Warnock agreed that APC would have acted to resolve the discrepancy between the numbers provided in Dr. Criscito's January 13, 2000 facsimile transmission and the brokerage statements, including bringing the issue to Dr. Casella's attention if Dr. Criscito failed to provide an adequate explanation. *See* Exhibit "B," Warnock Dep., T6/19/09; 161:24 – 163:11.

34) Mr. Warnock has admitted that APC, the Plan's third party administrator, charged with the responsibility to independently verify account balances, and to determine distributions based upon those verified account balances, was in possession of brokerage account statements from early 2000 which, had they been consulted, would have, no later than October of 2001, revealed discrepancies in the valuation of the Plan account which would have prevented the events of which the plaintiffs now complain. *See* Exhibit "B," Warnock Dep., T6/19/09; 157:6 - 163:11.

35) By Mr. Warnock's own admission, the latest date upon which APC should have been aware of the true value of the Plan assets was October of 2001, *see* Exhibit "B," Warnock Dep., T6/19/09; 163:2 – 11.