Exhibit A

```
                                                    1
           UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
           CIVIL ACTION CASE NO. 2:08-CV-1567
---------------------------------------:
DR. FADI CHAABAN; DR. SABINO R. TORRE, DR. :
CONSTANTINOS A. COSTEAS and DR. ANTHONY J. :
CASELLA, as Trustee of Diagnostic & Clinical:
Cardiology, P.A. Profit Sharing Plan,       :
                                            :
              Plaintiffs,                   :
                                            :
         vs.                                :
                                            :
DR. MARIO A. CRISCITO,                      :
                                            :
              Defendant.                    :
---------------------------------------:
            Tuesday, June 16, 2009

    Deposition of BRIAN WARNOCK, VOLUME I, before
Nancy A. Miani, a Certified Court Reporter, License
No. XI00814, and a Notary Public of the State of New
Jersey at the offices of WITMAN, STADTMAUER, ESQS, 26
Columbia Turnpike, Florham Park, New Jersey, on
Tuesday, June 16, 2009, at 10 a.m.




               MIANI COURT REPORTING
              CERTIFIED COURT REPORTERS
                 1741 DANIEL COURT
                  WALL, NJ  07719
                   (732) 681-4776
```

---

Page 2

APPEARANCES:

WITMAN, STADTMAUER, ESQS.
26 Columbia Turnpike
Florham Park, NJ 07932
By: STEPHEN M. CHARME, ESQ.
Attorneys for the Plaintiffs

KERN, AUGUSTINE, CONROY & SCHOPPMANN, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
BY: STEVEN KERN, ESQ.
AND CHARLES H. NEWMAN, ESQ.
Attorneys for the Defendant

ALSO PRESENT:

Anthony Casella, M.D.

---

Page 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRIAN WARNOCK | | | | |
| BY MR. CHARME | 6 | | | |
| BY MR. KERN | | 114 | | |

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Warnock-1 | Loan Amortization Schedule, Four Pages | 28 |
| Warnock-2 | Nine Page Document from American Pension Corporation Entitled "Money Purchase Retirement Plan" | 30 |
| Warnock-3 | Seven Pages of Handrwritten Notes | 33 |
| Warnock-4 | Three Pages of Handwritten Notes | 39 |
| Warnock-5 | Two Pages of Handwritten Notes | 45 |
| Warnock-6 | One-Page Handwritten Letter with Attached Typewritten Letter to Dr. Criscito dated 1/7/91 from Brian Warnock | 50 |
| Warnock-7 | Form 5500 for 1999, 18 Pages | 54 |
| Warnock-8 | Form 5500 for 2000, 12 Pages | 56 |
| Warnock-9 | One Pages of Handwritten Notes With Attached Three Pages of Typewritten Notes | 57 |
| Warnock-10 | Two Pages of Typewritten Notes | 63 |
| Warnock-11 | Two Pages Reconciliation of Trust Assets for 1999 | 69 |

---

Page 4

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Warnock-12 | Reconciliation of Trust Assets for 2005, One Page | 71 |
| Warnock-13 | Form 1096 for 2005, Two Pages | 75 |
| Warnock-14 | Form 5498 for 2006, One Page | 76 |
| Warnock-15 | Copy of Savings Withdrawal Slip, One Page | 76 |
| Warnock-16 | Seven Pages of Handwritten Notes | 79 |
| Warnock-17 | Memo from Brian Warnock Dated 9/14/07 with Two Page Attachment | 90 |
| Warnock-18 | Two-Page Letter to Anthony Casella, M.D., from Brian Warnock dated August 28, 2007 | 101 |
| Warnock-19 | One-Page E-mail from Marysue McCarthy dated 7/28/06 | 104 |
| Warnock-20 | Two-Page Letter to Joy M. Mercer, Esq. From Brian Warnock dated 11/13/07 | 107 |
| Warnock-21 | Three-Page Letter to Joy M. Mercer, Esq., from Brian Warnock dated 12/6/07 | 108 |

5

LITIGATION SUPPORT

DIRECTION NOT TO ANSWER
    (None)

MOTION TO STRIKE
    (None)

DOCUMENT REQUEST
    (None)

EXHIBIT ANALYSIS
    Original Exhibits Attached to Original
    Transcript.

