

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF NEW JERSEY
 3              CASE NO. 2:08-cv-1567 (JAG - MCA)
 4
 5   DR. FADI CHAABAN; DR. SABINO R.    :
 6   TORRE; DR. CONSTANTINOS A.         :
 7   COSTEAS and DR. ANTHONY J.         :
 8   CASELLA, as Trustees of            :
 9   Diagnostic & Clinical              :
10   Cardiology, P.A. Profit Sharing    :
11   Plan,                              :
12              Plaintiffs,             :
13        vs.                           :
14   DR. MARIO A. CRISCITO,             :
15              Defendant.              :
16   -  -  -  -  -  -  -  -  -
17          DEPOSITION OF:  SCOTT M. FEIT
18              WEDNESDAY, JULY 21, 2010
19
20          ROSENBERG & ASSOCIATES, INC.
21       Certified Court Reporters & Videographers
22   425 Eagle Rock Ave., Suite 201      575 Madison Ave.
23   Roseland, New Jersey 07068    New York, New York 10022
24     (973) 228-9100   1-800-662-6878    (212) 868-1936
25              www.rosenbergandassociates.com
```

```
 1         Deposition of SCOTT M. FEIT taken in the
 2   above-entitled matter before Gary M. Talpins, a
 3   Certified Court Reporter (License No. XI-000561) of
 4   the State of New Jersey, taken at the offices of
 5   WITMAN STADTMAUER, 26 Columbia Turnpike, Florham
 6   Park, New Jersey, on Wednesday, July 21, 2010,
 7   commencing at 10:40 a.m.
 8
 9
10   A P P E A R A N C E S:
11         WITMAN STADTMAUER
12         26 Columbia Turnpike
13         Florham Park, New Jersey 07932-2213
14         (973) 822-0220
15         Email:  Scharme@wsmesq.com
16         BY:  STEPHEN M. CHARME, ESQ.
17              -and-
18         CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART
19         & OLSTEIN, P.C.
20         5 Becker Farm Road
21         Roseland, New Jersey 07068-1751
22         (973) 994-1700
23         Email:  Jagnello@carellabyrne.com
24         BY:  JOHN M. AGNELLO, ESQ.
25         Attorneys for the Plaintiffs.
```

```
                                                                3

 1    APPEARANCES (Cont'd):

 2

 3          KERN, AUGUSTINE, CONROY & SCHOPPMANN

 4          1120 US Highway 22

 5          Bridgewater, New Jersey 08807-2944

 6          (908) 704-8585

 7          Email:  Sikern@drlaw.com

 8          BY:  STEVEN I. KERN, ESQ.

 9          Attorneys for the Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2

 3   WITNESS              EXAMINATION BY              PAGE

 4   SCOTT M. FEIT        MR. KERN                    5

 5

 6

 7

 8

 9

10

11                        E X H I B I T S

12

13   NUMBER               DESCRIPTION                 PAGE

14   Feit 1    Document Bates stamped Feit 00001,

15             et seq.                                16

16

17             (Exhibit retained by counsel.)

18

19

20

21

22

23

24

25
```

```
1                    SCOTT M. FEIT,
2  25B Vreeland Road, Florham Park, New Jersey, having
3  been first duly sworn, was examined and testified as
4  follows:
5           MR. AGNELLO:  Housekeeping matters, I
6  spoke to Mr. Kern about this before we went on the
7  record.  We are delivering to Mr. Kern, pursuant to
8  his request, the documents reviewed and used by Mr.
9  Feit in connection with his expert report.  We have
10 marked them Bates stamp Feit 1 through 1761 so there
11 are 1,761 pages we are delivering.
12          In addition, it's been agreed in advance
13 that Mr. Feit will be paid by Mr. Kern today for the
14 time he spends during his deposition at the rate of
15 $400 an hour.  And with that said, I leave it to Mr.
16 Kern.
17          MR. KERN:  Thank you.  Bear with me for
18 another couple of minutes.
19
20                    EXAMINATION
21 BY MR. KERN:
22    Q.    Mr. Feit, my name is Steven Kern.  I
23 represent Dr. Mario Criscito in the case of Chaaban
24 v. Criscito.  I'm going to be asking you a number of
25 questions here today.  If at any time you don't
```

