Exhibit
G

**Page 1**

```
                                            1
```

```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
                  CIVIL ACTION CASE NO. 2:08-CV-1567
        -------------------------------------
  3  DR. FADI CHAABAN; DR. SABINO R. TORRE, DR.  :
     CONSTANTINOS A. COSTEAS and DR. ANTHONY J.   :
  4  CASELLA, as Trustee of Diagnostic & Clinical :
     Cardiology, P.A. Profit Sharing Plan,        :
  5                                               :
                    Plaintiffs,                    :
  6                                               :
                    vs.                            :
  7                                               :
     DR. MARIO A. CRISCITO,                       :
  8                                               :
                    Defendant.                     :
  9  -------------------------------------
                    Friday, December 4, 2009
 10
 11       Deposition of MARIO CRISCITO, M.D., VOLUME I,
 12  before Nancy A. Miani, a Certified Court Reporter,
 13  License No. XI00814, at the offices of WITMAN,
 14  STADTMAUER, ESQS, 26 Columbia Turnpike, Florham Park,
 15  New Jersey, on Friday, December 4, 2009, at 12:45 p.m.
```

```
                    MIANI COURT REPORTING
                  CERTIFIED COURT REPORTERS
                      1741 DANIEL COURT
                       WALL, NJ  07719
                       (732) 681-4776
```

**Page 2**

A P P E A R A N C E S :

WITMAN, STADTMAUER, ESQS.
26 Columbia Turnpike
Florham Park, NJ 07932
By: STEPHEN M. CHARME, ESQ.
Attorneys for the Plaintiffs

KERN, CONROY & SCHOPPMANN, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
BY: STEVEN KERN, ESQ.
Attorneys for the Defendant

ALSO PRESENT:

Anthony Casella, M.D.

**Page 3**

I N D E X .

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARIO CRISCITO, M.D. | | | | |
| BY MR. CHARME | 6 | | | |

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Criscito-1 | Indenture Creating Diagnostic & Clinical Cardiology, PA Money-Purchase Pension Plan | 11 |
| Criscito-2 | Amendments to the Trust Instrument | 14 |
| Criscito-3 | Minutes of Meeting | 17 |
| Criscito-4 | Diagnostic & Clinical Cardiology Money-Purchase Pension Plan Adoption Agreement | 19 |
| Criscito-5 | Regional Prototype Non-Standardized Money-Purchase Safe Harbor Pension Plan Adoption Agreement Number 02-003 | 21 |
| Criscito-6 | Amendment to Diagnostic & Clinical Cardiology, P.A. | 24 |
| Criscito-7 | Adoption Agreement for the American Pension Corporation Prototype Non-Standardized Money Purchase Plan 01-007 | 25 |
| Criscito-8 | Resolution of the Board of Directors of Diagnostic & Clinical Cardiology, P.A. | 27 |
| Criscito-9 | Diagnostic & Clinical Cardiology, P.A., Profit Sharing Plan | 28 |

**Page 4**

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Criscito-10 | Limitation of Legal Liability | 29 |
| Criscito-11 | Resolution of the Board of Directors of Diagnostic & Clinical Cardiology, P.A. | 34 |
| Criscito-12 | Amendment to the Diagnostic & Clinical Cardiology, P.A., Money Purchase Plan | 35 |
| Criscito-13 | Form 5500 for 1999 | 36 |
| Criscito-14 | Form 5500 for 2000 | 37 |
| Criscito-15 | Form 5500 for 2001 | 38 |
| Criscito-16 | Form 5500 for 2002 | 38 |
| Criscito-17 | Form 5500 for 2003 | 42 |
| Criscito-18 | Form 5500 for 2004 | 43 |
| Criscito-19 | Form 5500 for 2005 | 44 |
| Criscito-20 | Mortgage Statements for Morgan Stanley for 1999 | 87 |
| Criscito-21 | Complaint | 93 |
| Criscito-22 | Document dated January 14, 2002 | 116 |
| Criscito-23A | Sovereign Bank Fax One of Two | 117 |
| Criscito-23B | Sovereign Bank Fax Two of Two | 117 |

**5**

1 <u>LITIGATION SUPPORT</u>

2

3 DIRECTION NOT TO ANSWER

4     115-7

5

6 MOTION TO STRIKE

7     (None)

8

9 DOCUMENT REQUEST

10     123-16

11

12 EXHIBIT ANALYSIS

13     Original Exhibits retained by Mr. Charme

14

15

16

17

18

19

20

21

22

23

24

25

**6**

1 M A R I O   C R I S C I T O, M.D.,

2 32 Chelsea Drive, Livingston, New Jersey, sworn.

3 DIRECT EXAMINATION BY MR. CHARME:

4     Q.    Good afternoon, Dr. Criscito.

5     A.    Good afternoon.

6     Q.    We've met once before. My name is

7 Stephen Charme. I represent the plaintiffs in the

8 federal lawsuit. Could you first tell me if you've

9 had your deposition ever taken before?

10     A.    Not that I can recall.

11     Q.    Okay. So let me just go over some of the

12 ground rules.

13     I'm going to be asking you some

14 questions, and the questions and your answers are

15 going to be recorded by the Reporter. Do you

16 understand that?

17     A.    Yes.

18     Q.    Okay. If I ask you something and you

19 don't understand it, please tell me and I will do my

20 best to clarify it for you. Do you understand that?

21     A.    Yes.

22     Q.    If you don't ask me to clarify something,

23 then I will assume you understood the question and

24 that you will give me a complete and honest answer.

25 Do you understand that?

**7**

1     A.    Yes.

2     Q.    I have to ask you the next question. Are

3 you taking any kind of medicine, or do you have any

4 other kind of medical situation that would stop you

5 from understanding what I'm going to be asking and

6 giving truthful answers?

7     A.    Well, I'm taking a lot of medication.

8     Q.    Okay. Does any of that medication, as

9 far as you know, interfere with your ability to give

10 truthful answers?

11     A.    No.

12     Q.    Would you state your date of birth for

13 the record?

14     A.    5/22/39.

15     Q.    And are you married?

16     A.    Yes.

17     Q.    Your wife's name?

18     A.    Donna.

19     Q.    And how long have you been married?

20     A.    Since 1989.

21     Q.    Okay. Do you have any children?

22     A.    Yes.

23     Q.    How many?

24     A.    Three.

25     Q.    All from Donna?

**8**

1     A.    No. One from Donna, two from a previous

2 marriage.

