Exhibit

I

187

```
 1            UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
 2            CIVIL ACTION CASE NO. 2:08-CV-1567

 3  ---------------------------------------
    DR. FADI CHAABAN; DR. SABINO R. TORRE, DR.  :
 4  CONSTANTINOS A. COSTEAS and DR. ANTHONY J.   :
    CASELLA, as Trustee of Diagnostic & Clinical :
 5  Cardiology, P.A. Profit Sharing Plan,        :

 6            Plaintiffs,                         :

 7    vs.                                         :

 8  DR. MARIO A. CRISCITO,                        :
              Defendant.                          :
 9  ---------------------------------------
                Wednesday, July 15, 2009
10

11       Deposition of BRIAN WARNOCK, VOLUME II,

12  before Nancy A. Miani, a Certified Court Reporter,

13  License No. XI00814, and a Notary Public of the State

14  of New Jersey at the offices of WITMAN, STADTMAUER,

15  ESQS, 26 Columbia Turnpike, Florham Park, New Jersey,

16  on Wednesday, July 15, 2009, at 10:10 a.m.

17

18

19

20

21              MIANI COURT REPORTING
22           CERTIFIED COURT REPORTERS
                  1741 DANIEL COURT
23                WALL, NJ  07719
                   (732) 681-4776
24

25
```

188

A P P E A R A N C E S :

WITMAN, STADTMAUER, ESQS.
26 Columbia Turnpike
Florham Park, NJ 07932
By: STEPHEN M. CHARME, ESQ.
Attorneys for the Plaintiffs

KERN, CONROY & SCHOPPMANN, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
BY: STEVEN KERN, ESQ.
AND  CHARLES H. NEWMAN, ESQ.
Attorneys for the Defendant

ALSO PRESENT:

Anthony Casella, M.D.

189

```
                I N D E X
 2  WITNESS        CROSS    REDIRECT    RECROSS
 3  BRIAN WARNOCK
 4    BY MR. KERN       192            352
                                  381
 5                                 383

 6
     BY MR. CHARME           307
 7                      377
                        383
 8                      384
 9
10            E X H I B I T S
11  EXHIBIT NO.      DESCRIPTION          PAGE

12  Warnock-22  Diagnositc & Clinical       214
                Cardiology, PA, Annual Report
13              And Participant Statement
                12/31/00
14
    Warnock-23  Three-Page Letter from Brian  218
15              Warnock dated 6/30/09 and
                Attachments
16
    Warnock-24  DCC Plan Document 12/31/99    246
17
    Warnock-25  One-Page Letter to Dr. Criscito  294
18              From Dominique Eck dated
                11/23/99 and One-Page
19              Attachment

20  Warnock-26  One-Page Letter from Peter    306
                Coughlan and One-Page
21              Attachment

22  Warnock-27  Employee Census, 4/1/89 -     315
                3/31/90
23
    Warnock-28  One-Page Letter to Dr. Casella  316
24              From Donald Cuny dated 8/23/91

25
```

190

```
 1            E X H I B I T S

 2  EXHIBIT NO.      DESCRIPTION          PAGE

 3  Warnock-29  One Page of Handwritten Notes  318

 4  Warnock-30  One-Page Memo to Mario Criscito  319
                From Brian Warnock dated 5/15/94
 5              And Three-Page Attachment

 6  Warnock-31  One-Page Letter to Dr. Criscito  320
                From Peter Coughlan dated 10/7/93
 7              And One-Page Attachment

 8  Warnock-32  Excerpt from DCC Money-Purchase  373
                Pension Plan effective 4/1/76
 9
    Warnock-33  Signature Page, Bate Stamp 7700  382
10
```

```
 1              LITIGATION SUPPORT
 2
 3  DIRECTION NOT TO ANSWER
 4       (None)
 5
    MOTION TO STRIKE
         (None)
 8
 9  DOCUMENT REQUEST
10    207-21  278-12   361-22
      236-22  279-7    362-8
11    262-9   284-18   369-4
      270-13  293-2
12    271-15  359-3
13  EXHIBIT ANALYSIS
14       Original Exhibits Warnock 22 through
         Warnock-33 are attached to Original
15       Transcript.
16       Copies of exhibits attached to transcripts.
17
18
19
20
21
22
23
24
25
```

