Exhibit
K

1          SUPERIOR COURT OF NEW JERSEY

2          CHANCERY DIVISION:ESSEX COUNTY

3          DOCKET NO. ESX-C-117-08

4  - - - - - - - - - - - - - - - - - - - -
                                        :
5  DIAGNOSTIC and CLINICAL CARDIOLOGY, P.A.,   :
                                        :
6          Plaintiff,                   :
                                        :
7     vs.                               :
                                        :
8  MARIO A. CRISCITO, M.D., ABC COMPANY, JOHN  :
                                        :
9  DOES 1-10, and XYZ COMPANIES 1-10,   :
                                        :
10         Defendants.                  :
                                        :
11    and                               :
                                        :
12 CAPTION CONTINUED ...                :

13

14

15

16      DEPOSITION OF:  ANTHONY CASELLA, M.D.

17         MONDAY, JUNE 22, 2009

18

19

20      ROSENBERG & ASSOCIATES, INC.

21   Certified Court Reporters & Videographers

22  425 Eagle Rock Ave., Suite 201     575 Madison Ave.

23  Roseland, NJ 07068           New York, NY 10022

24   (973) 228-9100    1-800-662-6878    (212) 868-1936

25       www.rosenbergandassociates.com

2

1  MARIO A. CRISCITO, M.D.,                              :
                                                        :
2            Third Party Plaintiff                      :
                                                        :
3      vs.                                              :
                                                        :
4  DIAGNOSTIC and CLINICAL CARDIOLOGY, P.A.,            :
                                                        :
5  GARY J. ROGAL, M.D., ANTHONY J. CASELLA,             :
                                                        :
6  M.D., KEITH A. HAWTHORNE, M.D., DONALD G.            :
                                                        :
7  RUBENSTEIN, M.D., MARC ROELKE, M.D., SABINO          :
                                                        :
8  R. TORRE, M.D., FADI N. CHAABAN, M.D.,               :
                                                        :
9  CONSTANTINOS A. COSTEAS, M.D., KAUSHIK C.            :
                                                        :
10  MODI, M.D., BRUCE J. HAIK, M.D., MARK BROWN          :
                                                        :
11  and JOHN DOES 1-10,                                 :
                                                        :
12            Third Party Defendants.                   :
                                                        :
13  - - - - - - - - - - - - - - - - - - - - - - -

14    Deposition of ANTHONY CASELLA, M.D., taken in

15  the above-entitled matter before WINIFRED A.

16  HANDEL, a Certified Court Reporter (License No.

17  XI00421) of the State of New Jersey, taken at the

18  offices of WITMAN STADTMAUER, P.A., 26 Columbia

19  Turnpike, Florham Park, New Jersey, on Monday, June

20  22, 2009, commencing at 10:10 a.m.

21

22

23

24

25

3

```
 1  A P P E A R A N C E S:

 2

 3  WITMAN STADTMAUER, P.A.

 4  26 Columbia Turnpike

 5  Florham Park, New Jersey 07932

 6  (973) 822-0220  scharme@wsmesq.com

 7  BY:  STEPHEN M. CHARME, ESQ.

 8  Attorneys for Plaintiff and Third Party

 9  Defendants

10

11  KERN, AUGUSTINE, CONROY & SCHOPPMANN, PC

12  1120 Route 22 East

13  Bridgewater, New Jersey 08807

14  (908) 704-8585

15  BY:  STEVEN I. KERN, ESQ.

16  Attorneys for Defendant and Third Party

17  Plaintiff

18

19

20

21

22

23

24

25
```

