**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DR. FADI CHAABAN, DR. SABINO R. TORRE, DR. CONSTANTINOS A. COSTEAS, and DR. ANTHONY J. CASELLA, as Trustees of Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan, | : : : : : : : : | |
| Plaintiffs, | : : | Civ. No. 08-1567 (GEB) |
| v. | : : | |
| DR. MARIO A. CRISCITO, | : | **MEMORANDUM OPINION** |
| Defendant. | : : : | |

**BROWN, Chief Judge**

This matter comes before the Court upon: (1) the motion for summary judgment filed by Plaintiffs Doctors Fadi Chaaban, Sabino R. Torre, Constantinos A. Costeas, and Anthony J. Casella (collectively, "Plaintiffs"); and (2) the motion for summary judgment filed by Defendant Doctor Mario A. Criscito ("Defendant").  (Docs. No. 57, 58.)  The Court has reviewed the parties' submissions and decided these motions without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, Plaintiffs' motion will be granted in large part, and Defendant's motion will be denied in all respects.

## I.    BACKGROUND

Plaintiffs are trustees of the Diagnostic & Clinical Cardiology, P.A. ("DCC") Profit

Sharing Plan ("Profit Sharing Plan").  (Pls.' R. 56.1 ¶¶ 1-4; Doc. No. 57-2.) (Def.'s Responsive

R. 56.1 ¶¶ 1-4; Doc. No. 62-13.)  Defendant was the sole trustee of the Profit Sharing Plan and

its predecessor, the DCC Money Purchase Plan ("Money Purchase Plan"), from April 1976 until

his removal from that position by Plaintiffs in July 2007.  (Pls.' R. 56.1 ¶¶ 5, 35; Def.'s

Responsive R. 56.1 ¶¶ 5, 35.) (Def.'s R. 56.1 ¶¶ 6, 7, 8; Doc. No. 58-17.) (Pls.' Responsive R.

56.1 ¶¶ 6, 7, 8; Doc. No. 61-1.) After July 2007, Plaintiffs assumed responsibilities as Plan

trustees.  (*Id.*)  The Money Purchase Plan and Profit Sharing Plan (together, "Plan") are pension

plans that include both segregated and commingled accounts.  (*See* Pls.' R. 56.1 ¶ 18; *see* Def.'s

Responsive R. 56.1 ¶ 44.)  By December 31, 1997, Defendant had placed the retirement savings

of Plan participants in the commingled account in several institutions, including Morgan Stanley

Dean Witter ("Morgan Stanley account") and Solomon Smith Barney ("Smith Barney account").

(Pls.' R. 56.1 ¶ 28; Def.'s Responsive R. 56.1 ¶ 28.)  The American Pension Corporation

("APC") has been the third party administrator of the Plan since 1981 and prepared annual

reports regarding the commingled accounts based on information provided by Defendant.  (Pls.'

R. 56.1 ¶¶ 16, 20; Def.'s Responsive R. 56.1 ¶¶ 16, 20.[1])

As of December 31, 1999, seventeen individuals had their retirement funds in

commingled accounts.  (Flax Decl. Ex. 42 at 11719; Doc. No. 57-10.)  As of January 13, 2000,

Defendant had expressed an intention to have Plan participants in the commingled accounts

transfer their assets into newly created segregated individual accounts.  The information

---

[1] Defendant at one point disputes that the information utilized by APC came solely from him (Def.'s Responsive R. 56.1 ¶ 20) but admits this elsewhere.  (*Id.* at ¶ 124.)  Furthermore, this information is corroborated by Brian P. Warnock ("Warnock"), Vice President of APC.  (Flax Decl. Ex. 39, Warnock Dep., 115:20-22; Doc. No. 57-8.)  Therefore, the Court treats this as an undisputed fact.

contained in the annual report prepared by APC in 1999 was used in the creation of the segregated accounts.  (Flax Decl. Ex. 51.) (Pls.' R. 56.1 ¶¶ 48, 49.) (Pls.' R. 56.1 ¶ 44; Def.'s Responsive R. 56.1 ¶ 44.)  After most participants transferred their assets into segregated accounts, only Defendant and two other Plan participants knowingly retained an interest in the Morgan Stanley commingled account.  (Pls.' R. 56.1 ¶ 55.) (Flax Decl. Ex. 51.) (Flax Decl. Ex. 39, Warnock Dep., 164:20-166:4; Doc. No. 57-8.)

Based generally upon the foregoing basic undisputed facts, Plaintiffs filed the instant complaint in United States District Court for the District of New Jersey on March 28, 2008. (Doc. No. 1.)  In their complaint, Plaintiffs allege Defendant's various actions violated his fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.  (*Id*. at ¶ 1.)  Specifically, Plaintiffs allege that "[a]s a direct result of defendant's fraudulent concealment, fraudulent misrepresentations, self-dealing, diversion of Plan assets, and unpaid loan from the Plan, he caused damage to the Plan and its participants and beneficiaries and breached his fiduciary duties under ERISA as the Plan's trustee."  (*Id*. at ¶ 71.)  To remedy Defendant's breach of fiduciary duties, Plaintiffs seek:

> 1. restitution of all losses to the Plan
> 2. disgorgement of all profits that defendant made using assets of the Plan
> 3. the imposition of a constructive trust on all real estate or other items in which defendant acquired any right, title or interest through the improper use of Plan assets
> 4. a full accounting by defendant of the use of Plan assets during his tenure as the sole trustee of the Plan
> 5. permanent injunctive relief preventing defendant from using or benefiting [*sic*] in any manner whatsoever from Plan assets to which he is not entitled
> 6. attorney's fees and costs
> 7. compensatory damages suffered by the Plan
> 8. punitive damages by reason of defendant's fraud
> 9. such other, further, or different relief as the Court deems just or equitable.

