## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DR. FADI CHAABAN, DR. SABINO R. TORRE, DR. CONSTANTINOS A. COSTEAS, AND DR. ANTHONY J. CASELLA as Trustees of Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan,<br><br>     Plaintiffs,<br><br>v.<br><br>DR. MARIO A. CRISCITO,<br><br>     Defendant. | Case No. 2:08-cv-01567 (GEB/MCA) |

---

## PLAINTIFFS' SUPPLEMENTAL BRIEF ADDRESSING THE APPROPRIATE CALCULATION OF INTEREST AND TOTAL COMPENSATORY DAMAGES

---

Stephen M. Charme
Tara S. Sinha
WITMAN STADTMAUER, P.A.
26 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 822-0220

    -and-

John M. Agnello
Melissa E. Flax
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Preliminary Statement**……………………………………………………..…1

    I.    **THE DEPARTMENT OF LABOR'S ONLINE CALCULATOR PROPERLY CALCULATES INTEREST WHERE PLAN ASSETS HAVE BEEN UNDERVALUED AND PARTICIPANTS HAVE BEEN SHORTCHANGED DUE TO FIDUCIARY BREACHES**...........................................4

    II.    **USING THE ONLINE CALCULATOR TO CALCULATE INTEREST ON THE PLAN'S UNDISPUTED LOSS FULFILLS THE REMEDIAL PURPOSES OF ERISA AND ACCORDS WITH EQUITABLE PRINCIPLES OF TRUST LAW**……………………………………..…….9

    III.    **THE FLAWED AND SPECULATIVE ANALYSIS OF DEFENDANT'S EXPERT FRUSTRATES ERISA'S REMEDIAL PURPOSES AND OFFENDS EQUITABLE CONSIDERATIONS BY IMPROPERLY REDUCING THE UNDISPUTED PRINCIPAL AMOUNT OF THE PLAN'S LOSS AND PROVIDING FOR $0 IN INTEREST**……………………………………...13

    IV.    **THE COSTS OF CORRECTING THE INACCURATE FORMS 5500 AND THE CORRESPONDING PLAN PARTICIPANTS' ANNUAL BENEFIT STATEMENTS SHOULD BE INCLUDED IN THE JUDGMENT AMOUNT**…………………………………………..….18

**Conclusion**………………………………………………………………....19

## TABLE OF AUTHORITIES

**Cases**

*Anthuis v. Colt Industries Operating Corp.,*
    971 F.2d 999 (3d Cir. 1992)……..………………………………….……..….11

*Chaaban v. Criscito,*
    2011 U.S. Dist. LEXIS 9106 (D.N.J. January 31, 2011)…1, 9, 12, 13, 15, 17, 18

*Cottrill v. Sparrow, Johnson & Ursillo, Inc.,*
    100 F.3d 220 (1st Cir. 1996)……………………….……………..……...11, 12

*Dasler v. E.F. Hutton & Co., Inc.,*
    694 F. Supp. 624 (D. Minn. 1988)………………………………………....17, 18

*Davis Cattle Co. v. Great Western Sugar Co.,*
    544 F.2d 436 (10th Cir. 1976)…………………………………...………..12

*Donovan v. Bierwirth,*
    754 F.2d 1049 (2d Cir. 1985)………………………………………………16, 18

*Eaves v. Penn,*
    587 F.2d 453 (10th Cir. 1978)……………………………..……...9, 10

*Fotta v. Trustees of the UMW Health & Ret. Fund of 1974,*
    165 F.3d 209 (3d Cir. 1998)…………………………………………..……11

*Graden v. Conexant Systems, Inc.,*
    496 F.3d 291 (3d Cir. 2007), cert. den., 522 U.S. 1243 (2008)……………15, 16

*Hansen v. Continental Ins. Co.,*
    940 F.2d 971 (5th Cir. 1991)………………………………………………...11

*Harzewski v. Gudiant Corp.,*
    489 F.3d 799 (7th Cir. 2007)………………………………………..……17

*Kinek v. Paramount Communications, Inc.,*
    22 F.3d 503 (2d Cir. 1994)……………………………………………..……12

*Miley v. Oppenheimer & Co., Inc.,*
    637 F.2d 318 (5th Cir. 1981)………………………………………………17, 18

*Peterson v. Crown Financial Corp.,*
    661 F.2d 287 (3d Cir. 1981)..………………………………………..……12

*Skretvedt v. E.I. DuPont de Nemours,*
    372 F.3d 193 (3d Cir. 2004)………………………………………………....11

*Unisys Corp. Retiree Med. Benefits ERISA Litig. v. Unisys Corp.,*
    579 F.3d 220 (3d Cir. 2009)…………………………………………………..9

*In re: Unisys Sav. Plan Litig.,*
    74 F.3d 420 (3d Cir. 1996)……………………………………………..9, 10

