# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

John M. Agnello
Melissa E. Flax
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Stephen M. Charme
Tara S. Sinha
WITMAN STADTMAUER, P.A.
26 Columbia Turnpike
Florham Park, New Jersey 07932-2213
(973) 822-0220

*Attorneys for Plaintiffs*

| | |
|---|---|
| DR. FADI CHAABAN, DR. SABINO R. TORRE, DR. CONSTANTINOS A. COSTEAS, AND DR. ANTHONY J. CASELLA as Trustees of Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan, <br><br> Plaintiffs, <br><br> v. <br><br> DR. MARIO A. CRISCITO, <br><br> Defendant. | Civil Action No. 2:08-cv-01567 (GEB/MCA) <br><br><br> **DECLARATION OF JOHN M. AGNELLO IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS** <br><br><br><br> **Return Date:  June 6, 2011** |

I, JOHN M. AGNELLO, of full age and upon my oath, declare as follows:

## TABLE OF CONTENTS

A.   Preliminary Information ................................................................ 4

B.   L. Civ. R. 54.2(a)(1) Criteria ........................................................ 5

    1.   Nature of Services Rendered .................................................. 5

        a.   Pre-Complaint Legal Work (September 2007 to March 2008) ............ 5

        b.   Initial Pleadings in the Action ........................................ 6

        c.   Pretrial Discovery .................................................... 7

        d.   Mediation and Defendant's Motion to Assert Claims Against APC ...... 9

        e.   Summary Judgment Motions ............................................. 10

        f.   Final Pretrial Order ................................................. 10

        g.   Post-Judgment Services ............................................... 12

    2.   Results Obtained ............................................................. 12

    3.   Difficulty in Prosecuting the Action ........................................ 15

C.   L. Civ. R. 54.2(a)(2) and (3) Criteria ............................................. 17

    1.   Joy M. Mercer, P.C. ......................................................... 19

        a.   Joy M. Mercer, Esq. ................................................. 19

        b.   Debra A. Russenberger (Paralegal) .................................... 20

    2.   Riker Danzing ............................................................... 20

        a.   Charles S. Detrizio, Esq. ............................................ 20

    3.   Witman Stadtmauer ........................................................... 21

        a.   Stephen M. Charme, Esq. .............................................. 21

        b.   Leonard J. Witman, Esq. .............................................. 22

        c.   Lewis Cohn, Esq. ..................................................... 23

              d.    Tara S. Sinha, Esq. .................................................. 24

              e.    Arlene Greenwald (Paralegal) ..................................... 24

    4.    Carella Byrne ............................................................ 24

              a.    John M. Agnello, Esq. ............................................. 24

              b.    Melissa E. Flax, Esq. .............................................. 26

              c.    Eric Magnelli, Esq. ................................................. 27

              d.    Brian H. Fenlon, Esq. ............................................ 27

              e.    Khoren Bandazian, Esq. .......................................... 28

              f.    Laura Tempesta (Paralegal) ..................................... 28

              g.    Ellen Josephson (Paralegal) .................................... 28

              h.    Sue Vicarisi (Paralegal) .......................................... 28

    5.    Abar Pension Services, Inc. ......................................... 28

              a.    Scott M. Feit, CPA, CPC, QPA, QKA ..................... 28

              b.     Mikel R. Uchitel, FSA .......................................... 29

              c.    Justin Rossi ............................................................ 30

D.    L. Civ. R. 54.2(a)(4) Criteria ................................................ 30

E.    L. Civ. R. 54.2(a)(5) Criteria ................................................ 32

F.    L. Civ. R. 54.2(b) Criteria .................................................... 33

## A.    Preliminary Information

1.    I am an attorney at law in the State of New Jersey, and a member of the firm of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne").  Carella Byrne and Witman Stadtmauer, P.A. ("Witman Stadtmauer) are co-counsel for Plaintiffs Dr. Fadi Chaaban, Dr. Sabino R. Torre, Dr. Constantinos A. Costeas and Dr. Anthony J. Casella, as Trustees of Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan ("Plaintiffs") in this matter.

2.    I submit this Declaration in support of Plaintiffs' Motion for an Award of Attorneys' Fees and Costs against Defendant Dr. Mario A. Criscito ("Defendant" or "Criscito") pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), Section 502(g), 29 *U.S.C.* § 1132(g)(1) and in accordance with Local Civil Rule 54.2.

3.    In this Court's Memorandum of Opinion (Docket Entry 68) ("Mem. Op."), the Court addressed Plaintiffs' request for an award of attorneys' fees and costs against Defendant as follows:

> Plaintiffs seek attorneys' fees pursuant to an ERISA provision, 29 U.S.C. § 1132(g)(1), which states "[i]n any action under this subchapter . . . the court in its discretion may allow a reasonable attorney's fees and costs of action to either party." The Court's decision today, however, does not comprise a final judgment in this case, as the parties must address the appropriate damage calculus stemming from Defendant's liability.  As such, in its discretion, the Court will deny Plaintiffs' attorney's fee request without prejudice.  At an appropriate time in the future, Plaintiffs may renew their motion for attorney's fees and provide documentation that will allow the Court to issue a sum certain award, if any.

Mem. Op at 19.

4.    This Court's Order awarding summary judgment in favor of Plaintiffs and against Defendant, provided that Plaintiffs' motion for an award of attorney's fees was denied without prejudice.  Docket Entry 69.

5.      Paragraph 2 of the Final Judgment (Compensatory Damages) entered by the Court on March 31, 2011 provides that "in the event Plaintiffs file a motion for an award of attorneys' fees and costs, any such award by the Court will be addressed separately."  Docket Entry 77.

6.      Plaintiffs' motion for an award of attorneys' fees and costs is being submitted in accordance with the Memorandum Opinion, Order and Final Judgment (Compensatory Damages) entered by the Court.  Docket Entries 68, 69 and 77.

7.      The following information is true and correct and is based upon my personal knowledge and/or information I obtained as a result of my representation of Plaintiffs in this case and in connection with the instant motion.

**B.    L. Civ. R. 54.2(a)(1) Criteria**

8.      As set forth in detail below and in Plaintiffs' moving brief, Plaintiffs incurred significant attorneys' fees and costs prosecuting their claims in this action against Defendant. The attorneys' fees and costs related to, among other things, pre-complaint investigations, preparation and filing of the Complaint, opposing Defendant's motion to dismiss, answering Defendant's Counterclaim, participating in extensive fact and expert discovery including numerous depositions, participating in the court ordered Mediation, opposing Defendant's motion for leave to file a third party complaint, preparing Plaintiffs' motion for summary judgment, opposing Defendant's motion for summary judgment, preparing the Final Pretrial Order, attending conferences with and hearings before the Court throughout the case, and preparing the within application for an award of attorneys' fees and costs.