    Copies of All Exhibits attached to
    All Transcripts.

6

BRIAN WARNOCK,
American Pension Corporation, 1375 Plainfield Avenue,
Watchung, New Jersey, sworn.
DIRECT EXAMINATION BY MR. CHARME:
    Q.    Good morning, Mr. Warnock. My name is Stephen Charme. I represent the plaintiffs in the lawsuit in which you were subpoenaed.
        Are you represented by counsel today?
    A.    No.
    Q.    Okay. Are you aware that you have a right to be represented by counsel?
    A.    Yeah.
    Q.    You've chosen --
    A.    I didn't --
    Q.    So you've chosen not to be represented by counsel. Is that correct?
    A.    That's correct.
    Q.    Okay. Have you ever had your deposition taken before?
    A.    Yes.
    Q.    How recently was the last time?
    A.    Maybe 2 or 3 years ago.
    Q.    What kind of case?
    A.    About 2 or 3 years ago. It was a case involving work.

7

    Q.    Okay. Let me just give you some instructions then.
    A.    Sure.
    Q.    I'm going to be asking you questions, your answers are going to be recorded. If I ask you something and you don't understand the question, please tell me and I will do my best to clarify it for you. Do you understand that?
    A.    Uh-hum.
    Q.    If you understand the question, I would appreciate if you would give me a complete and honest answer to it. Do you understand that?
    A.    Yes.
    Q.    If at some point you feel you need to take a break, please tell me and I will try to accommodate you. Do you understand that?
    A.    Yes.
    Q.    I have to ask you the last question.
    Are you taking any kind of medicine or do you have any kind of physical condition that would stop you from understanding my questions and giving me complete and honest answers?
    A.    No.
    Q.    Okay. Could you tell me your educational background, if any, beyond high school.

8

    A.    I have a degree in sociology from Montclair State College.
    Q.    Is that a BA?
    A.    I guess a Bachelor of Science, actually. Social sciences.
    Q.    And what year did you get that?
    A.    1976.
    Q.    Okay. Could you state your date of birth, please.
    A.    April 6th, 1954.
    Q.    Besides the bachelor's degree from Montclair -- was it Montclair State?
    A.    Yes.
    Q.    Have you taken any other advanced courses?
    A.    No.
    Q.    Would you tell me your employment background starting when you graduated from college, please.
    A.    I worked for Mutual Benefit Life Insurance Company in their Pension Department for two and a half years. Then I worked in Bankers National Life Insurance Company.
    Q.    So it's two and a half years, say, to what, 1979?

### 25

1 been more involved with just the calculating the
2 contribution part. I don't know that I ever did the
3 5500. I may have. I don't know -- I don't recall
4 doing it. Typically someone else would have been
5 assigned to doing that.
6     Q.    Do you know who Dr. Mario Criscito is?
7     A.    Yes, I do.
8     Q.    When did you first learn of Dr. Criscito?
9     A.    It would be early on in my appointment
10 with APC.
11     Q.    Okay. Did you ever personally meet him?
12     A.    I don't recall ever meeting him in
13 person, no. I spoke to him on the phone.
14     Q.    Okay. When you spoke to him on the
15 phone, do you recall what topics you discussed?
16     A.    Could have been a termination claim,
17 could be someone was leaving, they wanted us to send
18 him the forms and calculate the -- tell him how much
19 money that person would receive out of the plan. He
20 could have called me. I remember sometimes he would
21 call and say, one time he called and asked me for a
22 copy of last year's report that we had sent the prior
23 year. The contributions, I don't think he was
24 involved in that.
25     Q.    Let me ask you a different question.