```
 1   distributions and transfers that took place out of
 2   the plan during 2000.
 3       Q.      Did you rely on that?
 4       A.      Yes.
 5       Q.      Go on.
 6       A.      Go to the next?
 7       Q.      Please.
 8       A.      Feit --
 9               MR. AGNELLO:  Just so I'm clear, Mr.
10   Kern, you are asking him to flip through and when he
11   comes to a document that he relied upon, to tell you
12   that was a document, what it is and that he relied on
13   it?
14               MR. KERN:  Right, and then either I will
15   ask him questions about it or not.  I'm trying to
16   move this forward as quickly as possible.
17               MR. AGNELLO:  I understand what you are
18   doing.  Does the witness understand?
19               THE WITNESS:  Yes, I understand.
20       A.      Feit 0094 shows the value of the assets
21   in the Salomon SmithBarney account for the year 2000.
22       Q.      Did you rely on that document?
23       A.      No, I did not rely on that document.
24       Q.      Why not?
25       A.      There was no activity that took place in
```

1  terms of distributions or transfers from the Salomon
2  SmithBarney account that I know of.
3      Q.      Who did that money belong to as of the
4  date of this document?
5          MR. AGNELLO:  What money?
6          MR. KERN:  The money in the Salomon
7  SmithBarney account, $3,657,000.
8      A.      My conclusion is that all the
9  participants, according to Dr. Criscito, their assets
10 were transferred out of the pooled accounts and into
11 their self-directed accounts and then he was taking
12 any other assets that were left over after all the
13 assets were transferred out.
14     Q.      What is the basis for that
15 understanding?
16     A.      There was a note in the files in the
17 beginning of 2000 where APC had a note that Dr.
18 Criscito wanted an immediate valuation at the end of
19 1999 to determine how much money belonged to each
20 individual so they can immediately transfer out in
21 the beginning of 2000 and account for everybody's
22 money to their self-directed accounts.
23     Q.      That didn't happen, though, did it?
24     A.      Clarify.  What did not happen?
25     Q.      As of -- let me correct myself.  As

1  of -- I'm sorry, I don't need to correct myself.  As
2  of 12/31/2000, according to this Salomon SmithBarney
3  statement, Feit 95, there remained in the commingled
4  account, the pooled account, as you are referring to
5  it, it looks like $3,557,000 and some change,
6  correct?
7       A.     No, I never said this was a pooled
8  account at the end of 2000.
9       Q.     It wasn't a pooled account or was it not
10 a pooled account?
11      A.     No, according to the documents I
12 reviewed in my analysis, I did not consider this a
13 pooled account, this was a self-directed account for
14 Dr. Criscito.  All the assets were transferred out of
15 the pooled accounts.
16      Q.     Really.  What led you to conclude that?
17 Did you determine the name on this account at any
18 point in time?
19           MR. AGNELLO:  Which question do you want
20 answered?
21           MR. KERN:  Let's answer the second one
22 first.
23      Q.     Did you determine at any point in time
24 the name on this account?
25      A.     I looked at the name on the account.

```
 1        Q.     What was the name on the account?
 2        A.     Diagnostic and Clinical Cardiology,
 3   P.A., Money Purchase Plan.
 4        Q.     And what was the name on the commingled
 5   account?
 6        A.     Prior to the segregation of the assets?
 7        Q.     Yes.
 8        A.     In the beginning of 2000?  I would have
 9   to take a look at the 1999 statements.
10        Q.     Please do so.
11               MR. AGNELLO:  Give us the Bates stamp of
12   the document you are looking at.
13               THE WITNESS:  I'm looking at Feit 133,
14   Diagnostic and Clinical Cardiology, P.A., Money
15   Purchase Pension Plan.
16        Q.     `The same account?
17        A.     The same account name.
18        Q.     Any difference in the account
19   whatsoever?
20        A.     Yes, I feel that as of the end of 2000,
21   it was no longer considered a pooled account.
22        Q.     What is the basis of your feeling?
23        A.     When the assets were -- the value of the
24   assets as of December 31, 1999, were provided by Dr.
25   Criscito to the third party administrator to
```