3     Q.    What's the name of the one from Donna?

4     A.    Maressa, M-A-R-E-S-S-A.

5     Q.    Is she an adult? Is she over --

6     A.    20.

7     Q.    She's 20. Okay. Can you tell me your

8 educational background briefly, please.

9     A.    From where?

10     Q.    Start with med school.

11     A.    University of Padova, Italy.

12     Q.    What year did you graduate?

13     A.    1969.

14     Q.    Okay.

15     A.    And internship at St. Barnabas in

16 Livingston. And three years of --

17     Q.    Excuse me. How long was the internship

18 at St. Barnabas?

19     A.    I think it was 15 months.

20     Q.    Okay.

21     A.    Then three years of internal medicine at

22 St. Barnabas.

23     Q.    Was that another internship?

24     A.    No, internal medicine residency.

25     Q.    Residency. Okay.

**9**

1　　A.　　And then two years of fellowship in
2　cardiology at St. Barnabas.
3　　Q.　　After the fellowship in cardiology, did
4　you open your own practice?
5　　A.　　I opened -- I was practicing prior to
6　that.
7　　Q.　　You were. When were you practicing on
8　your own?
9　　A.　　19 -- what the hell is it? 1974.
10　　Q.　　Okay. What was the name of the practice?
11　　A.　　It was myself.
12　　Q.　　Just yourself. Okay. At some point, did
13　you participate in a practice called Diagnostic &
14　Clinical Cardiology?
15　　A.　　Yes.
16　　Q.　　When was that?
17　　A.　　1975 or '76.
18　　Q.　　Okay. And is there a reason that you
19　used that entity to practice instead of just
20　practicing on your own?
21　　A.　　No, I was advised to form a corporation.
22　　Q.　　And that was Diagnostic & Clinical
23　Cardiology, P. A.?
24　　A.　　Correct.
25　　Q.　　Okay. When you started it in 1975, were

**10**

1　there any other members of it besides you?
2　　A.　　No.
3　　Q.　　Subsequently, did anyone join -- for
4　short, I'm going to just call it Diagnostic.
5　　A.　　Okay.
6　　Q.　　Subsequently, did anyone join Diagnostic?
7　　A.　　Yes.
8　　Q.　　Who was that?
9　　A.　　Dr. Casella.
10　　Q.　　When did he come?
11　　A.　　1977.
12　　Q.　　Okay. And at some point, did he become a
13　member of Diagnostic, or did he become a member right
14　away?
15　　　　MR. KERN: What do you mean by "member"?
16　　Q.　　It's a professional association. Did he
17　become a shareholder right away?
18　　A.　　I would -- you know, I don't know. I
19　don't know.
20　　Q.　　Okay. When you hired him, did you view
21　him as an equal partner?
22　　A.　　He became an equal partner.
23　　Q.　　When was that?
24　　A.　　I don't know. You'd have to ask him.
25　　Q.　　Was it within the first five years after

**11**

1　he was hired?
2　　A.　　I believe so.
3　　Q.　　Okay. When Diagnostic was formed, did
4　you also arrange for a pension plan to be enacted?
5　　A.　　Yes.
6　　Q.　　What I'm going to do is show you a series
7　of documents. I don't need you to read them, but I
8　just need you to confirm for me whether or not it's
9　your signature on the documents. Okay.
10　　　　(Exhibit Criscito-1 is marked for
11　Identification.)
12　　Q.　　Let's start, I'm going to show you what's
13　premarked as Criscito 1. It's entitled "Indenture
14　Creating Diagnostic & Clinical Cardiology, P.A.,
15　Money-Purchase Pension Plan," and further down on the
16　page it says effective April 1, 1976.
17　　　　If you would please, Dr. Criscito, turn
18　--
19　　A.　　Take these?
20　　Q.　　Yes, take that, please. Turn to the last
21　page. There's Bate stamps. It's 2279. Okay. There
22　is a signature on the right side that says "by." Is
23　that your signature?
24　　A.　　It may be.
25　　Q.　　You're not sure?

**12**

1　　A.　　If I don't see originals, I'm -- no, I
2　will never do -- never say it's mine.
3　　Q.　　Well, do you recognize that to be your
4　handwriting?
5　　A.　　May be.
6　　Q.　　You're not sure?
7　　A.　　It may be.
8　　Q.　　Do you know what your own handwriting
9　looks like?
10　　A.　　Yes.
11　　Q.　　Do you know what your own signature looks
12　like?
13　　A.　　Yes.
14　　Q.　　Does that look like somebody else's
15　signature?
16　　　　MR. KERN: Objection. Argumentative.
17　　A.　　I don't know.
18　　　　MR. CHARME: It's not argumentative at
19　all.
20　　　　MR. KERN: He already said he doesn't
21　know.
22　　Q.　　Look at the line below that says
23　"trustee." Do you know if that's your signature?
24　　A.　　May be.
25　　Q.　　So sitting here today, you're not sure if

**13**

1  that's your signature?
2      A.    I can't vouch by it.
3      Q.    In 1976, as far as you know, were you the
trustee of the Diagnostic & Clinical Cardiology P.A.
Money-Purchase Pension Plan?
6      A.    Well, can you tell me what a trustee
7  means?
8      Q.    You don't know what a trustee means?
9      A.    No.
10     Q.    So let me ask the question differently.
11           There is a reference on the last page
12  that's Bate stamped 2279, and it says "trustee" and
13  then there's a signature. I know you've told me that
14  you can't say for sure if that's your signature. Are
15  you also telling me that sitting here today you don't
16  know what a trustee is?
17     A.    I don't know, correct.
18     Q.    Okay. If that is your signature and you
19  signed this document, do you think you knew what a
20  trustee was when you signed the document?
21     A.    I signed a lot of documents, Mr. Charme,
22  to be honest, and I don't -- didn't read them. I just
23  signed them.
24     Q.    You just signed documents without reading
25  them?