191

```
 1  We don't always necessarily get a signed copy.
 2       Q.    How would you get a signed copy?
 3       A.    We ask them to send us a signed copy just
 4  so we have it in our file as evidence that it was
 5  done, but some people send it back, some people don't.
 6       Q.    If we go to Page 259 -- no number on this
 7  one.  The fifth page, one, two, three, four -- fifth
 8  page.
 9       A.    25959.
10       MR. KERN:  Is there a stamp on this one?
11       MR. CHARME:  I don't see it.
12       Q.    It's the fifth page of what's been marked
13  Warnock-8.  It doesn't have a Bate stamp on it.
14       A.    All right.
15       Q.    Is it your testimony that this form would
16  have gone to Dr. Criscito unsigned, and he would have
17  returned it to you with a signature, a copy to you
18  with a signature?
19       A.    He would send us one page.  We send him
20  the forms to sign, send the whole package into the
21  IRS, and then we send one page, one blank first page
22  for him to sign and send back to us, and that way we
23  have it in the file, and it's really for if the IRS
24  ever asks, A, we didn't get the form or whatever, we
25  got it late, we can say no, he filed it on this day,
```

194

192

```
 1  B R I A N    W A R N O C K,
 2  American Pension Corporation, 1375 Plainfield Avenue,
 3  Watchung, New Jersey, resworn.
 4  CONTINUED CROSS EXAMINATION BY MR. KERN:
 5       Q.    I want to begin by turning to what's been
 6  previously marked Warnock-8.
 7       A.    Okay.
 8       Q.    Can I start?  Okay.  Now, is this a copy
 9  of the 5500 that was in your file?
10       A.    Yes.  Yes.
11       Q.    I note that on the third page of this
12  exhibit, marked 25958, there is no signature of the
13  employer or plan sponsor.  Do you know why that is?
14       A.    No, I don't.
15       Q.    And who was the plan sponsor?
16       A.    Well, the employer would be, so an
17  officer of Diagnostic would sign.
18       Q.    I also note on the first page of the
19  document that there is no signature of either the plan
20  administrator or the employer, plan sponsor, right?
21       A.    That is correct.
22       Q.    That was 25946.  Would this have gone out
23  to the IRS in this form?
24       A.    No.  We send the forms to Dr. Criscito or
25  to the employer.  He signs it, sends it into the IRS.
```

```
 1  and he even sent us a copy saying -- with the same
 2  date.  That's the reason we ask for it.
 3       Q.    You see the signatures on the bottom of
 4  this page?
 5       A.    Yes, I do.
 6       Q.    Do they appear to be two different
 7  signatures, the signature of the second individual?
 8       A.    I would think they were the same.
 9       Q.    They don't look different to you?
10       MR. CHARME:  Asked and answered.
11  Objection.
12       Q.    They don't look different to you?
13       A.    One has an A in it and one doesn't.
14       Q.    Let's go down two more pages.  This is
15  another page which is not Bate stamped, but on the
16  bottom page it says October 19th, 2004.  Do you have
17  that one?  Again, two signatures?
18       A.    Yes.
19       Q.    Do they appear to be the same signature
20  of the same person?
21       A.    They do look somewhat different, somewhat
22  the same.
23       Q.    Do you have any explanation for it?
24       A.    No idea.
25       Q.    Okay.  Let's go then to Warnock-9.
```

323

1   contributions, correct?
2       A.      1993. Yes.
3       Q.      Okay. So this statement, this prior
4   statement about how you were speaking to Dr. Casella
5   about contribution overall, you're referring to the
6   year 2005?
7       A.      Then I was referring to 2005 because I
8   was talking about the comparability plan, but Dr.
9   Casella did start giving me the census information
10  before 2005. He's been -- for at least ten years we
11  have been getting it from him.
12      Q.      Sometime subsequent to 1993?
13      A.      Sometime after -- yes, sometime after
14  1993 we started getting it, and I couldn't tell you
15  the exact year.
16      Q.      Okay. At your last deposition, and this
17  is on Page 138, you were asked if either a participant
18  or someone on behalf of a participant in the
19  commingled account ever asked for information and you
20  were unable to provide it, and you answered no. Do
21  you recall that?
22      A.      I think my answer was I would say, talk
23  to Dr. Criscito.
24      Q.      Okay. Did any, in other -- you're a
25  third party administrator for other plans, correct?

324

1       A.      Uh-hum.
2       Q.      And you've had other plans where there
3   have been commingled accounts?
4       A.      Yes.
5       Q.      In those situations, have you had
6   participants call you directly for information as to
7   their accounts?
8       A.      We have had people call directly for the
9   accounts.
10      Q.      And have they been given that
11  information?
12      A.      It depends on the employer. A lot of
13  employers will say give us -- give the person my phone
14  number, talk to Brian, go ahead, he'll answer your
15  questions, you know, tell them everything you want.
16  Others are like tell them to ask me, go through me,
17  give me the information and I will give it to the
18  client. They don't want us disclosing information.
19      Q.      What category did Dr. Criscito fall into?
20      A.      He would be the more give it to Dr.
21  Criscito and he will convey the information. I don't
22  recall -- and I can't say it never happened --
23  speaking to participants of the plan. We would speak
24  to the doctors who had their own separate accounts
25  would call, and speak --