4

```
1                    I N D E X

2

3   WITNESS                EXAMINATION BY      PAGE

4   ANTHONY CASELLA, M.D.   MR. KERN             5

5

6

7

8

9

10                   E X H I B I T S

11  NUMBER              DESCRIPTION           PAGE

12                  (No exhibits marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

1              ANTHONY CASELLA, M.D.,

2    375 Mount Pleasant Avenue, West Orange, New Jersey

3    07052, having been first duly sworn, was examined

4    and testified as follows:

5

6                   EXAMINATION

7    BY MR. KERN:

8        Q.    Dr. Casella, as you know, my name is

9    Steven Kern.  I represent Dr. Criscito in an action

10   brought by Diagnostic and Clinical Cardiology,

11   which I'll refer to during this deposition as DCC,

12   against Dr. Criscito.  You have been deposed

13   before, correct?

14       A.    Yes.

15       Q.    In fact, I've deposed you before,

16   correct?

17       A.    Yes.

18       Q.    Let me repeat a couple of the

19   directions.  I'm going to ask you a series of

20   questions here today.  If at any time you don't

21   understand my question or believe it to be

22   ambiguous or confusing, please let me know.

23   Otherwise, the answer you give will be deemed to be

24   responsive to the question I ask you.  Do you

25   understand that?

87

1  of DCC with regard to revenues received outside of

2  regular business hours -- revenues received by

3  doctors outside of regular business hours?

4          A.      The policy is that if the work -- if

5  the outside work is done during the workday, the

6  moneys should come into DCC, and if it's done after

7  hours, it can go to the doctor who is doing it.

8          The only person who ever disagreed

9  with that was Criscito, and he was very, very vocal

10 in saying that all the money outside of business

11 hours should come into DCC, although we never saw

12 any of his income from after hours coming in, but

13 the rest of the group agreed if you did it during

14 work hours, it came into the business.  If you did

15 it after work hours, it was yours.

16         Q.      So, he was outvoted on that?

17         A.      Yes.

18         Q.      Earlier you talked about the fact

19 that Dr. Criscito was not good at keeping financial

20 information.

21         A.      In the checkbook -- in the practice.

22         Q.      Can you give me an example of that?

23         A.      Well, he had no interest -- the

24 accountants wanted -- they wanted accurate

25 information on how much money was spent for office

1    supplies, for entertainment, for books, et cetera,

2    and Criscito just didn't keep those kind of

3    records.  He would give them the American Express

4    statement, and say -- if it was up to him, he would

5    have given them the American Express statements and

6    say work it out.  You figure it out.  So, I wound

7    up figuring it out

8         Q.     Why didn't he work it out?

9         A.     He had no interest in doing it.

10        Q.     The same holds true for tracking

11   profitability and dealing with billings and

12   collections and those aspects?

13        A.     He had no interest in it.

14        Q.     No interest in the financial aspect

15   of the business?

16        A.     He had no interest in doing the work.

17        Q.     Doing work on the financial aspect of

18   the business?

19        A.     Doing the accounting to track or to

20   improve it.

21        Q.     Let's define accounting.  Would you

22   consider dealing with billing and collection issues

23   part of the accounting?

24        A.     Well, it's the receivables.  He had

25   no interest in managing any of the numbers.

89

1    Q.    I take it because he had no interest

2 in doing it, he did not do it.

3    A.    I don't know exactly who did it

4 before I took it over, but it was my impression

5 that the two office girls did it.

6    Q.    To your knowledge, was there ever a

7 time where Dr. Criscito involved himself in

8 managing the financial affairs of the practice?

9    A.    Before I took it over, he probably

10 managed the affairs with Betty Bulkowski, who did

11 the paperwork.

12    Q.    And after you took it over?

13    A.    I took care of it, and I worked with

14 the accountants.

15    Q.    And Dr. Criscito did not involve

16 himself in it?

17    A.    No.  The only thing he involved

18 himself with was he kept his own expense account

19 records.

20    Q.    And how well did he do that?

21    A.    Very haphazard.  He would forget to

22 write things down on his expense account, and he

23 would write out a check and forget to put it on the

24 sheet, and I would correct it.

25    Q.    Did that happen frequently?

1        A.      Yes.

2        Q.      Were there times where he failed to

3 request reimbursement of his expense account items?

4        A.      No.  He would just write out the

5 check.

6        Q.      What do you mean?

7        A.      No.  If he spent money, and he didn't

8 write it -- if he spent money, he would write out a

9 check and reimburse himself, and if it was personal

10 money, then it would go on his expense account.  If

11 it was considered a business expense, then the

12 business paid for it, but a lot of the problem with

13 him was separating a business expense from personal

14 expense.  He tended to over call business expenses

15 that were really personal.

16        Q.      When he wrote checks to reimburse

17 himself, what back-up did he provide?

18        A.      He might not provide any back-up.

19        Q.      What would you do if he provided no

20 back-up?

21        A.      I would have to try to figure out

22 what it was.  If I had a question, sometimes I'd

23 ask him.  Other times he might leave a receipt or

24 if I assumed it was a personal expense, I would

25 just put it on his expense account.

91

1        Q.     His expense account had an upper
2  limit, right?
3        A.     Yes.
4        Q.     Did he generally exceed that limit?
5        A.     Yes.
6        Q.     What did you do when he exceeded that
7  limit?
8        A.     I took it out of his salary.
9        Q.     Do you know from year to year the
10  amount by which he exceeded his limit?
11        A.     It was variable.  Anywhere between
12  twenty to $50,000 a year.
13        Q.     And when DCC deducted that from his
14  salary, how did he respond?
15        A.     It would come out of bonuses.
16        Q.     If you deducted it from bonuses, how
17  did he respond?
18        A.     He probably wasn't even aware of it
19  most of the time.
20        Q.     Why not?
21        A.     Because he never got the bonus check.
22        Q.     Never inquired as to how his bonus
23  check compared to anybody else's?
24        A.     No.
25        Q.     So, he left it to you to decide what

92

1  to include and what to exclude from his expense
2  account and to adjust the difference?
3      A.      I don't know what he expected.
4      Q.      I didn't ask you what he expected.
5  That's what you did.
6      A.      That's what I did.
7      Q.      And he never questioned it.
8      A.      He never questioned me about it, no.
9      Q.      Do you know if he questioned anybody
10 else?
11     A.      I don't know.
12     Q.      Do you have any reason to believe he
13 questioned anybody else about it?
14     A.      No.  He never questioned anybody
15 else.
16     Q.      Did you ever track the outside
17 revenues received by other physicians for work they
18 performed outside of regular business hours?
19     A.      No.
20     Q.      So, if a doctor gave a lecture after
21 business hours and received an honorarium for that,
22 that was not reported to DCC?
23     A.      No.
24     Q.      Yes, it was not reported.
25     A.      It was not reported.

1           C E R T I F I C A T E

2

3         I, WINIFRED A. HANDEL, a Certified Court

4   Reporter of the State of New Jersey, do hereby

5   certify that prior to the commencement of the

6   examination, the witness was duly sworn to

7   testify to the truth, the whole truth and

8   nothing but the truth.

9         I DO FURTHER CERTIFY that the foregoing

10  is a true and accurate transcript of the

11  testimony as taken stenographically by and

12  before me at the time, place and on the date

13  hereinbefore set forth, to the best of my

14  ability.

15        I DO FURTHER CERTIFY that I am neither a

16  relative nor employee nor attorney nor counsel

17  of any of the parties to the action, and that

18  I am neither a relative nor employee of such

19  attorney or counsel, and that I am not

20  financially interested in the action.

21

22  The foregoing certification of this transcript does not apply to any reproduction of the same

23  in any respect unless under the direct control and/or direction of the certifying reporter.

24

25  *Winifred A. Handel*
     WINIFRED A. HANDEL, CCR NO. XI00421