3

(*Id*.)

Defendant filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) in lieu of an answer on May 7, 2008, and therein argued that Plaintiffs' complaint was barred by the statute of limitations.  (Doc. No. 5.1.)  On June 24, 2008, then-presiding Judge William J. Martini, U.S.D.J. denied Defendant's motion after he concluded that "Plaintiffs adequately allege that Defendant concealed his wrongdoing, preventing Plaintiffs from discovering it until quite recently."  (Doc. No. 12.)  Thereafter, Plaintiff Dr. Casella filed a motion for sanctions on July 2, 2008 (Doc. No. 14), and a request for default on July 16, 2008 (Doc. No. 15).  The Clerk of the Court entered default on the same day.  On July 17, 2008, the case was reassigned to Judge Joseph A. Greenaway, Jr., U.S.D.J., and referred to Judge Madeline C. Arleo, U.S.M.J.  (Doc. No. 16.)  On July 21, 2008, Defendant moved to set aside the default entered against him.  (Doc. No. 17)  Judge Greenaway granted that motion and also denied Dr. Casella's motion for sanctions on February 5, 2009.  (Doc. Nos. 24, 25.)

Following these decisions, Defendant filed an answer and counterclaim to Plaintiffs' complaint on February 17, 2009, and therein provided general denials, admissions, and affirmative defenses.  (Doc. No. 26.)  Defendant's counterclaim alleged that "plaintiffs have acted to interfere with his access to and control over [his] accounts . . . resulting in the substantial loss of value of the assets held in these accounts . . . as a result of [which Defendant] suffered serious losses to the value of the assets held in these accounts."  (*Id*.)  Defendant has since voluntarily abandoned his counterclaim.  (Def.'s Opp'n. Br. at 35; Doc. No. 62-12.)

On March 15, 2010, the case was reassigned to the undersigned.  (Doc. No. 39.)

4

Subsequently, on April 23, 2010, Defendant moved for leave to file a third-party complaint against APC, Warnock, and Dominique Sandra Eck, a pension consultant employed by APC. (Doc. No. 42.)  That motion was denied by Judge Arleo on June 21, 2010.  (Doc. No. 52.)

Ultimately, Plaintiffs and Defendant filed their present motions for summary judgment on September 17, 2010.  (Doc. Nos. 57, 58.)  Both motions are opposed.  (Doc. Nos. 61, 62.) Defendant opposes Plaintiffs' motion by arguing that there are issues of material fact, that there was no fraud, and that Plaintiffs are estopped from alleging breaches of fiduciary duty against Defendant based on negligence or strict liability theories.   Similarly, Plaintiffs oppose Defendant's claim that he is entitled to summary judgment by arguing that there was indeed fraudulent conduct, and as a result, the "fraud or concealment" exception to the statute of limitations is applicable, and additionally, that Judge Martini's denial of Defendant's motion to dismiss that was based upon the same theory is the law of the case.  (Pls.' Opp'n. Br. at 5, 9, 14.)

## II.    DISCUSSION

### A.  Summary Judgment Standard

A party seeking summary judgment must "show that . . . [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  The moving party carries the burden of showing "the absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In countering a motion for summary judgment, the nonmoving party has

the burden of "showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The

nonmoving party "may not rely merely on allegations or denials" but must present "specific

facts."  *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

("[nonmoving party] must do more than simply show that there is some metaphysical doubt as to

the material facts").  In deciding whether triable issues of fact exist, the court must view the

underlying facts and draw all reasonable inferences in favor of the nonmoving party.  *Id.* at 587;

*Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

### B.  Application

After viewing the facts in the light most favorable to Defendant, the Court concludes that

Plaintiffs are entitled to judgment as a matter of law on their ERISA breach of fiduciary duty

claims against Defendant because there is no "genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

To prevail on a claim pursuant to 29 U.S.C. § 1132(a)(2), ERISA's civil enforcement

provision, three elements must be present: "(1) a plan fiduciary (2) breaches an ERISA-imposed

duty (3) causing a loss to the plan."  *Leckey v. Stefano*, 501 F.3d 212, 225-26 (3d Cir. 2007).  The

Court concludes that these elements are met as a matter of law and, for the reasons discussed

below, that Defendant engaged in conduct that was in violation of 29 U.S.C. §§ 1104(a)(1) and

1106(b)(1).

### i.  Defendant Was a Fiduciary of the Plan.

ERISA states:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any
discretionary authority or discretionary control respecting management of such
plan or exercises any authority or control respecting management or disposition of
its assets . . . or (iii) he has any discretionary authority or discretionary
responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  Here, both parties concede that Defendant was the sole trustee of the Plan for the period in question.  (Pls.' R. 56.1 ¶ 5; Def.'s Responsive R. 56.1 ¶ 5.) (Flax Decl. Ex. 36; Doc. No. 57-7.) (Flax Decl. Ex. 40 at 7668; Doc. No. 57-9.)  As such, in light of that undisputed fact and the clear statutory language noted above, the Court concludes that Defendant's status as a "fiduciary" of the Plan for ERISA purposes is not reasonably disputable. Therefore, the Court concludes that Defendant was a "fiduciary" of the Plan at all relevant times as a matter of law.