**Statutes**

28 U.S.C. §1961(a)……………………………………………………...……11

29 U.S.C. §1104(a)………………………………………………………….…..9

29 U.S.C. §1132(a)(2)……………………………………………………...15

Section 502(a)(3)(B) of ERISA………………………………………….…..11

**Treatises**

Restatement (Second) of Trusts §205……………………………………………9

Restatement (Second) of Trusts §214……………………………………………..10

**Administrative Materials**

Voluntary Fiduciary Correction Program Under the Employee Retirement Income
Security Act of 1974; Notice,
71 Fed. Reg. 20262 (April 19, 2006)…………………………………………4, 5, 6

**Websites**

Department of Labor Online Calculator
http://www.dol.gov/ebsa/calculator/main.html…………………………………………5

FAQs About The 2006 VFCP
http://www.dol.gov/ebsa/faqs/faq_vfcp.html…………………………………………5

## Preliminary Statement

Plaintiffs respectfully submit this brief pursuant to this Court's January 31, 2011 Order to support their calculation of interest on the undisputed loss in principal of $1,681,572.65 suffered by the pension plan as a result of Defendant's breach of his fiduciary duties.

On January 31, 2011, this Court granted Plaintiffs summary judgment against Defendant on their breach of fiduciary duty claims. <u>Chaaban v. Criscito</u>, 2011 U.S. Dist. LEXIS 9106 (D.N.J.). Plaintiffs are the trustees of the Diagnostic & Clinical Cardiology Profit Sharing Plan; Defendant was the sole trustee of the Profit Sharing Plan and the predecessor Money Purchase Plan (collectively "Plan"). <u>Id</u>. at *2. This Court found that "Defendant, through his misrepresentations, falsification of records, and improper distribution of Plan assets, failed to discharge his duties in the interest of participants and instead dealt with the assets in his own interest." <u>Id</u>. at *12.

More specifically, this Court found that in January 2000 "as a result of Defendant's misrepresentations and the resulting falsification of records, Plan participants were kept from receiving $1,681,572.65 that belonged to them when their funds were removed to segregated accounts." <u>Id</u>. at *24-25. In other words, absent Defendant's breaches of fiduciary duty, in January 2000 "Plan participants would have received an additional $1,681,572.65." <u>Id</u>. at *13. "[T]he veracity of this figure is not reasonably disputable, as both Plaintiffs' and Defendant's experts on damages agree that it is correct." <u>Id</u>. at *13 n.3.

The Court noted that when "Defendant essentially cleared out the [Morgan Stanley] account, the other Plan participants lost out on the interest that would have been generated." <u>Id</u>. at *20. "[W]hile the exact amount of interest owed Plaintiffs is as yet

unascertained," nevertheless "Plan participants other than Defendant continued to have an interest in the Morgan Stanley account; therefore, clearly the balance of $0 that Defendant left in the account caused a loss to the Plan." Id. at *25.

The Court found that Plaintiffs are entitled to "compensatory damages for the losses caused to the segregated accounts of Plan participants and to cover the costs of correcting the 1999 to 2005 Forms 5500 as well as to any interest that has accumulated on this amount." Id. at *26. While the Court disallowed compensatory damages for "Defendant's alleged misuse of assets in the Smith Barney account" and an "alleged unpaid loan from 1982." Id. at *26-27, Plaintiffs do not seek any recovery for those items; they seek to recover only (i) the undisputed shortfall of $1,681,572.65 together with interest thereon of $2,418,292 (as of January 31, 2011, subject to further update) as calculated by Plaintiffs' expert using the Department of Labor's Online Calculator for fiduciary breaches, and (ii) the costs of $ 17,600 to correct the inaccurate Forms 5500.

Since "the parties disagree on the appropriate method of interest calculation," Id. at *27, pursuant to the Order entered on January 31, 2011, the Court directed Plaintiffs to "submit a supplemental brief that addresses the appropriate calculation of interest regarding Plaintiffs' compensatory damages not later than 20 days from the date of this order." Accordingly, Plaintiffs submit this brief to show that their expert properly calculated interest in accordance with specific guidelines provided by the Department of Labor, and that this Court should exercise its discretion to award such interest in the circumstances here.

As discussed herein, by contrast, Defendant's expert does not calculate interest at all. Instead he asserts that the undisputed shortfall of $1,681,572.65 should be reduced to $ 1,376,258.51, with no allowance for any interest. He essentially asserts that Defendant

2

should benefit from the stock market crash in 2008. However, since his analysis ends as of December 31, 2009, he denies the Plan participants any benefits from the subsequent bull market. Regardless of that deficiency, his methodology is fatally flawed because it is based on his personal speculation as to how, over nearly a decade, the different Plan participants who either cashed out or remained in the Plan would have invested or otherwise used the money that Defendant took from them.

Thus, Defendant's expert uses incomplete stock market analysis, coupled with rank speculation, to assert that Defendant should pay hundreds of thousands of dollars <u>less</u> than the undisputed principal amount that Defendant stole from the Plan participants, and pay $0 in interest on money that has wrongfully been withheld from them for over a decade. He asserts that stock market performance and the S&P 500 Index trump the specific interest calculation that the Department of Labor has established to compensate plan participants for losses caused by fiduciary breaches, including a situation where, as here, plan participants are shortchanged because plan assets have been undervalued.