**1.      Nature of the Services Rendered**

**a.      Pre-Complaint Legal Work (September 2007 to March 2008)**

9.      Defendant was the sole Trustee of the Diagnostic & Clinical Cardiology, P.A. Profit Sharing Plan and the predecessor Money Purchase Plan (collectively the "Plan") from the

day the Plan was created through July 2007 when he was removed as Trustee.  Mem. Op. at 2. At no time during Defendant's tenure as sole Trustee or at any point after he was removed from the position, did Defendant provide any accounting with regard to his conduct as the sole Trustee.  Defendant's Rule 56.1 Statement at 35, ¶ 150 (Docket Entry 57-2).  Thus, Plaintiffs had to retain counsel to conduct a comprehensive investigation to obtain and assemble the Plan's financial documents and records, and to determine the status and location of misappropriated Plan assets.

10.     It was also necessary for the Plan to have counsel interface with Defendant and his lawyer and give advice regarding the appropriate course to take as a result of the fiduciary breaches by Defendant that were revealed by the investigation.   Plaintiffs retained Joy M. Mercer, P.C. for this work.

11.     Plaintiffs also obtained advice and legal services from Charles S. Detrizio, Esq., of the law firm of Riker Danzig Scherer Hyland Peretti LLP ("Riker Danzig") related to various Plan issues stemming from Defendant's breach of his fiduciary duties.

**b.      Initial Pleadings in the Action**

12.     In the beginning of November 2007, the Plan retained Stephen M. Charme, Esq. ("Charme") and the firm of Witman Stadtmauer to represent the Plan in connection with the institution of an ERISA breach of fiduciary duty action against Criscito in the United States District Court, District of New Jersey.

13.     The Complaint in this action was filed on March 28, 2008 by Charme.  Docket Entry 1.  From March 28, 2008 until my Firm and I were retained to serve as co-counsel to Plaintiffs, Charme was the attorney with overall responsibility for representing Plaintiffs in this case.  Charme and his firm handled all of the pretrial matters up until April 2010.

14.     In an attempt to avoid liability summarily, Defendant moved to dismiss the Complaint arguing that the statute of limitations had run with respect to Plaintiffs' claims. Docket Entry 5.

15.     Plaintiffs were compelled to oppose the motion to dismiss.  Docket Entries 8 and 9.

16.     The Court denied Defendant's motion to dismiss.  Docket Entries 12 and 13.

17.     As a result of Defendant's failure to answer the Complaint following the denial of his motion to dismiss, Plaintiffs requested the Clerk to enter a default against Defendant.  On July 16, 2008, default was entered against Defendant.  Docket Entry 15.

18.     Defendant filed a motion to set aside the default, arguing, in part, that the Plaintiffs' complaint went unanswered due to a "communications breakdown" in Defendant's counsel's office.  Docket Entry 17.  The Court granted Defendant's motion to set aside the default.  Docket Entries 24 and 25.  Subsequently, Defendant filed an Answer and Counterclaim. Docket Entry 26.

19.     In the Counterclaim, Defendant alleged, among other things, that he (not the Plan) owned the Smith Barney pension account.[1]  *Id.*

20.     On March 5, 2009, Plaintiffs' filed their Answer to Defendant's Counterclaim. Docket Entry 28.

**c.     Pretrial Discovery**

21.     The Rule 16 status conference in this case was held on April 16, 2009 before Magistrate Arleo.  Docket Entry 31.  Prior to the start of the Rule 16 conference, Defendant's

---

[1] The Counterclaim remained in the case until it was strategically abandoned by Defendant in his opposition brief to Plaintiffs' summary judgment motion.  Docket Entry 62-12 at 35; Mem. Op. at 4.

counsel initiated discovery by handing Plaintiffs' counsel interrogatories and deposition notices.

22.     Defendant noticed and took the following fact depositions:

| Deponent | Connection to Case | Deposition Date |
|---|---|---|
| Dr. Anthony Casella | Plaintiff Trustee | 5/21/09 |
| Dr. Fadi Chaaban | Plaintiff Trustee | 5/28/09 |
| Dr. Constantinos Costeas | Plaintiff Trustee | 5/28/09 |
| Dr. Sabino Torre | Plaintiff Trustee | 5/28/09 |
| Mark Brown | Third-party / office administrator for the Diagnostic & Clinical Cardiology, P.A. | 6/17/09 |

23.     Plaintiffs noticed and took the following fact depositions:

| Deponent | Connection to Case | Deposition Date |
|---|---|---|
| Kenneth Young | Third-party / accountant who had submitted a certification in support of Defendant's motion to dismiss the complaint | 6/10/09 |
| Brian Warnock | Third-party / Vice President of American Pension Corporation, third-party administrator for the Plan | 6/16/09 and 7/15/09 |
| Dr. Mario Criscito | Defendant | 12/04/11 and 12/11/11 |
| Donna Criscito | Defendant's wife | 1/18/10 |

24.     In addition to fact discovery, Plaintiffs retained Abar Pension Services, Inc. ("Abar") to assist them in determining the amount of the loss sustained by the Plan resulting from Defendant's breaches of fiduciary duty and fraudulent conduct.  Scott M. Feit, a Principal

of Abar, analyzed the loss sustained by the Plan as a result of Defendant's conduct and issued an expert report in this matter dated March 4, 2009.[2]

25.     Feit was deposed by Defendant on July 21, 2010.  His report and testimony was used by Plaintiffs in support of their successful application for summary judgment and in connection with Plaintiffs' calculation of the total compensatory damages.  Plaintiffs' calculation of total compensatory damages was ultimately adopted by the Court and included in the Final Judgment (Compensatory Damages).

26.     Defendant's expert was Kenneth Marblestone, Esq. ("Marblestone") of MandMarblestone Group LLC.  Plaintiffs did not depose Marblestone.

27.     The depositions, third party document subpoenas and paper discovery exchanged by the parties resulted in the production of tens of thousands of pages of documents.

### d.      Mediation and Defendant's Motion to Assert Claims Against APC

28.     The parties were ordered to participate in Mediation before the Hon. John M. Boyle (Ret.).  Docket Entry 38.

29.     As a result, Plaintiffs prepared and submitted a mediation position statement to the Mediator.  Plaintiffs and Defendant participated in the Mediation before Judge Boyle on March 12, 2010.  The Mediation was unsuccessful.

30.     In April 2010, Defendant filed a Motion for Leave to File a Third Party Complaint against American Pension Corporation ("APC"), the Plan's third party administrator, and two of APC's employees.  The proposed third party complaint alleged that APC and its employees should indemnify Defendant against Plaintiffs' breach of fiduciary claims and

---

[2] Feit's expert report was supplemented and updated by letters dated May 28, 2009, April 14, 2010 and February 8, 2011.

contribute to the losses sustained by the Plan as a result of Defendant's fraudulent conduct. Docket Entry 41.

31.     Plaintiffs opposed Defendant's motion.  Docket Entry 44.

32.     Following oral argument, the Court denied Defendant's Motion for Leave to File a Third Party Complaint.  Docket Entry 52.