### 26

1 Were you aware whether Dr. Criscito was a
2 trustee of the DCC plan?
3     A.    Yes. Yes.
4     Q.    Were you aware if there were any other
5 trustees besides him?
6     A.    I would have to look at the document. I
7 believe he was the only trustee.
8     Q.    Okay. Now, you told me before that when
9 you worked, I think at Mutual Benefit and you did Form
10 5500's, that you would get information from the owners
11 and the trustees to prepare those forms. Is that
12 correct?
13     A.    Correct.
14     Q.    Did you get information from Dr.
15 Criscito, you or someone else at APC that you know in
16 order to prepare the Form 5500 for DCC?
17     A.    Yes.
18     Q.    You got that information from Dr.
19 Criscito as opposed to Dr. Casella. Is that correct?
20     A.    That is correct.
21     Q.    Okay.
22     A.    There was a -- let me clarify. Because
23 the information came from a few different sources.
24 With the individual accounts, there were about five
25 doctors with individual accounts, they would either

### 27

1 send it personally, they might have given it to Dr.
2 Casella to send to me, they might have given it to Dr.
3 Criscito to send to me, they might have sent it
4 themselves, but it was their own separate account so
5 that information could have come from whoever it was
6 convenient for them to do. They might have mailed it
7 to me, they might have given it to Dr. Criscito, they
8 may have given it to Dr. Casella to send on those
9 separate accounts.
10     The statements that came for the, I'll
11 call it the rank and file employees for Morgan
12 Stanley, I believe Morgan Stanley sent them directly
13 to us. Any information regarding the account that
14 Dr. Criscito was in came only from Dr. Criscito.
15     Q.    Okay. You mentioned at some point in
16 time there was something called a commingled account.
17 Are you familiar with that term --
18     A.    Yes.
19     Q.    -- as it applies to DCC?
20     A.    Yes.
21     Q.    And as far as you knew, who was in the
22 commingled account? I don't mean the individual
23 names, I mean generally, who comprised it?
24     A.    It was Mario Criscito, all of the rank
25 and file, clerical, whatever, and generally, the -- I

### 28

1 think the newer doctors were in the plan for the first
2 couple of years.
3     Q.    And am I correct that to get the
4 information for the Form 5500 as to the valuation of
5 the commingled account in which Dr. Criscito and other
6 DCC employees were, you got that from Dr. Criscito?
7     A.    Yes.
8     Q.    And you got that from no one else?
9     A.    Only from Dr. Criscito.
10     Q.    Okay. Are you aware that at some point,
11 Dr. Criscito took a loan from the plan?
12     A.    I am aware of it because Dr. Casella told
13 me that in the last year or something. I was not --
14     Q.    Okay. I'm going --
15     A.    We did a statement then, certainly we
16 were aware of it.
17     Q.    I'll show it to you. Give me a second.
18     MR. CHARME: I'm going to have the
19 reporter mark as Warnock Exhibit 1 a document that is
20 entitled "Loan Amortization Schedule."
21     (Exhibit Warnock-1 is received and marked
22 by the Reporter for Identification.)
23     Q.    Mr. Warnock, take a look at that and tell
24 me if you've seen that before.
25     A.    This would have been prepared by our

29

1  office. I'm sure I did see it at some point in time.
2     Q.   That was something prepared by APC?
3     A.   By APC, yes.
4     Q.   Okay. According to this it says
5  "initial amount borrowed, $250,000." Do you see that?
6     A.   Yes.
7     Q.   Were you aware whether there was any
8  limitation in the plan documents as to the amount of
9  money that could be borrowed?
10    A.   Back in 1982, the limit -- you would have
11 been able to take a very high loan. I don't recall
12 exactly what the law was at the time, but he would
13 have needed enough in his account to cover that. Now
14 it's a $50,000 limit. But that changed several years
15 later.
16    Q.   Did you recall reviewing the plan
17 documents before this loan was taken out by Dr.
18 Criscito to see if he could borrow this?
19    A.   I don't specifically remember that. That
20 would have been our normal practice.
21    Q.   You don't remember doing that?
22    A.   Do I remember doing this? No.
23    Q.   Okay. I'm going to show you a series of
24 documents that I'm going to mark as Warnock-2, have
25 the reporter mark it before I give it to you.