```
1    calculate how much each participant was entitled to,
2    to determine the value of the assets, to determine
3    how much the participants were entitled to, the value
4    that he gave was incorrect. It was significantly
5    understated. Based on that value, the assets were
6    transferred out for all the participants to their
7    self-directed accounts and then he took possession of
8    the remaining accounts where there were distributions
9    that took place in those accounts for his benefit.
10        Q.    He didn't distribute -- he didn't take
11   distribution of the entirety of the money in the
12   accounts, did he?
13             MR. AGNELLO: Objection to form.
14        A.    As of what date? I don't know.
15        Q.    Let's start here, as of the end of 2000.
16        A.    At the end of 2000, there is money still
17   in the plan.
18        Q.    There is money still in the plan, not
19   transferred to Dr. Criscito nor to any of the other
20   plan participants, right?
21        A.    They were not transferred to the
22   participants.
23        Q.    Nor to any of the participants including
24   Dr. Criscito?
25        A.    From my expertise and my analysis and
```

based on the facts here, I assume that this account belonged to Dr. Criscito because he transferred all the money out to all the participants and then he was left with the remainder, the balance.

Q. On what do you rely for that determination? Do you have any document which says all of the moneys remaining in the commingled account belong to Dr. Criscito?

A. I do not.

MR. AGNELLO: It's two questions. Do you want to ask the second one?

MR. KERN: The second one.

A. Repeat the second question, then.

Q. Are you aware of any document which suggests that all of the moneys remaining in the commingled accounts belong to Dr. Criscito, yes or no?

A. No.

Q. Are you aware of any efforts in 2000 of Dr. Criscito to remove the moneys in the Salomon SmithBarney account to his own account?

A. I'm not aware of any.

Q. As of the end of 2000, these moneys continued to be invested in the name of the plan, correct?

1    A.    Yes.
2    Q.    They were not transferred to Dr.
3 Criscito?
4    A.    During 2000?
5    Q.    Correct.
6    A.    No.
7    Q.    If information had come to the attention
8 of the third party administrator in 2000 to the
9 effect that the numbers they were originally provided
10 by which to make distributions and transfers was an
11 incorrect number, there remained as of the end of
12 2000 more than enough money in this Salomon
13 SmithBarney account to have made the correction and
14 distributed the additional moneys, correct?
15         MR. AGNELLO:  Objection as to form.
16   Q.    You can answer.
17   A.    I would have had to use the online
18 calculator to go from the beginning of 2000 to the
19 end of 2000 to determine how much the participants
20 would have been entitled to and compared that to the
21 actual, this statement here at Salomon SmithBarney,
22 to see if there was enough money.
23   Q.    There was roughly a million seven that
24 you determined should have been distributed and
25 wasn't distributed as of the end of 2009, correct?

1  characteristic code on that document?
2      A.    It would have been put on that document
3  by APC and signed off by Dr. Criscito.
4      Q.    In your experience, would the trustees
5  likely have understood that characteristic code?
6           MR. AGNELLO:  Objection to form.
7      A.    I don't know if they would understand.
8  Some of my clients do understand it.  I don't know if
9  he would.
10     Q.    I take it from your answer that others
11 would not understand it, correct?
12          MR. AGNELLO:  Objection to form.
13     A.    I'm not sure what other people would
14 understand or not.  But they are signing the form
15 under penalty of perjury that they have reviewed it.
16     Q.    Is it reasonable for trustees to rely
17 upon information provided to them from third party
18 administrators in signing that form?
19     A.    Yes.
20     Q.    With respect to the Salomon SmithBarney
21 account, if this money was distributed, whose name
22 should it be?
23     A.    As of what year?
24     Q.    As of end of 2000.
25     A.    I did not make an opinion in my report

1   at the end of 2000 who that money belonged to.
2        Q.    I'm asking do you have an opinion?
3        A.    No.
4        Q.    Let's go back to Feit 5 for a minute.
5        A.    Okay.
6        Q.    According to Feit 5, there were no
7   transfers made out of the pooled account to Dr.
8   Criscito during the year 2000, correct?
9        A.    Correct.
10       Q.    And there were distributions made out of
11  the pooled account in the amount of $1,775,000 to Dr.
12  Criscito?
13       A.    Correct.
14       Q.    And that left a balance in the pooled
15  account of how much due to Dr. Criscito?
16       A.    There is no pooled account after all the
17  assets were transferred out.  They were all now
18  considered self-directed accounts.
19       Q.    If the assets were all transferred out
20  and the amount in the pooled account was, in fact,
21  what you calculated it to be, there is still money
22  left over, correct?
23       A.    Where did I calculate that there was
24  still money in the pooled account after everything
25  was transferred out?