**14**

1      A.    Correct.
2      Q.    Is that your usual practice?
3      A.    A lot of times, yes.
4      Q.    Okay. Let me take that back.
5            Have you heard of a company called
6  American Pension Corporation?
7      A.    Yes.
8      Q.    And who are they?
9      A.    American Pension.
10     Q.    Did you hire them to be the third party
11  administrator for the Diagnostic pension plan?
12     A.    I believe so.
13     Q.    And when did you do that?
14     A.    I haven't the slightest idea.
15     Q.    Do you think you did it soon after the
16  pension plan was formed?
17     A.    I -- honestly, I can't tell you. I
18  don't know.
19           (Exhibit Criscito-2 is marked for
20  Identification.)
21     Q.    Okay. I'm going to show you what I'm
22  marking as Criscito-2, which is entitled "Amendments
23  to the Trust Instrument Creating the Diagnostic &
24  Clinical Cardiology, P.A., Money Purchase Pension
25  Plan." There is Bate stamp numbers on this, and I'd

**15**

1  like you to turn to the last page that's Bate stamped
2  7875. Do you recognize that as your signature, where
3  it says "by"?
4      A.    May be. Looks different than the other
5  one.
6      Q.    Did you ever authorize anyone to sign
7  your name on legal documents?
8      A.    I don't recall.
9      Q.    You don't recall doing that, do you?
10     A.    I don't recall.
11     Q.    Looking down where it says "trustee," do
12  you know if that's your signature?
13     A.    May be.
14     Q.    You're not sure?
15     A.    Correct.
16     Q.    It could be, but you don't know?
17     A.    Correct.
18     Q.    What would be required in order for you
19  to know?
20     A.    Somebody to look at the original and go
21  over it.
22     Q.    Okay. So --
23     A.    I don't know. You're always told not to
24  express things. I have had people sign my documents,
25  my name.

**16**

1      Q.    Okay.
2      A.    That have been involved in lawsuits that
3  proved not to be me.
4      Q.    You've had people without your prior
5  knowledge or consent sign your name to documents?
6      A.    Correct.
7      Q.    What kind of documents were those?
8      A.    Stock documents.
9      Q.    Okay. Anything besides stock documents?
10     A.    No, just documents on the whole. A lot
11  of documents have come across my desk, crossed me,
12  that I do not read, and I -- foolishly, I don't read,
13  and I don't look at it in detail.
14     Q.    Okay. What kind of stock documents are
15  you talking about?
16     A.    Stock documents involved putting me as a
17  trustee for debt that other people have incurred.
18     Q.    A trustee  -- I'm sorry.
19     A.    I don't know if that's the correct word.
20  Mr. Charme. Making me responsible for debt that other
21  people have incurred.
22     Q.    Okay. In a stock situation?
23     A.    Correct.
24     Q.    Did it ever come to your attention
25  concerning the Diagnostic pension plan that anyone

57

1    Q.    Okay. Do you think you signed it first
2  and then sent it back?
3    A.    Yeah.
4    Q.    Okay. So is it your testimony that you
5  did not arrange to file any of the Form 5500's?
6    A.    Not that I recall.
7    Q.    Okay. You don't recall mailing any Form
8  5500's to the IRS?
9    A.    Not that I recall. Not that I recall.
10   Q.    Okay. I'm going to show you what was
11 marked as Warnock-10. Can I have that back, please.
12   A.    (The witness complies.)
13   Q.    Which consists of two separate pages. If
14 you look at the top of the first page, there is a fax
15 number, it says 973-994-1906. That was your home fax
16 number?
17   A.    Correct.
18   Q.    So is it fair for me to assume that this
19 document came from your home fax machine?
20   A.    Yes.
21   Q.    Okay. And on the second page, it also
22 has a fax number of 973-994-1906. Same number, right?
23   A.    To me they look the same pages.
24   Q.    Well, there's a little bit of a
25 difference, which I'll talk to you about.   Hang on a

58

1  minute.
2          MR. CHARME: Off the record a minute.
3          (There is a discussion off the record.)
4    Q.    First of all, do you remember seeing this
5  document before today?
6          MR. KERN: Before today?
7          MR. CHARME: Yes, before today.
8    A.    Yeah, I saw it.
9    Q.    Do you remember seeing it before the
10 lawsuit was started?
11   A.    Not that I recall.
12   Q.    Okay. So the first time you remember
13 seeing this is after the lawsuit?
14   A.    Correct.
15   Q.    Okay. Do you know what this document is?
16   A.    No. I mean, no.
17   Q.    Okay. Brian Warnock testified that these
18 were year end values that you furnished to him so that
19 he could put together a Form 5500. Does that refresh
20 your memory as to what this is?
21   A.    If that's what he said, then that may be
22 what it is. I have no idea.
23   Q.    Okay. There is an entry here for Morgan
24 Stanley Dean Witter, it says 4,017,942.57. Do you
25 recall that's the year end value for 1999 that you

59

1  supplied to Brian Warnock?
2    A.    It may be the -- it may be the year end
3  value of the pension. See, here it says December. I
4  don't know if this was year end value, whether it was
5  considered year end value as far as -- because we had
6  year end values in March, end of March, and I don't
7  remember.
8    Q.    See on the first page it says January 1,
9  1999, to December 31st, 1999.
10   A.    I understand that, but that was the
11 calendar year, and I don't know if the pension fund
12 was, pension fund was ended at the end of March, 1999.
13   Q.    Well, do you know, did you understand
14 that American Pension Corporation, when they asked for
15 year end values, was looking for year end calendar
16 values?
17   A.    No.
18   Q.    You didn't understand that?
19   A.    No.
20   Q.    You thought they might be asking for a
21 different kind of year end value?
22   A.    Yes.
23   Q.    What kind of other year end value is
24 there if it's not tied to the calendar?
25   A.    You know, I thought -- this was a

60

1  confusing year for me. It may have been in March.
2    Q.    Why was 1999 a confusing year for you?
3    A.    Well, my parents were dying. I was
4  diagnosed with radical cancer, prostate, so multiple
5  things. It was a very confusing year for me.
6    Q.    Was the whole year very confusing?
7    A.    Very confusing. I had my father living
8  with me, Alzheimer's, my mother-in-law was with us,
9  dying. Subsequently after that, too, but that's not
10 -- that's not --
11   Q.    Did you tell any of that to the American
12 Pension Corporation, that it was a very confusing year
13 for you?
14   A.    Personal things I don't like to discuss
15 with anybody.
16   Q.    Okay. Well, without telling them the
17 reasons, did you tell them it was a very confusing
18 year?
19   A.    No. No, sir.
20   Q.    Okay. Are you aware whether in 1999
21 there was a commingled account at Morgan Stanley Dean
22 Witter?
23   A.    No, sir.
24   Q.    Okay. Going to Solomon Smith Barney, are
25 you aware in 1999 whether there was a commingled