325

1       Q.      But those were segregated accounts?
2       A.      They had their own separate accounts. I
3   can't recall people calling me about the commingled
4   account. You know, could it have happened? Yes, but
5   I don't remember it.
6       Q.      Did Dr. Criscito ever discuss with you
7   whether he had told the participants in the commingled
8   account that if they wanted any information, it had to
9   go through him?
10      A.      That I don't know.
11      Q.      Okay. Now, at your last deposition, on
12  Page 39, the question was "He," referring to Dr.
13  Criscito, "didn't care if other people knew their
14  individual account balances, as far as you can tell?"
15  Answer: "Right, he didn't want people to know what
16  his account was worth," et cetera. Yet you said that
17  if any participant had called you, you would have told
18  them to speak to Dr. Criscito, correct?
19      A.      I would have done that, just because he
20  always, you know, don't tell anybody anything. That
21  was the message.
22      Q.      That was the message, don't tell anybody
23  anything?
24      A.      So I would not talk to anybody without
25  his okay, you know.

326

1       Q.      Also, so that I'm clear, even if you gave
2   a participant the value of their individual
3   investment, that wouldn't tell them the entire value
4   of the commingled account, would it?
5       A.      No.
6       Q.      So that even if a participant knew the
7   specific amount allocated to them, they would have no
8   idea whether the year end values were correct or not,
9   would they?
10      A.      No.
11      Q.      And the year end values of the commingled
12  account for Diagnostic included not only Dr.
13  Criscito's investment, but also that of other people,
14  correct?
15      A.      The commingled account, yes. I never
16  recall there being a problem with people saying I
17  don't know how much money is in my account, or that
18  being any kind of mystery about the value of the
19  people's accounts in the commingled account. You keep
20  asking me what if somebody called me up. I don't
21  think it was a big secret.
22      Q.      Did anyone ever call you up?
23      A.      I don't recall anyone ever calling me up,
24  but I certainly don't remember anyone saying like
25  don't tell anybody what's in their own account.

327

1   Well, let me rephrase that.  Okay.
2   Because he wouldn't want me talking to anybody, but as
3   far as what a person had in their account, I don't
4   remember that being any problem with people saying we
5   don't know how much money is in our account, everybody
6   being mad about that.  We have plans like that, where
7   employers don't tell them anything, you know, I don't
8   even know about my account.  That was never an issue
9   with this plan, people calling me, begging me to tell
10  them how much money is in their account, and me having
11  to say go talk to Dr. Criscito.  I don't think that
12  happened.
13      Q.      Were you aware whether any participants
14  had asked Dr. Criscito for information about the value
15  of their accounts and were not satisfied with the
16  answer?
17      A.      No.  No.
18      Q.      So you don't know one way or the other --
19      A.      I don't know one way or the other.
20      Q.      -- what the story was with participants
21  getting information directly from Dr. Criscito, do
22  you?
23      A.      No.
24      Q.      Now, at your last deposition, this was
25  concerning a loan that was taken out.  At Page 141,

328

1   you testified that when Dr. Criscito said I paid it
2   off, that you assumed that he had paid off the loan,
3   correct?
4       A.      That's correct.
5       Q.      But APC isn't an auditor, right?
6       A.      That's correct.
7       Q.      So am I correct that APC never performed
8   any kind of audit or any other kind of independent
9   verification to determine that Dr. Criscito did, in
10  fact, pay off the loan?
11      A.      We did not.
12      Q.      You did not?
13      A.      No.
14      Q.      So the only basis you have for saying
15  that the loan was paid off is because that's what Dr.
16  Criscito told you, correct?
17      A.      That is correct.
18      Q.      I want to talk to you about exhibits that
19  we marked the last time, Warnock-5 and Warnock-6.
20  Let's start with Warnock-5, which involved $25,531.60.
21  The last time -- this was at Page 141 -- you testified
22  that you had no reason to believe the extra money
23  that's referred to on Warnock-5 was a contribution,
24  that no one had complained, and that therefore, it was
25  okay to use that money to reduce Dr. Criscito's loan.