### ii. Defendant Breached His ERISA-Imposed Fiduciary Duties.

ERISA-governed plan fiduciaries owe ERISA plans the duties of loyalty and care (*Massachusetts Mut. Life Ins. Co. v. Russell*, 471 U.S. 134, 143 n.10 (1985)), and are "assigned a number of detailed duties and responsibilities, which include 'the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest.'"  *Mertens v. Hewitt Associates*, 508 U.S. 248, 251-52 (1993) (quoting *Russell*, 471 U.S. at 142-43).  ERISA specifically provides that

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104(a).  ERISA further provides that a fiduciary "shall not [] deal with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b)(1).

Based upon the evidence submitted, the Court concludes that no reasonable trier of fact could fail to determine that Defendant violated these ERISA prohibitions as a matter of law.  As

discussed below, Defendant, through his misrepresentations, falsification of records, and improper distribution of Plan assets, failed to discharge his duties in the interest of participants and instead dealt with the assets in his own interest.

First, the evidence before the Court establishes that Defendant provided false information regarding account balances to APC, which APC used in preparing the 1999 Annual Report on January 13, 2000, which was prepared with a view "to enabl[ing] Dr. Criscito to distribute benefits and transfer account balances to segregated accounts." (Flax Decl. Ex. 51.) (Pls.' R. 56.1 ¶¶ 48, 49.) Specifically, while the balance of the Morgan Stanley account as of December 31, 1999 was $12,952,936.43 ((Pls.' R. 56.1 ¶ 30) (Flax Decl. Ex. 49; Doc. No. 57-10)), Defendant reported to APC that the balance was $4,017,942.57. (Pls.' R. 56.1 ¶ 32.) (Flax Decl. Ex. 47; Doc. No. 57-10.) Likewise, whereas the 1999 year-end balance of the Smith Barney account was $3,924,549.92, Defendant reported to APC that it was $798,425.50. (Pls.' R. 56.1 ¶ 37.) (Flax Decl. Exs. 47, 49.) These understated values were then used to create the segregated accounts; since the assets were undervalued, the amounts transferred into the segregated accounts were also undervalued.[2] (Pls.' R. 56.1 ¶ 50.) Had the true 1999 balances been reported before

---

[2] On this point, Defendant attempts to create an issue of fact by asserting that "there were more than sufficient assets in . . . the Smith Barney Account[] to cover any amounts in the Plan which allegedly belonged to any of the other Plan participants," the establishment of segregated accounts did not facilitate the removal of assets from the Plan for Defendant's personal use, and the maintenance of segregated and commingled accounts was permitted by the Plan. (Def.'s Responsive R. 56.1 ¶¶ 48, 49, 50.) Defendant, however, fails to address the facts asserted and fails to rebut concrete evidence, which clearly shows that the 1999 year-end balances in the Morgan Stanley and Smith Barney accounts were undervalued. (Flax Decl. Ex. 1 at 20, 32; Doc. No. 57-4.) (Flax Decl. Ex. 47.) (Flax Decl. Ex. 42; Doc. No. 57-10.) It is irrelevant that there may have been enough money remaining in the Smith Barney account to cover the undervaluation or that segregated and commingled accounts could be maintained simultaneously; as the Court has and will further explain, the undisputed and not reasonably disputable facts establish that Defendant misrepresented the value of the assets in these accounts and that Plan

the segregated accounts were created, Plan participants would have received an additional $1,681,572.65.[3]  (Pls.' R. 56.1 ¶ 154.)  Likewise, APC used the information provided by Defendant to prepare the annual IRS Form 5500 in 1999 and, since the information used in preparing the 1999 Form 5500 was based on false information and the value of assets in the 1999 Form 5500 affected all the subsequent Forms 5500, the 1999 to 2005 Forms 5500 are all clearly incorrect.  (Pls.' R. 56.1 ¶¶ 124, 145, 146; Def.'s Responsive R. 56.1 ¶ 124.) (Flax Decl. Exs. 70-76; Doc. Nos. 13-15.)

Therefore, Defendant's misrepresentation of the true 1999 year-end balance of the Morgan Stanley and Smith Barney accounts was a breach of his fiduciary duties as "'a fiduciary may not, in the performance of [its] duties, materially mislead those to whom the duties of loyalty and prudence are owed.'" *Shook v. Avaya Inc.*, 2010 U.S. App. LEXIS 22681, at *9 (3d Cir. Nov. 2, 2010) (quoting *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009) (*Unisys IV*)).  Rather, fiduciaries have a duty "'to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection.'"  *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 242 F.3d 497, 509 (3d Cir. 2001) (*Unisys III*) (quoting *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1994)).

---

participants who opted for segregated accounts received less than their fair share of Plan assets as a result of these original understatements.

[3] Defendant positions himself as denying the truth of this statement while in actuality he fails to address its veracity at all; rather, Defendant again baldly asserts that there were enough assets in the Smith Barney account to cover losses.  (Def.'s Responsive R. 56.1 ¶ 154.)  The irrelevancy of this has already been discussed.  *See supra* note 2.  The Court concludes that the veracity of this figure is not reasonably disputable, as both Plaintiffs' and Defendant's experts on damages agree that it is correct.  (Pls.' R. 56.1 ¶ 155; Def.'s Responsive R. 56.1 ¶ 155.)