The analysis offered by Defendant's expert should be rejected because it frustrates the remedial purposes of ERISA and offends the equitable considerations underlying the statute.  It unfairly offers a fiduciary who steals plan assets the sanctuary of a bear stock market by permitting the breaching fiduciary to claim that the plan participants really suffered only a partial loss (or even no loss at all depending on the severity of the bear market) because the stolen assets would have been partially or completely wiped out anyhow.

Accordingly, this Court should exercise its discretion to award interest on the shortfall of $1,681,572.65 in the amount calculated by Plaintiffs' expert using the specific

Department of Labor guidelines for doing so where, as here, plan participants have been shortchanged because plan assets have been undervalued.[1]

### I.   THE DEPARTMENT OF LABOR'S ONLINE CALCULATOR PROPERLY CALCULATES INTEREST WHERE PLAN ASSETS HAVE BEEN UNDERVALUED AND PARTICIPANTS HAVE BEEN SHORTCHANGED DUE TO FIDUCIARY BREACHES

In March 2000, the Employee Benefits Security Administration ("EBSA"), the agency in the Department of Labor charged with enforcing ERISA, initiated the Voluntary Fiduciary Correction Program ("VFC Program" or "Program"), which became permanent in March 2002, and was subsequently expanded in April 2005 and April 2006. 71 Fed. Reg. 20262 (April 19, 2006).  The Program's purpose "is to protect the financial security of workers by encouraging identification and correction of transactions" that violate the fiduciary duties of plan fiduciaries under ERISA. Id. at 20269.  The EBSA uses the Program to provide "guidance on what constitutes adequate correction" for breaches of fiduciary duty. Id.

To correct a breach of fiduciary duty that shortchanges a plan participant, the breaching fiduciary must pay to the plan the "Principal Amount" plus the greater of either "Lost Earnings" or "Restoration of Profits" derived from using the Principal Amount.  Id. Section 7.1(a)(2)(i). The "Principal Amount" is "the amount that would have been available to the plan for investment or distribution on the date of the Breach, had the Breach not occurred." Id. at 20271, Section 5(b)(2). "'Lost Earnings' is intended to approximate the amount that would have been earned by the plan on the Principal Amount, but for the Breach." Id., Section 5(b)(5). "Lost Earnings" must be calculated either using the Online Calculator on EBSA's Web site or manually using EBSA

---

[1] Point IV addresses the additional amount awarded by the Court for the costs of correcting the inaccurate Forms 5500.  Id. at *16.

guidelines. Id. at Section 5(b)(5)(v). The Online Calculator can be found at

http://www.dol.gov/ebsa/calculator/main.html. As for Restoration of Profits, the EBSA

has found that usually such profits "can't be determined." *FAQs About The 2006 VFCP*

*Update*, http://www.dol.gov/ebsa/faqs/faq_vfcp.html. at p.4.

Plaintiffs' expert, Scott Feit of Abar Pension Services, Inc. ("Feit"), testified that

he used the VFC Program Online Calculator to calculate interest on the $1,681,572.65

shortfall because "the participants did not receive the correct amount that they were

entitled to in their self-directed accounts…" Declaration of Stephen M. Charme

("Charme Decl."), Exhibit 1, Feit Tr.20:9-15. Feit testified that he also did the calculation

manually and "received the same results as if I used the online calculator." Id. 22:18-25.[2]

Feit relied on Example 5 on the EBSA Website containing the Online Calculator,

which discusses "Payment Of Benefits Without Properly Valuing Plan Assets On Which

Payment Is Based." Feit Tr. 84:5-18; VFC Program Section 7.5, 71 Fed. Reg. 20280

(April 19, 2006). Section 7.5(a)(2) of the current Program is titled "Correction of

Transaction" and expressly states in subparagraph (v): "The Principal Amount plus the

Lost Earnings, as described in section 5(b), must be restored to the plan or to any

participants who received distributions that were too low." Feit disagreed with the

analysis by Defendant's expert because "the Department of Labor does not want you to

speculate" as to how plan participants would have invested their money.  Feit Tr. 84:5-

18.  That statement is confirmed by the fact that the April 2005 VFC Program eliminated

language in the earlier Program concerning "actual net earnings or realized net

appreciation" as well as "net loss to the plan as a result of the transaction" in "an effort to

provide more straightforward calculations." 71 Fed. Reg. 20265 (April 19, 2006),

_____

[2] Feit has updated his interest calculations and determined that as of January 31, 2011 the
amount of interest is $2,418,292.  Charme Decl., Exhibit 2.

paragraph B(5)(ii) entitled "Lost Earnings Formulation." The April 2005 Program "was designed to provide simplicity and uniformity in correction amount calculations", and "focused on the IRC section 6621 rate in its Lost Earnings calculation." Id. The current Program "retains this approach." Id.