### e.     Summary Judgment Motions

33.     Both Plaintiffs and Defendant moved for summary judgment.  In accordance with the briefing schedule established by Magistrate Arleo, the parties were required to file moving papers on September 17, 2010, opposition papers on October 6, 2010, and reply papers on October 15, 2010.  Docket Entry 55.

34.     As the Court is aware, the summary judgment briefs and supporting submissions were extensive.

### f.     Final Pretrial Order

35.     Pursuant to the Court's Order Scheduling Final Pretrial Conference, the Final Pretrial Order ("FPO") was to be submitted to the Court by September 16, 2010.  The Final Pretrial Conference was scheduled for September 17, 2010.  Docket Entry 51.

36.     Plaintiffs' counsel undertook the preparation of the first draft of the proposed FPO.  The parties then exchanged their respective portions of the FPO and met and conferred on September 7, 2010 to resolve open issues.

37.     The parties were only able to stipulate to a limited number of facts.  The "Stipulation of Facts" section of the FPO contained only 12 paragraphs.  Plaintiffs' "Contested Facts" section of the FPO contained 141 paragraphs.  Defendant's "Contested Facts" section of the FPO contained 42 paragraphs.  Docket Entry 59.

38.    The Joint Trial Exhibit List, included as part of the FPO, initially contained 41 joint trial exhibits.  In addition, Plaintiffs' Trial Exhibit List had 100 exhibits and Defendant's Trial Exhibit List had 165 exhibits.  Plaintiffs had to review each of Defendant's 165 trial exhibits in order to set forth their objections to the admissibility of each exhibit.

39.    The Final Pretrial Conference was conducted on September 17, 2010.  Docket Entry 56.

40.    At the Final Pretrial Conference, Plaintiffs agreed to review 24 of Defendant's 165 trial exhibits in an attempt to stipulate to the admissibility of these exhibits.

41.    Subsequently, Defendant provided Plaintiffs with a CD containing approximately 10,000 pages (that were not sorted and contained no index) that Defendant represented contained, amongst other documents, the 24 exhibits to be reviewed by Plaintiffs. [3]  As a result of the manner in which these documents were provided, significant work had to be performed to locate the 24 exhibits amongst the 10,000 pages.  Once the 24 exhibits were located and reviewed, it was discovered that complete copies of only 10 of the 24 exhibits were amongst the 10,000 pages.

42.    As a result, Plaintiffs were only able to stipulate to the admissibility of 10 of the 24 exhibits.

43.    Plaintiffs then prepared for submission to the Court (i) a proposed First Amended Joint Trial Exhibit List (adding the 10 additional exhibits), and (ii) a proposed Defendant's First Amended Trial Exhibit List (deleting the 10 exhibits from Defendant's trial exhibit list). Plaintiffs also prepared and submitted to the Court a proposed Order permitting the amendments.

_____

[3] The portions of the 24 exhibits that were buried amongst the CD's 10,000 pages totaled only 10% of what was on the CD

44. On December 7, 2010, Magistrate Arleo entered the form of Order submitted by Plaintiffs. Docket Entry 67.

### g.    Post-Judgment Services

45. Pursuant to ERISA § 502(g), as well as the Memorandum Opinion, Order and Final Judgment (Compensatory Damages) entered by the Court (Docket Entries 68, 69 and 77), Plaintiffs prepared and submitted the within Motion for an Award of Attorneys' Fees and Costs.

46. The work performed in connection with the submission of the within motion included preparing this Declaration and the supporting Brief and other necessary submissions; legal research; and compiling and reviewing bills and invoices from counsel, consultants and third party vendors relating to Plaintiffs' claims against Defendant. This and other related work was necessary in order to accurately calculate the amount of attorneys' fees and costs that Plaintiffs request the Court to award.

47. In addition, following the entry of the Final Judgment (Compensatory Damages), Plaintiffs' counsel provided services relating to the collection of the amount awarded by the Court in the Final Judgment (Compensatory Damages). Those services included attempts to settle the case with Defendant and moving forward with post-judgment discovery in the event that a settlement was not reached.[4]

### 2.    Results Obtained

48. On January 31, 2011, the Court entered its Memorandum Opinion and an Order that: (i) granted Plaintiffs' motion for summary judgment regarding Defendant's liability for breach of his fiduciary duties under ERISA; (ii) found that Defendant's breach caused a loss to the Plan participants of $1,681,572.65; (iii) denied Defendant's motion for summary judgment in

---

[4] As of the submission of this motion, no Order staying execution has been entered by the Court and there has been no settlement.

its entirety; (iv) required further submissions from the parties regarding the calculation of interest and the total amount of compensatory damages; and (v) denied Plaintiffs' request for attorneys' fees and costs without prejudice.  Docket Entries 68 and 69.

49.     Pursuant to the Court's ruling, the parties filed supplemental briefs addressing the calculation of interest and the total amount of compensatory damages.  Docket Entries 70, 72 and 73.

50.     Plaintiffs argued in their supplemental submissions that they were entitled to an award of compensatory damages totaling $4,117,464.65 – consisting of the $1,681,572.65 the Court determined was the direct loss to the participants; $2,418,292 in interest; and $17,600 for the costs to amend the Forms 5500 and corresponding participants' annual benefit statements. Docket Entries 70 and 73.

51.     In his supplemental submission, Defendant took the position that Plaintiffs were only entitled to recover $488,329.27 including interest (despite the fact that the Court had already ruled that Plaintiffs were due $1,681,572.65 before interest was added).  Docket Entry 72.

52.     By Order dated March 29, 2011, the Court adopted Plaintiffs' position with respect to the amount of compensatory damages and awarded Plaintiffs compensatory damages in the amount of $4,117,464.65.  Docket Entry 74.

53.     The Final Judgment (Compensatory Damages) entered by the Court on March 31, 2011 likewise awarded compensatory damages to Plaintiffs in the amount of $4,117,464.65. Docket Entry 77.

54.     Plaintiffs were 100% successful on their claims against Defendant for breach of his fiduciary duty based on his fraudulent conduct.  Plaintiffs were likewise 100% successful in

their opposition to Defendant's summary judgment motion seeking dismissal of Plaintiffs' claims and in their defense against Defendant's Counterclaim (that Defendant voluntarily dismissed).

55.   In its January 31, 2011 Memorandum Opinion, the Court agreed with substantially all of Plaintiffs' assertions regarding Defendant's conduct, including but not limited to the following findings:

- "Defendant, through his misrepresentations, falsification of records, and improper distribution of plan assets, failed to discharge his duties in the interest of participants and instead dealt with the assets in his own interest." Mem. Op. at 8.

- "Defendant provided false information regarding account balances . . . ." *Id.*

- "[T]he record is replete with evidence of Defendant's self-interested discharge of Plan assets and self-dealing." *Id.* at 10.