30

1        (Exhibit Warnock-2 is received and marked
2  by the Reporter for Identification.)
3     Q.   What I'd like to do to save time is have
4  you flip through these pages, and after you're done
5  looking through, just tell me whether these were all
6  prepared by American Pension Corporation. I believe
7  they were because the name is at the bottom of each
8  page, but I need you to confirm it.
9     A.   Not this. This.
10    Q.   I'm sorry. That's not part of it.
11    A.   Yes. They were prepared by American
12 Pension Corporation.
13    Q.   Just so the record is clear, because
14 inadvertently some other pages were handed to you.
15 The first page of this document is Bate stamped 25387
16 at the bottom, and the last page is Bate stamped
17 25533. I just want to make sure we're all looking at
18 the same thing.
19    A.   It's difficult for me to read the 237.
20    Q.   Yes. It is.
21    A.   It looks like it is. The first --
22    Q.   Let me say it. The first page says
23 participant loan, and underneath that it says loan
24 outstanding as of April 1, 1983.
25    A.   Correct.

31

1     Q.   And the very last page says balance
2  sheet, March 31, 1991.
3     A.   Yes.
4     Q.   Okay.
5        MR. KERN: Steve, these are not in Bate
6  stamped order.
7        MR. CHARME: That's correct, they're not.
8        MR. KERN: So why don't we read off the
9  Bate stamps so we know what we're talking about.
10       MR. CHARME: Okay. The first page is
11 25387, second is 25405. The next is 25388. The next
12 is 25436. The next is 25404. The next is 25482. The
13 next is 25495. The next is 25512, and the last is
14 25533.
15    Q.   Okay. If you look through these sheets,
16 if you look at the next to the last page, it says
17 balance sheet March 31, 1990, and under assets, it
18 lists participant loan, and next to that it says
19 65,439.02. Do you see that?
20    A.   Yes.
21    Q.   If you turn to the next page --
22       MR. KERN: Where are you looking? I got
23 it.
24    Q.   If you turn to the next page, which says
25 balance sheet, March 31, 1991, there is no longer a

32

1  reference to the participant loan. Does that indicate
2  that it was paid?
3     A.   That would indicate it was paid.
4     Q.   That's the reason it doesn't appear?
5     A.   Yes.
6     Q.   Okay. Do you know who prepared these
7  documents?
8     A.   Not without looking at the files, no.
9     Q.   Do you recall if you did?
10    A.   I may have. I don't recall, no.
11    Q.   Okay.
12    A.   I should just add to that, most likely I
13 did not prepare them.
14    Q.   Do you have any idea who in the office
15 did?
16    A.   In the 1990's, most likely Dominique.
17       MR. CHARME: Okay. I'm going to ask
18 the reporter to mark another series of documents.
19    A.   Let me change that answer, because I'm
20 looking, it was 1991, maybe not Dominique. In the
21 later 1990's, in the last ten years, it would have
22 been Dominique. Then it could have been anyone. So
23 I could not say who did it in 1991.
24    Q.   Okay. Is there --
25       MR. KERN: I assume it was somebody at