```
 1   says erroneously forfeited in --
 2        A.    I don't know.
 3        Q.    Okay.  Continue.
 4        A.    235 and 236 go together.  236 shows the
 5   value of the assets in the pooled account being
 6   reported by Dr. Criscito for as of December 31, 1999.
 7   This was the value that was used by the APC to
 8   determine the amounts that were -- every participant
 9   was entitled to and then on Feit 235, at the top, the
10   same as 236 except for some notes where it says do
11   Mario's report ASAP and send to Mario so he can
12   transfer to separate accounts.
13        Q.    And do you know what it was that
14   precipitated that request from Dr. Criscito?
15        A.    Based on my expertise and my experience
16   as a Certified Fraud Examiner, and from reading these
17   documents, what I concluded was that he wanted to
18   transfer out the moneys to self-directed accounts as
19   soon as possible because the assets were
20   significantly higher than this amount and that if the
21   participants received their benefits based on this
22   value, he would take the rest.
23        Q.    You have not set that out in the written
24   opinion, have you?
25        A.    No.
```

1  Q.    Is this a new opinion you now have?
2  A.    No, it's not a new opinion, just not
3  disclosed in the report.  They were not asking me to
4  make that determination.
5  Q.    So you have not been asked to opine
6  concerning the intent of Dr. Criscito, correct?
7  A.    No.
8  Q.    You are not opining the intent of Dr.
9  Criscito in this case, correct?
10 A.    If you are asking me a question, in my
11 expert opinion, why he gave these values and why he
12 wanted to do it so quickly, it's because from my
13 expertise as a fraud examiner, I thought there was
14 fraud involved.  It appears to be fraud.
15 Q.    But you have not been asked to give an
16 opinion concerning whether or not Dr. Criscito has
17 engaged in fraud in this case, correct?
18 A.    No, I have not specifically been asked
19 if he has engaged in fraud.
20 Q.    And you have not been retained to give
21 an opinion as to whether or not he engaged in fraud,
22 correct?
23 A.    The determination if he engaged in fraud
24 was not something that I was asked to do.
25 Q.    Okay.  I take it, therefore, you have

1  not reviewed Mr. Warnock's deposition where he
2  indicated that there was a lot of pressure being
3  brought on Dr. Criscito and on APC at this point in
4  time by other plan participants to turn this into
5  self-regulated, right?
6      A.    No.
7      Q.    If you were to learn that the impetus to
8  set up the self-directed accounts didn't come from
9  Dr. Criscito but came from other plan participants, I
10 take it that would be important information for you
11 to have in terms of determining whether or not there
12 was an intent to defraud here, correct?
13     A.    No, that wouldn't be relevant.
14     Q.    It wouldn't be relevant at all, why
15 self-directed accounts were formed wouldn't be
16 relevant, is that your testimony?
17     A.    Say that one more time.
18     Q.    Why self-directed accounts were created
19 would not be relevant, from your perspective?
20     A.    The reason behind, for my report, the
21 reason behind the self-directed accounts is not
22 relevant on who made that determination.
23     Q.    To your written report because you
24 didn't opine on whether or not there was fraud?
25     A.    Correct.

1    Q.    But if you were asked to determine
2  whether or not there were fraud, it would be
3  necessary for you first to conduct an inquiry to
4  determine why a decision was made to turn these into
5  self-directed accounts in the beginning of 2000,
6  correct?
7    A.    That is one thing that I would ask.
8    Q.    And you have not done that?
9    A.    I have not done that.
10   Q.    And that would be an important element,
11 correct?
12   A.    I don't think it would be absolutely
13 necessary, based on these facts, to make a
14 determination if it was fraud or not.
15   Q.    But it would be important to know?
16   A.    Maybe. Feit --
17   Q.    If the decision to move to a
18 self-directed account or to self-directed accounts
19 was not that of Dr. Criscito but that of somebody
20 else, the problems which arose here could not be
21 attributed to Dr. Criscito, correct?
22   A.    No, that's not the case. The problem
23 that I see that arose --
24   Q.    I'm sorry, let me rephrase the question.
25 If --

C E R T I F I C A T E

I, GARY M. TALPINS, a Certified Court Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, the witness was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____

Gary M. Talpins
CCR No. XI-000561