61

1  account for Solomon Smith Barney?
2      A.    No, sir.
3      Q.    Up above, there's handwriting, which says
4  "do Mario's report ASAP and send to Mario so he can
5  transfer to separate account." Do you recall in 1999
6  around that time telling Brian Warnock that you wanted
7  to segregate the accounts?
8      A.    1999?
9      Q.    Yes. Around the end of 1999, early 2000,
10 do you remember telling Brian Warnock that you wanted
11 to segregate the accounts that were in the commingled
12 account?
13     A.    No.
14     Q.    Do you know what he is referring to?
15 Because Brian Warnock testified that that notation was
16 an instruction by you so that the accounts could be
17 segregated, those accounts in the commingled account,
18 in January of 2000. Do you remember having any
19 discussion with Brian Warnock about that?
20     A.    Maybe prior -- maybe in January I found
21 out that there was commingled accounts, and I said you
22 got to be kidding me. I said, whoever is in my
23 account, get them the hell out of it, I don't want to
24 be responsible for it.
25     Q.    So in January of 2000 is the first time

62

1  you found out there were other people in the
2  commingled account, which you thought was just you
3  before?
4      A.    Correct.
5      Q.    And so when you said to Brian, you said
6  to Brian, you know, I want those people out. Is that
7  correct?
8      A.    Correct.
9      Q.    And what did he say?
10     A.    We'll get them out.
11     Q.    Do you know someone named Antoinette
12 Foggio, F-O-G-G-I-O?
13     A.    Yes.
14     Q.    Brian Warnock testified that she remained
15 in the commingled account with you after the other
16 people were segregated out. Do you know why?
17     A.    Because she was supposed to go out with
18 everybody else.
19     Q.    So you think that was a mistake?
20     A.    Probably so.
21     Q.    But you don't know one way or the other
22 why she remained in?
23     A.    I didn't even know she was in.
24     Q.    There is a reference on the first page of
25 Exhibit 10, where it says Morgan Stanley, to the

63

1  number 4,017,942.57. Do you know if that number came
2  from a brokerage statement?
3      A.    I don't remember, sir.
4      Q.    And same question for Solomon Smith
5  Barney, where it says 798,425.50, do you know if that
6  came from a brokerage statement?
7      A.    I don't know.
8      Q.    North American Venture, same question, do
9  you know if the $50,000 came from a brokerage
10 statement?
11     A.    I don't know.
12     Q.    So you don't know where those numbers
13 came from?
14     A.    I may have called. I may have called.
15     Q.    You might have called the financial
16 institutions?
17     A.    Right.
18     Q.    Do you recall specifically doing that?
19     A.    I think they wanted some -- some
20 information, and that's, I think, the way I got it,
21 called them, asked them what the value of the accounts
22 were back in March, and they gave me these numbers.
23     Q.    Why did you ask them what the value of
24 the accounts were back in March?
25     A.    Because that's when I thought the year

64

1  ended.
2      Q.    The year ended for what?
3      A.    For the pension fund.
4      Q.    And you didn't understand that APC was
5  looking for year end values based on the calendar?
6      A.    No.
7      Q.    Okay. In prior years, do you remember
8  sending year end values to APC based on the calendar
9  years?
10     A.    I don't -- I don't remember at all.
11     Q.    Brian Warnock testified that you did, but
12 you don't remember?
13     A.    Not at all, sir.
14     Q.    Okay. In 1999, you were receiving
15 brokerage statements from Morgan Stanley Dean Witter,
16 correct?
17     A.    Yes.
18     Q.    And you were also receiving brokerage
19 statements from Solomon Smith Barney, correct?
20     A.    Correct.
21     Q.    Let me have that back for a moment,
22 please.
23     A.    (The witness complies.)
24           (There is a discussion off the record.)
25     Q.    I'd like to show you Warnock-23, which is

**73**

Q. Which people were they?

A. Mark Brown, Dr. Chaaban, that I know of.

Q. When you say they wanted their money, was it your understanding they wanted a distribution, or they just wanted their own separate, segregated account?

A. Separate, segregated account.

Q. Okay. Who was the first person you heard of who wanted their own separate, segregated account?

A. I don't know.

Q. Okay. Do you recall Mark Brown ever asking you for the value of his account and holding up your hand and writing something in ink on your hand?

A. Absolutely not.

Q. Never happened?

A. Never happened.

Q. Do you recall him ever asking you for the value of his account?

A. If he did, I told him to see Dr. Casella because he was the man that was writing all the checks.

Q. Well, as far as you knew, was Dr. Casella receiving copies of the same brokerage statements that you did, that designated you as the trustee?

A. I have no idea.

**74**

Q. Well, I thought you said that since you believe that the money was all yours, you told Brian that only you were supposed to get information. Isn't that right?

A. About my own accounts.

Q. Okay. And so that we're clear, you believe that the Morgan Stanley account, in which you were listed as the trustee, that all the money belonged to you?

A. Correct.

Q. And the same with Smith Barney, right?

A. Yes.

Q. So before you found out that there were other people in there, your instructions to Brian Warnock were that only you were supposed to get the information because you thought this was all your money, right?

A. Correct.

Q. And you alone made the investment decisions for those accounts because you believed it was your own money you were investing, right?

A. Correct.

Q. Before early 2000 or late 1999, do you recall anyone who terminated their employment with Diagnostic who said, you know, I have money in the

**75**

commingled account, I'd like it?

A. Talking to me?

Q. Yes.

A. I mean not you talking to me. The employee talking to me?

Q. Yes.

A. No.

Q. Or American Pension Corporation talking to you about that.

A. No.

Q. Do you recall ever -- withdrawn. Brian Warnock testified that he never received any brokerage statements from you to support year end values. Is that correct?

A. Not that I can recall. I thought he was getting them all from the brokerage firms.

Q. Did you tell any of the brokerage firms, and I mean specifically Morgan Stanley and Smith Barney, to send Brian Warnock brokerage statements?

A. May have.

Q. But do you recall doing it?

A. I may have.

Q. But you don't have a specific recollection that you did?

A. Correct.

**76**

Q. Okay. Brian Warnock also said there was no other form of backup that you sent to him for year end values. Is that correct?

A. I don't know.

Q. You don't know?

A. No.

Q. Brian Warnock said that he expected to rely on you for the accuracy of the information you gave him as to year end values. Was that your understanding?

A. I mean, he's -- Mr. Charme, he's talking a lot. I probably spent 30 seconds with this guy a year.

Q. Did you ever give Brian Warnock any reason to think that he couldn't rely on you to give him accurate information as to year end values?

A. No.

Q. Did you ever give Brian Warnock or anyone else at APC any reason to think that you would be dishonest in supplying year end values?