329

1   Do you recall that?
2       A.      I don't remember saying exactly that.
3       Q.      Well, then I'll ask you that.  Then I'm
4   prepared to go over the same territory again.
5               With regard to this money, the $25,000 on
6   Warnock-5, if you look at page Bate stamped 10314, is
7   that your note where it says "per Mario, 9/25/87,
8   reduce balance by 25,531.60"?
9       A.      Yes.
10      Q.      And my question to you is did you believe
11  that it was appropriate to do that because this was,
12  quote, "extra money"?
13      A.      Yes, I did.  Because --
14      Q.      Okay.  There had been some questioning
15  concerning this amount, or a later amount, which was
16  on Warnock-6, which involves the sum of 35,421.44 as
17  to whether or not there could be any reason for there
18  to be extra money being contributed except for the
19  fact that Dr. Criscito wanted this to pay off the
20  loan.  Do you recall that?
21      A.      Yes.
22      Q.      And at the time I interjected, Mr. Kern
23  said it was inappropriate, that it could have also
24  been a mistake.  Could it not have been a mistake that
25  too much money was contributed, could that be the

330

1   reason why there was an excess?
2       A.      That they contributed too much money?
3       Q.      Yes.  That was a mistake, that someone
4   just made a mistake.
5       A.      It could have been anything, yeah.
6       Q.      So it could have just been a mistake,
7   right?
8       A.      It could have been a mistake.
9       Q.      Now, the last time around, I just want to
10  make sure that I understand this.  You said, and this
11  is on Warnock-6, and this is with regard to the
12  35,421.44, if you look at Bate stamped page 25511,
13  which was a January 7, 1991 letter, if you look at the
14  third paragraph, you say "rather than carry it as an
15  advanced contribution (and possibly incur a 10 percent
16  excise tax), we applied the 35,421.44 to a participant
17  loan."  Do you see that?
18      A.      Yes.
19      Q.      I want to understand something.  If, in
20  fact -- withdrawn.
21              I believe we established that at least
22  through 1993, Dr. Criscito was the person in charge of
23  making contributions to the plan, correct?
24      A.      Correct.
25      Q.      Okay.  If, in fact, the extra 35,421.44

383

1  Q.  Finally, you previously testified that an
2  active participant could maintain monies in both the
3  commingled account and in the segregated account,
4  correct?
   A.  It would be legal to do it, yes.
6  Q.  Nothing which would have precluded that,
7  correct?
8  A.  There's nothing to preclude that no.
9      MR. KERN:  I have nothing further.
10 A.  It would be unusual, but there's nothing
11 to preclude it, no.
12     MR. KERN:  I have nothing further.  Thank
13 you.
14     MR. CHARME:  I have one quick question.
15 REDIRECT EXAMINATION BY MR. CHARME:
16 Q.  Do you know if, in the case of
17 Diagnostic, anyone maintained both money in a
18 commingled account and in a segregated account?
19 A.  No, no one did.
20 RECROSS EXAMINATION BY MR. KERN:
21 Q.  Well, how do you know that?  If there
22 were monies sitting in the Smith Barney account that
23 hadn't been distributed for whatever reason, and those
24 monies belonged to active participants, then the fact
25 is that there would have been monies maintained in

385

1  Criscito maintained an individual segregated account
2  at Smith Barney?
3  A.  For himself?
4  Q.  For himself.
5  A.  No.
6      MR. CHARME:  No further questions.
7      MR. KERN:  No further questions.
8      (At 4:40 p.m., the deposition is
9  adjourned.)

384

1  both the commingled account and a segregated account
2  for that individual, right?
3  A.  That is correct.  But no one
4  intentionally was in both accounts.
5  Q.  As far as you know?
6  A.  As far as I know, for sure, no one was
7  intentionally in the commingled account and the
8  segregated account because nobody said keep half of my
9  money in the commingled account, put half of my money
10 in a separate account.
11 Q.  I understand.  That commingled account
12 was maintained at least through 1995 -- at least
13 through 2005, correct?
14 A.  Yes, it was a small balance left in the
15 2005.
16 Q.  You don't know how much was in the Smith
17 Barney account in 2005, though, do you?
18 A.  No.  What we had, it was just --
19 Q.  Do you know what the name on the Smith
20 Barney account is until this very day?
   A.  No.
22     MR. KERN:  I have nothing further.
23     MR. CHARME:  I have one quick question.
24 REDIRECT EXAMINATION BY MR. CHARME:
25 Q.  Did anyone ever say to you that Dr.

386

1      C E R T I F I C A T I O N
2
3
4
5      I, NANCY A. MIANI, a Certified Court Reporter
6  and a Notary Public, License No. XI00814, do hereby
7  certify that the foregoing witness, ^ , was duly sworn
8  by me on the date indicated, and that the foregoing is
9  a true and accurate transcription of my stenographic
10 notes.
11     I further certify that I am not employed by
12 nor related to any party to this action.
13
14
15
16     NANCY A. MIANI, C.S.R.
       LICENSE NO. XI00814
17
18  .
19
20
21
22
23
24
25