Simply put, Defendant had a duty to reveal the true value of these accounts, unarguably material facts of which the participants should have been informed before being allowed to transfer their assets into segregated accounts.  By failing to so inform Plaintiffs in this case, Defendant breached his fiduciary duty as a matter of law.

Furthermore, the record is replete with evidence of Defendant's self-interested discharge of Plan assets and self-dealing.  In fact, the parties agree that Defendant used the assets in the Morgan Stanley account for his personal use, as well as the assets in a new pension fund account he opened at Sovereign Bank ("Sovereign Bank account") using DCC's name, the Plan's Employer Identification Number, and $6,000,000 withdrawn from the Morgan Stanley account. (Pls.' R. 56.1 ¶¶ 59-118; Def.'s Responsive R. 56.1 ¶¶ 59-118.) (Flax Decl. Ex. 61.)  Indeed, as noted, Defendant admits that he used the assets in the Morgan Stanley and Sovereign Bank accounts for his personal use, but instead contends that "[t]he withdrawn funds did not belong to any other Plan participant" (Def.'s Responsive R. 56.1 ¶¶ 60-92) and that "the record shows that Dr. Criscito never removed anything more than his share of the funds in the Plan."  (Def.'s Opp'n. Br. at 9.)

The evidence submitted, however, does not support this contention.  Instead, the evidence reveals that from May 2000 to November 2006,[4] Defendant withdrew $9,282,027.65 from the Morgan Stanley account, some of which was spent on resort membership and private investments, some of which was transferred into Defendant's personal accounts, $6,000,000 of which was transferred to open the Sovereign Bank account, and much of which Defendant cannot

---

[4] The Court discusses these dates specifically because these withdrawals and transfers of funds occurred after the segregated accounts were created.

account for at all.  (Pls.' R. 56.1 ¶¶ 60-88; Def.'s Responsive R. 56.1 ¶¶ 60-88.)  As a result, the

balance of the Morgan Stanley account as of November 30, 2006 was $0.  (Pls.' R. 56.1 ¶ 88;

Def.'s Responsive R. 56.1 ¶ 88.) (Flax Decl. Ex. 55; Doc. No. 57-11.)  While this $9,282,027.65

was withdrawn from the Morgan Stanley account after the segregated accounts had been created,

Defendant was at no point the only Plan participant with an interest in the account.  Rather, after

most participants transferred their assets into segregated accounts, not only did Defendant and

two other Plan participants knowingly retain an interest in the Morgan Stanley commingled

account[5] ((Pls.' R. 56.1 ¶ 55) (Flax Decl. Ex. 51) (Flax Decl. Ex. 39, Warnock Dep., 164:20-

166:4; Doc. No. 57-8)), but the Plan participants with segregated accounts continued to have an

interest since the full value of their assets was never transferred from the Morgan Stanley

commingled account.  Thus, based upon the foregoing, the Court concludes that no reasonable

trier of fact could fail to determine that Defendant dealt with the assets of the Plan for his own

account in violation of 29 U.S.C. § 1106(b)(1).

The dearth of counter-evidence provided by Defendant galvanizes Plaintiffs' assertions

that there are no "genuine factual issues" for a jury's consideration regarding Plaintiffs' ERISA

claims.  *Anderson*, 477 U.S. at 250.  Indeed, rather than address the evidence presented by

Plaintiffs that support their contentions, Defendant instead repeatedly raises a series of "mere[]"

---

[5] Defendant denies this fact in a transparent attempt to create an issue of disputed material fact; however, Defendant's reasons for denying this fact again do not address its veracity.  (Def.'s Responsive R. 56.1 ¶ 55.)  Specifically, Defendant bases his denial on the fact that the Morgan Stanley and Smith Barney accounts remained as commingled accounts.  This is irrelevant.  As explained, the facts are that only three participants knowingly retained any assets in the commingled account; the Plan participants who opted for segregated accounts unwittingly received less than their fair share of Plan assets and, as a result, were unaware that they still had any interest in the commingled account.

allegations [and] denials." FED. R. CIV. P. 56(e)(2).  For example, Defendant's repeated

contention that enough assets remained in the Smith Barney account to cover the interests of

other Plan participants and that there was thus no fraud (*see, e.g.*, Def.'s Opp'n. Br. at 9; Def.'s

Mot. Br. at 17), and his reliance on common law fraud in claiming that his conduct was not

fraudulent, since only funds belonging to him were removed (Def.'s Opp'n. Br. at 9-21), wholly

miss the mark for the reasons that follow.  First, it is disputed that any Plan participant other than

Defendant had any interest in the Smith Barney account after the segregated accounts were

created (*see* Pls.' Reply Br. at 2-5).   In any case, the existence of sufficient assets in this account

is irrelevant because, as noted, Defendant breached his fiduciary duties as a matter of law by

lying to participants about the value of the assets, allowing them to transfer their understated

shares into segregated accounts, and using the Morgan Stanley account, the value of which was

far greater than any Plan participants imagined, for his own personal benefit.  Moreover, when

Defendant essentially cleared out the account, the other Plan participants lost out on the interest

that would have been generated.  In any case, the Court has already found that Defendant's

conduct constituted a breach of his fiduciary duties according to ERISA.