In short, by using the Online Calculator, the EBSA eliminated speculation and guesswork in calculating the interest on a loss suffered by a plan, including a situation where, as here, participants are shortchanged because of an improper valuation of plan assets. Conspicuously absent from any version of the VFC Program is any mention of calculating interest based on stock market risk, the S&P 500 Index (or any other financial index), or on speculation as to the individual investment preferences of plan participants. To the contrary, whether one uses the Online Calculator or chooses to do calculations manually, interest is calculated in a simple straightforward manner designed to provide uniform results and protect the financial security of participants who are victimized by fiduciary breaches. Indeed, using the Online Calculator serves to avoid a situation where, as here, based on an uncertain and volatile financial market, the breaching fiduciary claims that plan participants cannot even recover the full Principal Amount, let alone any interest, despite a serious fiduciary breach.

This case also demonstrates why, as previously noted, the EBSA has found that the profits from a breaching fiduciary's improper use of plan assets usually "can't be determined." That is why using the EBSA's Online Calculator to calculate interest based on "Lost Earnings" enables victimized plan participants who cannot prove such profits to nonetheless receive appropriate interest on the loss of the Principal Amount.

Moreover, while Defendant through his expert claims that the Plan participants are entitled to no interest (or negative interest) on the monies he stole from the Plan

6

participants, Defendant earned interest on the stolen monies.  As set forth in Plaintiffs'

Rule 56.1 Statement (Docket Entry 57-2), Defendant withdrew $6,000,000 from the

Morgan Stanley Account in early 2002 and deposited that money into a certificate of

deposit account at Sovereign Bank (successor to Independence Community Bank) that he

opened in the name of, and using the I.R.S. Employer Identification Number for, the

DCC pension plan.  *See* Docket Entry 57-2, ¶¶75 and 92.  The records obtained from

Sovereign Bank reveal that during the seven month period from June 2002 through

December 2002, Defendant earned a total of $177,765.22 in interest on the monies he

deposited into the Sovereign Bank certificate of deposit.  *See* Docket Entry 57-12, Ex. 60,

p. 6.  During that seven month period (June to December), Defendant earned interest at

the rate of 5.00% on the monies transferred from the Morgan Stanley Account to

Sovereign Bank ($177,765.22 ÷ 7 x 12 ÷ $6,091,424.29[3] = 5.00%).

In the years following 2002, up until when Defendant closed the Sovereign Bank

certificate of deposit account in August 2006, Defendant made deposits and withdrawals

from the Sovereign Bank certificate of deposit account for his own purposes.

Nevertheless, during that period, Defendant earned the following interest on the monies

in the Sovereign Bank certificate of deposit, the bulk of which came from the Morgan

Stanley Account:

---

[3] Balance in the Sovereign Bank certificate of deposit as of 6/4/02.  *See*  Docket Entry 57-
12, Ex. 60, p. 6.

| Year | Principal at Month Ending | Interest for Period | Interest Rate Annualized |
|------|---------------------------|---------------------|--------------------------|
| 2003 | $8,069,928.36 at 5/30/03 | $33,230.05 for 5/31/03 – 6/30/03 | 4.94%[4] |
| 2004 | $5,440,354.41 at 5/29/04 | $23,340.75 for 5/30/04 – 6/29/04 | 5.15%[5] |
| 2005 | $4,489,640.04 at 5/28/05 | $18,212.94 for 5/29/05 – 6/29/05 | 4.87%[6] |
| 2006 | $3,790,594.21 at 5/30/06 | $15,534.66 for 5/31/06 – 6/29/06 | 4.92%[7] |

*See* Docket Entry 57-12, Ex. 60, pp. 6-11.

Sovereign Bank records show that for most of the period in which monies from the Morgan Stanley Account were on deposit in the Sovereign Bank certificate of deposit, Defendant earned about 5.0% interest on those monies.

While Defendant was indisputably earning interest on that portion of the $9,282,027.65 that he stole from the Morgan Stanley account, the full and precise amount of what he earned by using that money cannot be determined. As this Court observed, Defendant used this $9,282,027.65 for different purposes, "some of which was spent on resort membership and private investments, some of which was transferred into Defendant's personal accounts, $6,000,000 of which was transferred to open the Sovereign Bank account, <u>and much of which Defendant cannot account for at all</u>."

---

[4] $33,230.05 ÷ $8,069,928.36 x 12 = 4.94%
[5] $23,340.75 ÷ $5,440,354.41 x 12 = 5.15%
[6] $18,212.94 ÷ $4,489,640.04 x 12 = 4.87%
[7] $15,534.66 ÷ $3,790,594.21 x 12 = 4.92%

(emphasis added). <u>Chaaban v. Criscito</u>, <u>supra</u> at *17. Using the Online Calculator

prevents Defendant from using the secrecy in which he cloaked his theft of Plan assets as

a shield against recovery of interest on the undisputed principal amount of $1,681,572.65

that has been wrongfully withheld from the Plan participants for over a decade since

January 2000.

Using the EBSA's Online Calculator, the interest due the Plan participants is

$2,418,292 (through 1/31/11).  Charme Decl., <u>Exhibit 2</u>.