- "Defendant withdrew $9,282,027.65 from the Morgan Stanley account, some of which was spent on resort membership and private investments, some of which was transferred into Defendant's personal accounts, $6,000,000 of which was transferred to open the Sovereign Bank account, and much of which Defendant cannot account for at all." *Id.* at 10-11.

- "[N]o reasonable trier of fact could fail to determine that Defendant dealt with the assets of the Plan for his own account in violation of 29 U.S.C. § 1106(b)(1)." *Id.* at 11.

- "Defendant breached his fiduciary duties as a matter of law by lying to participants about the value of the assets, allowing them to transfer their understated shares into segregated accounts, and using the Morgan Stanley

account, the value of which was far greater than any Plan participants imagined, for his own personal benefit." *Id.* at 12.

- "[W]hen Defendant essentially cleared out the account, the other Plan participants lost out on the interest that would have been generated." *Id.*

- "[A]s a result of Defendant's misrepresentations and the resulting falsification of records, Plan participants were kept from receiving $1,681,572.65 that belonged to them when their funds were removed to segregated accounts." *Id.* at 15.

- "Defendant's conduct cannot reasonably be viewed as the result of a 'mere accident.'" *Id.* at 19.

- "Defendant's conduct was clearly tortious . . . ." *Id.*

- "Defendant 'took affirmative steps to hide his breach of fiduciary duty' . . . ." *Id.* at 23.

56.     As a result of the Court's findings that Defendant breached his fiduciary duty, the Court awarded Plaintiffs 100% of the compensatory damages they sought, consisting of (i) $1,681,572.65 for the undisputed loss of Plan assets to participants; (ii) $2,418,292 in interest through January 31, 2011 on the undisputed loss; and (iii) $17,600 for costs relating to correcting the Forms 5500 and corresponding participants' annual benefit statements, for a total of $4,117,464.65.  Docket Entries 71 and 74.

### 3.     Difficulties Experienced By Plaintiffs

57.     Defendant was the sole Trustee of the Plan from its inception in or about 1976. Notwithstanding his fiduciary obligations to maintain records and account for his activities during that period, Defendant failed to maintain any records or prepare and/or submit any accounting of his action as sole Trustee of the Plan.  As a result, following the removal of

Defendant as sole Trustee in July 2007, Plaintiffs had to engage in an extensive investigation to obtain and assemble the Plan's financial documents and records, determine the status and location of misappropriated Plan assets, and unwind Defendant's concealment of his fraudulent activities through depositions and document productions.

58.    Plaintiffs were required to incur the attorneys' fees and costs that Plaintiffs are requesting be awarded by the Court relating to, among other things, pre-complaint investigations, preparation and filing of the Complaint, opposing Defendant's motion to dismiss, answering Defendant's Counterclaim, participating in extensive fact and expert discovery including numerous depositions, participating in the court ordered Mediation, opposing Defendant's motion for leave to file a third party complaint, preparing Plaintiffs' motion for summary judgment, opposing Defendant's motion for summary judgment, preparing the Final Pretrial Order, attending conferences with and hearings before the Court throughout the case, and preparing the within application for an award of attorneys' fees and costs as a result of Defendant's steadfast position that the substance of Plaintiffs' claims were meritless, and in addition, were time barred.

59.    In addition, Defendant vigorously opposed Plaintiffs' claims and availed himself of every procedural opportunity to dismiss Plaintiffs' claims and multiply the litigation.  By way of example, and as set forth above:

- Defendant initially moved to dismiss Plaintiffs' Complaint (the motion was denied);

- Defendant sought to multiply the litigation by adding APC and its employees as a party (the motion was denied);

- Defendant moved for summary judgment to dismiss Plaintiffs' Complaint (the motion was denied);

- Defendant opposed Plaintiffs' motion for summary judgment (Plaintiffs' motion was granted); and

- Defendant opposed Plaintiffs' calculation of total compensatory damages (the Court rejected Defendant's opposition and adopted Plaintiffs' position).

**C.    L. Civ. R. 54.2(a)(2) & (a)(3) Criteria**

60.    In accordance with L. Civ. R. 54.2(a)(2), attached hereto as Exhibits A through E are true and accurate copies of invoices from Plaintiffs' counsel and consultant in connection with this matter.[5]  These invoices provide detailed descriptions (including dates) of the services rendered by each in connection with Plaintiffs' ERISA claims against Defendant.

61.    All of the attorneys, paralegals, professionals and paraprofessionals billed "by the hour".  The time was recorded daily and is set forth in monthly bills.  Each month's bill itemizes the hours each attorney, paralegal, consultant and/or paraprofessional worked each day, and provides a description of that work.  Exhibits A through E.

62.    The following chart provides a summary of the total dollar amounts that each law firm and consultant billed for their services relating to Plaintiffs' ERISA claims against Defendant (the detail is shown on the referenced Exhibits A through E):[6]

---

[5] Individual invoices have been redacted to delete services unrelated to Plaintiffs' ERISA claims against Defendant.  The invoice amount for any invoices containing a redaction(s) has been reduced accordingly.

[6] The first page of each of the Exhibits A through F presents a breakdown by month of the fees and costs billed by each law firm or consultant.

| Exhibit | Attorney/Consultant | Total Fees | Total Costs | Total |
|---------|---------------------|------------|-------------|-------|
| A | Joy M. Mercer, P.C. | $58,835.50 | $5,245.52 | $64,081.02 |
| B | Riker Danzig | $7,042.00 | ------------------- | $7,042.00 |
| C | Witman Stadtmauer | $444,248.00 | $6,723.98 | $450,971.98 |
| D | Carella Byrne | $338,046.50 | $4,189.76 | $342,236.26 |
| E | Abar Pension Services, Inc. | $27,978.00 | ------------------- | $27,978.00 |
| | **Totals:** | **$876,150.00** | **$16,159.26** | **$892,309.26** |

63.    Most of the expenses incurred in this litigation were paid by Plaintiffs' counsel and then billed to Plaintiffs.  These expenses include, by example and not by limitation, photocopying, computer searches, travel, facsimile, messenger services, federal express, etc. Those expenses (shown as the "Total Costs" column above) are reflected on the law firm invoices.

64.    Plaintiffs arranged for some costs to be paid directly to third party vendors. [7]  The following chart sets forth the costs that Plaintiffs' arranged to be paid directly, as shown in detail on the referenced Exhibits F through I:

| Exhibit | Entity | Total | Description of services |
|---------|--------|-------|-------------------------|
| F | Lindabury McCormick | $1,618.12 | Court appointed Mediator |
| G | Rosenberg & Associates | $1,054.00 | Court reporter |
| H | Miani Court Reporting | $3,031.70 | Court reporter |
| I | MCD Solutions | $643.02 | Electronic/hardcopy document vendor |
| | | **$6,346.84** | |

65.    The total amount of attorneys' fees and costs incurred by Plaintiffs for which Plaintiffs seek an award is **$898,656.61** ($876,150.00 for attorneys' fees and consultant's fees, $16,159.26 in costs paid by attorneys, plus $6,346.84 in costs paid directly by Plaintiffs).