## Page 33

1  APC, though?
2       THE WITNESS:  Oh, yeah.
3       A.    If I had access to all the files, I would
4  be able to tell you.
5       Q.    What would you have to look at to tell me
6  who prepared those?
7       A.    I would probably have backup sheets that
8  I could recognize the handwriting of who did it.
9       MR. CHARME:  Okay.  I'm going to show
10  you what I'm asking the reporter to mark as Warnock-3,
11  which is a series of sheets.  They're not in Bate
12  stamped order.
13       Steve, do you want me to read the Bate
14  stamps into the record?
15       MR. KERN:  Wouldn't be a bad idea.
16       MR. CHARME:  Okay.
17       (Warnock-3 is received and marked by the
18  Reporter for Identification.)
19       MR. CHARME:  Just for the record, the
20  first page is Bate stamped 25430, the second is 25432.
21  The third is 25473.  The next is 25475.  The next is
22  25493.  The next is 25527.  The next is 25550.
23       Q.    Do you have all those pages, Mr. Warnock?
24       A.    The last page I don't have.
25       MR. KERN:  25550?

## Page 34

1       Q.    You got it?
2       A.    Yes.
3       Q.    Once again, in an effort to save time, I
4  would like you to look through these, and if any of
5  the handwriting is yours, please tell me and then
6  we'll go through which handwriting is yours.
7       A.    On the last page.
8       Q.    The very last page, which is 25550?
9       A.    Yes.
10       Q.    What handwriting is yours?
11       A.    Where it says "loan all paid."
12       Q.    That's in the middle of the page?
13       A.    Right.
14       Q.    That is your handwriting?
15       A.    That is my handwriting.  And then where
16  it says "deposited before," looks like "March 31st,"
17  that's my handwriting, and the parentheses on the
18  sides, "30 plus 30 plus 5 for," and that would be
19  referring to the $65,000.
20       Q.    Do you know whose handwriting it is at
21  the bottom right where it says "loan has been paid
22  off"?
23       A.    No.
24       Q.    Okay.  Aside from what you identified on
25  the last page, none of the other handwriting on these

## Page 35

1  documents is yours?
2       A.    It looks like the very first page, where
3  it says "off miscellaneous 49.12," that looks like
4  mine.  And the "balance in liquid asset fund," where I
5  have 36,981 crossed out and that's my writing
6  underneath, 38,929.09.
7       Q.    What about on the next page?
8       A.    No.  None of that's mine.
9       Q.    And the next page, which is 25473?
10       A.    No.
11       Q.    And the next page, which is 25475?
12       A.    No.
13       Q.    The next page, which is 25493?
14       A.    No.
15       Q.    And the next page, which is 25527?
16       A.    No.
17       Q.    We've already discussed the last page.
18  Do you know, do you recognize any of the handwriting
19  that you can identify as belonging to someone else?
20       A.    Well, I believe the majority is Mario
21  Criscito's.
22       Q.    Let's start --
23       A.    They were prepared by him.
24       Q.    Let's start with the first page, which is
25  25430.  Aside from the little bit of handwriting you

## Page 36

1  identified as yours, you believe the other handwriting
2  is that of Dr. Criscito?
3       A.    Yes.
4       Q.    You're familiar with his handwriting?
5       A.    Well, I've seen enough of these, they're
6  all coming from him, so --
7       Q.    Turn to the second page.  There is all
8  kinds of writing, and not all of it, unfortunately, is
9  legible.  Do you see any writing on this page that you
10  believe is Dr. Criscito's?
11       A.    I would say all the ones in the dark.
12       Q.    All the ones that's in dark?
13       A.    It looks like his.  The one at the bottom
14  you can hardly see, it's hard to make out so I don't
15  know.
16       Q.    So if you see in the middle of the page
17  it says "Israeli bond, $25,000," do you believe it's
18  Dr. Criscito's handwriting as you move up the page?
19  In other words, the handwriting above where it says
20  "Israel bond, $25,000"?
21       A.    I believe this all came from Dr.
22  Criscito.
23       Q.    Okay.  The next page, 25473, do you
24  believe that's Dr. Criscito's handwriting?
25       A.    I believe it is.