A. No.

Q. You said you only spoke to Brian Warnock, what did you say, 30 seconds a year?

A. Something in that league. There was no long discussion. There was no repetitive discussion,

77

1  either.
2      Q.    Did you speak to anyone else more than a
3  few minutes a year besides Brian Warnock at APC?
4      A.    No. I may have spoken to Dominique. I
5  think years ago there was another gentleman, I don't
6  recall his name.
7      Q.    When you found out that there were other
8  people in the commingled account, did you understand
9  that they were entitled to get their share of the
10 value of the commingled account to put into their own
11 segregated account?
12         MR. KERN: Could you repeat that.
13         MR. CHARME: I'll say it again.
14     Q.    When you found out in late 1999 or early
15 2000 that there were other people in the commingled
16 account besides you, did you understand that to
17 separate them out into their own segregated accounts,
18 they were entitled to get a portion of what was in the
19 commingled account?
20     A.    Yes. If -- yes, when I found out -- yes,
21 give them whatever their proportionate share would be,
22 yes.
23     Q.    So you understood at that point that all
24 the money didn't belong to you, correct?
25     A.    Correct.

78

1      Q.    Okay. And you said -- and I think you
2  just said they were entitled to get whatever their
3  proportionate share was, correct?
4      A.    Right.
5      Q.    And that proportionate share would be
6  based on the year end value of the accounts for 1999,
7  since they were being segregated in 2000, right?
8      A.    Yes. Whatever, yes.
9      Q.    When you learned that other people -- you
10 say you learned other people were in the commingled
11 account and wanted to be segregated out. Did you make
12 any particular efforts to make sure that the year end
13 values for 1999 that APC would be relying on to
14 segregate people out were correct?
15     A.    Did I make any --
16     Q.    Any special efforts to make sure, because
17 now -- let me back up.
18          You said that when the people got
19 segregated out, they would be entitled to a
20 proportionate share of the value, year end value in
21 the commingled account, right?
22     A.    Correct.
23     Q.    And that was the year end value as of
24 1999 because they were getting segregated out in
25 January of 2000, right?

79

1      A.    Correct.
2      Q.    And what I'm saying is to make sure that
3  everyone got the right amount of money, did you make
4  any special efforts as trustee to ensure that the 1999
5  year end values were correct?
6      A.    The year end values that I gave were the
7  ones I -- I believe, I believe were the ones at the
8  end of March I gave to them and I told them do
9  whatever you have to do.
10     Q.    Okay. But not my question. Aside from
11 saying you gave them year end values, once you found
12 out -- withdrawn.
13          When you first gave Brian Warnock the
14 year end values, I think your testimony was you didn't
15 know that there were other people in the commingled
16 account, did you?
17     A.    Correct.
18     Q.    Okay. Once you found out that there
19 were other people in the commingled account who would
20 have to get segregated out, did you say to yourself,
21 you know, I really better make sure, since this isn't
22 all my money, to make sure that the year end values
23 are correct?
24     A.    To me, they were correct.
25     Q.    Okay. So you didn't do anything in

80

1  addition to whatever efforts you had made previously
2  to make sure they were correct.
3      A.    That's correct. And I didn't know,
4  either, I didn't know what percentages anybody was,
5  either. I had no idea.
6      Q.    I wasn't talking about their percentages,
7  I was simply talking about the correct total 1999 year
8  end value for Morgan Stanley and Smith Barney. You
9  didn't make any special efforts to verify the
10 information that you gave to Brian Warnock.
11     A.    Not that I recall.
12     Q.    Okay. Were you aware, once you found out
13 that there were other participants in the commingled
14 account, that they were entitled to have allocated to
15 them the full value of whatever their proportionate
16 share was?
17     A.    Say that again.
18     Q.    I'll rephrase the question.
19          When you found out that there were people
20 in the commingled account who were entitled to a piece
21 of it, if you will, were you aware that they were
22 entitled to have that entire piece allocated to them
23 all at once as opposed to in bits and pieces?
24     A.    No.
25     Q.    Did you think that you could still hold

81

1    back some of the money to which those people were
2    entitled?
3        A.    Could be.
        Q.    What was that based on?
        A.    I -- I'm not into this. I'm not into
6    this. I understand what you're saying, but could be.
7    I had no idea what was going on then. No idea. In
8    fact, it blew my mind when that happened.
9        Q.    So that I understand --
10       A.    To me, only one person knew all about
11   that, and that was Dr. Casella. He knew what they
12   made, their names, their address, and what monies were
13   given to them. I didn't know that. I had no idea.
14       Q.    Do you recall that at one point, the
15   pension plan year ended in March of 1999 -- I mean
16   ended in March?
17       A.    I had -- no.
18       Q.    Okay. Because I think you said before
19   that you used year end values as of March of 1999.
20       A.    Correct.
21       Q.    And I thought you said you did that
22   because you thought that that's what the pension
23   plan's year was.
24       A.    Correct.
25       Q.    What I'm saying to you, are you aware

82

1    that as of 2000, as well as 1999, the pension plan's
2    year didn't end in 1999 -- didn't end in March?
3        A.    Let me -- I learned a lot since this
4    thing. All right. At that time, when I gave those
5    numbers, I felt, I thought that the year ended in
6    March of that year. Subsequently, I hear that that's
7    not the case. All right. Now --
8        Q.    When you say -- excuse me. When you say
9    subsequently, you mean subsequent to the lawsuit?
10       A.    Yeah, right. Now.
11       Q.    Excluding your attorney, did you hear
12   that from anybody else?
13       A.    No, I didn't hear it from him.
14       Q.    Who did you hear it from?
15       A.    Myself.
16       Q.    How did you find out?
17       A.    I found out because somebody told me.
18   Someone told me, because I needed the documents, that
19   it changed at a certain point in time. It may have.
20   I was not -- for years, it was March of 31. For
21   years. Then it went back to the end of the year.
22   Then I thought it was back. I'm totally confused the
23   when, whatnot, et cetera.
24       Q.    Okay. Do you think it went back and
25   forth from March to the end of the year more than

83

1    once, or that it used to be the pension plan ended in
2    March of the year and then it was changed to the end
3    of the calendar year?
4        A.    I can't tell you, Mr. Charme. I -- I
5    can't tell you.
6        Q.    But when you sent in year end values in
7    1999, you thought the year end values were supposed to
8    be through March 31st?
9        A.    Correct.
10       Q.    Did you ever tell that to Brian Warnock?
11       A.    No.
12       Q.    On the sheet that was faxed to Brian
13   Warnock that I showed you before, it says January --
14   let me get the sheet out.
15           I'm looking at what was attached to Brian
16   Warnock's letter that was Warnock-23. It says at the
17   very top, "January 1, 1999 - December 31, 1999."
18       A.    Correct.
19       Q.    There's nothing on that sheet that
20   indicates that year end values are through March 31,
21   1999, is there?
22       A.    No, but I thought that -- that was the
23   calendar year you had to put down, but the pension
24   fund was different. Pension funds were ending, I
25   think, in March 31st. Calendar year was different