  Further, Defendant unavailingly presents his mental state as an apparent quasi-affirmative

defense.  Specifically, relying on elements necessary to prove common law fraud, Defendant

claims that "he had no intent to defraud anyone when he supplied the Plan valuation numbers in

January of 2000" and therefore there was no fraud.  (Def.'s Opp'n. Br. at 11.)  Plaintiffs' claim,

however, is one for breach of fiduciary duties under ERISA, not for common law fraud.[6]  While

---

   [6]  The Court will briefly expound on why Defendant's consistent reliance on common law
fraud is misguided.  Defendant apparently posits common law fraud arguments based on a
mistaken belief that "plaintiffs [are alleging] fraud to recover money damages" (Def.'s Opp'n.

"[i]t is true that making out a valid claim under § 1132(a)(2) requires proving a breach of fiduciary duty, which, in certain circumstances, requires a showing of fault (negligence or bad faith)" (*Leckey*, 501 F.3d at 229), this is not a circumstance where a showing of bad faith is necessary.  Rather, "'[w]hen the question whether the trustee has committed a breach of trust depends not upon the extent of his powers and duties, but upon whether he has acted with proper care and caution . . . he is liable for breach of trust if he is negligent, but not if he acts with proper care and caution.'"  *Leckey*, 501 F.3d at 224 (quoting RESTATEMENT (SECOND) OF TORTS § 201 cmt. c (1959)).  Moreover, "[w]hen[] a trustee takes action that exceeds his authority, he is strictly liable for any loss (and accountable for any profit)."  *Id*.

        Thus, Defendant can be found to have breached his fiduciary duties on theories of negligence and strict liability because, if he acted within his authority, he failed to act with proper care and caution or, conversely, he can be found to have acted without authority.  Therefore, even if the Court accepts as both true and material Defendant's contention that he did not act in bad faith and that his conduct stemmed from the fact that "1999 was a 'confusing' year for him, as his parents were dying, his father, who was suffering with Alzheimer's Disease, was living with him, his mother-in-law was dying and Dr. Criscito had been diagnosed with radical prostate cancer" (Def.'s Opp'n. Br. at 12), this information is unavailing.  Moreover, Defendant's affirmative submissions that he was careless, confused, and lacked interest (*see* Def.'s Opp'n. Br. at 11-16) only strengthen Plaintiffs' position as this is not the behavior of the "prudent man."

        Relatedly, and also unavailingly, Defendant argues that Plaintiffs are judicially estopped

---

Br. at 10).  This is simply not true.  Rather, Plaintiffs allege that Defendant breached his fiduciary duties as a result of which they are entitled money damages.

from alleging he breached his fiduciary duties because Plaintiffs' motion is based on theories of negligence and strict liability, which causes of action were "specifically disavowed by both of plaintiffs' counsel, who agreed with Magistrate Judge Cox Arleo that the plaintiffs' action was based ***solely*** on allegations of fraud." (Def.'s Opp'n. Br. at 22.)  Defendant's argument is without merit.  The record makes clear that Judge Arleo denied Defendant's motion for leave to assert a third-party complaint for several reasons, including: (1) the fact that Defendant's indemnification and contribution claim was separate and independent from the fraud claim brought by Plaintiffs, and in violation of Fed. R. Civ. P. 14(a); (2) Defendant's lack of standing to bring the third-party complaint; and (3) the Judge's finding that Defendant failed to establish that any losses he may have suffered were caused by third-party negligence.  (Transcript of Hearing, June 21, 2010, at 9:21-23, 10:9-11, 11:8-10; Doc. No. 53.)  Clearly, none of Judge Arleo's determinations preclude Plaintiffs' cause of action on their face.  In any event, however, Plaintiffs' complaint and the present motion for summary judgment allege that Defendant breached his fiduciary duties and that his actions were intentional.  (*See, e.g.*, Pls.' Mot. Br. at 2.) Plaintiffs' argument that fiduciaries can be strictly liable or liable for negligence for breaches of their duties does not alter their claim that Defendant's conduct was intentional; rather, as already discussed, Plaintiffs use this to argue that a showing of bad faith is unnecessary to finding a breach of fiduciary duties.  (Pls.' Mot. Br. at 13-14.)  Nowhere do Plaintiffs disavow their claims of intentional fraudulent conduct.

Thus, for all the reasons above, the Court concludes that Defendant breached his ERISA-imposed fiduciary duties owed to the Plan as a matter of law.

### iii.  Defendant's Breach Caused Loss to the Plan.

14

To determine whether there has been a loss to the Plan, "'a comparison must be made between the value of the plan assets before and after the breach.'" *Leckey*, 501 F.3d at 226 (quoting *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 559, 603 (8th Cir. 1995)).  As previously discussed, as a result of Defendant's misrepresentations and the resulting falsification of records, Plan participants were kept from receiving $1,681,572.65 that belonged to them when their funds were removed to segregated accounts.  (Pls.' R. 56.1 ¶¶ 154, 155.)  Furthermore, while the exact amount of interest owed Plaintiffs is as yet unascertained, the Court has already determined that Plan participants other than Defendant continued to have an interest in the Morgan Stanley account; therefore, clearly the balance of $0 that Defendant left in the account caused a loss to the Plan.  Thus, the Court concludes that Plaintiffs have satisfied the third element for a § 1132(a)(2) claim against Defendant as a matter of law.