**II.    USING THE ONLINE CALCULATOR TO
CALCULATE INTEREST ON THE PLAN'S UNDISPUTED
LOSS FULFILLS THE REMEDIAL PURPOSES OF ERISA
AND ACCORDS WITH EQUITABLE PRINCIPLES
<u>OF TRUST LAW</u>**

In enacting ERISA, "Congress relied upon the common law of trusts to  define the

general scope of [trustees' and other fiduciaries'] authority and responsibility." <u>Unisys</u>

<u>Corp. Retiree Med. Benefits ERISA Litig. v. Unisys Corp.</u>, 579 F.3d 220, 227 (3d Cir.

2009)(citations omitted; alterations in original). When applying section 404(a), 29 U.S.C.

§1104(a), "to the facts of a particular case," the Third Circuit  has stated that "Congress

has instructed that section 1104 in essence, codifies and makes applicable to fiduciaries

certain principles developed in the evolution of the law of trusts." <u>In re: Unisys Sav. Plan</u>

<u>Litig.</u>, 74 F.3d 420, 434 (3d Cir. 1996) (internal quotations and citations omitted). Indeed,

the legislative history underlying ERISA shows that "[i]n developing a law of remedies,

the Congress intended the federal courts to draw on principles of  traditional trust law.

<u>Eaves v. Penn</u>, 587 F.2d 453, 462 (10th Cir. 1978) (citation omitted).

Citing the <u>Restatement (Second) of Trusts</u>, §205, Comment a., the court in <u>Eaves</u>

noted that: "In addition to specific remedies for recovery of profits obtained by

fiduciaries by use of plan assets, trust law provides the alternative remedy of restoring

9

plan participants to the position in which they would have occupied but for the breach of trust." Id. Citing §214 of the same Restatement, the court also noted that absent the "election of a particular remedy by all beneficiaries, the court has a duty to enforce the remedy which is most advantageous to the participants and most conducive to effectuating the purposes of the trust." Id. That is precisely what using the Online Calculator accomplishes.

As previously noted, the VFC Program requires using the greater amount of Lost Earnings or Restoration of Profits, and recognizes that Lost Earnings will generally be used because determining the profits made on the wrongful use of money by a breaching fiduciary is usually not practical, as is true in the present case. Thus, the VFC Program establishes a remedy that is "most advantageous" to plan participants and is also "most conducive" to "effectuating the purposes" of ERISA. As the Third Circuit stated in In re: Unisys Sav. Plan Litig., 74 F.3d 420, 434 (3d Cir. 1996):

> [W]e remain mindful of ERISA's underlying purposes: to protect and strengthen the rights of employees, to enforce strict fiduciary standards, and to encourage the development of private retirement plans. We also bear in mind that Congress has instructed that section 1104 in essence codifies and makes applicable to…fiduciaries certain principles developed in the evolution of the law of trusts. (internal quotations and citations omitted).

By contrast, Defendant's expert uses an analysis that serves to weaken the rights of employees, to encourage breaches of fiduciary duty by permitting a breaching fiduciary to rely on a  bear stock market to pay reduced damages (or even none at all), and to discourage the development of private retirement plans (by sending the message to participants that depending on the state of the stock market, their assets may be stolen with impunity).

While the Online Calculator does not determine prejudgment interest, and that is not what Plaintiffs are seeking, the cases discussing the award of prejudgment interest

10

under ERISA are instructive for showing how the remedial purposes of ERISA and equitable considerations guide the courts in awarding such interest. Those same factors, which are discussed below, are also appropriate for this Court to consider in exercising its discretion in awarding interest calculated using the Online Calculator.

The Third Circuit has consistently recognized that awarding prejudgment interest in an ERISA case is not only permissible, but necessary to effectuate the statute's remedial purposes. Anthuis v. Colt Industries Operating Corp., 971 F.2d 999, 1010 (3d Cir. 1992) ("in the district court's discretion, prejudgment interest may be awarded for a denial of pension benefits"); Fotta v. Trustees of the UMW Health & Ret. Fund of 1974, 165 F.3d 209, 212 (3d Cir. 1998) (prejudgment interest can be awarded even absent litigation: "The principles justifying prejudgment interest also justify an award of interest where benefits are delayed but paid without the beneficiary's having obtained a judgment."); Skretvedt v. E.I. DuPont de Nemours, 372 F.3d 193, 215 (3d Cir. 2004) (court further expanded the applicability of prejudgment interest by permitting it on a claim for delayed benefits brought under Section 502 (a)(3)(B) of ERISA, which allows for "other appropriate equitable relief.").