---

[7] As a result of Defendant having caused the Plan's commingled account to be broken into individual segregated accounts at the beginning of 2000, the Plan had no fund of money from which to pay attorneys' fees, consultant fees and costs relating to the Plan's claims against Defendant.  As a result, Diagnostic & Clinical Cardiology, P.A. ("DCC"), the Plan sponsor, agreed to advance all of the monies necessary to pay those attorneys' fees, consultant fees and costs with the understanding that upon recovery of monies from Defendant, the Plan would reimburse DCC for the monies advanced.  *See* Declaration of Anthony J. Casella in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Costs ("Casella Decl."), ¶ 5.

66.     In accordance with L. Civ. R. 54.2(a)(3), the following is a brief description of the professional experience of the individuals (attorneys, paraprofessionals and consultants) who performed services that are part of the award sought by Plaintiffs:

**1.     Joy M. Mercer, P.C.**

      **a.     Joy M. Mercer, Esq.**

67.     Ms. Mercer graduated from University of Pennsylvania in 1977 with a Bachelor of Arts.  She graduated from George Washington University Law School in 1980.  In 1984, she obtained a Masters of Law in Taxation from Georgetown University Law Center.

68.     Ms. Mercer advises employers with respect to their retirement and welfare benefit plans and executive compensation programs.  Her practice focuses on advising companies on establishing and maintaining benefit programs, including compliance with ERISA and the Internal Revenue Code. Ms. Mercer counsels employers concerning the design, drafting, and administration of defined contribution and defined benefit retirement plans, both qualified and non-qualified, as well as all types of employee welfare plans and executive compensation programs.  Her practice includes representing clients before the Internal Revenue Service, the Department of Labor and the Pension Benefit Guaranty Corporation in both government audits and voluntary submissions. She also advises clients on benefits issues that arise in connection with business transactions.

69.     Ms. Mercer is a fellow of the American College of Employee Benefits Counsel. She was Chair of the Section of Taxation, New Jersey State Bar Association (1995-1996) and has been a member of the Executive Council for the Section for many years. Ms. Mercer has also chaired the Employee Benefits Committee of the Section of Taxation, New Jersey State Bar Association.  She is a past Chair of the Closely Held Business Committee, Section of Taxation,

American Bar Association, and is an active member of the Employee Benefits Committee of the Section of Taxation, American Bar Association. Ms. Mercer is chair of the Master, Prototype & Volume Submitter Plans Subcommittee for the ABA Section of Taxation's Employee Benefits Committee. She is also a member of the board of editors of the Journal of Business Entity Taxation. Ms. Mercer frequently lectures for the American Bar Association, New Jersey Institute of Continuing Legal Education, and WEB, as well as other professional organizations.

### b.      Debra A. Russenberger (Paralegal)

70.     Ms. Russenberger is a paralegal with Joy Mercer, P.C. and has assisted Joy Mercer, P.C. with ERISA related matters throughout her tenure.

71.     The detailed description of the work performed by Joy M. Mercer and her paraprofessional during the period September 2007 through June 2008 is set forth in the monthly bills attached hereto as Exhibit A.

### 2.      Riker Danzig

### a.      Charles S. Detrizio, Esq.

72.     Mr. Detrizio is a 1988 magna cum laude graduate of Case Western Reserve University and a 1991 graduate of Duke University School of Law. He is a member of the Bar of the States of New York and New Jersey.

73.     Mr. Detrizio began his legal career in 1991 as an associate in the New York office of Winston & Strawn, LLP. From 1993 to 1997, he practiced law at Epstein Becker & Green, PC in New York. From 1997 to 2004, he practiced in the New York office of King & Spalding LLP, where he was elected partner in 2000. Mr. Detrizio joined Riker Danzig in 2004 and is a partner in its Corporate Group. Mr. Detrizio's practice focuses primarily on transactional work

and counseling clients.  Amongst his clients are medical practice groups, surgical centers and hospitals.

74.    The detailed description of the work performed by Riker Danzig during the period August 2007 through November 2007 is set forth in the monthly bills attached hereto as Exhibit B.

**3.    Witman Stadtmauer**

**a.    Stephen M. Charme, Esq.**

75.    Mr. Charme is a 1969 summa cum laude graduate of Rutgers College and a 1975 graduate of Columbia Law School, where he was the writing and research editor for the Columbia Journal of Law and Social Problems.  In 1976, he became a member of the Bar of the State of New York, and was also admitted to practice law in the United States District Courts for the Eastern, Southern and Northern Districts of New York.  In 1980, he was admitted to practice law before the United States Court of Appeals for the Second Circuit as well as the United States Supreme Court.  In 1983, he was admitted to practice law by the Supreme Court of New Jersey and the United States District Court for the District of New Jersey.  In 1996, he was admitted to practice law before the United States Court of Appeals for the Third Circuit, as well as the U.S. Tax Court.

76.    From 1975 to 1985, Mr. Charme was a litigation associate in two New York City firms that ultimately merged respectively into the national firms Troutman Sanders and Bryan Cave.  From 1985 through 1994, he was a name partner in a New York City firm last known as Liebman, Charme and Oppenheimer when it merged in 1994 with another New York City firm, which was Holtzman, Wise & Shepherd, where he practiced as a partner until March 1996.  He

then left to join the predecessor firm of Witman Stadtmauer in Florham Park, New Jersey as a partner and established a litigation department.

77.     100% of Mr. Charme's practice involves civil litigation.  He has litigated and tried civil cases in both Federal and State Courts during his career.  The litigated matters in which he has represented clients include matters involving corporate, partnership, real estate, labor and employment and ERISA claims.  Both prior to and contemporaneous with the present lawsuit, he has represented trustees of pension plans in ERISA litigation matters.

78.     Mr. Charme had overall responsibility for Witman Stadtmauer's representation of Plaintiffs in this case since he was initially retained as counsel in November 2007.  He has been involved directly or indirectly with all of the legal services provided by Witman Stadtmauer to Plaintiffs.  Due to the number and complexity of the issues that were involved in this lawsuit, several other personnel from Witman Stadtmauer have, from time to time, been designated to handle certain tasks.  The backgrounds of those persons are described below:

       **b.**     **Leonard J. Witman, Esq.**

79.     Mr. Witman is a 1972 graduate of Rutgers University and a 1975 graduate of New York Law School.  He has been admitted to practice before the Federal and State Courts in both the States of New Jersey and New York, as well as before the United States Supreme Court and the United States Court of Appeals for the Second Circuit.