97

1  was basically a note to the attorneys who were copying
2  the entire file. It was put on, you know, put on the
3  top. That was a sticky that was stuck on the top. It
4  was Joy Mercer, I think, who asked for all the
5  accounts, so we got all the accounts and I put a
6  sticky note on the top telling her what that is.
7      Q.   Turn to the next page, which is Bate
8  stamped 11954. Is that your handwriting?
9      A.   Yes, I think -- is that the same one?
10 They do not tie in. Yes, that is my handwriting.
11     Q.   Am I correct, that's not the same as the
12 note on the other page?
13     A.   It's not the exact note, but it seems to
14 mean the same thing.
15     Q.   Could you read it.
16     A.   "These are statements that Dr. Casella
17 located in file. APC was unaware of them. Use info
18 provided by Dr. Criscito -- used info provided by Dr.
19 Criscito, that do not tie into Mario's numbers. Used
20 to separate accounts as of 12/31/99 valuation."
21     Q.   Do you know who you wrote that note for?
22     A.   I believe that was also put in the file,
23 it was a note for the attorneys. It's on a sticky, a
24 little sticky on the top.
25     Q.   I want to show you again what we marked

98

1  as Warnock-7, which is the Form 5500 for 1999.
2      A.   Okay.
3      Q.   The information that's on --
4          MR. KERN: What number is that again?
5  I'm sorry. Warnock-7.
6      Q.   The information --
7          MR. KERN: Can you hang on for one
8  second?
9          MR. CHARME: Sure.
10         MR. KERN: Okay.
11     Q.   The information that's on Schedule I of
12 that form is information that you got based on the fax
13 that was sent to you as Warnock-10. Is that correct?
14     A.   This is -- well, that would have been
15 part of it. .
16     Q.   That would have been part of it.
17     A.   It includes the other accounts.
18     Q.   Right, it includes the other accounts,
19 but Schedule I includes the information that you
20 received from Dr. Criscito on Warnock-10, correct?
21     A.   Yes.
22     Q.   So if the information on Warnock-10 is
23 incorrect, that means the numbers on the Form 5500
24 Schedule I are incorrect also?
25     A.   That is correct.

99

1      Q.   Okay. When you filed a Form 5500 for the
2  year 2000, you used, on the Schedule I for 2000 -- and
3  I will show it to you again -- we marked this as
4  Warnock-8, you used the year end values from the
5  previous Form 5500, did you not?
6      A.   They would tie in.
7      Q.   They would tie in, correct?
8      A.   Yes.
9      Q.   So am I correct, it's kind of like a
10 domino effect; if the numbers are wrong on your 1999
11 Form 5500, then the numbers are going to be wrong on
12 each 5500 going forward because they rely on those
13 earlier numbers?
14     A.   Yes. This is a -- here is the 2000.
15 Yes. That is correct.
16     Q.   Okay.
17     A.   Yes.
18     Q.   Do you know what would be required in
19 order to correct the Form 5500 starting in 1999?
20     A.   Well, it would be a lot of work, but we
21 would file amended returns, amended 5500 forms.
22     Q.   You said it would be a lot of work.
23 Tell me specifically what would have to be done.
24     A.   To amend the 5500? We would have to go
25 back and get the true values, the correct values that

100

1  should have been on there, and re-file, prepare new --
2  excuse me. Can I get a drink of water?
3          MR. CHARME: Sure.
4          (There is a discussion off the record.)
5      A.   We would have to get the correct
6  information, and then most of the 5500 would not
7  change, but the Schedule I, that's the one that's got
8  all the numbers, then we would have to redo them each
9  year.
10     Q.   So you would have to redo Schedule I for
11 each year starting in 1999 going forward, correct?
12     A.   That is correct.
13     Q.   Do you know if there are any interest or
14 penalties that would occur?
15     A.   There's no -- for filing an amended
16 return, there's no penalty that goes with it, no.
17     Q.   If you understated the true amount? If
18 you know.
19     A.   No, I'm not aware of any penalty that
20 would go with an amended form. There's no excise tax
21 or any form that you would attach. No.
22     Q.   Okay.
23         (Luncheon recess.)
24     Q.   Mr. Warnock, in order to redo the Form
25 5500's, would it also be necessary to know all

137

Q. Your discussions with him, those five minute telephone conversations per year or so, were they generally cordial?

A. Yes.

Q. Friendly fellow?

A. He was friendly, but he could be -- he could be tough. He would warn me every year, Brian, I'm telling you, send this stuff, send it to me, make sure everything goes to me.