84

1    than the pension fund, you know.
2        Q.    Okay. I understand what you're saying,
3    but was it your understanding that -- withdrawn.
4            Did you ever, did you understand that
5    looking at this, Brian Warnock would know that you
6    were using March 31, 1999 year end values?
7        A.    I thought he would.
8        Q.    Why did you think that?
9        A.    Because I thought that's when the pension
10   fund year ended.
11       Q.    Why didn't you put the date March 31,
12   1999, anyplace on this fax that's attached to
13   Warnock-23?
14       A.    I have no idea.
15       Q.    No idea?
16       A.    No.
17       Q.    Brian Warnock is not the person who
18   prepared this fax, correct?
19       A.    I don't believe so.
20       Q.    You believe you did?
21       A.    I -- I couldn't have prepared both of
22   them.
23       Q.    You couldn't have prepared both of them?
24       A.    Right.
25       Q.    Why not?

85

1    A.    Because I'm not home at that time.

2    Q.    I didn't ask if you sent them, I asked if

3 you prepared it.  You could have prepared it a day or

4 two earlier.

5    A.    But there's changes, you said, on it.

6    Q.    That's correct.

7    A.    When those changes came back and then

8 subsequently sent out, not me.

9    Q.    Okay.  In January of 2000, besides you

10 and your wife, was there anyone else at home?

11    A.    Not that I know of.  Not that I can

12 recall.

13    Q.    So if you didn't send it back on that

14 date with the change, you think your wife did?

15    A.    Could have.

16    Q.    Did you discuss with your wife the

17 finances of the pension plan?

18    A.    She doesn't -- I would say whatever the

19 changes were to do.

20    Q.    Okay.  And so whatever the changes were,

21 she would have to do on your instructions, right?

22    A.    Correct.

23    Q.    Assuming she did them.

24    A.    Correct.

25    Q.    Okay.  So these, both of these documents

86

1 were prepared under your instructions, right?

2    A.    Correct.

3    Q.    Okay.  When did you realize for the

4 first time that the year end value that the people in

5 the commingled account were supposed to get was

6 supposed to be through December 31, 1999, and not

7 March 31, 1999?

8    A.    Recently.

9    Q.    Not until after the lawsuit was started?

10    A.    Uh-hum.  Yes.

11    Q.    So before the lawsuit was started, your

12 understanding was that the year end values for the

13 participants was whatever the statements, the

14 brokerage statements showed as of March 31, 1999?

15    A.    Yes.

16    Q.    Okay.  Let me just switch gears real

17 quickly.

18         Did you ever make a claim on behalf of

19 the plan with Selective Insurance Company?

20         MR. KERN: Ask that question again.  I

21 missed the question.

22         MR. CHARME: Could you repeat it please.

23         (The pending question is read back by the

24 Reporter.)

25    A.    Not that I know of.

87

1    Q.    Did you ever make a claim on behalf of

2 the plan with Travelers Insurance Company?

3    A.    Not that I know of.

4    Q.    Did you ever make a claim on behalf of

5 the plan with any insurance company?

6    A.    Not that I know of.

7    Q.    Okay.  I'm going to show you -- you need

8 a minute?

9    A.    No.

10         (Criscito-20 is marked for

11 Identification.)

12    Q.    I'm going to show you what's marked as

13 Criscito-20, which are brokerage statements from

14 Morgan Stanley for the year 1999.

15         MR. CHARME: You should have that.  It

16 should be in there, I guarantee it.  I took it out of

17 order.

18         MR. KERN: Since you guarantee, I'll let

19 you find it.

20         (There is a discussion off the record.)

21    Q.    Have you seen brokerage statements from

22 Morgan Stanley before for 1999, Dr. Criscito?

23    A.    Before now?

24    Q.    Yes, before now.

25    A.    You mean in 1999?

88

1    Q.    Yes.  In 1999, did you get brokerage

2 statements from Morgan Stanley?

3    A.    Yeah.

4    Q.    You did, right?

5    A.    Yeah, yeah.

6    Q.    Okay.  Can I have that for one moment,

7 please.  I want to show you something.

8         There is a name, Herb Mendel.  Do you

9 know Herb Mendel?

10    A.    He was there.  He was at Morgan Stanley.

11    Q.    Okay.  Is he the person at Morgan Stanley

12 that you dealt with concerning the commingled account

13 there?

14    A.    He would have been one of them.

15    Q.    Who else?

16    A.    I don't remember.  Marysue was there.

17    Q.    Is that Marysue McCarthy?

18    A.    Yes.  There may have been some guy, or

19 some lady, I forgot their names.

20    Q.    Okay.  I'm going to go back to

21 Warnock-23, and the sheet that says "DCC P.A. Pension

22 Fund January 1, 1999, to December 31, 1999."  The

23 number, the year end value for Morgan Stanley Dean

24 Witter is 4,017,942.57.  Do you see that?

25    A.    Yes.

---

93

1    Q.    How did you happen to sell some of the
2  Veritas stock in January of 2000?
3    A.    Something must have came into my head
4  that said do it, and I do it.
5            (Exhibit Criscito-21 is marked for
6  Identification.)
7    Q.    I'm going to show you what I've marked as
8  Criscito-21, which is the complaint in this lawsuit,
9  and ask you if you've seen that document before today.
10   A.    Yes.
11   Q.    Okay.  If you would, please, take a look
12 at what's Exhibit 1 to the complaint, which is a
13 Morgan Stanley statement for the period ending
14 December 31, 1998.
15   A.    Where is that?
16   Q.    I'll get it for you.
17        Okay.  In 1998, I see reference to 11
18 Chadwick Road, Livingston, New Jersey.  That's where
19 you were living?
20   A.    Correct.
21   Q.    You were getting brokerage statements
22 from Morgan Stanley in 1998, correct?
23   A.    Correct.
24   Q.    Okay.  And there is a description on this
25 statement of different investments, Lucent

---

94

1  Technologies, NYCAL, Sandis Corp., UniCapital
2  Corporation, Veritas Software.  Do you see those?
3    A.    Yes.
4    Q.    Whether in consultation with the broker
5  or on your own, you're the one who made the ultimate
6  decision to purchase those particular stocks, right?
7    A.    Correct.
8    Q.    Okay.  Do you recall in 1998 when you
9  gave Brian Warnock year end values if you used them as
10 of March 31, 1998, as opposed to December 31?
11   A.    I can't tell you, sir.
12   Q.    Don't know.  Okay.  Veritas stock, would
13 it be fair to say, was a volatile stock, a lot of
14 movement?
15   A.    There was movement in it.
16   Q.    It was moving quite a bit in 1998, 1999,
17 wasn't it?
18   A.    Yes, I believe so.
19   Q.    You picked it because you thought you
20 could make money, right?
21   A.    Absolutely.
22   Q.    In fact, you picked each of these
23 investments because you thought you could make money,
24 right?
25   A.    Correct.