**C.  Damages.**

29 U.S.C. § 1132(a)(2) provides that "[a] civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."  29 U.S.C. § 1109(a) states:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. []

Based upon the parties' submissions, the Court concludes that Plaintiffs are entitled to compensatory damages and interest, but not to punitive damages.

### i. Compensatory Damages.

According to the "plain text of § 1132(a)(2)," recovery of "the whole of its loss" is the

Plan's "right." *Graden v. Conexant Systems Inc.*, 496 F.3d 291, 302 (3d Cir. 2007) (finding

"former employees whose benefits would be made whole by a restoration of losses to the plan are

participants with standing to sue on behalf of the plan -- and take part in any recovery"). In this

case, the Court concludes as a matter of law that Plaintiffs are entitled to compensatory damages

for the losses caused to the segregated accounts of Plan participants and to cover the costs of

correcting the 1999 to 2005 Forms 5500 as well as to any interest that has accumulated on this

amount; however, Plaintiffs are not entitled to compensatory damages for Defendant's alleged

misuse of assets in the Smith Barney account.[7]  In addition, the alleged unpaid loan from 1982

will not be considered by the Court in ruling on whether Defendant breached his fiduciary duties,

since Plaintiffs do not present sufficient evidence to establish that this loan was unpaid.  (Pls.'s

R. 56.1 ¶¶ 151-53; Def.'s Responsive R. 56.1 ¶¶ 151-53.)  Absent such evidence, the Court

cannot find damages based on this loan, as loans from the Plan to participants were permitted by

the Trust Document creating the Money Purchase Plan.  (Flax Decl. Ex. 33 at ¶ 11.1; Doc. No.

57-6.)  In any event, the allegation that this loan caused damage to the Plan appears to have been

abandoned by Plaintiffs, as it is not discussed in their motion brief.  (Doc. No. 57-1.)  In sum,

---

[7] Plaintiffs themselves admit that "it is crystal clear that no Plan participant other than Criscito had an interest in the Smith Barney account after December 31, 1999."  (Pls.' Reply Br. at 2.)  While a fiduciary can still be liable to a plan where a loss to the plan is found even though the plan only had one participant, such a finding depends upon the plan documents. *See Leckey*, 501 F.3d at 226-27.  Although the Trust Document creating the Money Purchase Plan put limitations on withdrawals by participants (*see* Flax Decl. Ex. 33 at 2245-47), nothing in the Profit Sharing Plan and Trust Document, effective in or by September 2002, restricts withdrawals by Plan participants.  (*See* Flax Decl. Ex. 40; Doc. No. 57-9.)  Thus, the Smith Barney account will not be considered in computing the compensatory damages award.

16

the Court will grant Plaintiffs summary judgment on the issue of Defendant's liability for compensatory damages, but will reserve decision on the final compensatory damage award to Plaintiffs as the parties disagree on the appropriate method of interest calculation.  (Def.'s Responsive. R. 56.1 ¶ 157.)  The Court will order subsequent briefing on this matter.

### ii. Punitive Damages.

Plaintiffs also seek punitive damages, noting that "ERISA does not expressly permit or prohibit recovery of punitive damages by a plan, and neither this Court nor the Third Circuit has ruled on the issue."  (Pls.' Mot. Br. at 21-22.)  In this case, Plaintiffs argue that punitive damages are appropriate because Defendant engaged in fraudulent conduct.[8]

"'Punitive damages awards are the product of numerous and sometimes intangible, factors . . . .' [] By their very definition, punitive damages are intended to punish a defendant." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 718  n.37 (3d Cir. 2010) (quoting *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 195 (3d Cir. 2007)) (internal citations omitted).  "[A] 'jury may award punitive damages when it finds reckless, callous, intentional, or malicious conduct.'" *Guarnieri v. Duryea Borough*, 364 Fed. Appx. 749, 754 (3d Cir. 2010) (quoting *Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006)) (cert. granted, *Borough of Duryea v. Guarnieri*, 131 S.Ct. 456, 178 L.Ed. 2d 285 (2010)).  "[T]he degree of reprehensibility of the defendant's conduct is '[t]he most important indicium of the reasonableness of a punitive damages award.'" *CGB*, 499 F.3d at 190 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)).  In evaluating reprehensibility, courts consider "whether: '[1] the

_____

[8] Plaintiffs, over the course of this action, have continuously reiterated that their action is not one for common law fraud.  Thus, the Court will not consider Plaintiffs' analysis of common law fraud, which Plaintiffs set forth in a footnote.  (Pls.' Mot. Br. at 21-22, n.2.)

harm caused was physical as opposed to economic; [2] the tortuous conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.'" *Id.* (quoting *Campbell*, 538 U.S. at 419).

The Court will consider these factors in turn. First, the harm caused here was indisputably economic, which makes it "'less worthy of large punitive damages awards than torts inflicting injuries to health or safety.'" *CGB*, 499 F.3d at 192 (quoting *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 467 (3d Cir. 1999)). This is related to the second factor; as Defendant's conduct was indisputably economic, it did not evince "an indifference to or reckless disregard of the health or safety of others." The third factor also stands against an award of punitive damages; while Plan participants' finances relied to a degree on Defendant, there is not sufficient evidence in the record for the Court to conclude that Plaintiffs were financially vulnerable. With regard to the fourth factor, "while the 'repeated conduct' subfactor will necessarily have 'less force' where the defendant's misconduct did not extend beyond his dealings with the plaintiff, it may still be 'relevant' in measuring the reprehensibility of the defendant's conduct, based on the particular facts and circumstances presented." *CGB*, 499 F.3d at 191 (quoting *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 232-33 (3d Cir. 2005)). Here, the Court is only considering Defendant's misconduct towards Plaintiffs, which can however be viewed as "repeated actions" since Defendant withdrew funds from the Morgan Stanley account on numerous occasions over the course of his trusteeship, and perpetuated his misrepresentation by filing the inaccurate Forms 5500. With regard to the fifth factor, for the

18

reasons noted by the Court above, Defendant's conduct cannot reasonably be viewed as the result of "mere accident."