Although "ERISA provides for postjudgment interest to be calculated at the federal rate, 28 U.S.C. §1961(a)", the statute "contains no explicit provision for prejudgment interest." Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 224 (1st Cir. 1996). "Of course, if the particular federal statute is silent, courts have discretion to select an appropriate rate, and they may look to outside sources…" Id. (cited in Skretvedt v. E.I. DuPont de Nemours, supra, at 207 n.19). Moreover, "a court that elects to award prejudgment interest in an ERISA case has broad discretion in choosing a rate." Id. at 225 (citing Hansen v. Continental Ins. Co., 940 F.2d 971, 983-85 (5th Cir. 1991)

11

(prejudgment interest at 10%)). "In such a situation, equitable considerations should guide the exercise of judicial discretion." Id. (citing Kinek v. Paramount Communications, Inc., 22 F.3d 503, 514 (2d Cir. 1994) (prejudgment interest at 9.5%)). [8]

Even in non-ERISA cases, the Third Circuit has recognized the necessity for exercising broad discretion in awarding prejudgment interest in order to satisfy equitable considerations. In Peterson v. Crown Financial Corp., which involved a contract action, the Third Circuit held that prejudgment interest was not limited to the specified contract rate of 6% reasoning that, since the plaintiff's claim "sounds in restitution, it calls for the exercise of the court's broader equitable powers." 661 F.2d 287, 292-93 (3d Cir. 1981). Accordingly, the Third Circuit held that the trial judge had the discretion "to award damages in the nature of prejudgment interest in an amount greater than six percent." Id. at 293. The court noted that its holding "is not without precedent in other jurisdictions." Id. at 297. (numerous citations omitted). See, e.g., Davis Cattle Co. v. Great Western Sugar Co., 544 F.2d 436, 441 (10th Cir. 1976) (11.5% award upheld in contract case).

None of the cases cited above involve the brazen theft of pension plan assets that occurred here, where Defendant "essentially cleared out" (Chaaban v. Criscito, supra, at *20) over $9 Million from a pension plan account in which other Plan participants had an interest. Moreover, the "record is replete with evidence of Defendant's self-interested discharge of Plan assets and self-dealing," and "Defendant breached his fiduciary duties as a matter of law by lying to participants about the value of the assets." Id. at *16, 20.

---

[8] If this Court chose to use the federal statutory rate for postjudgment interest to calculate the interest lost by the Plan participants in this case, the interest rate over the period January 1, 2000 through February 15, 2011 would be 5.67%, and the amount of interest would be $1,525,856.75. See Charme Decl., Exhibit 3.

The stark enormity of what occurred, the remedial purposes of ERISA, and equitable considerations cry out for this Court to exercise its broad discretion and award Plaintiffs the interest that their expert calculated using the EBSA's Online Calculator, totaling $2,418,292 (as of 1/31/11). *See* Charme Decl., Exhibit 2.

### III. THE FLAWED AND SPECULATIVE ANALYSIS OF DEFENDANT'S EXPERT FRUSTRATES ERISA'S REMEDIAL PURPOSES AND OFFENDS EQUITABLE CONSIDERATIONS BY IMPROPERLY REDUCING THE UNDISPUTED PRINCIPAL AMOUNT OF THE PLAN'S LOSS AND PROVIDING FOR $0 IN INTEREST

Defendant's expert, Kenneth Marblestone, Esq. ("Marblestone"), agrees with Plaintiffs' expert that the Plan participants were shortchanged $1,681,572.65 by Defendant's breach of fiduciary duty. Chaaban v. Criscito, supra, *12 n.3. However, Marblestone asserts that using the Online Calculator to calculate interest lacks the supposed accuracy of his methodology—an ironic claim since his methodology is infected with rampant speculation by purporting to divine the investments that the Plan participants would have made over the period of a decade using the $1,681,572.65 that was wrongfully withheld from them. He also asserts that the case law supports his methodology—but his report does not cite a single one of the cases presented in Point II above. *See* Charme Decl., Exhibit 4. Moreover, the cases that he does cite are all inapposite because they do not address the calculation of interest, but rather how to compute the amount of the loss of principal, which here is undisputed by both experts.

Marblestone claims that calculating interest (*i.e.* "Lost Earnings" under the VFC Program) using the Online Calculator is inappropriate because it "does not reflect any element of risk". He opines that instead, it is necessary to focus on "the actual rates of return on similar portfolios appropriately invested during the same period (including, *inter alia*, the effect of the 2008 market crash)." (Charme Decl., Exhibit 4, third page

13

[there are no page numbers]). For participants with self-directed accounts, he asserts that "their actual cumulative rates of return are the appropriate measure of damages." Id. at fourth page. For participants who cashed out, he asserts that "the S&P 500 index is an appropriate measure of the rate of return." Id.

The foregoing analysis is nothing more than a "house of cards." It requires rank speculation as to how all of the shortchanged Plan participants would have invested or otherwise used their share of the $1,681,572.65 shortfall over a period   in excess of 10 years. While Marblestone asserts that "the appropriate determination is a factual one: what the Plan would have earned had the funds been transferred appropriately", (Id. second page), he does not and cannot offer any facts to demonstrate the manner in which each of the Plan participants would have invested or otherwise used his share of the shortfall.

Further, Marblestone totally discounts the possibility that there might have been Plan participants who would have used their share of the shortfall in a manner that would have outperformed other investments in their portfolios as well as the S&P 500 average. Instead, he speculates under the guise of a so-called "factual determination" that all the Plan participants would have invested the shortfall in a manner that mirrored their existing portfolios and would never have made any changes in the manner in which the shortfall monies were invested.  He further assumes that if investment changes were made, those changes could not have overcome the negative effect of the 2008 market crash or have outperformed the S&P 500 average.