80.     From 1975 through 1977, Mr. Witman was employed within the Employee Plans and Exempt Organizations Division of the Internal Revenue Service.  From 1977 through 1980, he was associated with the Lampf Pleva law firm.  From 1980 to 1989, Mr. Witman was a partner with Brach, Eichler, Rosenberg, et al.  In 1989, he founded what is now Witman Stadtmauer and has since served as its managing partner.  He has chaired various bar committees

devoted to retirement benefits and has served as a faculty member in the same area for various local law schools and universities. He has also lectured extensively and published a series of works concerned with retirement plans and benefits.

81. Mr. Witman currently devotes approximately 50% of his time to providing legal advice to and performing legal services for a significant number of pension plan clients.

### c.    Lewis Cohn, Esq.

82. Mr. Cohn is a 1972 magna cum laude graduate of Hobart College and a 1975 graduate of the University Of Virginia School Of Law where he was an editor of the Virginia Journal of International Law. He is admitted to the practice of law in the State of New Jersey and before the United States District Court for the District of New Jersey. He has also been admitted before the United States Court of Appeals for the Third Circuit and the United States Tax Court.

83. Following law school, Mr. Cohn served as law clerk to Honorable Morris Pashman, Associate Justice, New Jersey Supreme Court. From 1976 through 1983, he practiced as an associate with the law firm of Sills, Beck, Cummis, Radin & Tischman. From 1983 through 1994, Mr. Cohn was an associate, and thereafter a partner, with the law firm of Fox & Fox, Esqs. From 1994 through 2001, he was of counsel to the firm of Hurley and Vasios, Esqs. Since 2001, Mr. Cohn has been a partner with Witman Stadtmauer (as well as its predecessor, Witman, Stadtmauer & Michaels, P.A.). Approximately 85% of his practice has been devoted to civil litigation. He has litigated and tried complex civil cases in both Federal and State Courts throughout his career. As part of his litigation practice, Mr. Cohn has litigated numerous cases involving issues concerning ERISA and pension fund related matters.

### d.      Tara S. Sinha, Esq.

84.      Ms. Sinha is a 1997 graduate of Rutgers College and a 2002 graduate of Rutgers School of Law-Newark where she served as Senior Articles Editor of the Women's Rights Law Reporter.  She was admitted to the practice of law in the State of New Jersey and before the United States District Court for the District of New Jersey.

85.      Following her admission to practice law, Ms. Sinha served as law clerk to Honorable Walter R. Barisonek, J.S.C., Superior Court of New Jersey, Law Division, Union County.  Upon completing her clerkship, Ms. Sinha became associated with Witman Stadtmauer Since joining the firm, she has spent approximately 75% of her time working on estate administration matters and approximately 25% of her time on litigated matters involving complex legal and factual issues including ERISA actions before the Federal Courts.

### e.      Arlene Greenwald (Paralegal)

86.      Ms. Greenwald is a 1969 graduate of Ithaca College.  In 1985, she joined the predecessor firm to Witman Stadtmauer as a paralegal and has been employed solely in that capacity since then.  She spends most of her time working on pension fund related matters.

87.      The detailed description of the work performed by Witman Stadtmauer attorneys and its paraprofessional during the period November 2007 through April 2011 is set forth in the monthly bills attached hereto as Exhibit C.

### 4.      Carella Byrne

### a.      John M. Agnello, Esq.

88.      I received a Bachelor of Engineering degree with Honor from Stevens Institute of Technology in 1975.  I am a 1979 cum laude graduate of Seton Hall University School of Law. In 1979, I was admitted to practice law by the Supreme Court of New Jersey and the United

States District Court for the District of New Jersey.  In 1985, I was admitted to practice law before the United States Supreme Court and before the United States Court of Appeals for the Third Circuit.  In 1988, I became a member of the bar of the State of New York.  In 1995, I was admitted to practice law in the United Sates District Courts for the Southern and Eastern Districts of New York.  In 2004, I was admitted to practice law before the United States Court of Appeals for the Second Circuit.  In 2010, I was admitted to practice law in the United States District Court for the District of Colorado.

89.    In 1979, I joined the law firm of Cecchi & Politan as an associate and became a member of the firm in 1983.  In 1987, I became a named partner in the successor law firm of Cecchi, Brody & Agnello.  In 1990, Cecchi, Brody & Agnello merged with Carella, Byrne, Bain & Gilfillan, the merged firms are now the Carella Byrne firm.  I have practiced law continually in New Jersey for in excess of 31 years.  Approximately 85% of my practice involves civil litigation.  I have litigated and tried complex civil cases in both Federal and State Courts throughout my career.  By way of example, I have represented clients in litigated matters involving environmental, corporate, insurance coverage, construction, real estate, labor and employment, and ERISA claims.

90.    I have extensive experience in ERISA related matters and litigation.  During the past 20 plus years, I have served as an Employer Trustee on the following Taft-Hartley pension funds: Textile Workers Pension Fund (1990-2005); UNITE HERE Workers Pension Fund (2005-2007); UNITE HERE National Retirement Fund n/k/a National Retirement Fund (a $2 billion pension fund, from 2007-present).  I have represented as special counsel and as general counsel ERISA pension and welfare funds sponsored by various I.B.E.W., U.F.C.W., I.U.E. and

Teamsters' Locals.   I have also represented corporate employers in various industries in connection with pension fund related matters and litigation.

91.     I have had overall responsibility at our firm for representing Plaintiffs in the case since Carella Byrne was retained as co-counsel in April 2010.  I have been involved directly or indirectly with all of the legal services provided by Carella Byrne to Plaintiffs.  Due to the number of issues that have been involved in this litigation, several other attorneys from our firm and paralegals have, from time to time, been designated to handle certain tasks.   The backgrounds of those attorneys are described below.

        **b.**       **Melissa E. Flax, Esq.**

92.     Ms. Flax received an A.B. Degree from the University of Michigan in 1989.  Ms. Flax is a 1992 graduate of Loyola University Law School and was admitted to practice law by the Supreme Court of New Jersey and the United States District Court for the District of New Jersey in 1992.  While in law school, she was a member of the Loyola University Law Review and a member of the Moot Court Board.  She was admitted to practice law in the State of New York and in the State of Florida in 1993 and 1997 respectively.   She is also admitted to the United States Supreme Court, the Court of Appeals for the Third Circuit, the Court of Appeals for the Eleventh Circuit, the Court of Appeals for the Federal Circuit, and the United States District Court for the Southern and Eastern Districts of New York.  Following law school, she served as a law clerk to the Hon. Julio M. Fuentes, Judge, Third Circuit Court of Appeals, when Judge Fuentes sat on the Superior Court of New Jersey, Law Division, Essex County.

93.     Ms. Flax joined Carella Byrne in 1996 as an associate and became a partner in 2002.  Since joining the firm, she has spent 90% of her time working with me on litigated

matters in both Federal and State Courts involving complex legal and factual issues, including ERISA matters on behalf of I.B.E.W., U.F.C.W., I.U.E. and Teamsters Locals.