Q. Has that always been the case, since the beginning of your relationship?

A. Yes.

Q. So from the very onset of the relationship, he didn't want information concerning his account shared with other people, correct?

A. That's correct.

Q. Okay. Did he ever tell you that you couldn't share information with participants in the commingled account as that information pertained to their particular participation in the commingled account?

A. He said the only person who gets information is him, you know.

Q. Did anybody ask for -- let me ask the question another way.

138

Were you ever asked for information, either by a participant or on behalf of a participant in the commingled account, and been unable to provide that information to that individual?

A. No. No, I mean the only question we would have gotten would have been, you know, what's their value of their account, and I probably provided it to him, to be honest. It would not have been a problem if, you know -- if, assuming the report was done and completed and the person wanted to know how much was in their account, I -- an awful lot of it, we would say ask Mario. I don't think he would have a problem giving that information out, though.

Q. Did you ever hear anyone complain that they couldn't get that information?

A. That they couldn't get the value of their account?

Q. Yes.

A. No.

Q. Would it, therefore, make sense that the information that he was seeking to maintain confidential was the amount of his own value in that account?

MR. CHARME: I object to the form. That wasn't the testimony at all.

139

Q. You can answer it.

A. Yeah. Yes.

Q. Okay. He didn't care if other people knew their individual account balances, as far as you can tell?

A. Right. He didn't want people to know what his account was worth, and you know, he also -- he pretty much prided himself as being a good stock picker, and didn't want people privy to, you know, what stocks he was picking. For whatever reason, he felt that was, you know, his picks to do that, and he didn't want to share it with other people.

Q. Would it also have been prudent for Dr. Criscito to not want information concerning other individuals' account balances shared with third parties?

A. It depends on who the third parties were. He certainly didn't want a secretary opening up the mail and seeing a report that had everybody's money. Certainly he did not want that to happen.

Q. Would that be a good reason why he would want the information sent to his home rather than to the office?

MR. CHARME: I object to the form.

A. That would be a reason, and fairly

140

typical, and we have several clients where we send everything to their home.

Q. To your knowledge, were employees, as opposed to physician employees, or non-physician employees aware of the discrepancy contribution percentages between themselves and physicians?

A. I have no idea.

Q. Would that generally be information that an employer would not necessarily want to share with employees?

MR. CHARME: I object to the form.

A. I think most employees know the big guys get more money than they do. It's not a shock to them, but they may not want everyone to know that they got 20 percent and everyone else got 5, yes.

Q. Would that be a reasonable business determination?

A. That would be reasonable, yes.

Q. From your review of the loan that was taken out by Dr. Criscito, I believe it was 1982, was that properly paid back? Was that all appropriately accounted for?

A. As far as I can -- the only discrepancies were, you know, the one that was cited, you know. We told them, they put in extra money in the plan, rather

185

1  answered.
2      A.   No, that -- the contribution receivable,
3  yes, that came from us.
4           MR. KERN:  We're going to need to stop
5  now and have to come back.
6           (There is a discussion off the record.)
7           (At 3:45 p.m., the deposition is
8  adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

186

C E R T I F I C A T I O N

   I, NANCY A. MIANI, a Certified Court Reporter
and a Notary Public, License No. XI00814, do hereby
certify that the foregoing witness, BRIAN WARNOCK, was
duly sworn by me on the date indicated, and that the
foregoing is a true and accurate transcription of my
stenographic notes.
   I further certify that I am not employed by
nor related to any party to this action.

_____
NANCY A. MIANI, C.S.R.
LICENSE NO. XI00814