---

95

1    Q.    And am I correct, you never discussed the
2  particular investments because in 1998, as far as you
3  knew, you were the only one in the commingled account?
4    A.    Yes.
5    Q.    And the same thing was true for most of
6  1999, except maybe toward the very end or the
7  beginning of 2000?
8    A.    Say that again.  Say that again, because
9  I didn't -- because my mind was someplace else.  Go
10 ahead.
11   Q.    You didn't discuss your investments in
12 1999 with anyone because as far as you were concerned,
13 you were the only one in the commingled account,
14 right?
15   A.    Correct.
16   Q.    Okay.  Turn, if you would, please, to
17 the next page, which is Exhibit 2 to the complaint.
18   A.    918?
19   Q.    Let me see.  If you look, this is a
20 statement for the month ending December 31, 1999,
21 right?
22   A.    Yes.
23   Q.    Okay.  You got this from Morgan Stanley?
24   A.    I don't know where it came from.
25   Q.    Let me say the question differently.

---

96

1            As far as you know, during the years 1998
2  and 1999, was there ever a month when Morgan Stanley
3  skipped sending you a brokerage statement?
4    A.    No.  I don't believe so, no.
5    Q.    It shows, it says total value of priced
6  investments, 12,919,403.12.  Do you see that?
7    A.    Yes.
8    Q.    Did you ever mention that number to Brian
9  Warnock?
10   A.    No, sir.
11   Q.    Why not?
12   A.    No reason to.
13   Q.    Okay.  And when you say no reason to,
14 it's because of what you told me before, you thought
15 when people were getting segregated from the
16 commingled account, that the year end value was
17 supposed to be March 31, 1999?
18   A.    Correct.
19   Q.    Okay.  Besides Brian Warnock, did you
20 tell anyone at Diagnostic that the year end value for
21 the Morgan Stanley account was 12,919,403.12?
22   A.    Not that I remember.
23   Q.    So no one had any idea that this account
24 had gone up significantly from the end of 1998 to the
25 end of 1999?

---

97

1    A.    Correct.

2        MR. KERN: No one?

3        MR. CHARME: At Diagnostic.

     A.    You know, that's a good -- that's a good

-- I don't know. But I don't know.

6    Q.    Okay. Let me ask you this --

7    A.    Yeah. I mean, it's a good question, but

8  there's -- there's other implications here.

9    Q.    What are those implications?

10    A.    I don't know if -- I don't know who was

11  getting these statements.

12    Q.    Okay. But I think you testified earlier

13  that you never instructed Morgan Stanley to send them

14  to anyone besides you, did you?

15    A.    I never instructed them, but I never told

16  them not to do it.

17    Q.    Okay. Do you think Morgan Stanley would

18  send me your brokerage statements?

19    A.    Could. Could. I mean, Mr. Charme, could

20  have.

21        MR. KERN: We know they did, so.

22    Q.    The point that I'm making, Dr. Criscito,

23  is brokerage companies don't send their brokerage

24  statements to anyone other than the person on the

25  statement unless they have permission.

98

1        MR. KERN: That's your testimony.

2        MR. CHARME: Well, I'm asking.

3        MR. KERN: But we know there were

4  statements sent.

5    Q.    I'm asking, is it your understanding that

6  Morgan Stanley was prepared to send your brokerage

7  statements to other people without your knowledge or

8  consent?

9    A.    Could have.

10    Q.    Okay. Do you know of any instances where

11  they did?

12    A.    I think they did.

13    Q.    Who did they send it to without your

14  knowledge or consent?

15    A.    They may have sent it to the office, they

16  may have sent it to American Pension.

17    Q.    Well, you keep saying may have, but do

18  you know specifically whether they ever did? Not may

19  have. Do you know specifically sitting here whether

20  they ever did that?

21    A.    Now I do.

22    Q.    Okay. What do you know?

23    A.    That they did do it.

24    Q.    To who?

25    A.    To American Pension.

99

1    Q.    When did they send brokerage statements

2  -- I'm talking about Morgan Stanley now -- to American

3  Pension without your knowledge or consent?

4        MR. KERN: Objection. They're two

5  different issues there.

6        MR. CHARME: Okay. I'll go back.

7    Q.    When did they send, when did Morgan

8  Stanley, as far as you know, first send your account

9  brokerage statements to American Pension?

10    A.    I don't know when exactly. I don't know

11  when.

12    Q.    Was it in 2000?

13    A.    It may have been 2000, may have been

14  before, and it may have been after.

15    Q.    Okay. How did you find out?

16    A.    Because Dr. Casella found them.

17    Q.    Okay. So you're referring to the Morgan

18  Stanley statements that Dr. Casella found in 2007?

19    A.    Yes.

20    Q.    And is it your testimony that you never

21  authorized Morgan Stanley to send those brokerage

22  statements to American Pension Corporation?

23    A.    It isn't I never authorized, I never -- I

24  never told them not to send them. I thought that was

25  an automatic.

100

1    Q.    So you thought Morgan Stanley was

2  automatically sending your --

3    A.    That's what I thought.

4    Q.    Let me finish, please.

5    A.    Sorry.

6    Q.    You thought Morgan Stanley was

7  automatically sending your pension statements to --

8  your brokerage statements to American Pension

9  Corporation ever since the beginning of the commingled

10  account at Morgan Stanley?

11    A.    Possibly, yes.

12    Q.    You say possibly, but did anyone at

13  Morgan Stanley ever tell you they were doing that?

14    A.    No.

15    Q.    Okay. Did you ever ask anyone at Morgan

16  Stanley why they sent the brokerage statements that

17  Dr. Casella discovered at APC, why they sent those

18  statements to APC?