Thus, with only the last two factors weighing in favor of awarding punitive damages to Plaintiffs, the Court concludes that punitive damages are not appropriate in this case as a matter of law.  "It should be presumed that a plaintiff has been made whole by compensatory damages, so punitive damages should be awarded only if the defendant's culpability, after having paid compensatory damages,  is so reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence." *Campbell*, 538 U.S. at 419.  Defendant's conduct was clearly tortious; however, the Court concludes that no reasonable trier of fact could conclude that it was so reprehensible to warrant punitive damages.  Therefore, Plaintiffs' request for summary judgment on that issue will be denied.

### iii.  Attorney's Fees

Plaintiffs seek attorney's fees pursuant to an ERISA provision, 29 U.S.C. § 1132(g)(1), which states "[i]n any action under this subchapter . . . the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  The Court's decision today, however, does not comprise a final judgment in this case, as the parties must address the appropriate damage calculus stemming from Defendant's liability.  As such, in its discretion, the Court will deny Plaintiffs' attorney's fee request without prejudice.  At an appropriate time in the future, Plaintiffs may renew their motion for attorney's fees and provide documentation that will allow the Court to issue a sum certain award, if any.

### D.  Defendant's Statute of Limitations Argument

As noted above, the Court will grant Plaintiffs' motion for summary judgment in most

respects.  Before doing so, however, the Court will briefly address Defendant's statute of

limitations argument.  Defendant contends that he is entitled to summary judgment because

Plaintiffs' action is barred by ERISA's statute of limitations, which states:

> No action may be commenced under this subchapter with respect to a fiduciary's
> breach of any responsibility, duty, or obligation under this part, or with respect to
> a violation of this part, after the earliest of–
>> (1) six years after (A) the date of the last action which constituted a part of
>> the breach or violation, or (B) in the case of an omission the latest date on
>> which the fiduciary could have cured the breach or violation, or
>> (2) three years after the earliest date on which the plaintiff had actual
>> knowledge of the breach or violation;
>> except that in the case of fraud or concealment, such action may be
>> commenced not later than six years after the date of discovery of such
>> breach or violation.

29 U.S.C. § 1113.  "'This section thus creates a general six year statute of limitations, shortened

to three years in cases where the plaintiff has actual knowledge of the breach, and potentially

extended to six years from the date of discovery in cases involving fraud or concealment.'"

*Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 201 (3d Cir. 2006) (quoting *Kurz v .Philadelphia*

*Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996)).

Defendant argues that Plaintiffs' present action is barred because the alleged fraud

occurred more than eight years before the complaint was filed and that the "fraud or

concealment" exception does not apply.  (Def.'s Mot. Br. at 21, 22-30.)  Plaintiffs, on the other

hand, contend that Judge Martini's denial of Defendant's motion to dismiss based on the running

of the statute of limitations is the law of the case and that the fraud or concealment exception is

applicable.  (Pls.' Opp'n. Br. at 14, 11.)  For the following reasons, and viewing the facts in the

light most favorable to Defendant, the Court concludes that Plaintiffs have carried their burden of

proving that Defendant concealed his fraudulent conduct and therefore tolled the statute of

limitations.  Thus, Defendant's argument fails as a matter of law, as the statute of limitations was tolled as per the "fraud or concealment" exception.

"Active concealment tolls the statute of limitations until the plaintiff exercising reasonable diligence knows or should know of the fraud." *Stier v. Satnick Development Corp.*, 974 F.Supp. 436, 439 (D.N.J. 1997).  "'The relevant question is not whether the complaint sounds in concealment, but rather whether there is evidence that the defendant took affirmative steps to hide its breach of fiduciary duty.'" *Ranke*, 436 F.3d at 204 (quoting *Kurz*, 96 F.3d at 1552) (internal citations omitted).  Defendant contends that even if he did act as Plaintiffs allege, there was no concealment. (Def.'s Mot. Br. at 23.)  Defendant specifically argues that there could have been no active concealment since APC had brokerage statements as of March 2000 showing the actual value of the assets in the Morgan Stanley account. (*Id.*)  In so arguing, Defendant presents what he deems to be the "industry standard" for third-party administrators, which he claims requires them to verify information regarding plan accounts provided by trustees. (*Id.* at 26.)  Defendant likewise contends that Plaintiffs failed to exercise due diligence with respect to the accounts, which "would have required APC to verify Dr. Criscito's numbers." (Def.'s Mot. Br. at 28-29.)  Industry standards are irrelevant here and these arguments fail as a matter of law as APC is not a party to this action; in fact, Defendant already moved for, and was denied, leave to file a third-party complaint for indemnification and contribution against APC.[9]