Worse, because Marblestone's analysis ends as of December 31, 2009, he totally ignores the subsequent market recovery that has dramatically increased the value of many stock portfolios and largely negated the effect of the 2008 market crash on which he

relies. In short, his analysis gives Defendant the benefit of a bear market at the expense of Plan participants, but gives the Plan participants none of the benefits of the subsequent bull  market. Using the Online Calculator eliminates such inequity.

None of the cases cited by Marblestone address the use of the Online Calculator, let alone prohibit its use. Indeed, Marblestone's report is in reality nothing more than a brief on the issue of interest. However, as discussed below, the cases upon which Marblestone relies address the determination of the extent of the loss; they do not address calculating interest. Hence, all of those cases are inapposite because the parties agree and the Court has determined that there was a loss to Plan participants of $1,681,572.65.

In Graden v. Conexant Systems, Inc., 496 F.3d 291 (3d Cir. 2007), cert. den., 522 U.S. 1243 (2008), upon which Marblestone relies, the court decided only that a cashed-out former employee had standing under ERISA as a "participant" to sue the administrator of his former employer's 401(k) plan for alleged mismanagement of plan assets that had caused a reduction in the benefits that he received when he cashed out. The claim centered on a seven month period during which the price of the company's common stock plummeted from a 52-week high after a proposed merger failed; the plaintiff cashed out at the low point.  The plaintiff claimed that offering the stock fund was a breach of fiduciary duty because the company knew that this was not a prudent investment, and made false and misleading statements about the proposed merger to induce plaintiff's investment. Id. at 294.

This Court noted Graden's recognition that under the "plain text of § 1132(a)(2), recovery of the whole of its loss is the Plan's right." (citation omitted) (internal quotations omitted). Chaaban v. Criscito, supra, at *26. Accordingly this Court concluded as a matter of law that "Plaintiffs are entitled to compensatory damages for the losses

15

caused to the segregated accounts of Plan participants and to cover the costs of correcting the 1999 to 2005 Forms 5500 <u>as well as to any interest that has accumulated on this amount</u>…" (emphasis added). <u>Id</u>.

Defendant's expert notes that in <u>Graden</u> the Third Circuit stated that "the measure of damages is the amount that affected accounts would have earned if prudently invested." <u>Id</u>. at 301. Therefore, if the employee succeeded, the "District Court will look to the prudent investment alternatives that the Conexant plan offered during this [seven month] period to determine what the Conexant Stock Fund B investors would have earned but for Conexant's breach." <u>Id</u>.

The court in <u>Graden</u> used the alternative investment approach to measure the amount of the loss, not to calculate interest. The decision nowhere suggests that the alternative investment approach is suitable for calculating interest, especially where, as here, the principal amount has been established and is undisputed. Moreover, <u>Graden</u> offers no support for  Marblestone's attempt  (under the guise of a lost earnings calculation) to reduce the amount of the undisputed loss by hundreds of thousands of dollars (effectively suggesting negative interest).  Marblestone's entire approach runs counter to the Plan's "right" under ERISA to recover "the whole of its loss."

 The court in <u>Graden</u> cited <u>Donovan v. Bierwirth</u>, 754 F.2d 1049, 1056 (2d Cir. 1985), in adopting the alternative investment methodology for calculating the amount of damages. 496 F.2d at 301. In <u>Donovan</u>, the "chief issue presented" was "the applicable measure of damages" where "securities were purchased in breach of trust but are later sold at a price exceeding the purchase price." 754 F.2d at 1052. Again, the case is inapposite because it does not address the issue of  calculating interest.

16

The <u>Graden</u> decision also cited <u>Harzewski v. Gudiant Corp.</u>, 489 F.3d 799 (7th Cir. 2007). As in <u>Graden</u>, there was drop in the company's stock price due to alleged fraud by the company's management, and the issue was whether cashed-out former employees were "participants" who had standing to sue under ERISA. The court in <u>Harzewski</u> held that they did have standing. In passing, the court noted that in a defined contribution plan a claim for benefits is "measured by the difference between what the retirement account was worth when the employee retired and cashed it out and what it would have been worth then had it not been for the breach." 489 F.2d at 807. Here, we already know that $1,681,572.65 should have been transferred to the Plan participants had it not been for Defendant's breach of fiduciary duties. <u>Harzewski</u> nowhere discusses the calculation of interest when the principal amount of the loss is known.

The final two cases relied upon by Marblestone are excessive trading or "churning" cases. <u>Dasler v. E.F. Hutton & Co., Inc.</u>, 694 F. Supp. 624 (D. Minn. 1988); <u>Miley v. Oppenheimer & Co., Inc.</u>, 637 F.2d 318 (5th Cir. 1981). In <u>Dasler</u>, the district court relied on the <u>Donovan</u> decision and held that "to measure the plan's 'losses,'" the court "must compare the plan's actual earnings under Hutton's management during the excessive trading period with those earnings which would have been reasonable had the plan's account not been excessively traded." 694. F. Supp. at 634. The court in <u>Miley</u> reached a similar conclusion. 637 F.2d at 328.