### c.    Eric Magnelli, Esq.

94.    Mr. Magnelli is a United States Marine Corps veteran and a 2003 graduate of Dominican College, receiving a Bachelor of Arts degree with Honor.  Mr. Magnelli graduated Seton Hall University School of Law in 2007.  Mr. Magnelli was admitted to practice law in New Jersey and the United States District Court for the District of New Jersey in 2007.  He was admitted to practice law in the State of New York, the Court of Appeals for the Third Circuit, the United States District Court for the Eastern District of New York, and the United States District Court for the Southern District of New York in 2008.

95.    Mr. Magnelli joined Carella Byrne as an associate in 2007.  Since joining the firm, Mr. Magnelli has spent 90% of his time working with me on litigated matters in both Federal and State Courts involving complex legal and factual issues, including ERISA matters on behalf of I.B.E.W., Mid-Atlantic Dyers Vacation and Welfare Fund, and corporate clients in connection with pension and welfare fund related matters and litigation.

### d.    Brian H. Fenlon, Esq.

96.    Mr. Fenlon received an A.B. Degree from Muhlenberg College in 1984.  Mr. Fenlon is a 1987 graduate of Seton Hall Law School and was admitted to practice law by the Supreme Court of New Jersey and the United States District Court for the District of New Jersey in 1987.  Mr. Fenlon joined Carella Byrne as an associate in 1994 became a partner in 2004. Fenlon's practice focuses on complex civil litigation in both Federal and State Courts.

      **e.**      **Khoren Bandazian, Esq.**

97.    Mr. Bandazian received a B.S. Degree from Northeastern University in 1991.  Mr. Bandazian received his J.D. Degree from Pace University in 1995.  He joined Carella Byrne as a partner in 2004.  Mr. Bandazian's practice focuses on commercial real estate transactions, representing lenders in connection with commercial loan workout matters, and representing developers in connection with residential real estate projects.

      **f.**      **Laura Tempesta (Paralegal)**

98.    Ms. Tempesta has been a paralegal with Carella Byrne since 2003 and has assisted litigation attorneys throughout her tenure.

      **g.**      **Ellen Josephson (Paralegal)**

99.    Ms. Josephson has been a paralegal with Carella Byrne since 2003 and has assisted litigation attorneys throughout her tenure.

      **h.**      **Sue Vicarisi (Paralegal)**

100.    Ms. Vicarisi has been a paralegal with Carella Byrne since 2005 and has assisted attorneys with transactional matters throughout her tenure.

101.    The detailed description of the work performed by Carella Byrne attorneys and paraprofessionals during the period May 2010 through April 2011 is set forth in the monthly bills attached hereto as Exhibit D.

**5.**      **Abar Pension Services, Inc.**

      **a.**      **Scott M. Feit, CPA, CPC, QPA, QKA**

102.    Mr. Feit is a 1992 graduate of Bucknell University with a Bachelor degree in Business Administration.  From 1992 to 1996, he worked for Arthur Andersen in New York as a Certified Public Accountant and a Certified Fraud Examiner where he specialized in the

examination of company books and records to determine fraud and calculating the amounts and penalties of that fraud.  In 1997, Mr. Feit began his employment with Abar Pension Services, Inc. ("Abar"), where he is currently a Principal.

103.    Mr. Feit has extensive experience as a pension consultant.  He designs, implements and administers thousands of corporate retirement plans.  Mr. Feit provides planned administration for qualified retirement plans, which includes, among other things, preparing plan documents, calculating employer contributions, ensuring IRS and Department of Labor compliance and preparing Forms 5500.  Mr. Feit also reviews plans from other third party administrators for issues, mistakes, errors, etc. and determines how to correct them and calculates the types and/or amounts of damages to be paid back to such plans.

104.    Mr. Feit has written and published an article for the New York State Society of CPA's, "Should a 401(k) Plan Be a Safe Harbor 401(k) Plan?" (The CPA Journal, March 2007). Mr. Feit lectures extensively on 401(k), profit sharing and pension plans.  Mr. Feit has lectured on various topics pertaining to retirement plans to the clients of investment firms.

**b.    Mikel R. Uchitel, FSA**

105.    Mr. Uchitel, the founding Principal of Abar, designs and oversees the administration of all forms of pension and profit sharing plans.  He is a 1967 magna cum laude graduate of the Wharton School of Finance and Commerce of the University of Pennsylvania, with an Actuarial Science major.  He achieved the Fellowship designation of the Society of Actuaries in 1975 and is also a Member of the American Academy of Actuaries and the American Society of Pension Professionals and Actuaries, as well as an Enrolled Actuary, licensed by the Joint Board of the Department of Treasury and Department of Labor to certify

Defined Benefit Plan funding.  He has been actively involved in the Qualified Plan arena since 1968 and has worked on thousands of Plans in his career.

           **c.**       **Justin Rossi**

106.    Mr. Rossi began his employment with Abar in May 2000 as a pension administrator.  He is responsible for the administration of over 100 retirement plans.  He also performs testing, calculates contributions and prepares government filings for retirement plans.

107.    The time spent by Abar's professionals and paraprofessionals during the period March 2008 through March 2011 is set forth in the monthly bills attached hereto as Exhibit E.

**D.**       **L. Civ. R. 54.2(a)(4) Criteria**

108.    As stated above, the invoices attached hereto as Exhibits A through E provide detail with respect to the time spent in rendering the services described.

109.    The following chart sets forth a summary of the hours contained in Exhibit A expended by each attorney and paralegal at Joy M. Mercer, P.C. who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Total Hours |
|---|---|
| J. Mercer (JMM) | 119.2 |
| D. Russenberger (DAR) | 107.6 |
| **Total:** | **226.8** |

110.    The following chart sets forth a summary of the hours contained in Exhibit B expended by each attorney at Riker Danzig who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Total Hours |
|---|---|
| C. Detrizio | **18.2** |

111.    The following chart sets forth a summary of the hours contained in Exhibit C expended by each attorney and paralegal at Witman Stadtmauer who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Total Hours |
| --- | --- |
| S. Charme (SC) | 1,102.7 |
| L. Witman (LW) | 17.9 |
| L. Cohn (LC) | 103.7 |
| T. Sinha (TR) | 73.0 |
| A. Greenwald (AG) | 32.6 |
| **Total:** | **1,329.9** |

112.    The following chart sets forth a summary of the hours contained in Exhibit D expended by each attorney and paralegal at Carella Byrne who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Total Hours |
| --- | --- |
| J. Agnello (JMA) | 393.9 |
| M. Flax (MEF) | 162.0 |
| E. Magnelli (EM) | 190.4 |
| B. Fenlon (BHF) | 8.0 |
| K. Bandazian (KB) | 1.9 |
| L. Tempesta (LT) | 126.2 |
| E. Josephson (EJ) | 14.6 |
| S. Vicarisi (SV) | 0.7 |
| **Total:** | **897.7** |