19    A.    No.

20    Q.    Never spoke to Herb Mendel about it?

21    A.    No.

22    Q.    Never spoke to Marysue McCarthy about it?

23    A.    No, sir.

24    Q.    Okay. Were you upset that those

25  brokerage statements had been sent by Morgan Stanley

105

1  point you thought was all your money, right?
2      A.    Correct.
3      Q.    Smith Barney was -- Smith Barney and
Morgan Stanley were those two commingled accounts
where you thought all the money was yours, right?
6      A.    Correct.
7      Q.    And so my question is we know that some
8  portion of the money in the Morgan Stanley account was
9  allocated to segregated accounts for participants.
10 Are you aware of that?
11     A.    Am I -- sorry.
12     Q.    I'll say it again.  Don't write on those.
13         Are you aware that some of the money from
14 the Morgan Stanley commingled account in 2000 was
15 allocated to segregated accounts for participants?
16         MR. KERN:  Allocated by who?
17         MR. CHARME:  It doesn't matter by whom,
18 it was allocated out to segregated accounts.
19     A.    Yes.
20     Q.    Okay.
21         MR. KERN:  You mean money was distributed
22 out of that account?
23         MR. CHARME:  I didn't say distributed.
24 Distribution is something different.
25         MR. KERN:  Transferred?  I want to know

106

1  what you mean by the word "allocated."
2          MR. CHARME:  It's a term of art.  It
3  means what it means.
4          MR. KERN:  I don't know what it means.
5      Q.    Do you know what it means?
6      A.    No.
7      Q.    Okay.  Well, let me state the question
8  differently.
9          In 2000, some of the money that you
10 thought was all yours in the commingled account went
11 to other participants, correct?
12     A.    Yes.
13     Q.    Okay.  I'm not saying it went to them
14 directly, it may have went to accounts for their
15 benefit, correct?
16     A.    Right.
17     Q.    Okay.  Did that happen at any time with
18 regard to any of the money in the Smith Barney
19 account?
20     A.    I don't know.
21     Q.    You don't know?
22     A.    No.
23     Q.    Okay.  If you take a look at what I
24 marked as Exhibit 5 to the complaint, if you look in
25 the lower right hand corner, it has "quarterly total

107

1  value comparison."  Do you see that?  There's a bar
2  chart.
3      A.    I saw that before, yeah.
4      Q.    And if you look under -- above 3/99, it
5  says .735.  Do you see that?
6      A.    Where?
7      Q.    Right here.
8      A.    Oh, okay.
9      Q.    Okay?
10     A.    Yes.
11     Q.    It says units in multiples of one
12 million, so .735 means 735,000, right?
13     A.    Right.
14     Q.    I'm going to show you again the fax cover
15 sheet that was sent to Brian Warnock that says "DCC
16 P.A. Pension Fund, January 1, 1999 - December 31,
17 1999," and next to Solomon Smith Barney the number is
18 798,425.50.  Do you see that?
19     A.    Yes.
20     Q.    You said before that you were using year
21 end values as of March 31, 1999, right?
22     A.    Correct.
23     Q.    Do you know why the amount on what was
24 faxed to Brian Warnock is higher than what's on the
25 Solomon Smith Barney statement?

108

1      A.    Someone may have gave it to me, that's
2  what I put down.  No.
3      Q.    So with regard to what you put down for
4  Solomon Smith Barney and what you faxed to Brian
5  Warnock, you called someone at Smith Barney for that
6  information?
7      A.    Yes.
8      Q.    Okay.  You didn't rely on the brokerage
9  statement?
10     A.    No, sir.
11     Q.    Okay.  At some point, you found out that
12 the 1999 year end values were supposed to be as of
13 December 31st, 1999, not March 31st, correct?
14     A.    Correct.
15     Q.    Did you find that out before the lawsuit?
16     A.    No.  After.
17     Q.    Okay.  What steps, if any, have you taken
18 to see that the participants in the commingled account
19 get the proportional value based on the year end
20 values for December 31st, 1999, instead of March 31st?
21         MR. KERN:  I object.  That assumes he has
22 any control over it, and as you well know, he no
23 longer is trustee, hasn't been a trustee since the
24 lawsuit was started.
25         MR. CHARME:  Then he can say he's done

149

1    Q.    So you were lending yourself the money?
2    A.    Yes.
3    Q.    Okay.  Did you repay yourself back?
          MR. KERN: Repay himself in terms of the
     pension fund?
6    Q.    Let's take the $150,000, because this is
7    typical of the other things.  With regard to this, so
8    you're saying you lent yourself $150,000 from the
9    pension fund and you used the 150 to put it into Home
10   Theater, right?
11   A.    Correct.
12   Q.    Did you pay yourself back somehow?
13        MR. KERN: You say yourself back.  He paid
14   monies back to the pension fund periodically.  He's
15   already testified to that.
16        MR. CHARME:  I understand that, but he
17   didn't --
18   Q.    I'm asking with regard specifically, say,
19   to this 150.  Did you --
20   A.    I can't --
21   Q.    You can't say that, right?
22        MR. KERN:  Say what?  Can't say what?
23        MR. CHARME:  That he specifically repaid
24   the 150 to the pension fund.
25        MR. KERN:  As opposed to a different 150?

150

1         MR. CHARME:  Let me say it differently.
2    Q.    You said that you took certain monies as
3    distributions ultimately, which means to me that they
4    didn't go back to the pension fund because otherwise
5    it wouldn't be a distribution, right?
6    A.    They went -- I don't know.  I don't know.
7    Listen to me, I don't know legally.   All I know is if
8    X number of dollars was taken as a loan, and then I
9    finally took them as a distribution and paid taxes on
10   it, that's what I did.
11   Q.    How did you decide what amount to take as
12   a distribution and what amount to put back into the
13   pension fund?
14   A.    (The witness nods in the negative.)
15   Q.    No rhyme or reason?
16   A.    No rhyme or reason.
17   Q.    Let's take a look at exhibit --
18        MR. KERN: It's --
19        MR. CHARME:  This is the last one.
20   Q.    Exhibit 2, that's a deposit of 95,975
     into the pension fund.
22   A.    Right.
23   Q.    Do you know where that money came from?
24   A.    From -- that's money that I had that I
25   deposited into the pension fund.

151

1    Q.    I understand.  Do you know from where,
2    from what account?
3    A.    I -- no.  From what account, no.
4         MR. CHARME:  Let's stop here for today.
5         (At 4:15 p.m., the deposition is
6    adjourned.)

152

C E R T I F I C A T I O N

     I, NANCY A. MIANI, a Certified Court Reporter
and a Notary Public, License No. XI00814, do hereby
certify that the foregoing witness, MARIO CRISCITO,
M.D., was duly sworn by me on the date indicated, and
that the foregoing is a true and accurate
transcription of my stenographic notes.
     I further certify that I am not employed by
nor related to any party to this action.


                    _____
                    NANCY A. MIANI, C.S.R.
                    LICENSE NO. XI00814