---

[9] Defendant persists in raising industry standards in both his opposition to Plaintiffs' motion for summary judgment and in his own motion for summary judgment.  Even if industry standards were relevant, Defendant's conjectures regarding what standards are applicable are exactly that: mere conjectures based upon a misguided reliance upon the testimony of Plaintiffs' witness, Scott M. Feit ("Feit"). (See, e.g., Def.'s R. 56.1 ¶¶ 28-31.)  Feit was **not** an expert on industry standards; he was offered as an expert on damages. (Pls.' Opp'n. Br. at 26.)  In any case, APC is not a party here and Defendant's attempts to transfer liability for his actions are

(Doc. Nos. 42, 52.)  Moreover, "without the administrator providing the relevant information,

'the beneficiary may have no reason to suspect that it should make inquiry into what may appear

to be a routine matter.'" *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 453 (3d Cir. 2000)

(quoting *Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.,*

93 F.3d 1171, 1181 (3d Cir. 1996)).  The parties' submissions reveal that Plaintiffs had no

apparent reason to suspect Defendant's actions.

      Rather, the undisputed and not reasonably disputable facts make clear that Defendant

submitted false information to APC, and that information was used to divide Plan participants'

assets.  Indeed, from 1981 to 2006, Defendant requested that APC send all documentation

regarding the Plan to his home address and that APC not speak to anyone but Defendant

regarding the commingled accounts; this information included the balances and his spending

habits.  (Pls.' R. 56.1 ¶ 23; Def.'s Responsive R. 56.1 ¶ 23.[10]) (Flax Decl. Exs. 43, 44 at 3; Doc.

No. 57-10.)  Defendant further certified that the information he provided to APC was accurate by

signing inaccurate Forms 5500.[11]  (Pls.' R. 56.1 ¶¶ 132-144.)  Even if Defendant did not sign

---

unavailing.

      [10] Defendant does not expressly admit or deny the veracity of this statement. However, Defendant does provide the deposition testimony of Warnock to show that APC was not prohibited from informing participants about their individual shares in the commingled account. (Conroy Decl. Ex. I, Warnock Dep., 326:15-327:17; Doc. No. 62-9.) This same evidence buttresses the fact that no one but Defendant had access to information regarding the balance of the commingled accounts; specifically, Warnock testified that information about an individual's assets in the commingled account would not reveal the total value of assets in the commingled account.  (*Id.* at 326:1-10.)

      [11] Defendant neither admits nor denies that the signature on these documents is his; rather, he refuses to "vouch that the signature is his" "without seeing an original document." (Def.'s Responsive R. 56.1 ¶¶ 139, 140.)  However, Warnock testified that APC's procedure was to send the Forms 5500 to Defendant, who would then sign them and submit them to the IRS.

these forms, the Court concludes as a matter of law that a reasonably prudent person, especially one who had been trustee of a plan for over thirty years, would be aware that these forms would be filed using the false information; in fact, as attested by Warnock, Defendant is the one who filed them.  (Flax Decl. Ex. 41, Warnock Dep., 192:24-25.)  As such, the Court concludes that it is not reasonably disputable that these actions comprise "affirmative steps [taken by Defendant] to hide [his] breach of fiduciary duty."  *Ranke*, 436 F.3d at 204.  There was "no basis on which [Plaintiffs] could have discovered the misstatements from the face of the reports" (*Stier*, 974 F.Supp. at 440) because they only had access to their individual account information.  *See supra* note 10.  In fact, Plaintiffs only learned of Defendant's use of the Morgan Stanley and Sovereign Bank accounts as his personal accounts after Defendant was removed as sole trustee of the Plan.[12] (Pls.' R. 56.1 ¶ 119.)

Thus, the record clearly indicates that Defendant "took affirmative steps to hide his breach of fiduciary duty," thereby tolling the statute of limitations.  As such, Plaintiffs had six years from their discovery of the breach; therefore, they had until 2013 to bring their complaint. In light of the foregoing conclusion, the Court need not address the issue of estoppel via the "law of the case" doctrine raised by Plaintiffs.

In sum, because all of Defendant's arguments in support of his own motion and in opposition to Plaintiffs' motion are unavailing for the reasons explained above, Defendant's

---

(Flax Decl. Ex. 41, Warnock Dep., 192: 24-25.)  Defendant's denials regarding the signature, in the absence of any specific facts, does not create a genuine factual issue regarding the signatures.

[12] Defendant does not deny the truth of this statement; rather, Defendant merely contends that "APC, on behalf of the plaintiffs, knew or should have known of the activities in these accounts."  (Def.'s Responsive R. 56.1 ¶ 119.)  As noted above, however, APC is not a party to this case, and therefore, Defendants attempt to create an issue of fact on this basis is unavailing.

motion for summary judgment will be denied.

## III.    CONCLUSION

For the foregoing reasons, the Court will GRANT Plaintiffs' motion for summary judgment as to Defendant's liability for breach of his fiduciary duties pursuant to ERISA, and any appropriately calculated compensatory damages resulting therefrom.  (Doc. No. 57.)  To that end, the Court will order the parties to submit additional briefing on the appropriate interest calculation to be applied in this case.  The Court will deny Plaintiffs' motion for summary judgment on the issue of punitive damages.  The Court will deny without prejudice Plaintiffs' motion for attorney's fees.  Finally, the Court will deny Defendant's motion for summary judgment in all respects.  (Doc. No. 58.)  An appropriate form of order accompanies this motion.

Dated: January 31, 2011

/s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.