The present case does not involve excessive trading, but rather is one where the participants were shortchanged because of Defendant's undervaluation of the Morgan Stanley account when they opted for segregated accounts. Hence, both <u>Dasler</u> and <u>Miley</u> are inapposite, especially because it is undisputed here that "Plan participants were kept from receiving $1,681,572.65 that belonged to them when their funds were removed to

17

segregated accounts." <u>Chaaban v. Criscito</u>, <u>supra</u>, at *24. Moreover, as with all the other cases upon which Marblestone relies, neither <u>Dasler</u> nor <u>Miley</u> address the calculation of interest when the principal amount of a plan's loss caused by a breach of fiduciary duty has already been ascertained.

It is well recognized that "once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer." <u>Donovan</u>, <u>supra</u>, 754. F.2d at 1056 (citations omitted). In reliance on <u>Donovan</u>, the court in <u>Dasler</u>, <u>supra</u>, stated: "Doubts resulting from difficulty in determining damages as a result of a fiduciary's breach should be resolved in favor of the plan." 694 F. Supp. at 634 (citation omitted).

While the foregoing cases deal with resolving uncertainty in calculating the amount of the loss, and do not address calculating interest, the policy considerations underlying these cases apply with equal force to the calculation of interest once the principal amount of a loss is determined. Simply put, in compensating the victim of a fiduciary's breach of a trust, the law requires that any doubts or calculation difficulties should be resolved in favor of the Plan participants and against the breaching fiduciary. That is especially true here in view of the egregious conduct of the Defendant and the lengths to which Defendant went to conceal his wrongdoing.

### IV. THE COSTS OF CORRECTING THE INACCURATE FORMS 5500 AND THE CORRESPONDING PLAN PARTICIPANTS' ANNUAL BENEFIT STATEMENTS SHOULD BE INCLUDED IN THE JUDGMENT AMOUNT

This Court stated: "Plaintiffs' are entitled to compensatory damages for the losses caused to the segregated accounts of the Plan Participants and to cover the costs of correcting the 1999 to 2005 Forms 5500 as well as to any interest that has accumulated on this amount . . ." <u>Chaaban v. Criscito</u>, <u>supra</u>, at *16.  To establish that amount, Plaintiffs have submitted the Declaration of Brian Warnock ("Warnock Decl."), who is

the vice-president of American Pension Corporation ("APC").  APC has been the third party administrator for the Plan from at least 1981.  Warnock Decl., ¶1.

In ¶2 of the Warnock Decl., Warnock states that the corrections to the Forms 5500 will also entail revising the "corresponding participants' benefit statements to reflect the correct amounts for each Plan participant for each year".  In ¶3 of the Warnock Decl., Warnock confirms that APC will charge the Plan $1,600 per year to make the corrections to the Forms 5500 and the corresponding participants' annual benefit statements.

Although the Court specified the correction period as 1999-2005[9], in fact, the Plan will also have to correct the four Forms 5500 and revise the corresponding participants' annual benefits statements for the years 2006-2009.  The cost to make the necessary corrections for the period 1999-2005 is $11,200.  *See* Warnock Decl. ¶3.  The cost to make the corrections for the period 2006-2009 is $6,400.  *See* Warnock Decl. ¶4.

Therefore, Plaintiffs respectfully request that this Court include the total amount of the corrective work, i.e. $17,600, in the Judgment amount.

### Conclusion

Based upon the foregoing, Plaintiffs respectfully request that this Court (1) exercise its broad discretion to award interest on the undisputed loss of $1,681,572.65 in the amount of $2,418,292 (through 1/31/11); (2) award Plaintiffs $17,600 for costs relating to correcting the Forms 5500 and corresponding participants' annual benefit

---

[9] Plaintiffs' Summary Judgment Brief (Docket Entry 57-1) and Rule 56.1 Statement (Docket Entry 57-2) were not crystal clear on the period for which the corrections must be made.  However, ¶147 of the Rule 56.1 Statement and the first sentence of the last paragraph on page 19 of Plaintiffs' Summary Judgment Brief do indicate that the corrections would have to start with the 1999 Form 5500 and continue to the most recently filed Form 5500.

statements; and (3) enter a Final Judgment as to damages in the amount of $4,117,464.65

($1,681,572.65 + $2,418,292 + $17,600 = $4,117,464.65) against Defendant and in favor

of Plaintiffs.


Dated: February 18, 2011                    Respectfully submitted,

                                            Stephen M. Charme
                                            Tara Sinha
                                            WITMAN STADTMAUER, P.A.
                                            26 Columbia Turnpike
                                            Florham Park, New Jersey 07932-2213
                                            (973) 822-0220



                                            By:    /s/Stephen M. Charme
                                                      Stephen M. Charme


                                            John M. Agnello
                                            Melissas E. flax
                                            CARELLA, BYRNE, CECCHI,
                                            OLSTEIN, BRODY & AGNELLO, P.C.
                                            5 Becker Farm Road
                                            Roseland, New Jersey 07068
                                            (973) 994-1700
                                            By:    /s/John M. Agnello
                                                      John M. Agnello

                                            *Attorneys for Plaintiffs*