113.    The following chart sets forth a summary of the hours contained in Exhibit E expended by each professional and paraprofessional at Abar Pension Services, Inc. who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Total Hours |
| --- | --- |
| S. Feit (SF) | 61 hrs., 33 mins. |
| M. Uchitel (MRU) | 0 hrs., 50 mins. |
| J. Rossi (JR) | 8 hrs., 15 mins. |
| **Total:** | **70 hrs.,  38 mins.** |

**E.      L. Civ. R. 54.2(a)(5) Criteria**

114.    The following chart sets forth a summary of the hourly billing rates contained in Exhibit A for each attorney and paralegal at Joy M. Mercer, P.C. who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Billing Rate Oct '07 – Dec '07 | Billing Rate Jan '08 – Apr '08 | Billing Rate May '08 – July '08 |
|---|---|---|---|
| J. Mercer (JMM) | $375.00 | $390.00 | $375.00 |
| D. Russenberger (DAR) | $125.00 | $130.00 | $125.00 |

115.    The following chart sets forth a summary of the hourly billing rate contained in Exhibit B for each attorney at Riker Danzig who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Billing Rate Aug '07 | Billing Rate Sept '07 – Nov '07 |
|---|---|---|
| C. Detrizio | $375.00 | $410.00 |

116.    The following chart sets forth a summary of the hourly billing rates for each attorney and paralegal at Witman Stadtmauer who provided services in connection with Plaintiffs' ERISA claims against Defendant: [8]

| Timekeeper | Billing Rate 2007 | Billing Rate 2008 & 2009 | Billing Rate 2010 | Billing Rate 2011 |
|---|---|---|---|---|
| S. Charme (SC)[9] | $350.00 | $350.00 | $400.00 | $400.00 |
| L. Witman (LW) | $450.00 | $450.00 | $450.00 | $475.00 |
| L. Cohn (LC) | ---------- | $300.00 | $300.00 | $300.00 |
| T. Sinha (TR) | ---------- | $225.00 | $250.00 | $250.00 |
| A. Greenwald (AG) | ---------- | $130.00 | $130.00 | ---------- |

---

[8] The Witman Stadtmauer bills (Exhibit C) do not set forth the hourly billing rates for its professionals and paraprofessionals.

[9] As set forth in the Casella Decl. at ¶ 7, as a courtesy to Plaintiffs, Charme's hourly rates were discounted by $50/hour throughout this action.

117.    The following chart sets forth a summary of the hourly billing rates contained in Exhibit D for each attorney and paralegal at Carella Byrne who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Billing Rate May '10 – July '10 | Billing Rate Aug '10 – Dec '10 | Billing Rate Jan '11 – Apr '11 |
|---|---|---|---|
| J. Agnello (JMA) | $500.00 | $500.00 | $500.00 |
| M. Flax (MEF) | $400.00 | $400.00 | $400.00 |
| E. Magnelli (EM) | $250.00 | $250.00 | $300.00 |
| B. Fenlon (BHF) | ---------- | ---------- | $350.00 |
| K. Bandazian (KB) | ---------- | ---------- | $350.00 |
| L. Tempesta (LT) | $105.00 | $125.00 | $125.00 |
| E. Josephson (EJ) | ---------- | $125.00 | ---------- |
| S. Vicarisi (SV) | ---------- | $125.00 | ---------- |

118.    The following chart sets forth a summary of the hourly billing rates contained in Exhibit E for each professional and paraprofessional at Abar Pension Services, Inc. who provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Timekeeper | Billing Rate |
|---|---|
| S. Feit (SF) | $400.00 |
| M. Uchitel (MRU) | $400.00 |
| J. Rossi (JR) | $225.00 |

## F.    L. Civ. R. 54.2(b) Criteria

119.    Plaintiffs agreed to pay Joy M. Mercer, P.C., Riker Danzig, Witman Stadtmauer, Carella Byrne and Abar Pension Services, Inc. based upon each firm's normal hourly rates plus out of pocket costs.  Plaintiffs agreed to pay Witman Stadtmauer at its normal hourly rates plus out of pocket costs with one exception.  Charme agreed as a courtesy to Plaintiffs to reduce his hourly rate by $50.00 per hour for his services throughout Witman Stadtmauer's representation of Plaintiffs.  *See* Casella Decl. at ¶¶ 6 and 7.

120.    The following chart sets forth the total amount billed to Plaintiffs, as of the filing of this motion, by the attorneys and consultants that provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Exhibit | Attorneys/Consultants | Total Fees Billed | Total Costs Billed | Total Amount Billed |
|---|---|---|---|---|
| A | Joy M. Mercer, P.C. | $58,835.50 | $5,245.52 | $64,081.02 |
| B | Riker Danzig | $7,042.00 | ----------------- | $7,042.00 |
| C | Witman Stadtmauer | $444,248.00 | $6,723.98 | $450,971.98 |
| D | Carella Byrne | $338,046.50 | $4,189.76 | $342,236.26 |
| E | Abar Pension Services, Inc. | $27,978.00 | ----------------- | $27,978.00 |
| **Totals:** | | $876,150.00 | $16,159.26 | **$892,309.26** |

121.    The chart below sets forth the amounts paid by Plaintiffs to date to the attorneys and consultant that provided services in connection with Plaintiffs' ERISA claims against Defendant:

| Exhibit | Attorneys/Consultants | Total Amount Paid |
|---|---|---|
| A | Joy M. Mercer, P.C. | $64,081.02 |
| B | Riker Danzig | $7,042.00 |
| C | Witman Stadtmauer | $417,874.48 |
| D | Carella Byrne | $230,203.61 |
| E | Abar Pension Services, Inc. | $27,511.00 |
| **Total:** | | **$746,712.11** |

*See* Casella Decl., ¶ 9.

122.    The chart below sets forth the costs paid by Plaintiffs to date directly to third party vendors:

| Exhibit | Entity | Total | Description of services |
|---|---|---|---|
| F | Lindabury McCormick | $1,618.12 | Court appointed Mediator |
| G | Rosenberg & Associates | $1,054.00 | Court reporter |
| H | Miani Court Reporting | $3,031.70 | Court reporter |
| I | MCD Solutions | $643.02 | Electronic/hardcopy document vendor |
| | | **$6,346.84** | |

123.    Plaintiffs remain obligated to and will pay the difference between the amounts set forth in paragraphs 118 and 119 above, *i.e.*, $145,597.15.  *See* Casella Decl., ¶ 11

124.    Based on the foregoing, Plaintiffs respectfully request an award of **$898,656.61** in attorneys' fees and costs ($876,150.00 for attorneys' fees and consultant's fees, $16,159.26 in costs paid by attorneys, plus $6,346.84 in costs paid directly by Plaintiffs).

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 26th day of April, 2011.

_s/ John M. Agnello_
JOHN M. AGNELLO
